**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (Arizona Bar 15838)
Brunn (Beau) W. Roysden III (Arizona Bar 28698)
Drew C. Ensign (Arizona Bar 25463)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joseph.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
*Attorneys for Plaintiff State of Arizona*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona,<br><br>  Plaintiff,<br>  v.<br>Alejandro Mayorkas in his official capacity as Secretary of Homeland Security; United States Department of Homeland Security; Troy Miller in his official capacity as serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection; Tae Johnson in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement.<br><br>  Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. This is an action challenging Defendants' pervasive violations of the National Environmental Policy Act of 1969 ("NEPA") as it relates to immigration policy. Although those immigration policies undeniably have significant effects on the environment, Defendants have not even attempted to comply with NEPA.

2. "NEPA 'protects the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action *before* the government launches any major federal action.'" *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (cleaned up) (emphasis added). But here Defendants have embarked on multiple environmentally disruptive policies without performing even cursory environmental analysis.

3. Since at least 1975, the Ninth Circuit has held that population growth can be an environmental impact that agencies must consider under NEPA. *See City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). In that case, the Court held that the Federal Highway Administration violated NEPA by failing to prepare an environmental impact statement ("EIS") prior to the construction of a freeway interchange near an agricultural area. *Id*. at 666. As the Court explained in that case, "plain common sense" indicated that the highway interchange was likely to cause growth in the area: "The growth-inducing effects of the … project are its raison d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services such as utilities, education, police and fire protection, and recreational facilities." *Id.* at 675. *See also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011) (holding that, with respect to project adding a new runway to an airport, "even if the stated purpose of the project is to increase safety and efficiency, the agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects").

1

4. Here, however, Defendants have, on information and belief, decided to (1) halt construction of hundreds of miles of border wall, leaving completely arbitrary gaps between physical barriers, encouraging and abetting widespread illegal migration and (2) halt the "Remain in Mexico" program, enabling tens of thousands of asylum claimants to enter the United States—all without preparing an environmental impact statement for *any* of these activities.

5. Each of these activities individually involves environmental consequences that are far greater than construction of a single highway interchange or runway. But Defendants have not prepared an EIS to consider any of them. Indeed, Defendants have not even prepared environmental assessments ("EAs"), which are less fulsome documents that can be employed where—unlike here—the actions at issue will not "significantly affect[] the quality of the human environment[.]" 42 U.S.C. § 4332(C).

6. Put simply, Defendants have flouted compliance with NEPA and have not even engaged in the pretense of performing any environmental analysis before taking environmentally transformative actions.

7. NEPA, 42 U.S.C. § 4321 *et seq.*, establishes "a national policy [to] encourage productive and enjoyable harmony between man and his environment[.]" 42 U.S.C. § 4321. NEPA effectuates this policy by imposing procedural requirements on federal agencies, and by providing that those agencies have to analyze the environmental impact of all their major actions.

8. NEPA is "particularly" concerned with "the profound influences of population growth" on the environment. *Id.* § 4331(a). Human population is among the biggest factors in environmental change. It is "plain common sense" that the number of people in an area has a significant impact on the environment, through factors such as urbanization, infrastructure development, pollution, and stress on natural resources. *See City of Davis*, 521 F.2d at 675.

9. Federal policies on immigration, asylum, refugee admission, refugee resettlement, border enforcement, and temporary workers, among others, have directly impacted and will continue to impact the population—and, consequently, the environment—of the State of Arizona.

10. As Justice Holmes explained in 1907: "the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Arizona has a strong interest in ensuring that policies that affect the environment of the state are enacted consistent with federal law governing environmental protection.

11. This action challenges a collection of policies of Defendants that have the direct effect of causing growth in the population of Arizona through immigration (collectively, "Population Augmentation Policies"), having a direct and substantial impact on the environment in Arizona. Many of these environmental impacts are negative, as the Ninth Circuit explained in *City of Davis*: "increased traffic, increased pollution, and increased demand for services" all result directly from population growth. *See City of Davis*, 521 F.2d at 675. But migration can bring positive environmental effects too: for example, increased tax revenue, which enhances resources available for environmental preservation.

