**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Robert J. Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiff State of Arizona*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona,<br><br>              Plaintiff,<br><br>       v.<br><br>Alejandro Mayorkas in his official capacity as Secretary of Homeland Security; United States Department of Homeland Security; Troy Miller in his official capacity as serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection; Tae Johnson in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; United States Department of Defense; Lloyd Austin in his official capacity as Secretary of Defense.<br><br>              Defendants. | No. 2:21-cv-00617-DWL<br><br>**MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION.........................................................................................................18

LEGAL BACKGROUND...............................................................................................4

FACTUAL BACKGROUND ..........................................................................................6

    A.  Border Wall Construction Termination.................................................................7

    B.  Termination Of The MPP Policy .........................................................................9

    C.  Population Augmentation Program ....................................................................11

    D.  Environmental Effects Resulting From Defendants' Actions.............................13

    E.  Defendants' Environmental Analysis To Date...................................................17

LEGAL STANDARD ...............................................................................................188

ARGUMENT ...........................................................................................................188

I.    Defendants' Challenged Actions Are Reviewable................................................18

    A.  The State Has Article III Standing ....................................................................18

        1.    Direct Environmental Harms/Geographic Nexus.........................................19

        2.    Costs Imposed By Defendants' Actions......................................................20

    B.  Prudential Standing Is Satisfied .......................................................................21

    C.  These Disputes Are Ripe For Review ...............................................................22

    D.  The Decisions Challenged Here Are Reviewable Agency Actions .....................23

        1.    Programmatic EIS (Claim One) ................................................................23

        2.    Border Wall Construction Termination......................................................26

        3.    MPP Termination.......................................................................................27

    E.  Defendants Have Authority And Discretion To Address The Harms At Issue     Here
        27

    F.  Congress's Waiver Of NEPA Compliance For *Building* A Border Barrier Does Not
        Immunize *Halting* Construction From NEPA.......................................................28

II.    The State Is Likely To Prevail On Its NEPA Claims.............................................28

    A.  The Challenged Actions Are "Major Federal Actions" ........................................29

    B.  The Actions At Issue Will Have Significant Environmental Effects.....................30

i

a.   Border Wall Construction Termination.................................................31

b.   MPP Termination ...............................................................................32

c.   Population Augmentation Program.....................................................34

d.   Population Augmentation Program Components.................................36

III.   The Remaining Requirements For Injunctive Relief Are Satisfied Here..............37

A.   Violating NEPA Coupled With Likely Environmental Harm is Generally Sufficient to Show Irreparable Harm .....................................................................38

B.   The Balance of Harms and Public Interest Favor an Injunction ...........................39

IV.   A Preliminary Injunction Tailored To The Violations Here Is Warranted ...........39

CONCLUSION .........................................................................................418

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*American Bird Conservancy, Inc. v. FCC*
  516 F.3d 1027 (D.C. Cir. 2008). ....................................................24

*Amoco Prod. Co. v. Vill. of Gambell, AK*
  480 U.S. 531 (1987). ..................................................37, 38, 39

*AT&T Corp. v. Coeur d'Alene Tribe*
  295 F.3d 899 (9th Cir. 2002) ...........................................26

*Barnes v. DOT*
  655 F.3d 1124 (9th Cir. 2011) ....................................1, 2, 33

*Bennett v. Spear*
  520 U.S. 154 (1997) ....................................................24, 26

*California v. DOI*
  767 F.3d 781 (9th Cir. 2014) ....................................................20

*California v. Trump*
  963 F.3d 926 (9th Cir. 2020) ....................................................19

*Cantrell v. City of Long Beach*
  241 F.3d 674 (9th Cir. 2001). ..............................................19, 20

*Center for Biological Diversity v. Nielsen*
  No. 17-163, 2018 WL 5776419 (D. Ariz. Nov. 2, 2018). ..............17, 18, 24

*Citizens for Better Forestry v. USDA*
  341 F.3d 961 (9th Cir. 2003) ..........................................22, 30-31

*City of Davis v. Coleman*
  521 F.2d 661 (9th Cir. 1975) ....................................................2, 33

*City of Sausalito v. O'Neill*
  386 F.3d 1186 (9th Cir. 2004) ....................................................20

*Conner v. Burford*
  848 F.2d 1441 (9th Cir. 1988) ....................................................40

*Doe #1 v. Trump*
  984 F.3d 848 (9th Cir. 2020) ....................................................39

*DOT v. Public Citizen*
  541 U.S. 752 (2004) ....................................................5, 28

*Envt'l. Prot. Info. Ctr. v. U.S. Forest Serv.*
  451 F.3d 1005 (9th Cir. 2006). ....................................................5

*Forelaws on Bd. v. Johnson*
  743 F.2d 677 (9th Cir. 1984). ....................................................24

*Galvan v. Press*
   347 U.S. 522 (1954). ...................................................................... 30

*Georgia v. Tenn. Copper Co.*
   206 U.S. 230 (1907). ...................................................................... 19

*Hanly v. Mitchell*
   460 F.2d 640 (2d Cir. 1972) ........................................................ 16

*High Sierra Hikers Ass'n v. Blackwell*
   390 F.3d 630 (9th Cir. 2004). ........................................ 5, 29, 30, 39, 40

*In re Border Infrastructure Env't Litig.*
   915 F.3d 1213 (9th Cir. 2019) ..................................................... 28

*Innovation L. Lab v. McAleenan*
   924 F.3d 503 (9th Cir. 2019) ....................................................... 27

*Innovation L. Lab v. Wolf*
   951 F.3d 1073 (9th Cir. 2020) ..................................................... 27

*Kern v. BLM*
   284 F.3d 1062 (9th Cir. 2002) ..................................................... 22

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*
   387 F.3d 989 (9th Cir. 2004) ....................................................... 35

*Kleppe v. Sierra Club*
   427 U.S. 390 (1976) ...................................................................... 34

*Laub v. DOI*
   342 F.3d 1080 (9th Cir. 2003) ........................................... 19, 22, 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
   572 U.S. 118 (2014) ...................................................................... 21

*Massachusetts v. EPA*
   549 U.S. 497 (2007) .............................................................. 19, 20

*Monsanto Co. v. Geertson Seed Farms*
   561 U.S. 139 (2010) ...................................................................... 22

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ........................................................................ 27

*Native Vill. of Point Hope v. Jewell*
   740 F.3d 489 (9th Cir. 2014) .......................................................... 1

*Northcoast Env't Ctr. v. Glickman*
   136 F.3d 660 (9th Cir. 1998). ..................................................... 29

*Northern Alaska Env't Ctr. v. DOI*
   983 F.3d 1077 (9th Cir. 2020) ..................................................... 29

iv

*NRDC v. EPA*
    542 F.3d 1235 (9th Cir. 2008)...........................................................................20

*Ocean Advocates v. U.S. Army Corps of Engineers*
    402 F.3d 846 (9th Cir. 2005)...................................................................2, 30, 32

*Ohio Forestry Ass'n, Inc. v. Sierra Club*
    523 U.S. 726 (1998) ..........................................................................................22

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*
    465 F.3d 977 (9th Cir. 2006)............................................................................26

*Pac. Nw. Generating Co-op. v. DOE*
    580 F.3d 792 (9th Cir. 2009)............................................................................26

*Piedmont Env't Council v. FERC*
    558 F.3d 304 (4th Cir. 2009)............................................................................34

*Pit River Tribe v. U.S. Forest Serv.*
    469 F.3d 768 (9th Cir. 2006)............................................................................40

*Plyler v. Doe*
    457 U.S. 202 (1982) ..........................................................................................20

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*
    415 F.3d 1078 (9th Cir. 2005)..........................................................................22

*Robertson v. Methow Valley Citizens Council*
    490 U.S. 332 (1989). ........................................................................................4, 5

*Ross v. Federal Highway Admin.*
    162 F.3d 1046 (10th Cir. 1998)....................................................................39, 40

*San Luis & Delta-Mendota Water Auth. v. Jewell*
    747 F.3d 581 (9th Cir. 2014).............................................................................29

*Save Our Sonoran, Inc. v. Flowers*
    408 F.3d 1113 (9th Cir. 2005)......................................................................38, 39

*Sierra Club v. U.S. Army Corps of Engineers*
    803 F.3d 31 (D.C. Cir. 2015) ...........................................................................35

*Summers v. Earth Island Inst.*
    555 U.S. 488 (2009) ..........................................................................................18

*Texas v. United States*
    __ F. Supp. 3d __, No. 21-3, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021). ...............12

*Univ. of Tex. v. Camenisch*
    451 U.S. 390 (1981) ..........................................................................................18

*U.S. Army Corps of Engineers v. Hawkes Co.*
    136 S. Ct. 1807 (2016) ......................................................................................25

*U.S. Forest Serv. v. Pacific Rivers Council*
   2012 WL 5838446 (U.S. Nov. 16, 2012) ........................................................23

*W. Watersheds Project v. Bernhardt*
   391 F. Supp. 3d 1002 (D. Or. 2019) ...........................................................38

*West v. Sec'y of Dep't of Transp.*
   206 F.3d 920 (9th Cir. 2000) ................................................................5, 23

*WildEarth Guardians v. Jewell*
   738 F.3d 298 (D.C. Cir. 2013) ..................................................................1, 5

*Winter v. NRDC*
   555 U.S. 7 (2008) .......................................................................2, 18, 37

