1  TODD KIM
   Assistant Attorney General
2  United States Department of Justice
3  Environment and Natural Resources Division

4  TYLER M. ALEXANDER (CA Bar No. 313188)
5  Trial Attorney
   Natural Resources Section
6  150 M St. NE, Third Floor
7  Washington, D.C. 20002
   (202) 598-3314
8  tyler.alexander@usdoj.gov

9
10 *Attorneys for Defendants*

# THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| State of Arizona, | Case No. 2:21-cv-00617-PHX-DWL |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Mayorkas, *et al.,* | |
| Defendants. | |

**TABLE OF CONTENTS**

Introduction ..................................................................................................... 1

Factual Background ......................................................................................... 3

    I.     Termination of the Border Wall Projects     3

    II.    Termination of the Migrant Protection Protocols (MPP)    5

Statutory Background ...................................................................................... 8

    I.     The National Environmental Policy Act (NEPA)    8

    II.    The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)    8

Standard of Review .......................................................................................... 9

    I.     Judicial Review of Final Agency Action under the APA    9

    II.    Preliminary Injunctions    10

Argument ........................................................................................................ 11

    I.     Arizona Lacks Standing to Sue    11

        a.    Arizona has not established a concrete and particularized harm that is actual or imminent. .............................. 12

        b.    Arizona has shown no injury traceable to the challenged conduct that a court order can redress. ......................... 15

            i.    Arizona has not shown a connection between cessation of border wall construction and its alleged harms ............... 16

            ii.    Arizona has not shown a connection between termination of MPP and its alleged harms. .......................... 18

            iii.    Arizona has not shown a connection between the so-called "Population Augmentation Program" and its alleged harms ...................................... 20

    II.    Arizona Has Not Shown Imminent, Irreparable Harm    21

    III.   Arizona Cannot Succeed on the Merits of Any of Its Claims    22

i

a.  Arizona's challenge to the termination of the border wall
    projects fails. ....................................................................... 23

    i.   The Secretary of Homeland Security waived NEPA for
         the 18 miles of border wall projects that were
         terminated.............................................................. 23

    ii.  IIRIRA's jurisdictional bar deprives this Court of
         subject matter jurisdiction over Arizona's APA claims. ...... 26

    iii. Termination of the border wall projects does not impact
         the environment or alter the environmental status quo......... 28

    iv.  Arizona may not seek APA review for actions by the
         President. .............................................................. 29

b.  The termination of MPP is not reviewable under the APA. ........... 31

    i.   Returning noncitizens to contiguous countries is
         committed to DHS's discretion by law............................... 32

    ii.  The June 1 memorandum is not a final agency action.......... 34

    iii. The termination of MPP is not a "major federal action." ..... 37

c.  Arizona's programmatic challenge fails. ........................................ 40

    i.   Arizona's challenge to a so-called "Population
         Augmentation Program" is foreclosed by Lujan and the
         Ninth Circuit's recent decision in Whitewater Draw........... 40

    ii.   None of the identified "components" of the so-called
         "population augmentation program" are reviewable, and
         Arizona's attempt to relitigate the February 18, 2021
         interim guidance is precluded. ............................................... 45

IV.  The Equities Weigh against Arizona's Requested Relief                     47

Conclusion.................................................................................................. 49

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ......................................................... 48

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) ........................................................... 24

*All. For the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................... 3, 10

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................................ 15

*Am. Bird Conservancy, Inc. v. FCC*,
516 F.3d 1027 (D.C. Cir. 2008) ....................................................... 42

*Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ....................................................... 27

*Anderson v. United States*,
612 F.2d 1112 (9th Cir. 1979) ......................................................... 10

*Arizona v. Dep't of Homeland Sec.*,
No. CV-21-00186-PHX-SRB, 2021 WL 2787930 (D. Ariz. June 30, 2021) ... 11, 45, 46

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................... 33, 48

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991)......................................................... 30

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015)................................................. 14, 15, 18

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015)........................................................................ 46

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983)............................................................................ 8

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................... 23, 33

*Biden v. Texas*,
--- S. Ct. ---, 2021 WL 3732667 (Aug. 24, 2021) ............................. 7

iii

*Bravo-Fernandez v. United States,*
   137 S. Ct. 352 (2016)..............................................................................46

*California v. Texas,*
   141 S. Ct. 2104 (2021)...........................................................11, 15, 18, 19

*California v. Trump,*
   963 F.3d 926 (9th Cir. 2020) ............................................................13, 31

*Calipatria Land Co. v. Lujan,*
   793 F. Supp. 241 (S.D. Cal. 1990) ..........................................................38

*Caribbean Marine Servs. Co. v. Baldrige,*
   844 F.2d 668 (9th Cir. 1988) ...................................................................22

*Citizens for Better Forestry v. U.S. Dep't of Agric.,*
   341 F.3d 961 (9th Cir. 2003) ...................................................................12

*Citizens for Clean Energy v. U.S. Dep't of the Interior,*
   384 F. Supp. 3d 1264 (D. Mont. 2019) ....................................................44

*City & Cnty. of San Francisco v. U.S. Dep't of Transp.,*
   796 F.3d 993 (9th Cir. 2015) ...................................................................32

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)............................................................................12, 18

*Cohen v. United States,*
   578 F.3d 1 (D.C. Cir. 2009) ...............................................................34, 44

*Colo. River Cutthroat Trout v. Salazar,*
   898 F. Supp. 2d 191 (D.D.C. 2012)...........................................................9

*Conservation Cong. v. U.S. Forest Serv.,*
   720 F.3d 1048 (9th Cir. 2013) .................................................................10

*Cross v. U.S. Dep't of Interior,*
   821 F. App'x 885 (9th Cir. 2020).......................................................37, 40

*Ctr. for Biological Diversity v. Bernhardt,*
   946 F.3d 553 (9th Cir. 2019) ...................................................................12

*Ctr. for Biological Diversity v. Mayorkas,*
   No. CV-17-00163-TUC-CKJ, 2021 WL 3726502 (D. Ariz. Aug. 23, 2021) ..............43

*Ctr. for Biological Diversity v. McAleenan,*
   404 F. Supp. 3d 218 (D.D.C. 2019)..........................................................27

*Ctr. for Biological Diversity v. Nielsen,*
   No. CV-17-00163-TUC-CKJ, 2018 WL 5776419 (D. Ariz. Nov. 2, 2018) ...............43

iv

*Ctr. for Biological Diversity v. Provencio*,
   No. CV 10-330-TUC-AWT, 2012 WL 13035479 (D. Ariz. Sept. 28, 2012) ............... 22

*Ctr. for Biological Diversity v. Salazar*,
   791 F. Supp. 2d 687 (D. Ariz. 2011) ........................................................................ 37

*Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev.*,
   241 F.R.D. 495 (D. Ariz. 2006) ............................................................................... 44

*Ctr. for Biological Diversity v. Wolf*,
   447 F. Supp. 3d 965 (D. Ariz. 2020) ........................................................................ 44

*Ctr. for Food Safety v. Vilsack*,
   636 F.3d 1166 (9th Cir. 2011) ................................................................................. 21

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................................................. 11

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................................. 30

*Dep't of Homeland Sec. v. Regents of Univ. of California*,
   140 S. Ct. 1891 (2020) ...................................................................................... 35, 36

*Dep't of Homeland Sec. v. Thuraissigiam*,
   140 S. Ct. 1959 (2020) ............................................................................................... 5

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ................................................................................................. 30

*Detroit Int'l Bridge Co. v. Canada*,
   189 F. Supp. 3d 85 (D.D.C. 2016) ........................................................................... 30

*Douglas Cty. v. Babbitt*,
   48 F.3d 1495 (9th Cir. 1995) .............................................................................. 28, 29

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ............................................................................. 47, 48

*E-R-M- & L-R-M-*,
   25 I. & N. Dec. 520 (B.I.A. 2011) ............................................................................. 5

*Forelaws on Board v. Johnson*,
   743 F.2d 677 (9th Cir. 1984) ............................................................................. 42, 43

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................................... 29, 30

*Freeport-McMoRan Corp. v. Bureau of Reclamation*,
   No. CV 09-427, PHX-SRB, 2010 WL 11515661 (D. Ariz. Mar. 9, 2010) ................. 17

v

*Friends of Se.'s Future v. Morrison,*
    153 F.3d 1059 (9th Cir. 1998) ................................................................. 25

*Gallo Cattle Co. v. U.S. Dep't of Agric.,*
    159 F.3d 1194 (9th Cir. 1998) ................................................................... 9

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
    383 F.3d 1082 (9th Cir. 2004) ................................................................. 30

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ................................................................................ 33

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .................................................................... 32, 33, 45

*Idaho Sporting Cong. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) ................................................................... 43

*In re Border Infrastructure Envtl. Litig.,*
    915 F.3d 1213 (9th Cir. 2019) ........................................................... 24, 26

*Innovation Law Lab v. McAleenan,*
    924 F.3d 503 (9th Cir. 2019) ............................................................. 34, 36

*Innovation Law Lab v. Wolf,*
    951 F.3d 1073 (9th Cir. 2020) ................................................................... 6

*Izaak Walton League of Am. v. Marsh,*
    655 F.2d 346 (D.C. Cir. 1981) ............................................................... 44

*Jama v. Immigr. & Customs Enf't.,*
    543 U.S. 335 (2005) ................................................................................ 32

*Jennings v. Rodriquez,*
    138 S. Ct. 830 (2018) ............................................................................. 36

*Juliana v. United States,*
    947 F.3d 1159 (9th Cir. 2020) ..................................................... 16, 20, 21

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
    379 F. Supp. 2d 1071 (N.D. Cal. 2005) ................................................. 37

*Kiobel v. Royal Dutch Petroleum Co.,*
    569 U.S. 108 (2013) ................................................................................ 48

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 2000) ............................................................... 17

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) ................................................................................ 44

*Kootenai Tribe of Idaho v. Veneman*,
   313 F.3d 1094 (9th Cir. 2002) ................................................................... 28

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ..................................................................... 22

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................... 21

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................. 31, 32

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................... 11

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................... 2, 9, 21, 40, 41

*Marsh v. Or. Natl. Res. Council*,
   490 U.S. 360 (1989) ................................................................................... 25

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ................................................................... 10

*Massachusetts v. Env't Prot. Agency*,
   549 U.S. 497 (2007) ................................................................................... 11

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ..................................................................................... 33

*Mendez-Gutierrez v. Ashcroft*,
   340 F.3d 865 (9th Cir. 2003) ..................................................................... 31

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ....................................................................... 10, 21, 22

*Motaghedi v. Pompeo*,
   No. 1:19-cv-01466-LJO-SKO 2020 WL 207155 (E.D. Cal. Jan. 14, 2020) ................ 48

*Nat'l Ass'n of Prop. Owners v. United States*,
   499 F. Supp. 1223 (D. Minn. 1980) ........................................................... 29

*Nat'l Min. Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................................... 34

*Nat'l Wildlife Fed'n v. Espy*,
   45 F.3d 1337 (9th Cir. 1995) ..................................................................... 28

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ..................................................................... 44

vii

*New Hampshire v. Maine,*
  532 U.S. 742 (2001) ................................................................................ 46

*Nielsen v. Preap,*
  139 S. Ct. 954 (2019) ............................................................................... 19

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................. 47

*Norton v. S. Utah Wilderness All. (SUWA),*
  542 U.S. 55 (2004) ................................................................. 2, 9, 10, 41

*Nw. Ctr. for Alts. to Pesticides v. U.S. D,*
  No. 3:20-CV-01816-IM, --- F. Supp. 3d ----, ----, 2021 WL 3374968
  (D. Or. Aug. 3, 2021) ............................................................................... 38

*Olin Corp. v. Caddo Bossier Parishes Port Comm'n,*
  87 F. App'x 994 (5th Cir. 2004) ............................................................ 24

*Paulsen v. Daniels,*
  413 F.3d 999 (9th Cir. 2005) ........................................................... 39, 41

*Pub. Citizen v. Dep't of Transp.,*
  316 F.3d 1002 (9th Cir. 2003) ......................................................... 15, 41

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) ................................................................................. 38

*Rattlesnake Coal. v. Env't Prot. Agency,*
  509 F.3d 1095 (9th Cir. 2007) ............................................................... 37

*Reno v. AADC,*
  525 U.S. 471 (1999) ................................................................................. 33

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ................................................................. 13

*Sierra Club v. Penfold,*
  857 F.2d 1307 (9th Cir. 1988) ............................................................... 38

*Stackla, Inc. v. Facebook Inc.,*
  No. 19-cv-05849-PJH, 2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ...... 47