12. NEPA requires that all environmental impacts of major federal actions—the good, the bad, and the ambiguous—be studied *prior* to the government taking action. *See, e.g.*, 40 C.F.R. § 1501.3 (requiring federal agencies to consider "[b]oth beneficial and adverse effects" under NEPA); 40 C.F.R. § 1508.1 (agencies must consider effects "resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial"). But Defendants are

simply ignoring NEPA entirely while engaging in actions that are certain to have dramatic impacts on the environment. This suit seeks to end these pervasive violations and require that Defendants discharge their duties under NEPA. It further seeks to compel Defendants to allow public participation in these processes, which is a central requirement of NEPA.

## PARTIES

13. Plaintiff State of Arizona is a sovereign state of the United States of America, and is represented by Arizona Attorney General Mark Brnovich. The Attorney General is the chief legal officer of the State of Arizona, and has the authority to represent the State in federal court.

14. Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of the United States Department of Homeland Security ("DHS") with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

15. Defendant United States Department of Homeland Security is a federal agency.

16. Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection ("CBP"). Defendant Miller is sued in his official capacity.

17. Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Defendant Johnson is sued in his official capacity.

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, as well as 5 U.S.C. §§ 702-703.

19. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

20. Venue is proper within this federal district pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiffs State of Arizona resides in Arizona and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

## LEGAL BACKGROUND

### A. The National Environmental Policy Act

21. NEPA declares that "it is the continuing responsibility of the Federal Government to … improve and coordinate" federal programs in order to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;" "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;" and, significantly, to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]" 42 U.S.C. § 4331(b).

22. The purpose of NEPA is to "infuse" these policy goals into agency decision-making. To accomplish its goals, NEPA creates a set of procedures which force federal government agencies to take account of environmental concerns. Accordingly, the statute provides, in relevant part, that "all agencies of the Federal Government shall" consider the environmental impacts of all "proposals . . . and other major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332.

23. Under NEPA, agencies must make a "detailed statement" on those impacts, addressing, among other things, alternatives to the proposed action. *Id.* This detailed statement is generally known as an environmental impact statement.

24. "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed

action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (citing *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)) (cleaned up); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

25. NEPA thus ensures that important environmental effects will not be "overlooked or underestimated[.]" *Robertson*, 490 U.S. at 349. The requirement to evaluate environmental impacts also provides the public with information about environmental impacts, assuring the public that the agency is considering the environment and providing a "springboard for public comment[.]" *Id*. Public participation under NEPA serves to improve the agency's process by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *See Department of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (cleaned up).

26. NEPA's requirements "are to be strictly interpreted to the fullest extent possible in accord with the policies embodied in the Act." *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (cleaned up).

27. Alongside these provisions, NEPA established the Council on Environmental Quality ("CEQ") with authority to issue regulations to assist federal agencies in administering the statute's requirements. The CEQ regulations define important terms such as the "[m]ajor Federal action" and "[e]ffects or impacts[,]" 40 C.F.R. § 1508.1, and set up procedures for public participation in the EIS process. *See, e.g.*, 40 C.F.R. § 1503 *et seq.* CEQ regulations also set forth the process for agencies to use in determining whether NEPA applies or is otherwise fulfilled. *See* 40 C.F.R. § 1501 *et seq*.

28. Under existing CEQ regulations, environmental impacts should be "considered early in the process in order to ensure informed decision making by Federal

agencies." 40 C.F.R. § 1500.1(b). NEPA should be integrated with other planning "at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions[.]" 40 C.F.R. § 1501.2(a).

29. Agencies may identify "categories of actions" which "normally do not have a significant effect on the human environment" and which therefore do not require the preparation of an EIS. 40 C.F.R. § 1501.4(a) ("categorical exclusions"). Such actions are exempt from environmental review, absent extraordinary circumstances.