**STATUTES**

42 U.S.C. § 4331 ....................................................................................2, 33

42 U.S.C. § 4332(2)(C). ...........................................................................5, 29

42 U.S.C. § 4332(C). ..............................................................................22, 23

42 U.S.C. §4321 .......................................................................................16

5 U.S.C. § 706(2)(A) ..................................................................................23

8 U.S.C. §1231(a)(1)(A) ...............................................................................12

**REGULATIONS**

40 C.F.R. § 1501.4(a) ...................................................................................5

40 C.F.R. § 1501.4(b) ...................................................................................5

40 C.F.R. § 1501.5 ......................................................................................5

40 C.F.R. § 1501.6 ......................................................................................5

40 C.F.R. § 1502.4(a) ..................................................................................34

40 C.F.R. § 1502.4(b)(1) ..............................................................................34

40 C.F.R. § 1508.1 (2020)...........................................................16, 29, 30, 31

83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018)...........................................9, 10

**OTHER AUTHORITIES**

DHS, *Implementation Of The National Environmental Policy Act*
   Directive No. 023-01 (2014) .........................................................................6

DHS, *Implementation of the National Environmental Policy Act*
   Instruction Manual 023-01-001-01, Revision 01 (2014)..........................................6

DHS, *Migrant Protection Protocols*
   (Jan. 24, 2019). ........................................................................................9

**INTRODUCTION**

This motion seeks to begin correction of Defendants' pervasive violations of the National Environmental Policy Act ("NEPA") as it relates to immigration policy. Specifically, the State of Arizona (the "State") challenges under NEPA: (1) Defendants' failure to prepare a programmatic environment impact statement ("EIS") for their overall policy of expanding the U.S. population through increased immigration and decreased deportations, as well as their failures to prepare an EIS (or any NEPA analysis at all) for a number of policies underlying this program; as well as their failure to prepare an EIS regarding (2) their halting of construction of border barriers ("Border Wall") and cancellation of contracts regarding the same, and (3) termination of the Migrant Protection Protocol ("MPP") program.

The need to comply with NEPA regarding immigration policies is no mystery to Defendants: their predecessors prepared a programmatic EIS in 1994, and supplemental EIS in 2001, relating to southern border enforcement. But not only have Defendants not supplemented these EISs to account for the profound changes of the subsequent two decades, they withdrew the 1994/2001 EISs in 2019—eliminating them as any possible source of NEPA compliance. Because all the actions challenged here violate NEPA and the other preliminary-injunction factors are met here, the Court should grant this motion.

NEPA is "'our basic national charter for protection of the environment.'" *Barnes v. DOT*, 655 F.3d 1124, 1131 (9th Cir. 2011) (citation omitted). "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns[.]" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (cleaned up). Ultimately, "NEPA 'protects the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action *before* the government launches any major federal action.'" *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (emphasis added) (citation omitted).

NEPA's core requirement is that agencies prepare an EIS for "every major Federal action significantly affecting the quality of the human environment." *Winter v. NRDC*, 555 U.S. 7, 16 (2008) (quoting 42 U.S.C. § 4332(2)(C) (cleaned up)). To that end, "an EIS *must* be prepared if 'substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor.'" *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 864 (9th Cir. 2005) (cleaned up) (emphasis in original) (citation omitted). That low threshold is easily satisfied here.

NEPA is, in substantial part, a product of its time: it was enacted in 1969, a year after Paul Ehrlich's best-selling book *The Population Bomb* was published and when his Neo-Malthusian ideology held considerable purchase on the national consciousness. NEPA's express language enshrines those prevailing concerns about population growth in federal law. The statute expressly declares that it is designed to address the "the *profound influences of population growth*" and to "achieve a *balance between population and resource use*[.]" 42 U.S.C. § 4331 (emphasis added).

Ninth Circuit case law reflects this focus, and has long made clear that agencies must consider *indirect*, *growth inducing* effects of agency action under NEPA. In *City of Davis v. Coleman*, that court held that the Federal Highway Administration violated NEPA by failing to prepare an EIS prior to the construction of a freeway interchange near an agricultural area. 521 F.2d 661, 666, 671 (9th Cir. 1975). The court explained that "plain common sense" indicated that the highway interchange was likely to cause growth in the area: "The growth-inducing effects of the … project are its raison d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services such as utilities, education, police and fire protection, and recreational facilities." *Id.* at 675. In 2011, the Ninth Circuit reiterated that, under NEPA, "agencies must analyze … growth-inducing effects" and therefore invalidated environmental analyses regarding construction of an additional runway that lacked such growth-inducing-effects evaluation. *Barnes*, 655 F.3d at 1139.

There is no reason to believe that NEPA is any less concerned with agency actions that *directly* increase the U.S. population—which is far less attenuated than building a highway interchange in *Davis* or the runway in *Barnes*. As explained below, the challenged policies both have direct environmental impacts and further directly result in increasing the U.S. population, leading to significant environmental impacts. Because those impacts are almost completely unevaluated, Defendants have violated NEPA.

It is important to note what this case is not about: the State does not share the Neo-Malthusian pessimism and alarmism about population growth that pervades NEPA. Immigrants are an enormous resource to the United States: they contribute to our economy, educational institutions, military, government, and our rich cultural tapestry—unmatched in its extraordinary diversity by any other nation on Earth. Arizona's economy, in particular, has benefited enormously from extensive domestic and international migration, with new arrivals contributing their unique gifts and know-how from around the U.S. and the world.

The United States is a nation of immigrants, and it would be absurd to deny the positive contributions that immigrants make to the U.S. But it would be equally absurd to contend that adding tens or hundreds of thousands of people to the U.S. population will not have any significant environmental impacts of any sort whatsoever, anywhere. Or that whether hundreds of miles of border barrier are constructed or not is completely without environmental consequence. NEPA exists to mandate that such environmental impacts are carefully studied before taking action. Defendants have abjectly failed to do so.

Similarly, immigrants, like all other U.S. residents, need housing, education, health services, etc. And building new houses, schools, hospitals, and fire departments will invariably have significant environmental impacts, including displacement of natural, undeveloped lands. They will also increase air emissions, which is otherwise a fixation of the current administration outside of this conspicuous ideological blind spot. And Defendants' intentional release of convicted felons into communities—which all prior administrations would have deported, as required by statute, will have significant and

predictably tragic effects on the "human environment" in Arizona.

The myriad environmental impacts of Defendants' policies are discussed in the accompanying expert environmental report. These include growth-inducing impacts, as well as other direct impacts from the Defendants' conduct, such as increased trash dumping from migrants crossing the border, harm to endangered species, and increases in air emissions. Any one of these impacts would alone trigger NEPA's low threshold for requiring EISs. Cumulatively, they leave no doubt that EISs are required.

As a purely procedural statute, "NEPA itself does not mandate particular results[.]" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA therefore does not itself preclude any of the particular challenged actions here. But NEPA absolutely *does* prohibit Defendants from taking them without first studying the environmental impacts adequately under NEPA's auspices. Ultimately, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351. Because Defendants have taken many such *uniformed* decisions here, relief is warranted.[1]

This motion raises somewhat novel issues that require more extended discussion. Much like the proverbial frog in boiling water, Defendants' violations of NEPA have accumulated over time and (until now) largely escaped meaningful judicial consideration. But they are now both scalding hot and ripe for review. Section I of this motion explains how the State has standing and the challenged actions/inaction are subject to judicial review. Section II sets forth why those actions violate NEPA and thus why the State is thus likely to prevail on its NEPA claims. Section III addresses the remaining factors for injunctive relief, and Section IV addresses the proper scope of that relief.

## LEGAL BACKGROUND

NEPA requires that agencies consider "*every significant aspect* of the environmental impact" of their proposed actions and "inform the public that [agencies have] indeed *considered* environmental concerns in its decisionmaking process."

---

[1]  This motion does not seek relief as to Counts Four through Seven in the State's First Amended Complaint, and instead only seeks a preliminary injunction with respect to Counts One, Two, and Three, which all assert violations of NEPA.

*WildEarth Guardians*, 738 F.3d at 302 (cleaned up) (emphasis added). NEPA's central requirement mandates preparation of an environmental impact statement ("EIS") for "every … major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA is a purely procedural statute, which "does not mandate particular results." *Robertson*, 490 U.S. at 350. "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351.

"[T]o determine whether the environmental impact of the proposed action is significant enough to warrant an EIS" an "agency may prepare an Environmental Assessment ('EA')." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004). *Accord* 40 C.F.R. § 1501.5. "If the agency concludes there is no significant effect associated with the proposed project, it may issue a [Finding of No Significant Impact ("FONSI")] in lieu of preparing an EIS." *Envt'l. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *accord* 40 C.F.R. § 1501.6. NEPA does not require an agency to prepare a full EIS if it determines, based on an EA, that the proposed action will not have a significant environmental impact. *DOT v. Public Citizen*, 541 U.S. 752, 757-58 (2004).

In addition, an agency may act pursuant to categorical exclusions, which exempt from individualized NEPA analyses "categor[ies] of actions which do not individually or cumulatively have a significant effect on the human environment[.]" *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 927 (9th Cir. 2000). *Accord* 40 C.F.R. § 1501.4(a). "Neither an EIS nor an EA is required for actions categorically excluded from NEPA review." *West*, 206 F.3d at 927.