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ................................................................................... 12

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ........................................................................... 11, 12

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997)..................................................................34, 37

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)...................................................................................46

*Texas v. Biden*,
    --- F. Supp. 3d ---, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021)...............7, 19, 31, 35

*Texas v. Biden*,
    --- F.4th -----, 2021 WL 3674780 (5th Cir. Aug. 19, 2021) ..............................7, 19, 35

*Texas v. Equal Emp. Opportunity Comm'n*,
    933 F.3d 433 (5th Cir. 2019) ......................................................................34, 35

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................................35

*Tripati v. Henman*,
    857 F.2d 1366 (9th Cir. 1988) ..........................................................................46

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) ..........................................................................43

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)...................................................................................33

*Tucson Rod & Gun Club v. McGee*,
    25 F. Supp. 2d 1025 (D. Ariz. 1998) .................................................................38

*Tulare Cty. v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ................................................................30, 31

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)........................................................................................5

*United States v. Glenn-Colusa Irrigation Dist.*,
    788 F. Supp. 1126 (E.D. Cal. 1992) ..................................................................38

*United States v. Rainbow Fam.*,
    695 F. Supp. 314 (E.D. Tex. 1988)....................................................................38

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981).....................................................................................10

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
    921 F.2d 232 (9th Cir. 1990) ..........................................................................28

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978)........................................................................................8

*W. Watersheds Project v. Ashe*,
   948 F. Supp. 2d 1166 (D. Idaho 2013) ............................................................ 9

*Wash. Envtl. Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) ...................................................................... 11

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ...................................................................... 11

*Weinberger v. Catholic Action of Haw./Peace Educ. Project*,
   454 U.S. 139 (1981) ...................................................................................... 8

*Whitewater Draw Nat. Res. Conservation Dist. v. Nielsen*,
   No. 3:16-CV-02583-L-BLM, 2018 WL 4700494 (S.D. Cal. Sept. 30, 2018) .............. 44

*Wilderness Soc'y, Inc. v. Rey*,
   622 F.3d 1251 (9th Cir. 2010) ................................................................ 11, 12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................... 10, 18, 47

*Zafarmand v. Pompeo*,
   No. 20-cv-00803-MMC, 2020 WL 4702322 (N.D. Cal. Aug. 13, 2020) .................... 48

**Statutes**

5 U.S.C. § 551(4) ....................................................................................... 9

5 U.S.C. § 702 ...................................................................................... 9, 29

5 U.S.C. § 704 ................................................................................... 33, 37

5 U.S.C. § 706(1) ................................................................................. 9, 41

6 U.S.C. § 202(5) ...................................................................................... 5

8 U.S.C. § 1103 ....................................................................................... 8

8 U.S.C. § 1103(a) .................................................................................... 5

8 U.S.C. § 1103(a)(1) ............................................................................... 20

8 U.S.C. § 1225(a)(1) ................................................................................. 5

8 U.S.C. § 1225(b)(2)(A) .......................................................................... 36

8 U.S.C. § 1225(b)(2)(C) ................................................................. 6, 32, 37

8 U.S.C. § 1229(a) ................................................................................. 5, 6

8 U.S.C. § 1252(f)(1) .............................................................................. 19

8 U.S.C. § 1324(d) ................................................................................. 45

10 U.S.C. § 284 ............................................................................................ 4

42 U.S.C. § 265 ............................................................................................ 6

42 U.S.C. § 4332(2)(C) ............................................................................ 8, 37

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ............................................... 8

**Regulations**

40 C.F.R. § 1502.3 (2019) ............................................................................ 8

40 C.F.R. § 1502.9(c)(1) (2019) ................................................................ 25

40 C.F.R. § 1502.14(c) ............................................................................... 25

40 C.F.R. § 1502.16 ..................................................................................... 8

40 C.F.R. § 1508.1(q) ............................................................................ 8, 38

40 C.F.R. § 1508.1(q)(3) ............................................................................ 38

**Other Authorities**

84 Fed. Reg. 6811-01 (Feb. 28, 2019) ......................................................... 6

84 Fed. Reg. 17,187 (Apr. 24, 2019) ......................................................... 27

85 Fed. Reg. 8715 (Feb. 13, 2020) .............................................................. 3

85 Fed. Reg. 14,961 (Mar. 16, 2020) ........................................................ 23

85 Fed. Reg. 14961-01, (Mar. 16, 2020) ................................................... 27

86 Fed. Reg. 6557 (Jan. 15, 2021) ............................................................... 3

U.S. Const. Art. III, § 2, cl. 1 .................................................................... 11

**INTRODUCTION**

2    Following his inauguration, President Biden began to pursue a comprehensive

3 approach to immigration that, among other things, seeks to address the root causes of

4 migration from Latin America. As part of this shift, the administration paused

5 construction on the border wall, announced the suspension of new enrollments in the

6 Migrant Protection Protocols (MPP), and began policy reviews of both. Upon

7 completion of those reviews, the administration terminated MPP, terminated certain

8 border wall construction projects—including those for the few remaining border wall

9 projects in Arizona—and released a plan outlining guiding principles for future border

10 infrastructure.

11    Arizona disagrees with those decisions, which it asserts are part of a covert

12 "population augmentation program" engineered to encourage unlawful migration and to

13 increase Arizona's population. Pl.'s Mot. for a Prelim. Inj. 6, ECF No. 14-2 (Pl.'s Br.).

14 The State describes its theories as "somewhat novel." Pl.'s Br. 4. They are not. Each

15 has been raised before, and each is foreclosed by binding Supreme Court and Ninth

16 Circuit precedent. No preliminary relief should issue, especially since Arizona seeks

17 *mandatory* preliminary relief rather than protection of the status quo.

18    Starting with first principles, Arizona lacks standing for the National

19 Environmental Policy Act (NEPA) claims that are the sole basis for its motion. Arizona

20 argues that the challenged decisions will lead to increased migration and attendant

21 environmental impacts. But the generic and speculative affidavits the State offers cannot

22 meet its burden to show an imminent, concrete injury to the State's interests. Nor can

23 Arizona show that its alleged injuries are traceable to the challenged decisions or

24 redressable by this Court. Indeed, one week after Arizona filed its motion, the Ninth

25 Circuit rejected the same "enticement theory" of immigration relied on by the State as too

26 attenuated "to demonstrate causation and redressability." *Whitewater Draw Nat. Res.*

27 *Conservation Dist. v. Mayorkas (Whitewater Draw)*, 5 F.4th 997, 1014-1016 (9th Cir.

28

2021).  Because these allegations fail to satisfy Arizona's standing burden, they are
certainly insufficient to warrant the drastic remedy of preliminary relief.

Even if Arizona had standing, its NEPA claims lack merit.  Arizona argues that the
Departments of Homeland Security (DHS) and Defense (DoD) needed to prepare an
Environmental Impact Statement (EIS) before deciding whether to terminate certain
border wall projects.  But the challenged projects are each covered by waivers issued by
the Secretary of Homeland Security under the Illegal Immigration Reform and Immigrant
Responsibility Act (IIRIRA) that waive NEPA and other environmental reviews.  These
waivers cover all aspects of construction—including the decision to halt construction—
and, indeed, IIRIRA divests this Court of jurisdiction to hold otherwise.  And even
without the waivers, there is no obligation to prepare a NEPA review for a decision to
halt border wall construction.

Arizona's NEPA challenge to the termination of MPP fares no better.  Under long-
settled caselaw, enforcement decisions—including decisions not to pursue enforcement
actions—are committed to agency discretion by law, and so are not reviewable under the
Administrative Procedure Act (APA).  The decision to terminate MPP also falls outside
the APA's definition of a "final agency action" because it is not the consummation of
DHS's decisionmaking for any noncitizen and does not create any rights or obligations
for the agency or any noncitizen.  Similarly, NEPA's implementing regulations provide
that enforcement decisions are not "major federal actions" requiring NEPA analysis.
Thus, Arizona cannot succeed on its NEPA challenge to MPP.  Finally, because the
District Court for the Northern District of Texas has already issued an order vacating the
June 1 Memorandum terminating MPP and requiring DHS to resume the policy, this
Court need not consider this claim at this time or issue duplicative preliminary relief.

Nor can Arizona prevail on its attempt to compel a NEPA analysis for a
"population augmentation program" of the State's own invention.  The Supreme Court's
decisions in *Lujan v. National Wildlife Federation (Lujan)*, 497 U.S. 871 (1990) and
*Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55 (2004)—as well as

the Ninth Circuit's recent opinion in *Whitewater Draw*—forbid broad, programmatic attacks on agency operations. And each of the identified "components" of the alleged program is itself an enforcement decision unreviewable under the APA and not a major federal action under NEPA.

Finally, Arizona chooses not to brief the balance of hardships or the public interest in any detail. This failure alone is sufficient reason for this Court to deny the State's motion. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (plaintiff must "make a showing on all four prongs"). In any event, here, the equities weigh against an injunction. Reinstating cancelled contracts and restarting MPP—a project that has been largely dormant for a year and that the Secretary terminated after concluding it had mixed effectiveness at achieving its stated goals—would interfere with core executive and legislative prerogatives at the heart of our system of separated powers. Ordering as much as a matter of mandatory *preliminary* injunctive relief would be particularly unwarranted. The Court should decline to issue that order, especially considering Arizona's weak showing of harm.

This Court should deny Arizona's motion for a preliminary injunction.

## FACTUAL BACKGROUND

### I. Termination of the Border Wall Projects

Upon taking office, President Biden issued Presidential Proclamation 10142 terminating former-President Trump's proclamation of a national emergency on the southern border. Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 20, 2021); *see also* Proclamation 9844, Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019); Continuation of the National Emergency With Respect to the Southern Border of the United States, 85 Fed. Reg. 8715 (Feb. 13, 2020); Continuation of the National Emergency With Respect to the Southern Border of the United States, 86 Fed. Reg. 6557 (Jan. 15, 2021). President Biden determined that "building a massive wall that spans the

3

entire southern border is not a serious policy solution. It is a waste of money that diverts attention from genuine threats to our homeland security." 86 Fed. Reg. at 7225. And so the President ordered "[t]he Secretary of Defense and the Secretary of Homeland Security, in consultation with the Director of the Office of Management and Budget," to immediately pause all border wall construction while the agencies reviewed the remaining construction contracts and developed a plan to redirect and repurpose those funds. *Id.* at 7225-26.

With the review complete, DoD determined that the termination of Proclamation 9844 ended DoD's authority to fund border wall construction under 10 U.S.C. § 2808, and so DoD could not continue those projects. Ex. 3 at 10. DoD will use the military construction funds remaining after paying cancellation costs to "restore funding for 66 projects in 11 States, 3 territories, and 16 countries" put on hold by construction of the border wall. *Id.* at 2. DoD also cancelled the remaining border wall projects funded through DoD's Drug Interdiction and Counter-Drug Activities authority at 10 U.S.C. § 284 because cancellation was "consistent with the policy intent, described in [President Biden's Proclamation], to end construction of a border wall." *Id.* at 11-12.

Likewise, DHS has completed its review and released its plan, under which DHS has suspended all border wall construction activities except those that are required to avert immediate physical dangers. Ex. 4 at 1-2. DHS's plan calls for the use of some funds from its fiscal year 2017-2020 appropriations for certain priority projects. *Id.* at 2-3. Apart from projects "needed to address life, safety, environmental, or other remediation requirements" or to "settle pending litigation," DHS will not undertake further construction without a thorough review and replanning process, including extensive environmental review. *Id.* at 2-3, 5.

Within Arizona, the agencies completed most of the planned border wall construction before President Biden's Proclamation. In fiscal year 2019, DoD completed about 68 miles of border wall construction in Arizona funded under § 284 and 66.5 miles of border wall construction funded under § 2808. Ex. 1, Declaration of Paul Enriquez ¶¶

11-12 (Enriquez Decl.). In fiscal year 2020, DoD contracted for about 74 miles of border wall construction in Arizona, all funded under § 284, of which the agency completed about 56 miles before the Proclamation. Enriquez Decl. ¶ 13. Between 2018 and 2020, DHS funded the replacement of about 26 miles of existing border barrier in the Yuma sector. Enriquez Decl ¶ 8. DHS completed that project before the Proclamation, and at the time of the Proclamation there was no ongoing barrier construction by DHS in Arizona. *Id.* at 8-9.

Arizona's challenge thus centers on 18 miles of uncompleted barrier along its 370 mile border with Mexico. Enriquez Decl. Ex. A.