30. CEQ regulations provide that agencies should prepare an Environmental Assessment ("EA") for proposed actions that are not categorically excluded if those actions are "not likely to have significant effects or when the significance of the effects is unknown[.]" 40 C.F.R. § 1501.5(a). The EA may assist the agency in determining whether to prepare a full-fledged EIS or whether to issue a finding of no significant impact. 40 C.F.R. § 1501.5(b).

31. The regulations also state that agencies "shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a). When considering such programmatic action, agencies should consider factors such as whether the relevant actions are "occurring in the same general location," and whether they "have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(b)(1).

32. CEQ regulations define the "[e]ffects or impacts" that agencies must consider to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and

detrimental effects, even if on balance the agency believes that the effect will be beneficial." 40 C.F.R. § 1508.1(g)(1).

**B.     The Administrative Procedure Act**

33.     The Administrative Procedure Act ("APA") provides for judicial review of agency action. *See* 5 U.S.C. § 701 *et seq.* Under the APA, a federal court reviewing agency action "shall" "hold unlawful and set aside agency action, findings, and conclusions" which the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

34.     When an agency undertakes final agency action that fails to comply with NEPA, such action is unlawful and set must be aside under the APA. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n.2 (9th Cir. 2001) ("Although NEPA does not provide a private right of action for violations of its provisions, private parties may enforce the requirements of NEPA by bringing an action against the federal agency under § 10(a) of the Administrative Procedure Act.").

**FACTUAL BACKGROUND**

35.     Defendants have undertaken a number of major federal actions which, collectively and in isolation, have caused and are causing significant effects to the quality of the human environment in the State of Arizona. Defendants have not prepared an environmental impact statement—or even an environmental assessment—for any of these activities.

**A.     Promised Termination of Border Wall Construction**

36.     On August 5, 2020, Joe Biden declared in an NPR interview that "[t]here will not be another foot of wall constructed in my administration, number one." *See* Lulu Garcia-Navarro August 5, 2020, interview of Joe Biden, https://twitter.com/i/status/1291000306915057669; *see also* Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't Tear Down Trump's Additions*,

https://www.npr.org/2020/08/05/899266045/biden-would-end-border-wall-construction-but-wont-tear-down-trump-s-additions (last visited April 11, 2021).

37. He further stated, "Number 2, … I'm gonna make sure that we have border protection, but it's going to be based on making sure that we use high-tech capacity to deal with it *and at the ports of entry, that's where all the bad stuff happens*." See https://twitter.com/i/status/1291000306915057669 (emphasis added)

38. He also responded when asked about land confiscations, he responded "End. Stop. Done. Over. Not gonna do it. *Withdraw the lawsuits. We're out.* We're not gonna confiscate the land." See https://twitter.com/i/status/1291000306915057669 (emphasis added).

39. These statements by Mr. Biden, individually and collectively, show that he promised to stop all new wall construction.

40. On January 20, 2021, President Biden, in one of his first official actions, issued a proclamation directing DHS to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall[.]" *See Proclamation on the Termination Of Emergency With Respect To The Southern Border Of The United States And Redirection Of Funds Diverted To Border Wall Construction*, Office of the White House (Jan. 20, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/proclamation-termination-of-emergency-with-respect-to-southern-border-of-united-states-and-redirection-of-funds-diverted-to-border-wall-construction/.

41. This proclamation was issued without any notice and comment or interagency review.

42. The proclamation states that Defendant Secretary Mayorkas, in consultation with various other members of the cabinet and other appropriate agency and department heads, "shall develop a plan for the redirection of funds concerning the

southern border wall[.]" *Id.* Contrary to this order, the plan has not yet been announced, creating even greater uncertainty as to the status of the nation's border security.