Even where an action fits within a promulgated categorical exception, an agency "shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. § 1501.4(b). If such potential significant effects may occur, and there are not "circumstances that lessen the impacts or other conditions sufficient to avoid significant effects[,]" then "the agency shall prepare an environmental assessment or environmental impact statement, as appropriate." *Id.*

DHS Directive 023-01 states that it is the policy of DHS to comply with NEPA.[2] The associated instruction manual "provides the procedures" for this compliance.[3] Among other things, the instruction manual provides DHS's list of categorical exclusions to NEPA, which covers several different activities.[4] However, neither the NEPA statutory text nor DHS's list of categorical exclusions contains an exception for actions related to immigration. Moreover, DHS's guidance makes clear that a categorical exclusion cannot be used unless *all* of following apply: (1) the activity "clearly fits the category described in the [categorical exclusion]," (2) the activity is "not part a piece of a larger action," and (3) no "extraordinary circumstances exist," which include "when the circumstance would have significant environmental impacts … or presents the potential for significant environment impacts … or the potential cannot be readily determined."[5]

## FACTUAL BACKGROUND

The State's complaint asserts three claims relevant here. Counts Two and Three challenge: (1) Defendants' actions in terminating border wall construction ("Border Wall Construction Termination") and (2) Defendants' elimination of the MPP program ("MPP Termination"), respectively. As discussed below, both actions have individually had significant environmental effects and both must be analyzed under NEPA. In addition, both actions are merely components of the Defendants' overarching program seeking to augment the United States population through increased migration and decreased immigration enforcement ("Population Augmentation Program"). That program is far reaching and extensive, and its significant environmental effects need to be examined under NEPA. Count One thus challenges Defendants' failure to prepare a programmatic EIS to analyze the environmental impacts of its Population Augmentation Program and,

---

[2] *See* DHS, *Implementation Of The National Environmental Policy Act*, Directive No. 023-01 (2014), *available at* https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.

[3] *Id.*

[4] *Id.* at Appendix A.

[5] *Id.* at V-5.

alternatively, Defendants' failure to analyze under NEPA its individual components.

Before turning to the merits, it is useful to provide background and context on each of these claims.

**A. Border Wall Construction Termination**

On his first day on office, President Biden issued a proclamation directing DHS to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall[.]" *See* Makar Decl. Ex. A. at 2. The proclamation directed Defendants to "develop a plan for the redirection of funds concerning the southern border wall[.]" *Id.* at 3. Since then, Defendants have outright canceled border wall projects. *See id.* Exs. B-C.

The President's Border Wall Proclamation justifies its policy change with a single sentence: stating that "building a massive wall … is not a serious policy solution" and that it is "a waste of money that diverts attention from genuine threats to our homeland security." *See id.* Ex. A at 1. The proclamation does not account any of the likely outcomes of its dictate, including possible environmental consequences. *Id.*

The Department of Homeland Security ("DHS") and the Department of Defense ("DOD") have implemented the Border Wall Proclamation by suspending all border wall projects, leaving hundreds of miles of fencing unfinished. Since January 20, machinery has literally been standing idle in some places, and vast areas of the wall are incomplete, left largely in whatever state existed in January. *See id.* Exs. D-E.

For the countless individuals constantly seeking to cross the U.S.-Mexico border, however, the wall has served both as a meaningful physical barrier and a powerful signal of the federal government's commitment to enforcing immigration law. Permanently halting construction of the barrier will increase (and has increased) unlawful crossings.

Post-Proclamation events bear this out. In particular, the government's own statistics show that migration—particularly in the areas of the wall gaps—has increased dramatically since the issuance of the Border Wall Proclamation. *See* Expert Report of Cameo Flood at 4 ("Flood Report"). Indeed, "[t]he US is on track to encounter more than

2 million migrants at the US-Mexico border by the end of the fiscal year, according to internal government estimates[,] marking a record high." Makar Decl. Ex. F, at 1; *accord id.* Ex. G (5/16/21 New York Times article explaining that many migrants cross at gaps in the wall near Yuma).

These impacts are so grave that DHS has reportedly "consider[ed]" making changes to address gaps in particular areas or implementing technology in places where the wall is unfinished. *See id.* Ex. H. That said, DHS has made clear it has no intent to deviate from the fundamental policy announced in the Presidential Proclamation. *Id.*

The environmental impacts of this policy are substantial. Individuals crossing as a result of the gaps in the border wall dump enormous quantities of trash along the way. *See* Flood Report at 5. The more individuals that cross, the more trash that will be dumped. *Id.* (explaining that the average border-crosser leaves approximately 6-8 pounds of trash while crossing the border). Migrants also damage the wilderness by crossing it in large numbers in areas not planned (or suited) to accommodate such large-scale migration. *Id.* at 6. Absent the Defendants' policy of leaving these gaps in the Border Wall, many fewer migrants would cross, less trash would be dumped, and less environmental damage would be occasioned by hundreds of thousands of individuals trekking across the desert.

The Border Wall Construction Termination also will have serious impacts on wildlife and endangered species in the areas impacted by the Defendants' actions. Importantly, wall construction is not being abandoned in a studied or well-understood way, nor is it being generally torn down. Instead, it is being left in a largely unfinished condition in a manner planned by no one. This arbitrary state of affairs inevitably will have significant impacts on the wildlife in the State. As explained by the State's expert: "[t]he cessation of border wall construction will likely result in diversion of illegal immigration and wildlife migration through the remaining currently open pathways, potentially affecting the wildlife and ecology in these areas in ways they would not have been affected otherwise." Flood Report at 6. This is likely to create a variety of unknown and unstudied consequences to those and other species.

1    Finally, Defendants' Border Wall Construction Termination will result directly in

2    increases in the population through additional migration. *See* Flood Report at 3-4.

3    **B. Termination Of The MPP Policy**

4    In 2018, the United States faced a surge of migrants. Many were from Central

5    American countries, crossing through Mexico and attempting to enter into the United

6    States despite having no lawful basis for admission. *See, e.g.*, 83 Fed. Reg. 55,934, 55,944-

7    55,945 (Nov. 9, 2018). This surge—much like the present-day surge—created a

8    humanitarian, public safety, and security crisis on the United States-Mexico border. *Id.*

9    In response, in January 2019, DHS enacted the MPP, commonly known as the

10   "Remain in Mexico" policy. Under this policy, "certain foreign individuals entering or

11   seeking admission to the U.S. from Mexico—illegally or without proper documentation"

12   were "returned to Mexico [to] wait outside of the U.S. for the duration of their immigration

13   proceedings[.]" *See Migrant Protection Protocols*, DHS (Jan. 24, 2019),

14   https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols.

15   The MPP's primary purpose was to alleviate burdens on the U.S. immigration

16   detention system and to eliminate a key incentive for illegal immigration—the ability of

17   aliens to stay in the U.S. during lengthy immigration proceedings, regardless of the

18   validity of their asylum claims, and to skip their court dates to stay in the country illegally.

19   *See*, *e.g.*, 83 Fed. Reg. 55,934 at 55,944-55,945 ("After this initial screening process,

20   however, significant proportions of aliens who receive a positive credible-fear

21   determination never file an application for asylum or are ordered removed in absentia.").

22   Under the MPP program, approximately 65,000 non-Mexican migrants attempting to enter

23   the United States illegally or without proper documentation were sent back to Mexico to

24   await the completion of their immigration processes. Makar Decl. Ex. I.

25   The MPP functionally came to an end on February 2, 2021, when President Biden

26   issued Executive Order 14,010. *Id.* Ex. J. That order instructs DHS "to reinstate the safe

27   and orderly reception and processing of arriving asylum seekers" and to "promptly review

28   and determine whether to terminate or modify the program known as the Migrant

9

Protection Protocols[.]" *Id.*

DHS then announced on February 11 that it would process into the U.S. individuals who had been returned to Mexico under the MPP, which began shortly thereafter. *See id.* Ex. K. DHS has also continued processing new migrants who would previously have been turned back under the MPP. *Id.*

Finally, on June 1, 2021, the Administration formally ended the MPP in a seven-page memorandum, issued without notice-and-comment rulemaking. *See id.* Ex. L ("MPP Termination Memorandum"). This memorandum offers several rationales, including that the MPP allegedly failed to reduce resource usage at DHS and failed to reduce Executive Office of Immigration Review case backlogs. *Id.*

The MPP Termination Memorandum makes no mention of a major justification for the MPP in the first place—*i.e.*, addressing the ability of asylum applicants to file non-meritorious claims to attempt to remain in the U.S., with the ultimate intent of absconding and remaining illegally. *See* 83 Fed. Reg. 55,934 at 55,944-55,945. Indeed, government statistics show that only 14% of asylum claims were granted and up to 49% of MPP and non-detained removal cases in 2020 led to *in absentia* removal orders, due to a migrant's failure to appear. *See* Makar Decl. Ex. M, AA; *see also* 83 Fed. Reg. at 55,946 (explaining that in FY 2018 there were "10,534 involved in absentia removal orders, meaning that in approximately 31% of all initial completions in FY 2018 that originated from a credible-fear referral, the alien failed to appear at a hearing"). The MPP Termination Memorandum thus did not address the ways in which it would allow more migrants to remain in the country and how it would incentivize migration. It also did not address potential environmental impacts whatsoever.

Defendants' MPP Termination has resulted in a substantial surge in migration. Today, tens of thousands of migrants are crossing the border in Arizona with the expectation that, in the unlikely event they are caught, they will be released into the U.S. while awaiting their immigration hearing. *See* Makar Decl. Ex. G; Flood Report at 3. As the New York Times explains, many migrants come with the specific expectation that they

will be able to skip out on their hearings and instead disappear into the country. Makar Decl. Ex. G.

The MPP Termination has significant environmental impacts, none of which have been analyzed by Defendants. First, it encourages migration, including through the holes in border fencing, since migrants know that if they are caught, they can always claim asylum, and thereby likely avoid deportation or detention. *Id.* This leads directly to the same sort of impacts discussed above—trash dumping and other direct environmental impacts as a result of thousands of individuals crossing the border. Flood Report at 5.

Second, the termination of MPP has directly led to more migrants settling in the United States, including a large number in Arizona. At a minimum, termination of the MPP has led to the admission of most of the approximately 65,000 non-Mexican migrants who were previously excluded. Makar Dec. Ex. I. But even beyond those initial enrollees, the decision to terminate the program will lead to thousands more migrants entering the country and likely remaining than would have otherwise. Napier Declaration ¶¶12-13, 16-17. As discussed in more detail below, these growth-inducing effects will have serious environmental impacts throughout the state which must be studied under NEPA.