## II. <u>Termination of the Migrant Protection Protocols (MPP</u>)

The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the Nation's immigration laws. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a). For decades, the Executive has exercised that authority through prosecutorial discretion to prioritize which noncitizens to remove and through what type of proceedings. *See In re E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (B.I.A. 2011).

When DHS encounters a noncitizen seeking to enter the country—either at a port of entry or crossing unlawfully—who lacks entitlement to be admitted to the United States, the Immigration and Naturalization Act (INA) affords DHS several options to process that person, whom the statute treats as an "applicant for admission," 8 U.S.C. 1225(a)(1). In some cases, DHS can start expedited removal proceedings. *See Department of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964-1965 (2020). Alternatively, DHS may place an applicant for admission into a full removal proceeding before an immigration judge with a potential appeal to the Board of Immigration Appeals. *See* 8 U.S.C. 1229a. DHS may choose between expedited removal and full removal proceedings for persons who are eligible for both. *See E-R-M-*, 25 I. & N. Dec. at 521-523. And when DHS places an applicant for admission into full removal proceedings, Congress has provided that, if the person is "arriving on land (whether or

5

not at a designated port of arrival) from a foreign territory contiguous to the United States," the Secretary "may return the alien to that territory pending a proceeding under section 1229a." 8 U.S.C. 1225(b)(2)(C).

In December 2018, then-Secretary of Homeland Security Kirstjen Nielsen announced that DHS would "begin implementation of" the contiguous-territory-return authority in § 1225(b)(2)(C), Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 Fed. Reg. 6811-01 (Feb. 28, 2019), a discretionary decision available to DHS in prioritizing how to best enforce immigration law. Secretary Nielsen then issued policy guidance implementing MPP, Ex. 6, which authorized immigration officers to "exercis[e] their prosecutorial discretion regarding whether" to return to Mexico certain classes of noncitizens arriving on land from Mexico. *Id.* at 3. MPP was temporarily enjoined, though the injunction was later stayed. *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077-80, 1095 (9th Cir. 2020), *vacating as moot sub nom.*, *Innovation Law Lab v. Mayorkas*, No. 19-15716, --- F.4th ----, 2021 WL 3439689 (9th Cir. Aug. 6, 2021) (discussing history of initial challenges to MPP).

Over the next year, DHS returned tens of thousands of noncitizens to Mexico under MPP. In March 2020, however, removal proceedings were suspended because of COVID-19, and DHS's use of MPP plunged as many noncitizens encountered seeking to enter the country were instead expelled from the United States based on an order of the Centers for Disease Control and Prevention (CDC) under 42 U.S.C. §§ 265, 268. *See* U.S. Customs and Border Protection, Migrant Protection Protocols FY 2020, https://go.usa.gov/xFA4X (last visited Sept. 3, 2021).

On January 20, 2021, the Acting Secretary of Homeland Security directed that DHS would suspend new enrollments in MPP, pending further review of the program. Ex. 5 at 1. President Biden then issued an Executive Order directing DHS to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have

been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify" MPP. *See* Exec. Order No. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8267, 8269 (Feb. 2, 2021). Upon completion of that review, Secretary Mayorkas terminated MPP because, among other reasons, he concluded that it had mixed effectiveness at achieving its stated goals, its continued operation interfered with diplomatic engagement with Mexico, and it diverted resources from other important DHS priorities and policy tools that would better achieve the agency's goals. Ex. 5.

　　　Texas and Missouri then sued in the Northern District of Texas challenging the termination of MPP as arbitrary and capricious under the APA. *See Texas v. Biden*, --- F. Supp. 3d ---, ---, 2021 WL 3603341, at *1 (N.D. Tex. Aug. 13, 2021). That court recently issued a decision finding that the states had standing based on an alleged increased "cost of providing driver's licenses to aliens released and paroled into the United States," *id.* at *11, and holding that the decision to terminate MPP was arbitrary and capricious. *Id.* at *17-23. The court vacated the June 1 memorandum and issued a nationwide injunction requiring DHS "to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1225 without releasing any aliens *because of* a lack of detention resources." *Id.* at *27. Defendants have appealed that flawed ruling and legally improper injunctive remedy, but the Fifth Circuit, *Texas v. Biden*, --- F.4th ---, ----, 2021 WL 3674780, at *16 (5th Cir. Aug. 19, 2021), and the Supreme Court, *Biden v. Texas*, --- S. Ct. ---, ---, 2021 WL 3732667, at *1 (Aug. 24, 2021), have both denied stays pending appeal.

# STATUTORY BACKGROUND

## I.   The National Environmental Policy Act (NEPA)

NEPA is a procedural statute that serves the twin aims of ensuring that agencies consider the significant environmental consequences of their proposed actions and inform the public about their decision making.  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978); *Weinberger v. Catholic Action of Haw./Peace Educ. Project*, 454 U.S. 139, 143 (1981)).  To help meet these goals, NEPA requires preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.3 (2019); 40 C.F.R. § 1508.1(q).  Where required, an EIS must examine, among other things, alternatives to the proposed action, and the project's direct, indirect, and cumulative impacts on the human environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.16, 1508.7 (2019).

## II.   The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)

IIRIRA provides DHS with authority to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104-208, Div. C, Title I § 102(a), 110 Stat. 3009, 3009-554 (1996) (codified at 8 U.S.C. § 1103 note).  IIRIRA also empowers the DHS Secretary to waive legal requirements, such as NEPA.  *Id.* § 102(c).  IIRIRA specifically provides that "[n]otwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in [his] sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."  IIRIRA § 102(c)(1), as amended.  All claims challenging these waivers must be filed in the District Court within 60 days and the only permissible causes of action are those alleging a violation of the United States Constitution.  *Id.* § 102(c)(2)(A)-(B).

STANDARD OF REVIEW

## I.  Judicial Review of Final Agency Action under the APA

"NEPA does not contain a 'special statutory review' provision," and so Arizona's NEPA claims are reviewable—if at all—only "under the general review provisions of the APA." *Whitewater Draw*, 5 F.4th at 1006; *see also Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998) (holding that the APA provides limited waiver of sovereign immunity in suits seeking judicial review of agency action).

The APA only allows challenges to discrete, final agency actions, 5 U.S.C. §§ 702, 704; *Lujan*, 497 U.S. at 882, and forbids "sweeping programmatic challenge[s]" and challenges to actions "yet to be taken." *Lujan*, 497 U.S. at 892-93; *accord Whitewater Draw*, 5 F.4th at 1009-013.  In reviewing a discrete, final agency action, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1173 (D. Idaho 2013) (quoting *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 200 (D.D.C. 2012)).

A plaintiff may also sue under the APA to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  But § 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *SUWA*, 542 U.S. at 64 (quoting Attorney General's Manual on the APA 108 (1947)).  A "failure to act" is merely "a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." *Id.* at 62.  "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear." *Id.*; *see* 5 U.S.C. § 551(4) (defining "rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief").  In addition, "the only agency action that can be compelled under the APA is action legally *required*." *SUWA*, 542 U.S. at 63.  "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64; *accord Whitewater Draw*, 5 F.4th at 1010-11 & n.6 ("in *Southern Utah Wilderness*

*Alliance*, the Court made clear that a plaintiff cannot obtain judicial review by simply recasting his or her challenge in terms of 'agency action unlawfully withheld' under § 706(1), rather than agency action 'not in accordance with law' under § 706(2)." (citation and internal quotation marks omitted)). Programmatic challenges are, again, not permitted under § 706(1). *SUWA*, 542 U.S. at 63.

## II.  **Preliminary Injunctions**

A preliminary injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), but reserved for when the movant makes "a clear showing" warranting relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  In seeking a preliminary injunction, the movant must show that "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 20, 22).  Alternatively, in the Ninth Circuit, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies*, 632 F.3d at 1132 (9th Cir. 2011).

While "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), Arizona seeks a mandatory injunction altering the status quo.  *See* Pl.'s Br. 39-40 (requesting, among other things, a Court order compelling the agencies to: (1) prepare several NEPA documents; (2) reinstate cancelled contracts; and (3) detain or expel an ambiguous class of noncitizens).  "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo Pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)); *accord id.* at 1115

1  ("mandatory injunctions, however, are not granted unless extreme or very serious damage
2  will result and are not issued in doubtful cases or where the injury complained of is
3  capable of compensation in damages." (citation omitted)).

4  ### ARGUMENT

5  I.  **Arizona Lacks Standing to Sue**

6      The standing doctrine arises from Article III's "cases" and "controversies"
7  limitation on the subject matter jurisdiction of federal courts.  U.S. Const. art. III, § 2, cl.
8  1.  The "irreducible constitutional minimum" for standing requires: (1) a legally
9  cognizable, concrete injury-in-fact; (2) fairly traceable to the conduct of the defendant;
10 that (3) may be redressed by a favorable order from a court.  *Lujan v. Defs. of Wildlife*,
11 504 U.S. 555, 560-61 (1992).

12     Arizona bears the burden of establishing standing.  *See Summers v. Earth Island
13 Inst.*, 555 U.S. 488, 493 (2009).  And although states sometimes may receive "special
14 solicitude in [the] standing analysis" to assert procedural rights and protect "quasi-
15 sovereign interests," that does not obviate Arizona's burden to establish each element of
16 standing.  *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see Washington v. Trump*,
17 847 F.3d 1151, 1159 (9th Cir. 2017) (noting "the States must make a clear showing of
18 each element of standing" (citation and internal quotation marks omitted)); *Arizona v.
19 Dep't of Homeland Sec.*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *6 (D.
20 Ariz. June 30, 2021) (noting states subject to "regular inquiry").  Standing is also not
21 dispensed in gross: "A plaintiff must demonstrate standing for each claim [it] seeks to
22 press and for each form of relief sought."  *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131,
23 1139 (9th Cir. 2013) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).
24 When the government action "being challenged do[es] not require or forbid any action on
25 the part of the [plaintiff], standing is substantially more difficult to establish."
26 *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1254 (9th Cir. 2010) (citing *Summers*, 555
27 U.S. at 493-94); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021).

28

11

Arizona confusingly conflates its three NEPA claims in alleging harm without specifying which harms it contends are attributable to each claim or how the relief it seeks would redress each specific harm. *See* Pl.'s Br. 13-17, 19-20. For that reason alone, the Court can hold that Arizona has not met its burden. In any event, as detailed below, disentangling the State's claimed harms and requested relief makes clear that the State has not adduced evidence to establish standing for any of its NEPA theories.

### a. Arizona has not established a concrete and particularized harm that is actual or imminent.

"Conjectural, hypothetical, or speculative injuries, such as allegations of possible future injury, do not suffice" to establish injury in fact. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019) (citation and internal quotation marks omitted); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (noting injury must be "certainly impending" and that "*possible* future injury" does not suffice); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (same). Additionally, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496; *accord Wilderness Soc'y*, 622 F.3d at 1260. Instead, a plaintiff asserting a procedural injury must identify specific facts showing "it is reasonably probable that the challenged action will threaten [its] concrete interests." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003).

Arizona offers two injury theories in its opening brief, neither of which is well founded. First, Arizona claims that cessation of border wall construction injures its interest in wildlife by creating narrow migration corridors that "may expose [wildlife] to concentrated human activity" and "may create *de facto* predator corridors where prey species . . . will be forced to 'run the gauntlet' of predators . . . ." Pl.'s Br. 16-17. Setting aside the facial implausibility of harm to wildlife by *retaining* existing migration corridors through cancelling border wall construction, this asserted harm amounts to unsubstantiated speculation. To support this alleged harm, Arizona depends on an

"expert" report from a retained former forester from Montana with no demonstrable

expertise in the wildlife or ecology of the southern border region or in immigration[1]:

"The cessation of border wall construction will likely result in diversion of illegal

immigration and wildlife migration through the remaining currently open pathways,

potentially affecting the wildlife and ecology in these areas in ways they would not have

been affected otherwise." ECF No. 14-4 at 12 (report at 6). This generic and speculative

statement about what "potentially" may happen falls well short of the type of evidence

courts have found sufficient to establish imminent, concrete, and particularized injury to a

state's interest in wildlife. *Cf. California v. Trump*, 963 F.3d 926, 936-38 (9th Cir. 2020)

(finding injury-in-fact based on state's detailed allegations of potential harm to wildlife

from border wall construction).