43. The proclamation justifies its policy change in stating that "building a massive wall … is not a serious policy solution" and the wall is "a waste of money that diverts attention from genuine threats to our homeland security." *Id.*

44. DHS has implemented this proclamation by suspending all border wall projects, on information and belief leaving hundreds of miles of fencing unfinished compared to what DHS had studied and planned. The termination of border wall construction has literally left huge holes in the border fencing, including substantial gaps across the Arizona-Mexico border.

45. Since January 20, machinery has been literally standing idle in some areas of Arizona's wilderness, with awkward-seeming and incomplete work in numerous places. *See* Mia Jankowicz, *Biden's order to pause construction on Trump's border wall expires on March 20. Nobody knows what happens next.*, Business Insider (Mar. 16, 2021, 6:47 AM), https://www.businessinsider.com/what-happen-end-biden-60-day-pause-border-wall-work-2021-3.

46. One major purpose of the Defendants' actions was to signal the relative openness of the United States-Mexico border and to encourage migration.

47. Accordingly, DHS, following the policy prescriptions in the President's proclamation, have finally decided that the United States-Mexico border is adequately secured without the wall.

48. Furthermore, contrary to the unsupported claims that the wall was "not a serious policy solution" in the proclamation, many individuals are constantly seeking to cross the United States-Mexico border, for whom the wall has served both as a meaningful physical barrier and a powerful signal of the federal government's commitment to enforcing immigration law. And while DHS has reportedly

"consider[ed]" making changes to address gaps in particular areas or implementing technology in places where the wall is finished, DHS has no intent to deviate from the fundamental policy announced in the Presidential Proclamation. *See* Ryan Saavedra, *Biden Admin Considers Restarting Border Wall Construction To 'Plug Gaps' Amid Biden's Border Crisis: Report*, Daily Wire (Apr. 6, 2021), https://www.dailywire.com/news/biden-admin-considers-restarting-border-wall-construction-to-plug-gaps-amid-bidens-border-crisis-report.

49. As a direct and foreseeable consequence of the gaps in the nation's border wall and the signal intentionally transmitted by the President and the Defendants, migrants have been crossing the border in Arizona in greater numbers than ever before. CBP reported it "encountered 171,700 migrants in March, including a record number of unaccompanied minors, far exceeding the prior month's totals." *See* Priscilla Alvarez, *Border apprehensions spiked in March, including a record number of unaccompanied migrant minors*, https://www.cnn.com/2021/04/02/politics/us-mexico-border-immigration-apprehended/index.html (last visited Apr. 11, 2021). Indeed, "[t]he US is on track to encounter more than 2 million migrants at the US-Mexico border by the end of the fiscal year, according to internal government estimates[,] marking a record high." *See* Priscilla Alvarez, *US on track to encounter record 2 million migrants on the southern border, government estimates show*, https://www.cnn.com/2021/03/31/politics/migrants-us-southern-border/index.html (last visited Apr. 11, 2021).

2. One border county sheriff stated that, at a particular gap in the fencing, "'five or six groups'" of migrants are able to cross a day. *See* Roman Chiarello, *Arizona sheriff says Biden halting border wall construction left area wide open for cartels*, Fox News (Mar. 5, 2021), https://www.foxnews.com/us/arizona-sheriff-biden-border-wall-construction-cartels. One news outlet reported that "[s]mugglers send groups of asylum

seekers through the gaps [in the fencing] to overwhelm the agents. When agents leave to intercept or apprehend one group, another group scampers across." *See* William La Jeunesse, *Migrants stream through gaps in border wall following Biden's order to halt construction*, Fox News (Mar. 31, 2021), https://www.foxnews.com/politics/migrants-stream-through-gaps-in-border-wall-following-bidens-order-to-halt-construction.

3. One source estimates that approximately 1,000 individuals are able to evade detention and enter the United States illegally every single day, many of which are able to do so because of these glaring holes in the nation's border. *See* Heritage Experts Release New Biden Border Crisis Fact Check, Heritage Foundation (March 25, 2021), https://www.heritage.org/press/heritage-experts-release-new-biden-border-crisis-fact-check. Inevitably, many of these migrants settle in Arizona, increasing the population of the state.