### C. Population Augmentation Program

Through policies like the ones discussed above, Defendants have, in effect, enacted a program of lax border/immigration enforcement with the intent of encouraging migration and population growth. Defendants knew early on that this program would cause a surge in migration, and only sought to manage the pace of this increased migration. Indeed, then-President-elect Biden himself explained that under his programs, such as ending the MPP, the United States could "end up with 2 million people on our border" claiming asylum without mitigation measures. *See* Makar Decl. Ex. N.

This understanding continued as the Defendants enacted this promised program. For example, Secretary Mayorkas recently pleaded with migrants merely to delay coming—not to stay in their home countries. On March 1, he directly told them: "[w]e [DHS] are not saying, 'Don't come' … We are saying, 'Don't come now[.]'" Makar Decl.

Ex. O.

Migrants have readily ascertained the existence of this *de facto* program. As the New York Times recently explained: "While most of the migrants do not necessarily understand the intricacies of U.S. border policy, many said in interviews that they perceived a limited-time offer to enter the United States. Friends and family members already in the country, along with smugglers eager to cash in, have assured them that they will not be turned away—and this is proving to be true." *See* Makar Decl. Ex. G.

In addition to these policies, several other policies enacted by the Defendants are evidence and elements of this program. None of these actions have been analyzed under NEPA, either individually or as part of a programmatic EIS. These policies include:

***Elimination of Fines for Violating Departure Orders.*** Defendants have directed ICE to stop issuing any fines to individuals that violated orders to leave the country. *See id.* Ex. P. DHS stated that "it was clear … that the fines were not effective and had not meaningfully advanced the interests of the agency," although no supporting evidence was identified. *Id.* DHS further announced that it would "work with the Department of Treasury to cancel the existing debts of those who had been fined." *Id.*

***Drastic, Intentional Reductions In Deportations Of Criminal Aliens.*** Shortly after inauguration, Defendants ordered a moratorium on deportations of aliens with criminal convictions who had final orders of removal (*i.e.*, had exhausted all appeals). Makar Decl. Ex. Q. It did so despite an unequivocal statutory command that the government "*shall* remove the [relevant] alien from the United States within a period of 90 days[.]" 8 U.S.C. §1231(a)(1)(A) (emphasis added). A federal district court enjoined that moratorium as violating the statute, arbitrary and capricious, and illegally issued without notice-and-comment procedures. *See generally Texas v. United States*, __ F. Supp. 3d __, No. 21-3, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021). The process of formulating the moratorium was so irregular that "Defendants [we]re unsure who authored the" policy. *Id.* at *40.

The moratorium was soon replaced by "Interim Guidance," which effectively precluded deportation outside of enumerated "priority" categories. *See* Makar Decl. Exs.

12

R-S. In an internal email, DHS projected that under the new policy "book-ins [*i.e.*, arrests] would be reduced by 50% of historical numbers and the vast majority of book-ins would come from CPB transfers." *See id.* Exs. T-U.

As predicted, deportations dropped dramatically. A judge on this Court explained that "what the evidence … shows is … that [ICE] lifted detainers that were previously in place, has not placed detainers on individuals that … they know or can know with ease are in detention or incarceration that have final orders of removal and, most significantly, that they have only removed some incredibly small number—seven or ten—nonpriority [cases]." *See id.* Ex. V at 14-15. "[T]hese people [i.e., aliens with criminal convictions] are not being removed right now. They're being released into our communities." *Id.* at 16. Under the Interim Guidance, "there have been at least 325 [aliens] who have not been detained by ICE…. [O]f 325 individuals who, before February 18th, would have been put into immigration detention and removed, only seven have [been removed.]" *Id.* at 19-20.

***Title 42 Exemptions.*** Defendants have also weakened a key component of this country's pandemic response by exempting 250 migrants per day from "Title 42," a public health order barring the entry of migrants without valid travel documents. *See id.* Ex. W. The application of Title 42 itself is also likely to be eliminated entirely soon, consistent with Defendants' goals of boosting U.S. population. *See id.* Ex. X.

Collectively these policies—along with the Border Wall Construction and MPP Terminations—amount to components of a program for increasing population growth in the United States. Individually, however, each is also an agency action with serious environmental consequences through growth-inducing effects.

The cumulative effect of all of these programs is significant. Figure 1 below, which is taken from DHS's own statistics/website, shows the dramatic surge in DHS encounters with immigrants since Defendants' policies took effect.

**D. Environmental Effects Resulting From Defendants' Actions**

Broadly speaking, the environmental impacts from Defendants' challenged actions fall into four categories.

First: trash and trampling desert. Specifically, because of Defendants' actions, migrants are crossing wilderness areas and other parts of the state not intended for human migration in huge numbers. Accordingly, migrants necessarily leave behind considerable refuse and can damage wildlife by their passing. As the Arizona Department of Environmental Quality ("ADEQ") has explained, border trash typically includes "plastic containers, clothing, backpacks, foodstuffs, vehicles, bicycles and paper. Human waste and medical products have also been found in border trash." FAC ¶118. As the Flood Report sets forth, waste left behind by migrants "includes strewn trash and piles, illegal trails and paths, erosion and watershed degradation, damaged infrastructure and property, loss of vegetation and wildlife, fires, abandoned vehicles and bicycles, vandalism, graffiti and site damage (historical and archaeological), and occurrence of bio-hazardous waste." Flood Report at 5. This can lead to serious impacts, including impacts to public health and the well-being of people and wildlife. *Id.*

The second category of impacts relates to increased air emissions, including emissions of greenhouse gases ("GHGs"). Migrants are responsible for emitting notably more GHG emissions in the United States than they would in their countries-of-origin. *Id.* at 6-7. Policies that admit more individuals into the country therefore have significant environmental impacts in the form of increased air emissions, including GHG emissions.

As the Flood Report explains, "Immigration to the U.S. could be considered particularly harmful in the context of climate change because immigrants adopt American consumption habits." *Id.* at 7. Compared to other countries which migrants may come from, the U.S. population produces significantly more GHGs per-capita (compared to Mexico: 5.4 times; El Salvador: 21.9 times; Guatemala: 22.4 times, and Honduras: 20.3 times). *Id.* Because Defendants' policies cause a significant shift in population from countries with much lower per-capita GHG emissions to the U.S., they directly lead to a substantial increase in GHG emissions. But these increased emissions are entirely unstudied by Defendants under NEPA.

14

1

**Figure 1: CPB Encounter Statistics**



Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

Notably, these increased emissions are, in large measure, the byproduct of economic improvement in the lives of the migrants. Many, for example, will able to afford cars and gasoline, to heat and cool their homes, and to purchase more products than they could previously in the countries-of-origin. FAC ¶¶124-28. NEPA does not preclude Defendants from concluding, after conducting the relevant analysis, that the increased air emissions are worth accepting in light of the corresponding benefits. It simply precludes Defendants

from accepting those increased air emissions without first studying them under NEPA.

The third category of impacts relate to all the growth in population caused by Defendants' actions ("growth impacts"). As the drafters of NEPA recognized, population growth has significant environmental impacts. Those impacts are notably not limited purely to the natural environment, but rather the entire "human environment." 42 U.S.C. §4321. NEPA thus "must be construed to include protection of the quality of life for city residents. Noise, traffic, overburdened mass transportation systems, crime, congestion … all affect the urban 'environment.'" *Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972). Indeed, the 2020 CEQ regulations reiterate that NEPA requires consideration of, inter alia, "ecological …, aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects." 40 C.F.R. § 1508.1 (2020).

Migrants (like everyone else) need housing, infrastructure, hospitals, and schools. As the Flood Report explains, "New residents require more infrastructure for transportation, housing, services, schools, retail, etc. The impacts of rapid population growth are well documented." Flood Report at 8. Critically for the State of Arizona, these impacts include water use, and even marginal population growth in an arid region like Arizona can have severe impacts. *See id.* Ultimately, courts have recognized all of these impacts as cognizable harms for purposes of standing under NEPA.

None of this is to say that population growth is inherently, or even on balance, negative. Arizona, for example, has benefited substantially from it as one of the fastest growing states. But such growth has predictable and substantial environmental impacts, both positive and negative, which the Ninth Circuit has repeatedly required agencies to evaluate under NEPA.

Fourth, Defendants' actions (particularly the Border Wall Construction Termination) will also have serious impacts on wildlife and endangered species in the areas impacted. Numerous threatened and endangered species such as the Mexican gray wolf, jaguar, ocelot, and Sonoran pronghorn, are located in the Arizona-Mexico border region. And they will likely be impacted by the creation of arbitrary and unstudied gaps in the

Border Wall. *See* Flood Report at 5-6.

In particular, these gaps may force wildlife to concentrate their activities around these gaps to accommodate their ordinary migration patterns. *See id.* This, in turn, may expose them to concentrated human activity (which is the reason why many of these species are endangered to begin with). *Id.* Moreover, the gaps may create *de facto* predator corridors where prey species (including the Sonoran pronghorn) will be forced to "run the gauntlet" of predators, who may simply park themselves at the gaps in the Border Wall and enjoy resulting feast as prey passes through *en masse*. *Id.*

**E.  Defendants' Environmental Analysis To Date**

Defendants have not prepared an EIS, or even an EA, to analyze the environmental impacts of even a single one of these programs discussed above. Nor are there any public documents released by Defendants that purport to analyze the environmental effects, whether under NEPA's auspices or otherwise. Additionally, the public has not been permitted to participate in the decision-making through comments, as they would be able to do if Defendants had elected to prepare either an EIS or EA.