Second, Arizona asserts various injuries it claims flow from an alleged increase in

migration. In particular, the State claims harm from "trash and trampling desert,"

"increased air emissions," "growth in population," and "costs on the State." Pl.'s Br. 13-

16, 19-20. Arizona, however, has not established that any of these harms are concrete,

particularized, and actual or imminent. For example, Arizona claims injury in fact based

on the alleged effect of increased migration on air emissions. To support this alleged

harm, the State again relies exclusively on its "expert" report. Pl.'s Br. 14. But that

---

[1] The Court should decline to consider the Flood Declaration. First, this is an APA case, and Arizona has not even tried to show that the declaration satisfies one of the narrow exceptions to the strict record review rule. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) ("When a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." (citation omitted)). Second, Mr. Flood is a forester from Montana, and has no expertise in the matters before the Court. His purported "expert" opinion is little more than a series of legal conclusions based on unsubstantiated assumptions about whether actions are or may be "significant" under NEPA. Thus, his opinions fall far short of meeting Rule 702's standards. But even if the Flood Report could be considered, it in no way supports Arizona's standing or warrants imposition of preliminary injunctive relief.

report merely notes that "the United States has a great potential for impacting climate change," "Arizona's $CO_2$ emissions continue to increase, despite some efforts to decrease the state's carbon footprint," a "principal impact of migration on the environment is its contribution to [greenhouse gas] emissions," and the "effect of immigration to the United States on climate change could be considered significant." ECF No. 14-4 at 13 (report at 7). These generic, amorphous, and speculative statements do not establish an injury in fact. *See Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (finding no injury based on "conjectural and conclusory" allegations that federal immigration policy increased illegal immigration resulting in more crime). Nor do the remaining allegations, which fail for similar reasons. *See* Pl.'s Br. 14 (relying on generic and speculative statements from "expert" report related to "trash and trampling desert"), 16 (same for "growth impacts"), 20 (submitting no evidence to support direct costs related to education and healthcare), 21 (relying on generic and speculative statements of increased crime and community supervision costs). As the Ninth Circuit recently concluded in a case involving a similar attempt to assert harm caused by an aggregation of immigration policies, a court "may not find standing based on the Plaintiffs' cumulative speculation about their injuries in fact." *Whitewater Draw*, 5 F.4th at 1019. The same is true here.

In its supplemental brief, Arizona alleges that the termination of border wall construction has led to an increase in fentanyl "flooding across" the State's border with Mexico. Pl.'s Notice of Factual and Legal Developments, 4, ECF No. 21 (Pl.'s Suppl. Br.) (citing Declaration of Theresa Rassas, ¶ 4, ECF No. 21-2 (Rassas Decl.)). In support, Arizona relies on statistics for seizures of fentanyl across the entire southwest border, including amounts seized at ports of entry. Rassas Decl. ¶ 3. The statistics on which the State relies have little relevance to the 18 miles of unconstructed border wall. More relevant are the amounts of fentanyl seized by U.S. Border Patrol between ports of

entry in Arizona.[2]  In fiscal year 2020, U.S. Border Patrol seized 296.9 pounds of fentanyl in the State of Arizona.  In fiscal year 2021, through July 31, 2021, USBP seized 297.9 pounds of fentanyl in the State of Arizona.  *See* Drug Seizure Statistics, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited Sept. 3, 2021). Arizona offers nothing supporting its contention that this modest increase in seizures is related to the termination of construction of 18 miles of border wall or MPP.

**b.  Arizona has shown no injury traceable to the challenged conduct that a court order can redress**.

For the reasons noted above, Arizona has not established an injury in fact.  Even if it had, however, it has not shown that any such injury is fairly traceable to the challenged conduct or that it could be redressed by a favorable decision.  Indeed, Arizona makes no attempt to establish causation or redressability.  Instead, the State seems to believe that it need not prove those elements because its NEPA claims are procedural.  *See* Pl.'s Br. 18-19.  While Arizona is correct that if a plaintiff can establish "an injury in fact under NEPA, the causation and redressability requirements are relaxed," *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1016 (9th Cir. 2003) (citation omitted), "a claim of procedural injury does not relieve Plaintiffs of their burden—even if relaxed—to demonstrate causation and redressability," *Whitewater Draw*, 5 F.4th at 1015 (citing *Arpaio*, 797 F.3d at 21).  This burden includes showing that the purported injury does not "result[] from the independent action[s] of some third party not before the court."  *Allen v. Wright*, 468 U.S. 737, 757 (1984) (citation omitted); *accord California v. Texas*, 141 S. Ct. 2104, 2117

---

[2] U.S. Customs and Border Protection is the DHS component mainly responsible for border security.  U.S. Customs and Border Protection has three distinct law enforcement components, each with its own enforcement mission.  The Office of Field Operations operates the nation's ports of entry.  The Office of Air and Marine Operations deploys helicopters, fixed-wing aircraft, and vessels to identify and track unlawful entry into the United States.  And U.S. Border Patrol monitors the areas of the border between ports of entry.

(2021) ("where a causal relation between injury and challenged action depends upon the decision of an independent third party. . . standing is not precluded, but is ordinarily substantially more difficult to establish." (citation and internal quotation marks omitted)). Moreover, as in every case, the requested relief must be "within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) (citation omitted). As discussed below, even if Arizona had established an injury in fact, it fails to show the injury was caused by the challenged actions, or would be redressed by the requested relief.

> i.  *Arizona has not shown a connection between cessation of border wall construction and its alleged harms*

Arizona claims that Defendants violated NEPA by not conducting an environmental analysis before ceasing border wall construction activities. But Arizona fails to accurately describe the scope of the border wall construction in claiming that its cessation led to any injury that the Court can redress. Arizona's alleged harms appear to hinge on the notion that cancellation of these projects has created gaps in what would otherwise be a contiguous border wall. But as detailed in the declaration of Paul Enriquez, Acquisitions, Real Estate and Environmental Director for the Border Wall Program Management Office, even if the cancelled projects had been completed, significant gaps would remain along Arizona's 370 mile border with Mexico. Enriquez Decl. ¶ 14, Ex. A. The State has adduced no evidence to show that the cessation of construction of 18 miles of barrier along the border in any way affects wildlife or increases human migration. Without that, the State cannot establish that any of its asserted harm is fairly traceable to the cessation of border wall construction.

Similarly, Arizona has not shown that any asserted harm could be redressed by a Court order. As displayed on the map attached to the Enriquez declaration, even if the agencies completed the remaining planned border wall construction, gaps in the wall would persist. *Id.* And President Biden's termination of the national emergency means there is no additional § 2808 funding to fill those gaps. *See* 86 Fed. Reg. 7225. Thus,

even if the Court required Defendants to prepare a NEPA analysis, and even if after that analysis Defendants decided to complete the 18 remaining planned miles of border wall, Arizona's asserted harms would persist because there is no source of funds to complete a contiguous border wall along Arizona's border with Mexico.

Besides seeking an order requiring NEPA analysis of the decision to stop border wall construction, Arizona asks the Court to enjoin Federal Defendants from "prevent[ing] the continuation of construction of border wall under contracts already entered into by the United States."  First Am. Compl. for Declaratory & Injunctive Relief, Prayer for Relief ¶ C, ECF No. 13 (Am. Compl.).  Put differently, Arizona requests a mandatory injunction requiring specific performance of contracts between Defendants and third parties not before the Court.  Not only would specific performance not redress Arizona's alleged harm for the reason noted above, Arizona has not even tried to show how it would have standing to pursue any remedies related to contracts to which it is not a party.  *See Freeport-McMoRan Corp. v. Bureau of Reclamation*, No. CV 09-427, PHX-SRB, 2010 WL 11515661, at *3 (D. Ariz. Mar. 9, 2010) ("A third party that benefits from the government's rights under a contract is assumed to be an incidental beneficiary. Thus, when the rights of the United States are involved, a third party beneficiary to a government contract 'may not enforce the contract absent a clear intent to the contrary.'" (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 2000))).  And the requested remedy would also contravene the discretion Congress has vested in the Secretary on the question of where to build barriers.  *See* IIRIRA § 102(b)(1)(D) ("nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.").  So the Court could not order the relief sought, and Arizona has not

established that any alleged injury from the cessation of border wall construction is redressable.

ii. *Arizona has not shown a connection between termination of MPP and its alleged harms.*

Arizona also points to no specific evidence showing any harm to its interests that are fairly traceable to the termination of MPP. Instead, Arizona makes the unsubstantiated claim that termination of MPP "has resulted in a substantial surge in migration," in which "tens of thousands of migrants are crossing the border in Arizona with the expectation that, in the unlikely event they are caught, they will be released into the U.S. while awaiting their immigration hearing." Pl.'s Br. 10. To support this causal link, the State cites two news articles and the State's "expert" report, which itself relies only on one of the same news articles. *Id.* at 10-11. Arizona thus provides no sound evidentiary basis for the extraordinary relief it requests. Moreover, even those articles nowhere link termination of MPP, increased migration, and any subsequent harm to the State. Put another way, the State has adduced "no facts supporting [its] allegations that [termination of MPP] caused illegal immigration" rather than the "'myriad economic, social, and political realities' that might influence an alien's decision to 'risk[] life and limb' to come to the United States." *Whitewater Draw*, 5 F.4th at 1015 (quoting *Arpaio*, 797 F.3d at 21).

Instead, Arizona relies on an attenuated "chain of reasoning . . . worthy of Rube Goldberg," in asserting that termination of MPP has enticed additional migrants and caused environmental harm. *Id.* But this type of "speculation about the decisions of independent actors" does not support standing. *Clapper*, 568 U.S. at 414. As the Supreme Court recently reaffirmed, absent a causal link between the conduct being challenged and the asserted injury, a state lacks standing. *See California*, 141 S. Ct. at 2116-20.

And again, this Court cannot grant the requested injunction. Section 1252(f) bars the relief sought:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). Section 1252(f) applies by its plain terms. This case does not involve "an individual alien against whom proceedings . . . have been initiated." *Id.* And so this Court cannot "enjoin," in a mandatory injunction, the "operation" of a covered provision: Section 1225.[3]

Because Arizona has brought forth no evidence showing that termination of MPP increased or imminently will increase migration to Arizona, or that any increase in migration harmed the State, it has not shown that the termination of MPP caused any injury or that any injury could be redressed by MPP's reinstatement.[4]

---

[3] The Northern District of Texas recently erred when it held Section 1252(f) inapplicable when "Plaintiffs are not seeking to *restrain* Defendants from enforcing Section 1225," but "attempting to make Defendants *comply* with Section 1225." *Texas*, 2021 WL 3603341, at *15. As two Justices have explained, that reasoning "is circular and unpersuasive." *Nielsen v. Preap*, 139 S. Ct. 954, 975 (2019) (Thomas, J., joined by Gorsuch, J., concurring in part and concurring in the judgment). "Many claims seeking to enjoin or restrain the operation of the relevant statutes will allege that the Executive's action does not comply with the statutory grant of authority, but the text clearly bars jurisdiction to enter an injunction '[r]egardless of the nature of the action or claim.'" *Id.*

[4] The recent non-binding decision in *Texas v. Biden*, --- F.4th ---, 2021 WL 3674780 (5th Cir. Aug. 19, 2021), does not compel a different result. In that case, the court erroneously upheld the district court's finding that the state had standing to challenge the MPP in light of speculative costs to the state for providing driver's licenses, education, and healthcare to individuals paroled into the United States rather than returned to Mexico. *Id.* at *3-6. But even if those speculative costs could support standing, Arizona does not try to draw a specific connection between any such costs and termination of the MPP. *See* Pl.'s Br. 20-21 (generically claiming increased costs from "Defendants' actions"). Instead, Arizona's claimed harm derives from the "growth-inducing effects"

*iii. Arizona has not shown a connection between the so-called "Population Augmentation Program" and its alleged harms.*

Finally, Arizona contrives a "Population Augmentation Program"—consisting of at least cancellation of 18 miles of border wall construction, termination of MPP, and an amorphous collection of other enforcement decisions—that it alleges comprises "a program of lax border/immigration enforcement with the intent of encouraging migration and population growth." Pl.'s Br. 11-13. Even accepting the existence of this figment of the State's imagination, however, Arizona has shown no connection between the fictional "Program" and any injury. Again, Arizona adduces no specific evidence showing that any of the listed actions, individually or cumulatively, have harmed it. This deficiency is fatal to the State's claim to standing. *See Whitewater Draw*, 5 F.4th at 1017 (finding no standing where "Plaintiffs have not shown a reasonable probability that the [challenged immigration policies] cause population growth *anywhere* in a manner that affects Plaintiffs' interests").