4. Despite these reasonably foreseeable effects of Defendants' policies, at no time did they undertake any analysis of the environmental impacts on the human environment in Arizona of leaving the wall unfinished. These effects required preparation of an EIS before Defendants undertook the challenged actions. Defendants violated NEPA by failing to do so.

5. The combined effect of (1) partially constructing a barrier (2) followed by intentional refusal to complete portions of the barrier, leaving enormous "gaps," also has significant environmental impacts by itself. In particular, the barrier—with its new gaps—fragments the habitat of wildlife that lives in the U.S.-Mexico border region. And it does so in a manner that is completely arbitrary, unplanned, and unstudied under NEPA.

6. Defendants are required to perform an EIS to study the effects on wildlife and the environment as a result of the gaps they have now intentionally created in the border barrier.

### B. Ending the "Remain in Mexico" Policy

7. In January, 2019, DHS enacted the "Migrant Protection Protocols," (the "MPP") commonly known as the "Remain in Mexico" policy. Under this policy, "certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation" were "returned to Mexico [to] wait outside of the U.S. for the duration of their immigration proceedings[.]" *See Migrant Protection Protocols*, Department of Homeland Security (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols.

8. Under this program, approximately 65,000 non-Mexican migrants who were detained attempting to enter the United States illegally or without proper documentation across the Mexican border were sent back to Mexico to await the completion of their immigration processes. *See* Ted Hesson & Mimi Dwyer, *Biden to bring in asylum seekers forced to wait in Mexico under Trump program*, Reuters (Feb. 12, 2021, 4:10 AM), https://www.reuters.com/article/us-usa-biden-immigration-asylum/biden-to-bring-in-asylum-seekers-forced-to-wait-in-mexico-under-trump-program-idUSKBN2AC113.

9. On February 2, 2021, President Biden issued "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border."[1] This order, among other

---

[1] *See Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Office of the White House (Feb. 2, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

things, ordered DHS and HHS to "reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints" and commanded DHS to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols[.]" *Id.*

10. On February 11, 2021, DHS announced it would process into the United States individuals who had been returned to Mexico under the MPP. *See DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, Department of Homeland Security (Feb. 11, 2021), https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases. Beginning on February 19, 2021, DHS started to execute this policy and bring those individuals into to the United States.

11. On information and belief, thousands of individuals have been released and are being released into Arizona as a result of the termination of this program that otherwise would never have entered the country. Many, if not most, will be able to remain and reside in the state, regardless of the formal outcomes of their immigration proceedings. Despite the intent to cause this outcome, at no time did Defendants undertake any analysis of the environmental impacts on the human environment in Arizona of this additional population.

C.     **Impact of Increased Population on the Human Environment**

12. On information and belief, thousands of additional individuals have settled and continue to settle in Arizona than otherwise would have as the intentional, anticipated, and direct result of Defendants actions.

13. As stated above, NEPA expressly states that one of its purposes is to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]" 42 U.S.C. § 4331(b). As the drafters of NEPA recognized, population growth has significant environmental impacts.

Migrants (like everyone else) need housing, infrastructure, hospitals, and schools. They drive cars, purchase goods, and use public parks and other facilities. Their actions also directly result in the release of pollutants, carbon dioxide, and other greenhouse gases into the atmosphere, which directly affects air quality. All of these activities have significant environment impact which, as discussed above, courts have recognized as cognizable impacts under NEPA.

14. Accordingly, numerous decisions have considered the impact of agency actions on growth and the extent to which impacts from that growth could come within the ambit of NEPA. Since at least 1975, the Ninth Circuit has recognized that population growth is an environmental impact that agencies must often consider under NEPA. *See City of Davis*, 521 F.2d at 671 (concluding that "an influx of population that will frustrate the city's policy of 'controlled growth' and render its planning efforts to date obsolete" was an "environmental consequence[]" sufficient to grant plaintiff standing under NEPA). *See also Barnes*, 655 F.3d at 1139 (holding that, with respect to project adding a new runway to an airport, "even if the stated purpose of the project is to increase safety and efficiency, the agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects"); *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997) ("Consideration of the growth-inducing effects furthers the National Environmental Policy Act's information and public awareness goals.").