There are two NEPA documents that might, at one time, have satisfied Defendants' obligations under NEPA. In 1994, Defendants and their predecessor agencies released a programmatic EIS addressing enforcement activities at the southern border, which was supplemented in 2001. *See Center for Biological Diversity v. Nielsen*, No. 17-163, 2018 WL 5776419, at *1-2, 4 (D. Ariz. Nov. 2, 2018). But that EIS was never updated to account for any of the changed policies and conditions in the ensuing two decades. Then, in 2019, the 1994 programmatic EIS and 2001 supplemental EIS were both withdrawn completely by DHS, rendering them legal nullities.[6]

This Court denied a motion to dismiss claims alleging that the failure to supplement the programmatic EISs (pre-vacatur) violated NEPA. *Nielsen*, 2018 WL 5776419, at *1-4. In doing so, this Court held that DHS and related defendants "have plausibly taken a

---

[6]  *See* DHS, *Notice of the Withdrawal of a 1994 Programmatic Environmental Impact Statement and a 2001 Supplemental Environmental Impact Statement Regarding Certain Activities Along the U.S. Southwest Border*, 84 Fed. Reg. 25,067 (May 30, 2019).

number of discrete, discretionary actions to enforce border security that have substantially changed the agency's proposed action in the 2001 SPEIS, and that both significant new circumstances and information relevant to the environmental impacts of agency's actions have emerged." *Id.* at *2.

## LEGAL STANDARD

The State seeks a preliminary injunction to "preserv[e] the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the moving party, a plaintiff can obtain a preliminary injunction by showing that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter*, 555 at 20.

## ARGUMENT

### I.   Defendants' Challenged Actions Are Reviewable

Given the clarity of Defendants' violations of NEPA, the State anticipates that Federal Defendants will raise an avalanche of procedural objections in service of avoiding adjudication of the merits here. But such objections will be unavailing: the State has standing, its challenges are ripe, and the decisions at issue are reviewable by this Court under the APA.

### A.  The State Has Article III Standing

"To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

These ordinary standing requirements are loosened here for two reasons. *First*, because NEPA claims are procedural in nature, "the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001). Where "a litigant to whom Congress has 'accorded a procedural right to protect his

concrete interests … can assert that right without meeting all the normal standards for redressability and immediacy.'" *Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) (citation omitted). The State thus "need not show that further analysis by the government would result in a different conclusion. Rather, [it] need only show that the decision[s] could be influenced by the environmental considerations that NEPA requires an agency to study." *Laub v. DOI*, 342 F.3d 1080, 1087 (9th Cir. 2003) (citation omitted). *Second*, States are "entitled to special solicitude [courts'] standing analysis." *Massachusetts*, 549 U.S. at 520; *accord California v. Trump*, 963 F.3d 926, 936 (9th Cir.) *cert. granted* 141 S. Ct. 618 (2020) (applying special solicitude standing and holding that California and New Mexico had standing to challenge border wall funding based *inter alia* on "injuries in fact to the environment and wildlife of their respective states").

Here the State has two separate bases establishing injury-in-fact, and thus Article III standing: direct environmental injury and directly imposed costs.

### 1.  Direct Environmental Harms/Geographic Nexus

As explained above, the environmental impacts from Defendants' conduct fall into several categories: (1) direct environmental impacts from migrants, including enormous amounts of trash left behind during their journeys, (2) increased air emissions, including GHG emissions, (3) growth-related impacts, and (4) impacts to wildlife. *Supra* at 14-17. *See also* Flood Report at 5-10.

Each of these categories establishes cognizable injury. The Supreme Court has long recognized that a "state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907).

More recently the Court relied upon *Georgia* to hold that a state had standing to challenge alleged environmental harms within its borders—including those as distantly attenuated as "rising seas … over the course of the next century" as a result of global warming resulting from increased GHG emissions. *Massachusetts*, 549 U.S. at 518-19,

522. The Ninth Circuit has similarly recognized that governmental entities "ha[ve] a proprietary interest in protecting its natural resources from harm." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004); *NRDC v. EPA*, 542 F.3d 1235, 1248–49 (9th Cir. 2008) (states have a "proprietary interest in protecting their waterways," breach of which "constitute[d] an injury in fact"); *California v. DOI*, 767 F.3d 781, 791 (9th Cir. 2014) (A government's "concrete interests" in its "environment and in land management" can establish standing.).

More generally, courts have routinely recognized environmental injury as establishing standing in NEPA cases. As the Ninth Circuit has explained, the injury-in-fact requirement can be satisfied by "a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." *Cantrell*, 241 F.3d at 679 (citation omitted). Such a nexus is obvious here: the environmental impacts are occurring *within* the State itself.

### 2. Costs Imposed By Defendants' Actions

In addition to affecting the State's natural and human environment, Defendants' actions will also impose direct costs on the State, including:

- Under *Plyler v. Doe*, 457 U.S. 202 (1982), the State is constitutionally required to provide free education to unauthorized aliens below the age of majority. If Defendants' policies result in any minor-aged children settling in the State, the State will necessarily suffer financial injury in educational expenditures.

- The State is similarly required by federal law to provide emergency health care to unauthorized aliens, regardless of ability to pay. *See* 42 U.S.C. § 1395dd. Thus, if any additional migrants visit the emergency rooms of any state hospitals, and are unable or unwilling to pay (as is frequently the case), the State will necessarily incur additional costs as a result of Defendants' policies. *See* 42 C.F.R. § 440.255(c) ("aliens who are not lawfully admitted…must receive [emergency services]").

- Defendants' policies of refusing to deport aliens with criminal convictions and final orders of removal (in the teeth of a statutory mandate to do so) imposes direct costs on the State—including the cost of putting felons on community supervision (akin to federal supervised release) that otherwise would have been deported in one month alone. *See* Makar Decl. Ex. V at 8:15-24, 37:4-12, 37:24-38:3; Ex. BB at 84:6-14.

- Defendants' policies will also predictably lead to more crimes being committed against Arizona residents. As a direct result of Defendants' policies, roughly 318 aliens with criminal convictions and final orders of removal were not deported and instead released into Arizona communities. *Supra* at 12-13.

  o Given predictable recidivism rates, the tragic and all-too-predictable reality is that additional crimes will be committed against Arizona citizens. That causes harms in two ways: it injures the State's interest in the welfare of its citizens and directly imposes costs in the form of police investigation, prosecution, and imprisonment. And, if Defendants again refuse to deport those felons following their prison sentences despite statutory mandates that they do so, the State will further incur yet more costs in the form of community supervision. *Infra* at 25-26.

## B. Prudential Standing Is Satisfied

As set forth above, the State will suffer direct harms to *its* environment, both natural and human, as a result of Defendants' actions. The State's interest in protecting its environment easily "'fall[s] within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). Indeed, the State need only "'arguably'" fall within that zone of interest, as "'the benefit of any doubt goes to the plaintiff.'" *Id.* at 130 (citation omitted).

Moreover, NEPA is not merely concerned with the natural environment, but instead the "human environment." 42 U.S.C. § 4332(C). As set forth above (at 2-3, 16), it includes

considerations of traffic, crime, human health, etc. And the State's claims readily fall within that sweeping scope.

Nor does the fact that some of the State's harms are economic preclude standing. Plaintiffs "have standing under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1103 (9th Cir. 2005) *accord Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (Prudential standing established where "injury has an environmental as well as an economic component.").

**C. These Disputes Are Ripe For Review**

The State's claims are also ripe for review. As the Supreme Court has unanimously explained, "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, *for the claim can never get riper*." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) (emphasis added). Thus, "if there was an injury under NEPA, it occurred when the allegedly inadequate EIS was promulgated. That is, any NEPA violation (and any procedural injury) inherent in the promulgation of an inadequate EIS … ha[s] already occurred" upon issuance. *Kern v. BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002); *accord Citizens for Better Forestry v. USDA*, 341 F.3d 961, 977 (9th Cir. 2003) (Ninth Circuit precedent has "adopted this dicta from *Ohio Forestry*" as binding law).

The Ninth Circuit has similarly recognized that failure to issue a programmatic EIS when required by NEPA is a sufficiently ripe injury when the violation occurs. In *Laub*, that court "agree[d]" that "the question of whether an agency has complied with NEPA's procedural requirements in formulating a programmatic EIS is immediately ripe for review before any site-specific action is taken." 342 F.3d at 1088. Indeed, "[s]ince *Ohio Forestry* was decided, [the Ninth Circuit] ha[s] recognized the distinction between substantive challenges which are not ripe until site-specific plans are formulated, and procedural challenges which are ripe for review when a programmatic EIS allegedly

violates NEPA." *Id.* at 1090 (collecting cases); *accord Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994) (NEPA "plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan."); *West*, 206 F.3d at 930 n.14 (holding that challenge to failure to prepare either an EIS or EA was ripe and need not wait for subsequent stage of development).

Moreover, in a petition for certiorari (which was granted but subsequently mooted), federal petitioners admitted that "the Ninth Circuit has repeatedly (though in [their] view incorrectly) held that challenges to regulations or other programmatic decisions are ripe even outside the context of a challenge to a site-specific project." Petition for Certiorari, *U.S. Forest Serv. v. Pacific Rivers Council*, 2012 WL 5838446, *27 (U.S. Nov. 16, 2012). Defendants are welcome to (again) seek review of the Ninth Circuit's ripeness precedents. But, for now, the U.S. Solicitor General's apt characterization of the Ninth Circuit's jurisprudence is correct and controlling here: Defendants' programmatic failures are ripe for review now.

### D. The Decisions Challenged Here Are Reviewable Agency Actions

The State's claims are cognizable under the APA as they challenge agency actions as "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law*." 5 U.S.C. § 706(2)(A) (emphasis added). Because NEPA requires preparation of an EIS *before* taking "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), taking such actions without preparing an EIS violates NEPA and is "not in accordance with law." 5 U.S.C. § 706(2)(A).

Here each of the State's claims is cognizable under section 706(2), because they are final agency actions that are "not in accordance with law"—*i.e.*, contrary to NEPA.