Moreover, to redress its asserted harm from this "Program," Arizona seeks the extraordinary relief of mandating Defendants "secure the border in Arizona to the satisfaction of this Court to prevent additional unlawful migration until such time as Defendants comply with NEPA." Am. Compl. Prayer for Relief ¶ E. In other words, Arizona "seek[s] not only to enjoin the Executive from exercising discretionary authority expressly granted by Congress, but also to enjoin Congress from exercising power expressly granted by the Constitution . . . " and to place this Court in the role of setting and enforcing national immigration policy. *Juliana*, 947 F.3d at 1170 (internal citations omitted); *see* U.S. Const. art. I, § 8, cl. 2 (vesting Congress with power to "establish an uniform Rule of Naturalization . . . ."); 8 U.S.C. § 1103(a)(1) (charging Secretary of DHS "with the administration and enforcement of [the INA] and all other laws relating to the

---

theory rejected by *Whitewater Draw,* 5 F.4th, at 1015 (rejecting "enticement theory"). *See* Pl.'s Br. 11 (relying on "growth-inducing effects").

immigration and naturalization of aliens").  A plaintiff "cannot seek *wholesale* improvement of [a federal] program by court decree, rather than in the offices of the [agency] or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891.  After all, "it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).  Yet here, Arizona seeks broad programmatic relief: asking the Court to assume hands-on management of the Executive's day-to-day operations to "secure the border" to "the satisfaction of the Court."  Simply put, "it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan. . . . [A]ny effective plan would necessarily require a host of complex policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches." *Juliana*, 947 F.3d at 1171-72.  Thus, even if the State could establish the existence of a "Population Augmentation Program" to which a concrete and particularized injury could be traced, it still cannot establish standing because any such injury is not redressable by the State's requested relief.

In short, Arizona has not shown that it has suffered a concrete, particularized, and actual or imminent harm that is fairly traceable to any of the challenged federal actions and redressable in this suit.  Without this, Arizona cannot show that it is likely to succeed on the merits.

II.     **Arizona Has Not Shown Imminent, Irreparable Harm**

Even if Arizona could establish injury in fact sufficient for standing purposes, it would still fall far short of meeting the more exacting requirement for preliminary injunctive relief.  *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("[A] plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it.").

In trying to show irreparable harm, Arizona argues that such harm automatically flows from the alleged NEPA violations.  Pl.'s Br. 38.  The Supreme Court has rejected

this precise argument, holding that injunctive relief is not the presumed remedy for a NEPA violation. *Monsanto Co.*, 561 U.S. at 157. Instead, rather than placing a "thumb on the scales" where a NEPA violation is established, a plaintiff must still show irreparable harm to qualify for injunctive relief. *Id.*; *see also Ctr. for Biological Diversity v. Provencio*, No. CV 10-330-TUC-AWT, 2012 WL 13035479, at *4 (D. Ariz. Sept. 28, 2012) (noting plaintiff "is incorrect that noncompliance with NEPA generally causes irreparable injury. That was at one time the law of this circuit, but the Supreme Court has since said that such a presumption is contrary to traditional equitable principles." (citations and internal quotation marks omitted)).

To show irreparable harm, Arizona relies on "environmental harms in the form of increased trash, increased air emissions, wildlife impacts, and negative growth effects." Pl.'s Br. 38. As detailed above, however, these asserted harms are supported by nothing beyond conjecture and speculation, which cannot satisfy the State's burden to *prove* irreparable injury. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."). Moreover, even if Arizona had established some non-speculative environmental harm, that alone would still not warrant injunctive relief because "the Supreme Court has not established that, as a rule, any potential environmental injury merits an injunction." *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008). Instead, any environmental harm must still outweigh harm to the public interest, and a plaintiff must still show a likelihood of success on the merits. Arizona can establish neither of these.

### III. Arizona Cannot Succeed on the Merits of Any of Its Claims

Even if Arizona had standing, each of its briefed claims for relief fails. First, Arizona cannot succeed on its NEPA claim challenging the termination of the border wall projects because: (1) the IIRIRA waivers are a complete defense to the claim; (2) IIRIRA's jurisdictional bar prevents non-constitutional challenges to the waivers; (3) no

NEPA analysis is required where an action does not alter the environmental status quo; and (4) actions by the President are not reviewable under the APA.

Second, Arizona cannot succeed on its NEPA claim against the termination of MPP because: (1) the termination of MPP is an enforcement decision committed to DHS's discretion by law and not reviewable under the APA; (2) the June 1, 2021 memorandum is not a reviewable final agency action under the *Bennett* test, *Bennett v. Spear*, 520 U.S. 154, 178 (1997); and (3) the termination of MPP is not a "major federal action" under NEPA's implementing regulations.

Third, Arizona cannot succeed on its programmatic NEPA challenge because: (1) programmatic challenges are foreclosed by *Lujan*, *SUWA*, and *Whitewater Draw* and (2) the identified "components" of the so-called "Population Augmentation Program" are, like the termination of MPP, enforcement decisions unreviewable under the APA and not "major federal actions" requiring NEPA analysis.

   **a. Arizona's challenge to the termination of the border wall projects fails**.

Arizona's NEPA challenge to the decision to terminate the border wall projects lacks merit. The Secretary of Homeland Security has waived NEPA for each of the cancelled projects, which extinguishes Arizona's NEPA claims. If Arizona seeks to challenge the waivers, IIRIRA's jurisdictional bar deprives this Court of subject matter jurisdiction to hear that claim. Even without the waivers, the cancellation of the border wall contracts would not require NEPA analysis because no NEPA review is required for a decision to not disturb the environment. Finally, as the policy directions set forth in the President's proclamation directed the agencies to terminate the border wall contracts, the decisions are unreviewable.

   *i. The Secretary of Homeland Security waived NEPA for the 18 miles of border wall projects that were terminated.*

The Secretary of Homeland Security's waivers of NEPA for the border wall projects extinguish Arizona's NEPA claim. Each waiver exempts the covered projects from NEPA review "with respect to" construction. *See, e.g.*, Determination Pursuant to

Section 102 of the Illegal Immigration Reform & Migrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,961, 14,962-63 (Mar. 16, 2020) ("I hereby waive in [its] entirety, with respect to the construction of physical barriers and roads . . . The National Environmental Policy Act . . ."). A decision to stop construction is a decision "with respect to" construction; indeed, that language shows that the Secretary meant broadly to waive NEPA as to the entire construction projects at issue. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005) (interpreting the phrase "with respect to" as similar to the broad language "relates to"); *Olin Corp. v. Caddo Bossier Parishes Port Comm'n*, 87 F. App'x 994, 995 (5th Cir. 2004) (per curiam) (describing "with respect to" as "broad language"). The waivers thus serve as a complete defense to the State's NEPA claim. *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019) ("a valid waiver of the relevant environmental laws under section 102(c) is an affirmative defense to all the environmental claims.").

Arizona argues that the waivers cannot apply to a decision to terminate construction and cease building barrier. Pl.'s Br. 28. It cites IIRIRA § 102(c)(1), which gives "the Secretary of Homeland Security . . . the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." Consistent with this text, however, the Secretary waived NEPA as to the entire projects. Although the Secretary considers what is "necessary to ensure expeditious construction" in determining what "legal requirements" to waive, that determination remains "in the Secretary's sole discretion." *Id.* Arizona thus misreads the statutory text in contending that the Secretary was categorically foreclosed from issuing waivers of NEPA as to entire projects, rather than just specific aspects of those projects.

Indeed, Congress' plain intent was to allow the Secretary to broadly waive environmental reviews for the projects (and Arizona was content with this broad reading while the projects were being constructed). Congress did not need to include a separate

24

power to waive environmental reviews for decisions to stop construction because all stages of construction—including termination—are covered by the initial waiver and "effective upon being published in the Federal Register." *Id.* It may be an obvious point, but part of any construction project is the possibility that construction might be modified or not completed as originally contemplated. For example, during construction the agencies might have determined a different route or construction method was needed to overcome an obstacle or might have decided to shift the limited funds to build a barrier on a different part of the border. Or else they might have decided not to build a certain portion following reassessment of the preexisting natural or artificial barriers. The point of the waivers is to broadly exempt these sorts of decisions from environmental review. Indeed, a prospective waiver of NEPA requirements for a decision to *stop* construction itself can *promote* construction, because it can dispel *ex ante* concerns that a decision to start construction would be difficult to reverse even in the face of changing circumstances or public-interest concerns. To suggest that coverage under the waivers ceases because construction did not adhere precisely to the original plan subverts the purpose of the waivers themselves.

To be sure, where NEPA applies, a substantial change to a proposed action would trigger an obligation to prepare a supplemental NEPA analysis to consider that change. *See* 40 C.F.R. § 1502.9(c)(1) (2019) (an agency must supplement an EIS when "[t]he agency makes substantial changes in the proposed action"); *Marsh v. Or. Natl. Res. Council*, 490 U.S. 360, 373 (1989) ("If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared."). But that requirement cannot apply when NEPA is waived and there is *no NEPA analysis to supplement*. When the initial NEPA obligation is waived, any duty to prepare a supplemental analysis based on new information or a substantial change to the projects—including termination of the projects—is also waived.

1    Arizona's position leads to another absurdity.  The NEPA analysis requested by

2    the State would need to include alternatives to the proposed action, including a no-action

3    alternative.  40 C.F.R. § 1502.14(c); *see also Friends of Se.'s Future v. Morrison*, 153

4    F.3d 1059, 1065 (9th Cir. 1998) ("the alternatives analysis section is the 'heart of the

5    environmental impact statement'" and must include "the no-action alternative" (citation

6    omitted)).  Presumably, the no-action alternative to a decision to terminate the border

7    wall projects would be to leave the contracts in place and continue construction.

8    Arizona's requested EIS would thus require an analysis of the environmental impacts of

9    border wall construction—the very analysis Arizona concedes was waived in the first

10   place.

11        In short, the Secretary's waivers apply to the entire projects, including the decision

12   to modify, relocate, or stop construction and to adjust or terminate related contracts.

13   Because the waivers are a complete defense, Arizona cannot succeed on its NEPA

14   challenge to the contract terminations.

15              *ii.  IIRIRA's jurisdictional bar deprives this Court of subject matter*

16                        *jurisdiction over Arizona's APA claims.*

17        Further, Arizona's attempt to challenge the scope of the waivers is outside this

18   Court's jurisdiction.  IIRIRA Section 102(c)(2)(A) strips the federal courts of jurisdiction

19   over any "claims arising from any action undertaken, or any decision made, by the

20   Secretary of Homeland Security pursuant to" an IIRIRA waiver except for claims

21   "alleging a violation of the Constitution of the United States" brought in the Federal

22   District Court.  IIRIRA § 102(c)(2)(A).  "The statutory directive is clear . . . there is no

23   judicial review of non-constitutional claims 'arising from' the waiver provision."  *In re*

24   *Border Infrastructure Envtl. Litig.*, 915 F.3d at 1220.  The Ninth Circuit has explained

25   that a claim "aris[es] from" an IIRIRA waiver when a plaintiff challenges "the scope of

26   waiver authority under section 102(c)" or "alleges the waivers themselves were not

27   authorized by the Secretary's authority under section 102(c)(1)."  *Id.* at 1221; *see also id.*

28   ("The environmental claims allege the planning and construction of the border barrier

projects violated various environmental laws. To the extent these claims challenge either the merits of the waivers themselves, or the Secretary's authority to issue the waivers under section 102(c), they are subject to the jurisdictional bar.").

Any challenge to the scope of the waivers cannot survive IIRIRA's jurisdictional bar. First, there can be no doubt the waivers were in effect when the projects were terminated; the Secretary issued each during construction. *See, e.g.*, 84 Fed. Reg. 17187 (Apr. 24, 2019) (IIRIRA waiver for FY2019 DoD § 284 projects); *cf. N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1260-61 (D.C. Cir. 2020) (a claim does not arise from the waiver if it predates issuance of the waiver). Second, in asserting that the waivers do not apply to the cancellation decision, the State concedes that its claim "arises from" the waivers. Pl.'s Br. 28. The State's claim directly—and necessarily—challenges the scope of the waivers and the Secretary's waiver authority by asking the Court to decide whether contract cancellation is an action "pursuant to" the waivers. *See, e.g.*, Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14961-01, 14962 (Mar. 16, 2020) ("I hereby waive in [its] entirety, with respect to the construction of physical barriers and roads . . . in the project areas . . . the National Environmental Policy Act . . . ."). Congress barred these arguments through Section 102(c)(2)(A)'s jurisdiction-stripping provision; "[i]ndeed, the plain language of the statute leaves no doubt that, except for review of alleged violations of the Constitution, Congress intended to preclude *completely* judicial review of agency actions taken, or decisions made, pursuant to section 102's waiver provision[.]" *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 238 (D.D.C. 2019); *see also id.* at 237-39 (describing an "indisputable pattern of congressional actions and statements that clearly and convincingly establish Congress's intent to preclude litigation over the DHS Secretary's waiver authority").