15. Population and growth effects must be considered as long as such effects are "'reasonably foreseeable[.]'" *Center for Biological Diversity*, 982 F.3d at 737. This includes indirect effects and such effects as may be "'later in time'" or "'farther removed in distance'" from the agency action in question. *Id.* For example, "[a]n increased risk of an oil spill caused by an increase in crude oil tanker traffic … is a reasonably foreseeable

indirect effect of a proposed dock extension." *Id.* (citing *Ocean Advocates v. U.S. Army Corps. of Eng'rs*, 402 F.3d 846, 867–70 (9th Cir. 2005)).

16. Where there is a question as to whether a major federal action will affect the environment, "[t]he appropriate inquiry" is whether the effect at issue is so "'remote and highly speculative'" that NEPA does not warrant its consideration. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1030 (9th Cir. 2006) (finding that Nuclear Regulatory Commission had violated NEPA by failing to consider the possibility of terrorist attacks on Diablo Canyon nuclear facility).

17. Furthermore, "NEPA requires that an environmental analysis for a single project consider the cumulative impacts of that project together with all past, present and reasonably foreseeable future actions." *See Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). *See also Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("In a cumulative impact analysis, an agency must take a 'hard look' at all actions that may combine with the action under consideration to affect the environment.") (quoting *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)) (cleaned up).

18. Here, all of the impacts from the actions detailed above should have been considered together, along with other parts of the administration's policy which serve to encourage migration. Whether considered separately or collectively, the impact of those policies, there can be little doubt, will foreseeably and directly impact the population of border states like Arizona.

19. Notwithstanding this governing law, in formulating the policies discussed above, the Defendants never took any of the specific procedures required by NEPA and the CEQ regulations. Defendants at no time have ever accounted for any environmental impacts of those policies or the cumulative impact of those actions in combination with each other.

**CLAIM FOR RELIEF**

**NEPA Violations**

20. The allegations in the preceding paragraphs are reincorporated herein.

21. Population growth in the State of Arizona is the reasonably foreseeable, direct, and proximate result of the Defendants actions, individually and when considered collectively along with all past, present and reasonably foreseeable future actions.

22. Population growth has significant environmental effects within the State, which Defendants were required to analyze under NEPA.

23. Each of the actions had other significant environmental effects which DHS similarly failed to consider. In particular, Defendants have not prepared either an EIS or EA to study the pertinent environmental effects.

24. In taking the above-referenced major federal actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, Defendants' actions should be held unlawful and set aside. *Id.*

**PRAYER FOR RELIEF**

Plaintiff respectfully request that this Court enter judgment:

A. Declaring that Defendants have violated NEPA by halting the construction of the border wall in Arizona and by processing migrants into the United States who were and who would have been covered by the MPP without preparing an EIS or EA;

B. Enjoining Defendants from continuing to take actions, including diverting and impounding appropriated funds, to prevent the continuation of construction of border wall under contracts already entered into by the United States until such time as Defendants comply with NEPA;

C. Enjoining Defendants any further from processing migrants into the United States, who were and who would have been covered by the MPP until such time as Defendants comply with NEPA;

D. Enjoining Defendants to secure the border in Arizona to the satisfaction of this Court to prevent additional unlawful migration until such time as Defendants comply with NEPA;

E. Awarding Plaintiff costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F. Granting any and all other such relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this 11th day of April, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By: /s/ Drew C. Ensign
  Joseph A. Kanefield (No. 15838)
  Brunn W. Roysden III (No. 28698)
  Drew C. Ensign (No. 25463)

*Attorneys for Plaintiff State of Arizona*