### 1. Programmatic EIS (Claim One)

The D.C. Circuit has made clear that the failure to prepare a programmatic EIS for ongoing agency programs is reviewable under the APA and NEPA. In *American Bird Conservancy, Inc. v. FCC*, that court permitted a NEPA challenge to the FCC's failure to "prepare an [EIS] under NEPA analyzing the effects of all past, present, and

reasonably foreseeable tower registrations on migratory birds in the Gulf Coast region." 516 F.3d 1027, 1029-30 (D.C. Cir. 2008). And because there was "no real dispute that towers 'may' have significant environmental impact[s]," the D.C. Circuit held that FCC had violated NEPA. *Id.* at 1033-34.

Similarly, the Ninth Circuit concluded that plaintiffs could challenge an agency's program of entering into "long term contracts for power delivery," which numbered "over 140." *Forelaws on Bd. v. Johnson*, 743 F.2d 677, 679, 685 (9th Cir. 1984). That court further concluded that "the failure to prepare an EIS demonstrating that the agency has considered all significant alternatives violates both NEPA and the APA." *Id.* at 685.

The same result should obtain here. Defendants' Population Augmentation Policy is a program with significant environmental effects for which no NEPA analysis has been conducted at all—let alone the programmatic EIS that is required here. Indeed, back when the 1994 Programmatic EIS/2001 Supplemental Programmatic EIS were still in place, this Court held that environmental plaintiffs had plausibly alleged that the same essential Defendants had "taken a number of discrete, discretionary actions to enforce border security" that rendered their actions reviewable. *Nielsen*, 2018 WL 5776419, at *2. They are equally reviewable here.

Moreover, the Population Augmentation Program's individual components all constitute reviewable final agency action, and the constellation of them should be no less reviewable. The Supreme Court has explained that "two conditions must be satisfied for agency action to be 'final:'" "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Both the Border Wall Construction and MPP Terminations satisfy these two requirements. And so too do the Population Augmentation Program's other individual components:

24

***Fines and Title 42 Exemptions***: Both the cancellation of all fines for violating departure mandates and the Title 42 exemptions are final decisions on their face—no further decision-making is contemplated. And legal consequences flow immediately from both. As to the fine abolition, that rule has by now likely been applied in thousands of deportation proceedings leading to violators not receiving fines, as well as migrants being less deterred from violating orders requiring their departure from the U.S. And the Title 42 exemptions have directly led to up to 250 additional migrants being admitted into the U.S. that otherwise would have been excluded *per day*, directly leading to environmental impacts and costs being imposed on the State. *Supra* at 13. Indeed, the exemption results in as many as 7,750 (31*250) migrants being admitted into the United States *each month*, and as many as 91,520 per year (365*250). Since many will undoubtedly settle in Arizona, directly affecting the environment of the State and imposing costs on the State, "legal consequences" are flowing from the Title 42 exemption now.

***Non-Deportations Under The Interim Guidance.*** Although styled "Interim," the Interim Guidance has been in place for months with only non-binding assertions that it will be at some point replaced. Indeed, while the "Interim" Guidance was set to expire by May 19, 2021, Defendants' most recent filing in this Court states that "the Secretary will issue new immigration priorities by the end of August or beginning of September." ECF No. 89 at 2, *Arizona v. DHS*, No.2:21-cv-186 (June 28, 2021). But the possibility that Defendants will amend the Interim Guidance "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016). The Interim Guidance also has immediate "legal consequences," with the State forced to incur costs of putting convicted alien felons in community supervision that previously would have been deported. *See*, *e.g.*, *Arizona v. DHS*, 2021 WL 2787930, at *8 (D. Ariz. June 30, 2021) (holding that "Arizona has established standing … due to its increased costs in community supervision of unremoved criminal noncitizens [resulting from the Interim Guidance]").

## 2.  Border Wall Construction Termination

Defendants' Border Wall Construction Termination is not "tentative or interlocutory [in] nature." *Bennett*, 520 U.S. at 177. The President's Proclamation makes clear that a border wall is, in his view, a "waste of money" and "not a serious policy." Makar Decl. Ex. A at 1. The finality of this determination is underscored by the fact that Defendants have not merely halted construction temporarily, but affirmatively *cancelled* contracts for wall construction. Makar Decl. Ex. B. The administration further has already announced alternative uses for the funds. Makar Decl. Ex. C.

Legal consequences flow from Defendants' action to terminate this enormous undertaking. Most obviously, contracts are a source of legal rights and thus cancellation of them has obvious "legal consequences." *Bennett*, 520 U.S. at 78 (citation omitted). Termination for convenience further confers on contractors "rights" to damages. The Ninth Circuit has further recognized that "approv[al of] [a] contract [was] a decision that constitute[d] a final agency action." *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 902 (9th Cir. 2002); *accord Pac. Nw. Generating Co-op. v. DOE*, 580 F.3d 792, 804 n. 16 (9th Cir. 2009) (awarding "four DSI contracts … [was] final agency actions subject to our review"). There is no reason why termination of contracts would be any less reviewable as final agency action than the granting of them.

Furthermore, these actions have immediate consequences for the rights of the State, as well. Many of those consequences affect the State's legal rights, *see supra* Part I.A.2, but Defendants' actions have other practical consequences as well. As the Ninth Circuit has explained, when considering finality, "[i]t is the effect of the action and not its label that must be considered. To this end, finality is to be interpreted in a pragmatic way.… [A]gency action may be final if it has a 'direct and immediate ... effect on the *day-to-day business* of the subject party.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006) (emphasis added) (cleaned up).

The Border Wall Construction Termination has significant effects on the State's and Defendants' "day-to-day business": it has led to a surge of immigration channeled

specifically into corridors where Defendants have intentionally left barriers unconstructed. It similarly augments and concentrates the environmental impacts to the State's environment there. It further has led to surge of migrants for which the State will predictably incur costs related to education, health care, and law enforcement. These day-to-day impacts easily satisfy the APA's pragmatic finality standard.

### 3. MPP Termination

The June 1, 2021 memorandum terminating the MPP bears all the hallmarks of final agency action. It announces the permanent termination and rescinding of prior final agency action and admits of no tentativeness. *See* Makar Decl. Ex. L. Courts have repeatedly found that enactment of the MPP was final agency action reviewable under the APA—including the Ninth Circuit, which has done so twice implicitly. *See*, *e.g.*, *Innovation L. Lab v. Wolf*, 951 F.3d 1073, 1081 (9th Cir. 2020), *cert. granted*, 141 S. Ct. 617 (2020); *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). For the same reasons, permanent revocation of it is equally reviewable. *See*, *e.g.*, *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change[.]") (reviewing rescinding of prior rule).

"Legal consequences" also flow directly from the termination of the MPP. In particular, most of the 65,000 migrants previously excluded have now been admitted into the United States—a clear change in conditions directly attributable to the change in law. Makar Dec. Ex. I.

### E. Defendants Have Authority And Discretion To Address The Harms At Issue Here

Because the actions at issue here were ones that Defendants had discretion to take (or not take), NEPA applies to the decisions: thereby mandating the evaluation of environmental impacts and public participation that are its twin aims.

The Supreme Court has held that "an agency [is not required] to prepare a full EIS due to the environmental impact of an action it could not refuse to perform." *Public Citizen*,

541 U.S. at 769. But the Presidential Proclamation makes clear that it was halting wall construction because President Biden believed it was *unwise*—not *illegal*—policy. Makar Decl. Ex. A at 1 (declaring the border wall ""not a serious policy solution" and a "waste of money"). NEPA therefore applies to the border wall construction termination.

### F.  Congress's Waiver Of NEPA Compliance For *Building* A Border Barrier Does Not Immunize *Halting* Construction From NEPA

The State's claims are also not barred by Congress's waiver of NEPA (and other laws) for purposes of *constructing* the border barrier. Because the challenged actions are designed to *thwart* construction—rather than ensuring it occurs expeditiously—the waiver does not apply.

Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") provides "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019) (quoting IIRIRA §102(c)). DHS has invoked this authority to waive compliance with NEPA and other laws to construct border barriers along the U.S.-Mexico Border, including in Arizona. *See, e.g.*, Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 86 Fed. Reg. 114 (Jan. 4, 2021).

On its face, however, this authority is limited to actions that "ensure expeditious construction" of the border barrier and associated roads. The challenged actions here do nothing of the sort, however. Far from "ensuring expeditious construction," Defendants have acted to ensure construction does not occur at all—expeditiously or otherwise— absent judicial intervention. Defendants accordingly cannot invoke their authority under 102(c) in a manner *precisely opposite* its purpose and permitted use.

## II.   The State Is Likely To Prevail On Its NEPA Claims

NEPA requires that "to the fullest extent possible ... all agencies of the Federal

Government shall" complete an EIS in connection with "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Here, Defendants have declined to prepare either an EIS or an EA in connection with any of the challenged actions. As a result, this Court's review is less deferential: when agencies "have not prepared an EIS or EA," then the APA's ordinary arbitrary-and-capricious standard does not apply. *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998). Instead, "the less deferential standard of 'reasonableness' applies to threshold agency decisions that certain activities are not subject to NEPA's procedures." *Id.*; *accord Northern Alaska Env't Ctr. v. DOI*, 983 F.3d 1077, 1084 (9th Cir. 2020); *High Sierra*, 390 F.3d at 639.

Accordingly, the question presented here is whether Defendants acted unreasonably in failing entirely to apply NEPA to their actions. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 641 (9th Cir. 2014).