Congress has deprived federal courts of jurisdiction to hear APA challenges to actions taken pursuant to an IIRIRA waiver. So this Court lacks jurisdiction to hear Arizona's NEPA challenge to the termination of the border wall projects.

*iii. Termination of the border wall projects does not impact the environment or alter the environmental status quo.*

Even if NEPA were not waived, a decision to stop border wall construction—*i.e.*, a decision to halt ground disturbance and environmental impacts—would not require NEPA analysis.

Arizona argues that President Biden's proclamation determined it was "unwise" but "not illegal" to build the border wall, and so the agencies had discretion over whether to terminate the border wall projects. Pl.'s Br. 27-28. But "agency action does not require an EIS simply because the action is discretionary. Discretionary agency action that does not alter the status quo does not require an EIS." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343-44 (9th Cir. 1995) (citing *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990)); *accord Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ("We have explained that NEPA procedures do not apply to federal actions that maintain the environmental status quo." (citing Ninth Circuit cases)); *Douglas Cty. v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) ("We find that NEPA procedures do not apply to federal actions that do nothing to alter the natural physical environment.").

In its supplemental brief, Arizona argues that DHS projects in the Rio Grande Valley in Texas and the San Diego and El Centro sectors in California are proof that the decision to terminate border wall construction has environmental impacts. Pl.'s Suppl. Br. 1-2. But these projects are designed to address impacts *from construction*, not from the decision to not build 18 more miles of border wall. In El Centro, power lines were cut for border barrier installation, and so DHS is working to restore power to the affected communities. Enriquez Decl. ¶ 17. In San Diego, gates and grates for installed border barrier are missing or in disrepair, and so DHS is working to complete those elements to protect human health and safety. *Id.* ¶ 18. And in the Rio Grande Valley, DHS is undertaking work to address the effects of border wall construction, including

"complet[ing] roads to ensure they are safe for driving, complet[ing] drainage and erosion control measures to protect the integrity of completed infrastructure, complet[ing] utility line relocations, and install[ing] canal crossings needed to maintain access for Border Patrol agents, landowners, and first responders." *Id.* ¶ 19. Each of these projects is covered by the existing waivers, and each addresses impacts from already-installed border wall, not from the decision to stop border wall construction.

At bottom, Arizona argues that the agencies must prepare a NEPA analysis considering the effects of leaving the world as it is. But "an EIS is not required 'in order to leave nature alone.'" *Douglas Cty.*, 48 F.3d at 1505 (quoting *Nat'l Ass'n of Prop. Owners v. United States*, 499 F. Supp. 1223, 1265 (D. Minn. 1980), *aff'd sub nom. Minnesota v. Block*, 660 F.2d 1240 (8th Cir. 1981)). President Biden's Proclamation did not change the environmental status quo on the Southern Border; its natural features and man-made disturbances remained. Nor was the environmental status quo altered by the eventual decision to terminate the remaining border wall projects in Arizona. The agencies' decisions to not build more border wall "do[] not alter the natural, untouched physical environment at all," *id.*, and so NEPA does not apply.

*iv. Arizona may not seek APA review for actions by the President.*

Arizona also argues that President Biden decided to terminate the remaining border wall projects by Proclamation when he found that the border wall was a "waste of money" and "not a serious policy." Pl.'s Br. 7, 26; *see also* Am. Compl. ¶¶ 169-70. This argument dooms the State's claims; the President is not an agency and the President's policy directives are not reviewable under the APA.

The APA only waives sovereign immunity for "claim[s] that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. Likewise, the APA only provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ." *Id.* § 704. The President of the United States is not an "agency," and, "out of respect for the separation of powers and the unique

29

constitutional position of the President," the Supreme Court has held that the President's actions do not constitute "agency action" reviewable under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *accord Dalton v. Specter*, 511 U.S. 462, 469 (1994); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 98-104 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017).

Similarly, courts have held that the APA does not apply when agencies are "merely carrying out directives of the president[.]" *Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) (citing *Franklin*, 505 U.S. at 800-01; *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991)); *see also Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1087-89 (9th Cir. 2004) (no APA review of deployment of missile systems where Navy was carrying out a 1994 Presidential Decision Directive).[5] For example, in *Tulare County*, the plaintiffs challenged President Clinton's proclamation declaring the Giant Sequoia National Monument and the United States' Forest Service's implementation of that proclamation. *Tulare Cty.*, 185 F. Supp. 2d at 21. The court rejected plaintiffs' APA challenges to the actions by the Forest Service: "[a]ny argument suggesting that this action is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Id.* at 28-29 (citing *Franklin*, 505 U.S. at 800-01; *Armstrong*, 924 F.2d at 298). Likewise, in *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, the court held that APA review is unavailable where agencies act based on delegations of power entrusted to the President—whether those powers flow from the President's inherent constitutional powers or from statutory grants of authority by

---

[5] And because cancellation flowed from the President's policy directives, the agency lacks discretion to disobey and there is no NEPA obligation to consider the impacts flowing from that decision. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004).

Congress—because "when those agencies act on behalf of the President, the separation of powers concerns [articulated in *Franklin*] ordinarily apply with full force . . . ." 801 F. Supp. 2d 383, 403 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

The APA does not provide for review of actions by the President. As Arizona acknowledges, cancellation of the border wall contracts was "merely [DoD] carrying out the directives of the president," *Tulare Cty.*, 185 F. Supp. at 28, which means the State's claims fall beyond the APA's waiver of sovereign immunity and this Court lacks subject matter jurisdiction to hear them.

### b. The termination of MPP is not reviewable under the APA.

Similarly, the Court should reject Arizona's challenge to the decision by the Secretary of Homeland Security to terminate MPP. To begin, the Northern District of Texas' vacatur of the June 1 memorandum and nationwide injunction requiring DHS to work in good faith to reinstate MPP obviates the need for this Court to reach this claim in resolving Arizona's motion for a preliminary injunction. *Texas*, 2021 WL 3603341, at *26-28. As the Ninth Circuit recently held, courts need not issue duplicative relief. *See California*, 963 F.3d at 949-950 (affirming district court's denial of injunctive relief to California and New Mexico because an injunction granting that relief had been granted to other plaintiffs).

In any event, the claim lacks merit. First, whether to exercise DHS's enforcement authority to return a noncitizen to Mexico during his or her removal proceedings is an enforcement decision committed to agency discretion by law, and is thus not reviewable under the APA. Second, because the June 1 memorandum terminating MPP is only a general statement of policy that does not determine the rights or obligations of any entity or produce any legal consequences, it is not a reviewable final agency action. Third, the termination of MPP is not a "major federal action" as defined by CEQ's NEPA implementing regulations and the body of federal caselaw interpreting those regulations.

31

*i. Returning noncitizens to contiguous countries is committed to DHS's discretion by law.*

The APA precludes review of "agency actions that are 'committed to agency discretion by law.'" *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (quoting 5 U.S.C. § 701(a)(2)); *accord Lincoln v. Vigil*, 508 U.S. 182, 190-191 (1993). A decision is generally "committed to agency discretion by law when 'a court would have no meaningful standard against which to judge the agency's exercise of discretion." *City & Cty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). Whether and how to exercise DHS's contiguous-territory-return authority is precisely the sort of discretionary decision that falls outside the ambit of APA review. *See Heckler*, 470 U.S. at 831.

First, the plain reading of the statute conveys an authority committed to DHS's discretion by law: "[i]n the case of an alien described in subparagraph (A) [*i.e.*, not clearly and beyond a doubt entitled to admission] who is arriving on land . . . from a foreign territory contiguous to the United States, [DHS] *may* return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C) (emphasis added). Congress's use of the term "may" confers discretion to DHS to choose whether to return noncitizens to contiguous countries, and the statute offers no criteria or standard for when the government must or should employ that discretion. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion"); *see also Heckler*, 470 U.S. at 831. And the INA expressly prohibits review of any "decision or action" of the Secretary of Homeland Security "the authority for which is specified under this subchapter to be in [his] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). In other words, "the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 830).

Second, even if Congress had not explicitly committed use of the contiguous-territory-return authority to DHS's discretion, deciding whether to return a noncitizen to

32

Mexico pending removal proceedings falls within the traditional scope of enforcement actions committed to agency discretion. Executive "[r]efusals to take enforcement steps" are presumptively not subject to review because deciding whether to do so in particular instances "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies." *Heckler*, 470 U.S. at 831; *see also* Ex. 5 at 3-4 ("MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens" and has "imposed additional responsibilities that detracted from the Department's critically important mission sets."). This discretion is inherent to the Executive power that the Constitution grants the President, especially in the immigration context. *See, e.g.*, *Reno v. AADC*, 525 U.S. 471, 490 (1999) (Scalia, J.) (explaining that prosecutorial discretion is "greatly magnified" in the removal context). "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous polices in regard to the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952), and a "principal feature of the removal system," therefore, "is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

Here, the Secretary exercised both his explicit statutory discretion over whether to invoke § 1225(b)(2)(C)'s return authority and his inherent discretion to cease conducting returns under MPP based on, among others, its impact on border management and communities, burdens on border security personnel and resources, and foreign relations. Ex. 5 at 3-6. DHS's decision to terminate the MPP is committed to agency discretion and is not reviewable under the APA.

33

*ii. The June 1 memorandum is not a final agency action.*

Even were it not committed to agency discretion by law, the decision to terminate MPP is not a reviewable final agency action, 5 U.S.C. § 704, because it does not determine "rights or obligations" or produce "legal consequences." *Bennett*, 520 U.S. at 178. The June 2021 memorandum ending MPP, like the January 2019 memorandum establishing "MPP[,] qualifies as a general statement of policy." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019). A "general statement of policy … is not a 'final agency action,' rendering it unreviewable," *Cohen v. United States*, 578 F.3d 1, 6 (D.C. Cir. 2009), *opinion vacated in part on other grounds*, 650 F.3d 717 (D.C. Cir. 2011) (en banc), unless it is applied "in a particular situation" to a regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) (similar). "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach" and the "agency retains the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). The memorandum implementing MPP stated DHS's approach to implementing its discretionary authority under § 1225(b)(2)(C), but did not bind DHS to any particular course for any individual or class of noncitizens. Rather, under MPP, "immigration officers [would] designate applicants for return on a discretionary case-by-case basis," and so the "MPP qualifie[d] as a general statement of policy." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019). So too with the June 1 memorandum; DHS retains discretion over how to implement the return authority under § 1225(b)(2)(C), including on an ad hoc basis.

For these same reasons, the June 1 memorandum is not the consummation of DHS's decisionmaking for any individual immigration case and does not determine any legal rights or impose any legal obligations on the agency or on noncitizens. The termination of MPP does not create or alter any right of *anyone* to enter or remain in the United States, or to obtain any immigration benefit. Ex. 5 at 7 (the memorandum "is not

34

intended to, and does not create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person"); *see also id.* ("The termination of MPP does not impact the status of individuals who were enrolled in MPP at any stage of their proceedings before the EOIR or the phased entry process described above."). Terminating one exercise of DHS's discretionary return authority does not foreclose others; DHS retains "discretion and the authority to change its position . . . in any specific case," including employing its traditional ad hoc use of the return authority under § 1225(b)(2)(C). *Texas*, 933 F.3d at 442.

A motion's panel of the Fifth Circuit recently erred when it held that the termination of MPP was a reviewable, final agency action. *Texas*, 2021 WL 3674780, at *6-7. Citing Fifth Circuit precedent, the court held that "a policy statement can nonetheless be final agency action under the APA" where it "withdraws an entity's previously-held discretion, . . . alters the legal regime, [or] binds an entity[.]" *Id.* at *6 (quotations omitted). But as discussed above, the termination of MPP does not remove discretion or bind any entity, and DHS retains discretion to employ the return authority. The Fifth Circuit also incorrectly held that MPP was "more than a non-enforcement policy." *Texas*, 2021 WL 36784780, at *8 (citing *Dep't of Homeland Sec. v. Regents of Univ. of California*, 140 S. Ct. 1891 (2020); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), aff'd by *United States v. Texas*, 136 S. Ct. 2271 (2016)). Unlike the Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) programs discussed in the cases to which the Fifth Circuit cited, termination of MPP does not grant "lawful presence and accompanying eligibility for benefits." *Texas*, 809 F.3d at 170; *accord Regents*, 140 S. Ct. at 1911 (discussing the Fifth Circuit's decision setting aside DAPA as focused on the program making "4.3 million otherwise removable aliens eligible for work authorization and public benefits" (internal quotation marks and citation omitted)). Rather, it only

ends one exercise of DHS's return authority for noncitizens during removal proceedings. This Court should decline to follow the flawed, non-binding opinion of the Fifth Circuit.