### A. The Challenged Actions Are "Major Federal Actions"

CEQ regulations provide guidance as to NEPA's applicability. Under those regulations, a "major federal action" is defined as "an activity or decision subject to Federal control and responsibility." *See* 40 C.F.R. § 1508.1(q). This definition is subject to several exceptions, such as extraterritorial actions, non-discretionary actions, or actions that are non-final under the APA—none of which apply here. *Id.* Major federal actions "may include" "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies." *Id.*

Defendants' Border Wall Construction Termination is a "major federal action," as a "project[] and program[] entirely or partly financed … or approved by Federal agencies." *Id.* Indeed, it quite literally involved the expenditure—and then non-expenditure substituted by a decision to pay contract termination damages—of *billions* of dollars in funding. It is doubtful that any construction project of equivalent scale has ever been deemed not "major," and Congress's delegation of authority to DHS to waive NEPA for

the purpose of building border barriers reflects Congress's understanding that NEPA otherwise applies to such decisions.

Similarly, the MPP Termination is a "major federal action." It too began with a Presidential order effectively terminating the program in question. *See* Makar Decl. Ex. J. This order, among other things, ordered DHS and HHS to "reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints" and commanded DHS to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols[.]" *Id*. Ultimately, Defendants formally ended the MPP with a seven-page memorandum on June 1, 2021. *See id.* Ex. L. As these formal documents demonstrate, the termination of the MPP falls squarely within the regulatory definition of "major federal action" which includes "formal documents establishing an agency's policies which will result in or substantially alter agency programs." 40 C.F.R. § 1508.1(q).

Similarly, Defendants' Population Augmentation Program is "an activity or decision subject to Federal control and responsibility." *See* 40 C.F.R. § 1508.1(q). Indeed, the Supreme Court has long made clear that immigration is uniquely federal in character: "Policies pertaining to the entry of aliens and their right to remain here are ... entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954).

**B.  The Actions At Issue Will Have Significant Environmental Effects**

The Ninth Circuit has repeatedly made plain that the standard for whether an action has a significant environmental impact is low: "an EIS *must* be prepared if 'substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor.'" *Ocean Advocates*, 402 F.3d at 864 (cleaned up) (emphasis in original); *accord High Sierra*, 390 F.3d at 639. Furthermore, a plaintiff need not present evidence of actual environmental harm, because requiring a NEPA plaintiff to prove "that the challenged federal project will have particular environmental effects, … would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *See Citizens for Better Forestry*,

341 F.3d at 972.

CEQ regulations also provide a definition for environmental effects, stating that this term includes "changes to the human environment … that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives." 40 C.F.R. § 1508.1(g). These may include "effects that are later in time or farther removed in distance from the proposed action or alternatives." *Id.* Further, relevant impacts include both "beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." *Id.*

Here, this low threshold is easily satisfied for each of the State's claims, and Defendants' failure to prepare an EIS—or even an EA—for any of them violates NEPA.

### a.  Border Wall Construction Termination

Defendants' Border Wall Construction Termination will have substantial environmental effects. At its most obvious, environmental groups have long complained that the construction of the Border Wall would have significant environmental impacts. *See*, *e.g.*, Makar Decl. Ex. Y. Congress itself recognized these potential impacts by permitting DHS to waive compliance with NEPA and other environmental laws to facilitate the wall's expeditious construction. *See supra* Section I.F. It necessarily follows that the decision to terminate this construction has similarly significant impacts since, under NEPA, environmental impacts must be considered whether they are *beneficial or detrimental* to the environment. *See* 40 C.F.R. § 1508.1(g). An agency may not avoid completing an EIS "even if on balance the agency believes that the effect will be beneficial." *Id.*

Thus, even if the Border Wall Construction Termination will avoid the negative environmental consequences that its critics have long alleged construction and maintenance of the wall would entail, NEPA compliance is still *mandatory*. And it has not even been attempted here.

In addition, the enormous holes in the border wall and in border security are having serious environmental impacts independent of the physical impacts related to wall construction. As set forth in the Flood Report:

- Refuse and trash from border crossers: approximately six-to-eight pounds per individual;
- Damage to vegetation and wildlife by individuals crossing in large numbers;
- Impacts to endangered species by diverting migrants and animals into remaining open pathways; and
- Sickness and mortality to the migrants themselves from permitting dangerous border crossings.

*See* Flood Report at 5-10. Moreover, there are the environmental harms occasioned by the additional population caused by the surge in migration, which are directly traceable to the problems in border security.

These impacts are supported by other evidence as well. As the Chief of Staff for the Cochise County Sheriff's Office has explained, crossings through gaps in the Border Wall have resulted in impacts from trash dumping and other physical impacts as a result of masses of individuals crossing through holes in the border wall. Napier Decl. ¶¶ 14-15.

Notably, Defendants' themselves appear to recognize the potential environmental harms from their Borden Wall Construction Termination. As reported by PBS, "The Biden Administration said … that it will begin work to address the risks of flooding and soil erosion *from unfinished sections of the wall*." Makar Decl. Ex. Z (emphasis added).

Even if Defendants contest some of these impacts, the State need only show the existence of a "substantial question[]" about whether there "may" be an environmental impact in order to prevail. *See Ocean Advocates*, 402 F.3d at 864. That standard is easily satisfied here.

### b. MPP Termination

It is similarly obvious that the MPP Termination at least *may* have significant environmental effects. Because of the holes in the border wall, the MPP Termination directly leads to additional unauthorized migration. *See* Napier Dec. at ¶¶16-17. Migrants know about the Defendants' "catch and release" policy, and it is "reasonably foreseeable" they will cross because of it. 40 C.F.R. § 1501.8(g); *accord* Makar Decl. Ex. G.

32

Over 65,000 individuals were returned to Mexico under the original MPP. *See* Makar Dec. Ex. I. Those individuals are now being admitted in the United States. *Id.* In addition, tens of thousands more migrants stand to be admitted under the Defendants new policy who would otherwise have been returned to Mexico or their home countries. *See* Napier Dec. at ¶¶16-17.

In addition to contributing to the impacts above by encouraging unauthorized migration, the Defendants decision to admit these tens thousands of additional migrants directly augments Arizona's population. As the Flood Report explains, this has several serious environmental impacts, including:

- Impacts from increased air emissions, as migrants who come here seeking (and finding) economic opportunity invariably add more pollutants and GHGs to the atmosphere than they would have in their home countries;
- Impacts growing and straining infrastructure and services in the State; and
- Impacts on natural resources in the State, particular water.

Flood Report at 8-10.

The scale of these impacts alone dwarfs previous Ninth Circuit cases recognizing the need to perform analyses under NEPA. NEPA's express statement of purpose declares that the statute is "particularly" concerned with "the profound influences of population growth" on the environment. 42 U.S.C. § 4331(a). These policies directly add to the population of the State and the nation. The growth impacts here are far more significant than would be occasioned by a single highway interchange or new runway. *See, e.g.*, *City of Davis*, 521 F.2d at 671 (holding that agency violated NEPA by failing to prepare EIS considering growth impacts prior to construction of freeway interchange near an agricultural area); *Barnes*, 655 F.3d at 1139 (holding that, with respect to project adding a new runway to airport, "the agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects").

Finally, although the emission and growth impacts from the additional individuals who are admitted to the country as a result of the termination of the MPP may be "later in

time" or "further removed in distance" from the release of migrants into the country, that does not mean the Defendants can ignore them. *Id.* On the contrary, these substantial effects bear a very close relationship with the Defendants decisions to encourage and facilitate the migrations of additional immigrants.

Accordingly, the State is likely to prevail on its claim that Defendants violated NEPA by terminating the MPP without first preparing an EIS.

### c.  Population Augmentation Program

Because Defendants' Population Augmentation Program will have significant environmental effects, and must be analyzed together under NEPA's implementing regulations, the State is likely to prevail on its claim that Defendants violated NEPA in failing to prepare a programmatic EIS.

CEQ regulations also state that agencies "*shall* evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a) (emphasis added). As the Supreme Court has recognized, programmatic environmental analysis is required where a program is "a coherent plan of national scope, and its adoption surely has significant environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976). When considering such programmatic action, agencies should consider factors such as whether the relevant actions are "occurring in the same general location," and whether they "have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(b)(1).

Courts have considered two questions in evaluating whether an agency should have prepared a programmatic EIS: "[1] Could the programmatic EIS be sufficiently forward looking to contribute to the agency's basic planning of the overall program? and, [2] Does the agency purport to 'segment' the overall program, thereby unreasonably constricting the scope of environmental evaluation?" *Piedmont Env't Council v. FERC*, 558 F.3d 304, 316 (4th Cir. 2009) (cleaned up). Here, Defendants enacted not just the Border Wall Construction and MPP Terminations, but several other policies directed toward

encouraging migration and augmenting the nation's population. Consideration of these policies together, in a single programmatic EIS, would enhance agency decision making and enhance NEPA's goals of ensure public participation and transparency in consideration of environmental impacts. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 999 (9th Cir. 2004) ("[T]wo or more agency actions must be discussed in the same impact statement where they are 'connected' or 'cumulative' actions.").[7]

First, each of the separate agency actions which make up the challenged program have similar environmental impacts, along with common timing and a similar geographic scope—the southern border. Considering them together would allow DHS to plan and properly consider how they interact to affect U.S. population and the environment. By segmenting the program from an environmental impact standpoint, the agency has lost the overall picture, and this diminishes the ability to see the connected and cumulative way in which these policies work together to create significant impacts. *See Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 49–50 (D.C. Cir. 2015) ("The point of the connected actions doctrine is to prevent the government from segmenting its own federal actions into separate projects and thereby failing to address the true scope and impact of the activities that should be under consideration." (cleaned up)). This is particularly true in relation to the growth impacts discussed above; population growth is pushed by each of these actions, but to what degree any given action may be moving this is a question which the agency must study under NEPA.