Arizona's arguments mischaracterize the effects of termination of MPP. Arizona asserts that "most of the 65,000 migrants previously excluded have now been admitted into the United States," Pl.'s Br. 27,[6] and that under a "'catch and release' policy," Pl.'s Br. 32, "tens of thousands more migrants stand to be admitted under the Defendants' new policy who would otherwise have been returned to Mexico or their home countries." Pl.'s Br. 33. But termination of MPP does not "admit" anyone into the United States or otherwise prevent removal, nor does the decision terminating MPP say anything about releasing migrants. *Cf. Regents*, 140 S. Ct. at 1906-07 (rescission of Deferred Action for Childhood Arrivals was reviewable because it was "not simply a non-enforcement policy" but "an 'affirmative act of approval'" that conveyed "affirmative immigration relief" (citation omitted)). All noncitizens who would be eligible for MPP continue to face potential removal and detention. Whether DHS returns a noncitizen to Mexico pending removal proceedings is a separate issue from whether the noncitizen is in removal proceedings—which is the case for all inadmissible noncitizens eligible for return under § 1225(b)(2)(C), as implemented through MPP. *See* 8 U.S.C. § 1225(b)(2)(A), (C); *Innovation Law Lab*, 924 F.3d at 509. And any noncitizen facing removal proceedings may be, in accordance with the Immigration and Nationality Act, detained during those proceedings. *See Jennings v. Rodriquez*, 138 S. Ct. 830, 844 (2018) (discussing detention authorities). Arizona conflates DHS's discretion to return noncitizens to Mexico during removal proceedings with separate issues related to

---

[6] Arizona's lone citation in support is to an article from Reuters. Declaration of Robert J. Makar, ¶ 10 Ex. I., ECF 17-5. But the article says only that MPP "forced more than 65,000 non-Mexican asylum seekers back across the border [into Mexico] to wait for U.S. court hearings." *Id.* It does not, as Arizona suggests, say that all of those asylum seekers have returned to the United States.

noncitizens' ability to obtain relief or protection from removal or release pending that removal determination—questions on which the termination of MPP has no bearing.

Termination of MPP is not a final agency action; it does not represent the consummation of DHS's decisionmaking process for any immigration proceeding and does not determine legal rights or obligations of either DHS or noncitizens. Rather, the June 1 memorandum "simply lets the public know [DHS's] current enforcement or adjudicatory approach," *Syncor Int'l Corp.*, 127 F.3d at 94, while preserving DHS's enforcement discretion under § 1225(b)(2)(C), including employing that authority on an ad hoc basis. Because termination of the MPP is not a final agency action, it falls beyond the APA's reach, 5 U.S.C. § 704, and this Court lacks subject matter jurisdiction over this claim. *See Cross v. U.S. Dep't of Interior*, 821 F. App'x 885, 886 (9th Cir. 2020) (citing *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007)).

### iii. The termination of MPP is not a "major federal action."

NEPA only requires preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If there is no major federal action, "that is the end of the inquiry[,] the agency need not prepare NEPA analysis." *Ctr. for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687, 696 (D. Ariz. 2011), *aff'd*, 706 F.3d 1085 (9th Cir. 2013) (quoting *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1099 (N.D. Cal. 2005)). CEQ's NEPA-implementing regulations state that the definition of "[m]ajor [f]ederal action does not include . . . activities or decisions that do not result in final agency action under the [APA]" or "[j]udicial or administrative civil or criminal enforcement actions." 40 C.F.R. § 1508.1(q)(1)(iii)-(iv). As discussed above, the termination of MPP is not a final agency action, and so by definition is not a major federal action requiring NEPA review. *Id.* § 1508.1(q)(1)(iii).

But even assuming the MPP and its termination were final agency actions under the APA, they are still not "major federal actions" triggering NEPA because they are enforcement decisions that fall outside the NEPA definition of major federal actions. *Id.*

§ 1508.1(q)(1)(iv)[7]; *see also* DHS Instruction Manuel 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act, at II-4 (defining "[m]ajor [f]ederal action" to be those actions "defined in 40 C.F.R. § 1508.18").[8]  As discussed above, the authority for MPP was Congress's grant of *discretionary* authority to return noncitizens to contiguous territories pending removal proceedings.  8 U.S.C. § 1225(b)(2)(C).  Because adopting MPP was an enforcement decision, no NEPA analysis was required.  And neither is NEPA analysis required for the termination of MPP, a different enforcement decision.

As the District of Oregon recently held, requiring NEPA for enforcement decisions "would lead to a highly impractical result in which any decision of a law enforcement agency—whether to go forward with an action or forbear from action— would require a NEPA analysis." *Nw. Ctr. for Alts. to Pesticides v. U.S. D*, No. 3:20-CV-01816-IM, --- F. Supp. 3d ----, ----, 2021 WL 3374968, at *9 (D. Or. Aug. 3, 2021) (quoting *United States v. Glenn-Colusa Irrigation Dist.*, 788 F. Supp. 1126, 1135 (E.D. Cal. 1992)).  Many other courts have recognized the inapplicability of NEPA to enforcement decisions.  *See, e.g.*, *Tucson Rod & Gun Club v. McGee*, 25 F. Supp. 2d 1025, 1029 (D. Ariz. 1998) ("Administrative enforcement actions . . . do not require performance of a NEPA analysis . . . ."); *Calipatria Land Co. v. Lujan*, 793 F. Supp. 241, 245 (S.D. Cal. 1990) (recognizing that there "can be no question that the enforcement itself of" Fish and Wildlife Service anti-baiting regulations through injunction is exempt from NEPA review); *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988) (recognizing that Bureau of Land Management's enforcement authority is not "major

---

[7] The previous version of this regulation was found at 40 C.F.R. § 1508.18(a) (2019) and similarly states that "Actions do not include bringing judicial or administrative civil or criminal enforcement actions."

[8] Available at https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508compliantversion.pdf (last visited Sept. 3, 2021).

Federal action" triggering NEPA review); *United States v. Rainbow Fam.*, 695 F. Supp. 314, 324 (E.D. Tex. 1988) (recognizing that NEPA exempts from review agency decisions about whether to "bring a civil or criminal action to enforce Forest Service or other governmental regulations and statutes").

Arizona argues that the termination of MPP qualifies as a major federal action because it is a "formal document[] establishing an agency's policies which will result in or substantially alter agency programs." Pl.'s Br. 30 (quoting 40 C.F.R. § 1508.1(q)). The quoted language that Arizona cites is from 40 C.F.R. § 1508.1(q)(3), which provides categories that "[m]ajor [f]ederal actions *tend* to fall within." *Id.* § 1508.1(q)(3) (emphasis added). It is a basic rule of statutory and regulatory interpretation that more specific regulatory provisions, like the NEPA civil and criminal enforcement exemption, control more general provisions. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (recognizing "commonplace" rule of construction that "specific governs the general." (citation omitted)). The general categories into which "[m]ajor [f]ederal actions tend to fall" must yield to the specific exemptions, including the law enforcement exemption.

Finally, at bottom, Arizona's NEPA challenge to the termination of MPP is self-defeating. If terminating MPP required NEPA analysis, so too did adopting the policy in the first place. If the Court finds NEPA review is required, the proper status quo is the regulatory regime before MPP, not judicial reinstatement of a policy that also lacks NEPA analysis. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) (holding 1997 rule invalid but declining to reinstate prior 1995 rule because it also contained legal error). Arizona cannot receive its requested remedy on this claim.

In the end, the State's failure to cite a single example in which a federal agency had to prepare a NEPA analysis before reaching an enforcement decision is telling. That is because—besides defying CEQ's NEPA implementing regulations, the body of federal caselaw interpreting those regulations, and the public interest—Arizona's position defies common sense. Arizona's NEPA challenge to the termination of MPP fails.

**c. Arizona's programmatic challenge fails**.

Finally, Arizona seeks to compel a programmatic EIS for a so-called "Population Augmentation Program." This claim fails for at least two reasons. First, the Supreme Court's decisions in *Lujan* and *SUWA*—as well as the Ninth Circuit's recent decision in *Whitewater Draw*—expressly forbid broad, programmatic APA challenges when the agency has not itself proposed a programmatic action. Second, none of the "components" of the "program" are reviewable under the APA, and in particular the doctrine of issue preclusion bars Arizona from trying to relitigate the reviewability of the February 18, 2021 interim guidance.

> *i.* *Arizona's challenge to a so-called "Population Augmentation Program" is foreclosed by Lujan and the Ninth Circuit's recent decision in* Whitewater Draw.

Arizona asks this Court to compel a programmatic NEPA document for an amorphous universe of agency guidance and enforcement decisions the State calls the "Population Augmentation Program." The APA, however, does not permit this sort of broad, programmatic challenge, and Arizona's programmatic NEPA challenge is not cognizable.

In *Lujan*, the Supreme Court held that the APA's requirement of a discrete "final agency action" precludes broad, programmatic NEPA challenges where the agency has not itself proposed a programmatic action. 497 U.S. at 899. There, the plaintiff alleged that the Bureau of Land Management's (BLM) practice of reclassifying public lands previously "withdrawn" from mineral leasing violated NEPA and the Federal Land Policy and Management Act. The plaintiff dubbed this practice—which consisted of 1,250 completed and contemplated land classifications and withdrawal revocation actions—the "land withdrawal review program," alleging that BLM had failed to "provide adequate environmental impact statements." *Id.* at 890−91.

The Supreme Court held that it was "impossible" for the plaintiff to challenge the "land withdrawal review program" because the "program" was not an "agency action" under the APA:

> The term 'land withdrawal review program' . . . does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans . . . . It is no more an identifiable 'agency action'—much less a 'final agency action'— than a 'weapons procurement program' of the [DoD] or a 'drug interdiction program' of the Drug Enforcement Administration.

*Id.* at 890. The Supreme Court also made clear that, even if one of the land status determinations qualified as a "final agency action," the plaintiff could not predicate its sweeping programmatic challenge on that single action: "the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them . . . is ripe for review." *Id.* at 892-93.

In *SUWA*, the Court reaffirmed the APA's bar on diffuse programmatic challenges. 542 U.S. at 55. The *SUWA* plaintiffs argued that BLM had failed to undertake supplemental NEPA analyses for certain wilderness study areas where off-road vehicle use had increased, *id.* at 60-61, suing under the APA's cause of action to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). The Supreme Court held that the plaintiffs' claims did not fall within the scope of § 706(1) because plaintiffs did not seek to compel legally required, discrete actions. In other words, "[t]he limitation to discrete agency action precludes . . . broad programmatic attack[s]." *SUWA*, 542 U.S. at 64; *see also Whitewater Draw*, 5 F.4th at 1010-1011 (the APA's definition of agency action "precludes 'broad programmatic attack[s],' whether

couched as a challenge to an agency's action or 'failure to act.'" (quoting *SUWA*, 542 U.S. at 64-65)).

A week after Arizona filed its motion, the Ninth Circuit reiterated that a plaintiff may not level a broad, programmatic attack without an agency-proposed programmatic action. In *Whitewater Draw*, plaintiffs "seek[ing] to reduce immigration into the United States because it causes population growth, which in turn, they claim, has a detrimental effect on the environment" sued, alleging that "DHS implements eight 'programs' in violation of NEPA." 5 F.4th at 1005-11. As here, the plaintiffs "d[id] not cite any regulations, rules, orders, public notices, or policy statements that authorize or enforce these 'programs[,]'" but relied on "81 DHS regulations and five policy memoranda" that they claimed "implement the[] programs." *Id.* at 1010. The Ninth Circuit held that plaintiffs' alleged programs were not "in any way distinguishable from the broad programmatic attack" rejected by the Supreme Court in *Lujan*. *Id.* at *1010-12. As in *Lujan*, the *Whitewater Draw* "[p]laintiffs [could not] obtain review of *all* of DHS's individual actions pertaining to, say, 'employment-based immigration' in one fell swoop by simply labeling them a 'program.'" *Id.* at 1012.