Moreover, the appropriateness of a programmatic EIS is underscored by the fact that Defendants and their predecessors *actually prepared* a programmatic EIS in 1994, and a supplemental programmatic EIS in 2001. For all of the same reasons that the Clinton Administration concluded that a programmatic EIS was required by NEPA, the Biden

---

[7] Although *Klamath-Siskiyou* was decided relying on previous CEQ regulations which were revised in 2020, the Court's conclusions are nonetheless significant insofar as the Court depended on the statute, rather than the regulation, as the basis for decision. 387 F.3d at 998-99 (applying "same impact statement" requirement to EAs notwithstanding regulatory language).

Administration has violated NEPA by failing to prepare one.

Accordingly, to prevent Defendants from ignoring the connected and interrelated nature of their actions, a programmatic impact statement should be required covering the entire Population Augmentation Program.

For the same reasons as discussed with respect to the Border Wall Construction and MPP Terminations, there is no meaningful doubt that, as an overall program, the Population Augmentation Program would have significant environmental effects. Indeed, because of the scale of the program, those effects are even more significant—the reason for the programmatic impact statement in the first place is the usefulness of considering all the connected impacts of the population growth components together.

### d.  Population Augmentation Program Components.

Alternatively, if this Court concludes that the overall Population Augmentation Program does not require a programmatic EIS, its individual components independently require compliance with NEPA. And none was even attempted. This Court should therefore hold that the State is likely to prevail on its alternative claims. Each of these policies has at least one significant environmental impact (including by increasing the U.S. population with the resulting environmental effects) . But Defendants have not even prepared an EA— let alone EIS—for any of them.

***Title 42 Exemptions.*** Under Defendants' exemptions from Title 42, up to 7,750 migrants will be admitted into the U.S. that would have been otherwise excluded per month, and over 90,000 per year—to say nothing if, as is anticipated, the Title 42 program is soon abolished entirely. These additional migrants will predictably lead to (1) additional air emissions, (2) increased demands on the State's education, health, and criminal justice systems, and (3) directly increased population. Defendants were required to analyze these effects under NEPA *before* undertaking them.

***Elimination of Fines.*** Congress's evident judgment was that imposition of fines would serve as a deterrent to violating orders to depart from the United States. *Supra* at 12. That premise—that potential punishment substantially deters violations of legal

obligations, even if not completely—is an essential cornerstone of our entire criminal justice system. True, no penalty has ever been 100% effective. But few, if any, fines have ever been shown completely ineffective in deterring violations.

Against that foundational premise, Defendants have blithely—and without any cited evidence—asserted that "fines were not effective and had not meaningfully advanced the interests of the agency." Makar Decl. Ex. P. That is exceedingly doubtful, as fines are one of the most quintessential forms of deterrence. Indeed, an equivalent assertion that complete abolition of all fines for speeding and parking violations would not affect the rate at which those infractions are committed would rightfully be met with scorn—or at least a request for evidence for such a profoundly counter-intuitive assertion.

Because of the obvious potential deterrent effect of fines, and the consequent elimination of that deterrence from their abolition, Defendants should have studied the potential effects in an EIS, or at least EA.

***Drastic Decreases in Deportations of Convicted Unauthorized Aliens***. As a judge on this Court has already recognized, Defendants' policies have caused hundreds of aliens with criminal convictions and final orders of removal not to be deported. *Supra* at 12-13. That non-deportation both increases the population of the State and is virtually certain to lead to increased crime, thereby affecting the human environment. *Supra* at 21. Such effects must be studied under NEPA, *supra* at 16—but Defendants failed to do so.

## III.    The Remaining Requirements For Injunctive Relief Are Satisfied Here

The remaining requirements for injunctive relief—irreparable harm, balance of the equities, and the public interest—all weigh in favor of issuing an injunction here. *See Winter*, 555 U.S. at 20. As the Supreme Court has explained, "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987). That is just so here: environmental injury is not just "sufficiently likely," but virtually certain, and,

as it "usually does," the balance of harms favors injunctive relief here.

### A. Violating NEPA Coupled With Likely Environmental Harm is Generally Sufficient to Show Irreparable Harm

Generally speaking, "When a court finds a likelihood of success on the merits of a NEPA claim coupled with likely environmental harm, the NEPA violation generally is found to rise to the level of irreparable harm supporting preliminary injunctive relief." *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1022 (D. Or. 2019) (citing cases). That is just so here: as set forth above, Defendants' actions are virtually certain to cause environmental harms in the form of increased trash, increased air emissions, wildlife impacts, and negative growth effects. *Supra* at 14-17. Such injury "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco*, 480 U.S. at 545.

The environmental injury is here is particularly acute given the delicate nature of desert ecosystems. As the Ninth Circuit has aptly observed, "once the desert is disturbed, it can never be restored." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005). And that court concluded that the irreparable harm requirement was satisfied where the disturbance consisted of building "794 single-family homes" on 608 acres of undeveloped land, filling in "7.5 acres of natural waterways." *Id.* at 1118.

Given the scale of Defendants' actions, the amount of desert and other lands[8] that will be disturbed dwarfs the amount at issue in *Save Our Sonoran*—very likely by *orders of magnitude*—both by migrants passing through the State and permanently settling there. Indeed, those 794 single-family homes in *Save Our Sonoran* likely could house only a small portion of the additional migrants that will settle in the State as a direct result of the Defendants' policies challenged here.

---

[8]  The State also has a variety of other climates/biomes, including forests and grasslands at high elevation, all of which will suffer disturbance. As a practical matter, however, the vast majority of new migrants would likely settle where the vast majority of existing residents live—*i.e.*, in the Phoenix and Tucson metropolitan areas where roughly 80% of the population resides. Both areas are desert climates/biomes. Similarly, the lands adjacent to the Arizona-Mexico border are predominantly desert.

**B.  The Balance of Harms and Public Interest Favor an Injunction**

Because "the Government is a party," the third and fourth *Winter* factors, "the balance of the equities and public interest factors merge" *Doe #1 v. Trump*, 984 F.3d 848, 861-62 (9th Cir. 2020) (cleaned up). Furthermore, where environmental harm is "sufficiently likely"—and here, *virtually certain*—"the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545; *accord Save Our Sonoran*, 408 F.3d at 1125 ("[W]e have long held that when environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." (cleaned up)).

Given the scale of the harms at issue here and the public interest disfavoring judicial blessing of Defendants' myriad violations of NEPA, the third and fourth *Winter* factors favor injunctive relief as well.

**IV.   A Preliminary Injunction Tailored To The Violations Here Is Warranted**

Where, as here, actions are "ongoing," the Ninth Circuit "has held that injunctive relief and the ordering of an EIS is an appropriate remedy." *High Sierra*, 390 F.3d at 644 (collecting cases); *accord Ross v. Federal Highway Admin.,* 162 F.3d 1046, 1054 (10th Cir. 1998) ("Courts have routinely recognized the appropriateness of injunctive relief requiring the preparation or completion of an EIS or SEIS."). The State seeks such relief here: this Court should mandate preparation of the required EISs and entered a tailored injunction against activities contrary to NEPA. The relief here should take four forms:

**1.     Order Preparation of an EIS.** As set forth above, an EIS is required for each of the Border Wall Construction Termination, MPP Termination, and Population Augmentation Program, which this Court should accordingly require preparation of by injunction. *High Sierra*, 390 F.3d at 644 (collecting cases); *Ross,* 162 F.3d at 1054. Alternatively, if this Court concludes a programmatic EIS is not required for the Population Augmentation Program, it should require that Defendants prepare an EIS or EA for each of its components.

**2.     Invalidate the Construction Contract Terminations.** This Court should

further invalidate the contract terminations by Defendants. The Ninth Circuit has held that leases made in violation of NEPA can, and in many cases, **"must be undone."** *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006). This Court should similarly enjoin the termination of the border wall construction contracts and therefore restore them to being operational and binding agreements.

**3.    Enjoin Border-Barrier-Related Actions That Irretrievably Commit Defendants To Particular Courses of Conduct Before EISs Are Prepared.** The Ninth Circuit has long made plain "that an EIS must be prepared *before* any irreversible and irretrievable commitment of resources." *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988). It is therefore appropriate to enjoin Defendants from taking any actions that irretrievably commit themselves to particular courses of action before the required EISs are prepared. Such actions include: (1) any further termination of construction contracts, (2) spending any funds previously earmarked for barrier construction in a manner that could not be replaced with alternative funds, and (3) taking any actions designed as permanent replacements for the intended border wall.

**4.    Partially Enjoin The Revocation Of The MPP.** As discussed above, suspension of the MPP is likely to admit tens of thousands of aliens asserting meritless asylum claims that will nonetheless be able to remain in the United States by absconding from their scheduled immigration hearings and evading immigration enforcement—thereby causing irreparable harm to the State. Prior to any final adjudication and permanent injunction/vacatur, this Court should issue a preliminary injunction requiring Defendants to (1) develop criteria for identifying aliens most likely not to appear at their scheduled hearings within 30 days (subject to this Court's approval) and (2) to exclude from the United States or detain such individuals pending their hearings. A tailored injunction of that sort will substantially mitigate the irreparable harms that the MPP was designed to eliminate and which the MPP Termination will inflict upon the State.

## CONCLUSION

The State's motion for a preliminary injunction should be granted.

RESPECTFULLY SUBMITTED this 12th day of July, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By <u>s/ Drew C. Ensign</u>
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    Robert J. Makar (No. 33579)
      *Assistant Attorneys General*

*Attorneys for Plaintiff Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of July, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for parties that are registered CM/ECF users will be served by the CM/ECF system pursuant to the notice of electronic filing. In addition, I have caused a copy of this motion to be served with a copy of the First Amended Complaint upon Defendants United States Department of Defense; Lloyd Austin in his official capacity as Secretary of Defense, who have not yet entered an appearance.

 s/ Drew C. Ensign
*Attorney for the State of Arizona*