Arizona's challenge is even broader and more ill-defined than that of the *Whitewater Draw* plaintiffs. Arizona alleges a "Population Augmentation Program" composed of all DHS's immigration enforcement actions, which the State believes is aimed at "encouraging migration and population growth." Pl.'s Br. 11. As in *Whitewater Draw*, the State "does not cite any regulations, rules, orders, public notices, or policy statements that authorize or enforce th[is] 'program[],'" *Whitewater Draw*, 5 F.4th at 1010, but, as in *Whitewater Draw*, relies on a handful of enforcement decisions that they argue implement the program. Pl.'s Br. 12-13. The same claim compels the same result; the State must either "identify a particular action by DHS that [it] wish[es] to challenge under the APA, or [it] must pursue [its] remedies before the agency or in Congress." *Whitewater Draw*, 5 F.4th at 1012.

Arizona's arguments to the contrary fail.  Arizona argues that the D.C. Circuit has endorsed judicial review of programmatic NEPA challenges.  Pl.'s Br. 23-24 (citing *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1029-30 (D.C. Cir. 2008).  But that case did not endorse a plaintiff assembling a "program" from a universe of alleged actions.  Rather, the plaintiffs there challenged a discrete, final agency action: an order from the Federal Communications Commission (FCC) denying a petition requesting the agency prepare a programmatic EIS for its permitting decisions in the gulf coast region.  *Am. Bird. Conservancy, Inc.*, 516 F.3d at 1031.  The court vacated the FCC's order because "the Order fail[ed] to follow the Commission's own regulations implementing NEPA" by demanding the plaintiffs' provide "definitive evidence of significant effects" and by "suggest[ing] that scientific consensus is a precondition to NEPA action." *Id.* at 1033.  Nowhere did the court suggest that a plaintiff could compel programmatic NEPA analysis for a program of the plaintiff's own making.  And even if it had, the law of *this* circuit forbids those claims.  *Whitewater Draw*, 5 F.4th at 1012.

*Forelaws on Board v. Johnson* does not help Arizona either.  743 F.2d 677 (9th Cir. 1984); *see also* Pl.'s Br. 24.  *Forelaws on Board* predates *Lujan*, *SUWA*, and *Whitewater Draw*, and so even if it could be read to endorse a programmatic NEPA challenge, it would no longer be good law.  But even more to the point, *Forelaws on Board* did not deal with an attempt to compel programmatic analysis.  There, the Bonneville Power Administration had prepared a single document "termed an 'Environmental Report'" for its 145 contract offers, "which did not analyze in detail any possible adverse environmental consequences of the contracts and ways that they might be avoided." *Forelaws on Bd.*, 743 F.3d at 681.  The Ninth Circuit held that the scope of the action analyzed as defined by the agency—"145 contracts of 20-year duration"—was a "major federal action" that required an EIS.  *Id.* at 681, 685; *see also Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1125 (9th Cir. 2012) ("An agency has 'the discretion to determine the physical scope used for measuring environmental impacts' so long as the scope of analysis is 'reasonable.'" (quoting *Idaho Sporting Cong. v.*

43

*Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002)).  The court did not compel the agency to employ programmatic NEPA analysis, but merely held that the analysis for the action as defined by the agency was insufficient.

Arizona also misunderstands Judge Jorgenson's decision at the Rule 12(b) stage in *Ctr. for Biological Diversity v. Nielsen*.  No. CV-17-00163-TUC-CKJ, 2018 WL 5776419 (D. Ariz. Nov. 2, 2018); *see* Pl.'s Br. 1, 17, 24, 35.  There, the plaintiffs challenged U.S. Customs and Border Protection's failure to prepare a supplemental NEPA analysis considering changed circumstances since the adoption of a 1994 programmatic EIS and 2001 supplemental programmatic EIS.  *Nielsen*, 2018 WL 5776419, at *2.  At summary judgment, the Court found that the agencies "should have contemporaneously considered and evaluated the need for supplemental environmental analysis" before withdrawing the historical programmatic analyses in 2019, *Ctr. for Biological Diversity v. Mayorkas*, No. CV-17-00163-TUC-CKJ, 2021 WL 3726502, at *9 (D. Ariz. Aug. 23, 2021), but that over the course of the litigation the agencies "thoroughly evaluated and explained the 'hard look' criteria" and that "[t]he interests of the public would not be served by updating environmental impact statements which have since been withdrawn and that no longer serve as guideposts for future agency activity," *id.* at 12-13.  The court did not endorse the broad, programmatic attack Arizona levels here.  Indeed, in resolving a record dispute in that same case, Judge Jorgenson disclaimed the ability of federal courts to compel programmatic NEPA analysis.  *See Ctr. for Biological Diversity v. Wolf*, 447 F. Supp. 3d 965, 972 (D. Ariz. 2020) (quoting *Whitewater Draw Nat. Res. Conservation Dist. v. Nielsen*, No. 3:16-CV-02583-L-BLM, 2018 WL 4700494, at *5 (S.D. Cal. Sept. 30, 2018)); *see also Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev.*, 241 F.R.D. 495, 502 (D. Ariz. 2006) (Jorgenson, J.) (noting courts lack jurisdiction over NEPA claims where "the claims and relief Plaintiffs request are the type of broad, programmatic attacks rejected by *Lujan*").  And, most relevant here, nothing in the *Center for Biological Diversity* case bolsters

Arizona's claim of an overarching DHS program to increase migration and grow the State's population.

Finally, as discussed below, none of the identified "components" of the so-called "Population Augmentation Program" are reviewable. But even if Arizona had identified some category of reviewable, final agency action, courts cannot compel programmatic NEPA analysis. On the contrary, courts have held that the decision of whether to prepare a programmatic NEPA document "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *accord Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006) ("The decision whether to prepare a programmatic EIS is committed to the agency's discretion."); *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n.73 (D.C. Cir. 1981) ("Even when the proposal is one of a series of closely related proposals, the decision whether to prepare a programmatic impact statement is committed to the agency's discretion."); *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1281 (D. Mont. 2019) (holding that federal courts cannot compel preparation of a programmatic EIS).

There is no "Population Augmentation Program." *Lujan* and progeny foreclose Arizona's attempt to force programmatic NEPA analysis over an amorphous category of DHS decisions. And because the decision to prepare a programmatic document is entrusted to the expert agencies, courts cannot compel programmatic NEPA analysis in any event. Arizona's programmatic challenge thus fails.

> *ii. None of the identified "components" of the so-called "population augmentation program" are reviewable, and Arizona's attempt to relitigate the February 18, 2021 interim guidance is precluded.*

For the same reasons that Arizona's challenge to the termination of MPP fails, the state's alternative challenge to the "components" of its so-called "Population Augmentation Program" is not reviewable. Again, enforcement decisions—including whether to levy fines, Pl.'s Br. 12, and whether to remove noncitizens, Pl.'s Br. 12-13—

involve "a complicated balancing of a number of factors which are peculiarly within [DHS's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Heckler*, 470 U.S. at 831. Enforcement decisions are thus not reviewable under the APA unless Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion." *Id.* at 834. The types of enforcement actions Arizona seeks to compel here—including whether to attempt to collect fines under 8 U.S.C. § 1324d and whether and how to remove noncitizens—are quintessential enforcement decisions insulated from judicial review. *See Arizona*, 2021 WL 2787930, at *9-10 (rejecting Arizona's argument that the current administration's immigration enforcement priorities are reviewable under the APA). And again, enforcement decisions are not "[m]ajor [f]ederal actions" as defined by NEPA's implementing regulations. 40 C.F.R. § 1508.1(q)(1)(iv).

For Arizona's attempt to relitigate the reviewability of the February 18, 2021 Interim Guidance, Arizona faces another insurmountable bar: issue preclusion. Res judicata comprises two allied doctrines, claim preclusion and issue preclusion. *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 357-58 (2016). Issue preclusion—the modern name for the common law doctrines of direct and collateral estoppel—"bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). Issue preclusion attaches where: (1) there was a full and fair opportunity to litigate the issue in the earlier litigation; (2) the issue was actually litigated; (3) the issue was actually decided; and (4) the party against whom issue preclusion is asserted was either a party to—or in privity with a party to—the

earlier litigation.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147-48 (2015).

Issue preclusion bars Arizona's new claim against the Interim Guidance.  In a suit filed several months ago in this same court, *Arizona v. U.S. Department of Homeland Security*, the same parties extensively briefed the reviewability of the Interim Guidance, and the court resolved that question against the State.  2021 WL 2787930, at * 10-11 ("the Interim Guidance does not 'prohibit the arrest, detention, or removal of any noncitizen,' but merely sets up procedural steps for 'other priority' cases to be pursued in light of ICE's 'limited resources' and other various factors" and so "is not subject to judicial review").  While the State has noticed an appeal to the Ninth Circuit, the District Court's decision retains preclusive effect in the interim.  *Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir. 1988) (quoting 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4433, at 308 (1981)); *see also id.* ("To deny preclusion in these circumstances would lead to an absurd result: Litigants would be able to refile identical cases while appeals are pending, enmeshing their opponents and the court system in tangles of duplicative litigation." (citation omitted)).  Issue preclusion bars any new challenge to the Interim Guidance.

## IV.    The Equities Weigh against Arizona's Requested Relief

The final two preliminary injunction factors—balance of harms and public interest—merge when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435-36 (2009).  Arizona offers nothing on the equities beyond arguing that environmental harm usually warrants an injunction and arguing that the public interest favors curing NEPA errors.  Pl.'s Br. 39.  This regurgitation of Arizona's irreparable injury and merits arguments makes no serious attempt to satisfy the State's burden to show each of the *Winter* factors favors preliminary relief.  555 U.S. at 20 (plaintiff bears the burden on each factor); *see also Stackla, Inc. v. Facebook Inc.*, No. 19-cv-05849-PJH, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) ("If an argument that a plaintiff is likely

prevail on the merits were enough to satisfy the public's interest in an injunction, the public's interest would be a superfluous element in the analysis.").

As noted above, Arizona's asserted harm fails to establish injury in fact to establish standing, much less the irreparable harm to support preliminary injunctive relief. By contrast, the harms to the United States from the extraordinary relief of a *mandatory* preliminary injunction favor denying Arizona's request, at least pending full resolution of this case on the merits.

Requiring specific performance of cancelled contracts to continue border wall construction and dictating spending decisions related to the border wall, as Arizona requests, Pl.'s Br. 39-40, would contravene the public interest by interfering with core executive and legislative prerogatives. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679 (9th Cir. 2021) ("[C]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." (alteration in original and citation omitted)). Arizona's requested relief to partially enjoin the termination of MPP is also flawed. Before the Northern District of Texas' improper nationwide injunction went into effect, MPP had been rescinded for 2.5 months, suspended for 8 months, and largely dormant for nearly 16 months. As with the overreaching relief ordered by that court, Arizona's requested injunction would effectively dictate the United States' foreign policy with Mexico, "deeply intrud[ing] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and constituting a major and "unwarranted judicial interference in the conduct of foreign policy," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *see Arizona v. United States*, 567 U.S. 387, 396 (2012) (noting Executive authority to make "discretionary decisions" with respect to "[r]eturning" noncitizens "that bear on this Nation's international relations."); Ex. 2, Declaration of David Shahoulian ¶ 15 (discussing how MPP requires "significant coordination with, and cooperation from, the Government of Mexico").

The Ninth Circuit is clear that "the government and the public have an interest in the efficient administration of the immigration laws at the border." *E. Bay Sanctuary Covenant*, 993 F.3d at 679 (internal quotations and citation omitted). And courts are to afford that interest substantial weight to ensure that injunctions "do not undermine separation of powers by blocking the Executive's lawful ability to regulate immigration and rely on its rulemaking to aid diplomacy." *Id.*; *see also Zafarmand v. Pompeo*, No. 20-cv-00803-MMC, 2020 WL 4702322, at *13 (N.D. Cal. Aug. 13, 2020) (denying mandatory preliminary injunctive relief despite finding irreparable harm considering public interest in "the significant national security issues at stake"); *Motaghedi v. Pompeo*, No. 1:19-cv-01466-LJO-SKO, 2020 WL 207155, at *15 (E.D. Cal. Jan. 14, 2020) (same). Granting Arizona's requested preliminary injunctive relief would do just that. As a result, even aside from the infirmities of Arizona's merits showing, the equities weigh strongly against a preliminary injunction.

## CONCLUSION

This Court should deny Arizona's motion.

Submitted this 3rd day of September, 2021,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER
Trial Attorney
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 598-3314
tyler.alexander@usdoj.gov

*Attorneys for Defendants*