**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona, et al., | No. CV-21-00617-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Alejandro Mayorkas, et al., | |
| Defendants. | |

In advance of the motion hearing on February 1, 2022, the Court wishes to provide the parties with its tentative ruling. This is, to be clear, only a tentative ruling. The point of providing it beforehand is to allow the parties to focus their argument on the issues that seem salient to the Court and to maximize their ability to address any perceived errors in the Court's logic. This is not an invitation to submit additional briefing.

Dated this 27th day of January, 2022.

Dominic W. Lanza
United States District Judge

<u>TENTATIVE RULING</u>

# INTRODUCTION

In this action, the State of Arizona ("the State") has sued an array of federal agencies and officials for implementing what the State characterizes as "the Population Augmentation Program," which is a "collection of policies of Defendants that have the direct effect of causing growth in the population of the United States generally, and Arizona specifically, through immigration." (Doc. 13 ¶¶ 1-12, 33, 61-65.) The five specific components of the Population Augmentation Program identified by the State, which "all work in tandem," are: (1) President Biden's January 2021 "proclamation" to stop building the border wall, which has since been implemented by the Department of Homeland Security ("DHS") and the Department of Defense ("DoD"); (2) DHS's formal recission in June 2021 of the Migrant Protection Protocols ("MPP"), a program created in 2018 to "ensure[] that individuals who lacked a legal basis to be in the United States, and who had passed through Mexico *en route* to the United States, had to remain in Mexico for the duration of their immigration proceedings"; (3) DHS's discontinuation in April 2021 of the practice of issuing fines to aliens who fail to comply with orders to leave the country; (4) DHS's decision in May 2021 to exempt 250 migrants per day from a pandemic-related public health order barring the entry of migrants without valid travel documents; and (5) DHS's issuance of a guidance in February 2021 that has resulted in "detaining fewer migrants than ever, including migrants with serious felony convictions." (*Id.* ¶¶ 61-65.)

The State, to be clear, emphasizes that it has no quarrel with immigrants or "population grown *per se*." (*Id.* ¶¶ 13, 135.) Instead, the State contends that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, by failing to consider the environmental impact of their challenged policies and programs, including "the proliferation of garbage and refuse as a result of the transit of hundreds of thousands of migrants"; "increased air emissions, including emissions of greenhouse gases"; other unspecified "growth impacts" arising from the fact that "[m]igrants (like everyone else) need housing, infrastructure, hospitals, and schools"; and impacts to "wildlife and endangered species," such as the creation of "*de facto* predator corridors"

1   caused by the existing gaps in the border wall.  (*Id.* ¶¶ 112-47.)

2         To that end, the State has moved for a preliminary injunction on three of its claims,

3   all of which arise under the Administrative Procedures Act ("APA") and are premised on

4   the notion that Defendants were required by NEPA to prepare an environmental impact

5   statement ("EIS") before pursuing the policies and programs in question.  (Doc. 17.)[1]

6   However, as the briefing process was unfolding, the legal landscape twice shifted.  First,

7   in mid-July 2021, less than a week after the State filed its operative complaint, the Ninth

8   Circuit decided *Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5

9   F.4th 997 (9th Cir. 2021).  There, the court upheld the dismissal of NEPA claims that were

10  premised, similar to the State's claims here, on the theory that the plaintiffs suffered harm

11  as a result of immigration-related policies that encouraged population growth.  Meanwhile,

12  in mid-December 2021, the Fifth Circuit decided *Texas v. Biden*, 20 F.4th 928 (5th Cir.

13  2021).  There, the court upheld the issuance of an injunction that required DHS to overturn

14  its recission of the MPP (albeit for different reasons than the State advances in its

15  preliminary injunction request).

16        Given these developments, the State's motion does not present a particularly close

17  call.  As explained below, the State has not shown a likelihood of success on (or even

18  serious questions going to the merits of) its first claim, which is a challenge to the entirety

19  of the alleged "Program Augmentation Program," because, as *Whitewater Draw* makes

20  clear, it is impermissible for a NEPA plaintiff to challenge an amalgamation of individual

21  programs and policies in this fashion.  As for the State's second claim, which is a challenge

22  to the cessation of border wall construction, *Whitewater Draw* undermines the State's

23  position for a different reason—because it rejects the so-called "enticement theory" of

24  environmental harm on which the State largely relies to establish causation and standing.

25  Finally, it is unnecessary to delve into the merits of the State's third claim, which is a

26  challenge to the rescission of the MPP, in light of the Fifth Circuit's recent ruling in *Texas*

---

[1]      The State also asserts various non-NEPA claims in its complaint (Doc. 13 ¶¶ 160-85) but does not move for a preliminary injunction on those claims (Doc. 17 at 4 n.1). Thus, the analysis here is confined to the NEPA claims.

*v. Biden*.   The Ninth Circuit has recognized that it is unnecessary to issue what would essentially be a piggyback injunction where a different court has already enjoined the same conduct.

## BACKGROUND

On April 11, 2021, the State initiated this action by filing a complaint for declaratory and injunctive relief.  (Doc. 1.)

On July 12, 2021, the State filed its operative pleading, the first amended complaint ("FAC").  (Doc. 13.)  The named defendants are two agencies (DHS and DoD), three DHS officials who are sued in their official capacities, and one DoD official who is sued in his official capacity.  (*Id.* ¶¶ 20-25.)

On July 14, 2021, the State filed the pending motion for preliminary injunction.  (Doc. 17.)

On July 19, 2021, the Ninth Circuit decided *Whitewater Draw*.

On August 20, 2021, the State filed a notice of factual and legal developments.  (Doc. 21.)

On September 3, 2021, Defendants filed a response to the motion for preliminary injunction.  (Doc. 24.)

On October 1, 2021, Defendants filed a motion to dismiss the FAC.  (Doc. 27.)

On October 18, 2021, the State filed a corrected reply in support of its motion for preliminary injunction.  (Doc. 29.)  Although the preliminary injunction request became fully briefed at this point, the Court postponed setting a hearing until the completion of the motion-to-dismiss briefing because it continued to develop and elaborate upon some of the arguments raised in the preliminary-injunction briefing.

On October 25, 2021, the State filed a second notice of additional factual developments.  (Doc. 31.)

On November 18, 2021, the State filed a response to the motion to dismiss.  (Doc. 33.)

On December 10, 2021, Defendants filed a reply in support of the motion to dismiss.

(Doc. 36.)

On December 13, 2021, the Fifth Circuit decided *Texas v. Biden*.  An amended version of the decision was issued on December 19, 2021.

On January 3, 2022, the State filed a notice of supplemental authority regarding *Texas v. Biden*.  (Doc. 37.)

On January 10, 2022, the State filed a third notice of additional factual developments.  (Doc. 38.)

On January 21, 2022, Defendants filed a response to the State's notice of supplemental authority and third notice of additional factual developments.  (Doc. 42.)

On January 26, 2022, the State filed a reply to Defendants' response.  (Doc. 44.)

On January 27, 2022, the Court issued a tentative ruling.  (Doc. 45.)

On February 1, 2022, the Court heard oral argument.

## ANALYSIS

I.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such a "drastic remedy . . . should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted).

To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief is denied, (3) that the balance of equities weighs in the plaintiff's favor, and (4) that the public interest favors injunctive relief.  *Id.* at 20.  The Ninth Circuit has also stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  Regardless of which standard applies, the movant "carries the burden of proof on each element of the test."  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Also, "[w]hen the government is a party, the[] last two factors merge."  *Drakes Bay Oyster*

1   *Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

2         The first factor incorporates an assessment of both the plaintiff's standing and the

3   merits of the underlying claim. *LA Alliance for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th

4   947, 958 (9th Cir. 2021) (reversing preliminary injunction in part because "Plaintiffs have

5   not made the required 'clear showing' that any individual Plaintiff has standing to bring

6   the . . . claim"); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v.*

7   *U.S. Dept. of Agric.*, 415 F.3d 1078, 1104 (9th Cir. 2005) ("We therefore hold that R-CALF

8   lacks standing to bring a NEPA challenge to the Final Rule. Thus, the district court erred

9   in . . . concluding that it had a likelihood of success on that claim.").

10   II.    <u>Count One (Population Augmentation Program)</u>

11         In Count One of the FAC, the State argues that Defendants violated NEPA by failing

12   to prepare a "programmatic EIS" before adopting the Population Augmentation Program.

13   (Doc. 13 ¶ 152.) Defendants argue the State is not entitled to preliminary injunctive relief

14   on Count One for five reasons: (1) a lack of standing (Doc. 24 at 11-16, 20-21); (2) failure

15   to demonstrate irreparable harm in the absence of injunctive relief (*id.* at 21-22); (3)

16   because "the APA's requirement of a discrete 'final agency action' precludes broad,

17   programmatic challenges where the agency has not itself proposed a programmatic action,"

18   and thus "Arizona's programmatic NEPA challenge is not cognizable" (*id.* at 40-45); (4)

19   because the components of the alleged Population Augmentation Program are, for various

20   reasons, not subject to individual challenge (*id.* at 45-47); and (5) because the equities

21   weigh against the State's request (*id.* at 47-49). The Court will focus on Defendants' third

22   argument—whether the type of challenge being asserted in Count One is cognizable—

23   because it is dispositive of the request for injunctive relief.

24         On that issue, the State argues that Defendants were required to prepare a

25   "programmatic EIS" to consider the collective environmental impact of all of the

26   components of the Population Augmentation Program and that Defendants' failure to do

27   so is actionable because courts have "made clear that the failure to prepare a programmatic

28   EIS for ongoing agency programs is reviewable under the APA and NEPA." (Doc. 17 at

23-25, 34-37.)   The State further contends that because "the Population Augmentation Program's individual components all constitute final agency action, . . . the constellation of them should be no less reviewable." (*Id.*)   In response, Defendants argue that multiple decisions of the Supreme Court, as well as *Whitewater Draw*, "expressly forbid broad, programmatic APA challenges when the agency has not itself proposed a programmatic action." (Doc. 24 at 40-45.)   In reply, the State argues that Defendants' cited cases are distinguishable because "here the challenged program actually exists" and note that, in 1994 and 2001, the government prepared programmatic EISs for similar collections of programs. (Doc. 29 at 19-21.)

The Court concludes that Defendants have the better side of these arguments and that the State has failed to establish a likelihood of success on (or even serious questions going to the merits of) Count One.   As background, the underlying statute that Defendants are accused of violating, NEPA, "imposes procedural requirements" that are intended to "protect[] the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (citations and internal quotation marks omitted).   Among other things, "NEPA requires that federal agencies prepare an EIS for any 'major Federal actions significantly affecting the quality of the human environment.'" *Id.* (quoting 42 U.S.C. § 4332(2)(C)).   Additionally, although NEPA itself "does not address the question," the applicable regulations issued by the Council on Environmental Quality ("CEQ") "call for preparation of a programmatic EIS in appropriate circumstances." *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1074 (9th Cir. 2001).   A programmatic EIS "is required for distinct projects when there is a single proposal governing the projects, or when the projects are 'connected,' 'cumulative,' or 'similar' actions under the regulations implementing NEPA." *Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002) (citations omitted).   "Although federal agencies are given considerable discretion to define the scope of NEPA review, connected, cumulative,

and similar actions must be considered together to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.* at 894 (citation and quotation marks omitted). Finally, because NEPA itself does not "contain provisions allowing a right of action," a party seeking to assert a NEPA violation must "bring an action under the APA." *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998). Under the APA, "the person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion" and "the 'agency action' in question must be 'final agency action.'" *Lujan v. Defenders of Wildlife*, 497 U.S. 871, 882 (1990) (citations omitted).

In *Whitewater Draw*, the plaintiffs asserted a NEPA/APA claim that is similar to Count One. There, the plaintiffs (a collection of "organizations and individuals who seek to reduce immigration into the United States because it causes population growth, which in turn . . . has a detrimental effect on the environment") alleged that DHS violated NEPA "by failing to consider the environmental impacts of various immigration programs and immigration-related policies." 5 F.4th at 1003-04, 1010-11. The seven programs and policies at issue were (1) employment-based immigration; (2) family-based immigration; (3) long-term nonimmigrant visas; (4) parole; (5) Temporary Protected Status; (6) refugees; and (7) asylum. *Id.* at 1010.[2] The district court granted DHS's motion to dismiss this claim under Rule 12(b)(6) and the Ninth Circuit affirmed, holding that a plaintiff asserting an APA claim "must direct its attack against some *particular* agency action that causes it harm" and, as a result, the APA "precludes broad programmatic attacks, whether couched as a challenge to an agency's action or failure to act." *Id.* (cleaned up). The court reasoned that the plaintiffs' claim qualified as an impermissible "broad programmatic attack"

---

[2] Although the plaintiffs in *Whitewater Draw* also identified an eighth program, Deferred Action for Childhood Arrivals ("DACA"), that was subject to the challenge, the Ninth Circuit analyzed the DACA challenge separately from the challenge to the other seven programs. *Id.* at 1010 n.5. Here, similarly, to the extent the State wishes to raise individual APA/NEPA challenges to discrete components of the alleged Population Augmentation Program, as it has done in Count Two (border wall cessation) and Count Three (MPP rescission), such challenges do not run afoul of the prohibition against broad programmatic attacks.

because "the challenged 'programs' merely refer to continuing operations of DHS in regulating various types of immigration." *Id.* at 1012. Although the court acknowledged that requiring a "case-by-case approach is understandably frustrating to those seeking across-the board relief," it concluded that "Plaintiffs either must identify a particular action by DHS that they wish to challenge under the APA, or they must pursue their remedies before the agency or in Congress." *Id.* at 1011-12 (cleaned up).

If the challenge in *Whitewater Draw* to seven of DHS's policies and programs related to immigration was treated as a "broad programmatic attack" that is unreviewable under the APA, it is difficult to see how the State's claim in Count One could escape the same characterization. The State is seeking to challenge all of Defendants' actions pertaining to "encouraging immigration" and "augmenting population" by characterizing an amalgamation of actions implemented by two different federal agencies as a "*de facto* program" that has, "in effect," encouraged migration and population growth. (Doc. 17 at 11.) This approach is foreclosed by *Whitewater Draw*, which holds that a "challenge [to] *all* rules relating to one subject matter in the aggregate . . . is not sufficient for review under the APA." 5 F.4th at 1012 n.7.

Courts have repeatedly held that similar "broad programmatic attacks" cannot be brought under the APA. *See, e.g., Lujan*, 497 U.S. at 890 (concluding that a "challenge [to] the entirety of petitioners' so-called 'land withdrawal review program' . . . [was] not an 'agency action' . . . , much less a 'final agency action,'" because the challenged program was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans"); *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 60-64 (2004) (rejecting APA action alleging that agency violated NEPA in the course of "fail[ing] to act to protect public lands in Utah from damage caused by [off-road vehicle] use" and emphasizing that that the APA's requirement that a plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take* . . . rule[s] out several kinds of challenges,"

- 10 -

including "broad programmatic attack[s]" of the sort rejected in *Lujan*); *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) ("[Plaintiffs] contend that the totality of various government actions contributes to the deprivation of constitutionally protected rights. Because the APA only allows challenges to discrete agency decisions, the plaintiffs cannot effectively pursue their constitutional claims—whatever their merits—under that statute.") (citations omitted).   As one treatise summarizes: "The APA authorizes challenges to specific actions—such as a particular rule or order.  It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'"  33 Charles Alan Wright et al., Fed. Prac. and Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update).  That is exactly what the State is attempting to do in Count One—characterize a "mish-mash" of actions by two different federal agencies as a unitary program.

With that said, courts have seemed to draw a distinction between "broad programmatic attacks" on an agency's actions in a particular subject area (which are verboten under *Whitewater Draw*, *Lujan*, and *SUWA*) and a claim that an agency was required to prepare a "programmatic EIS."  As noted, the Ninth Circuit has recognized that the latter type of claim is cognizable.  *Dombeck*, 304 F.3d at 894 ("Plaintiffs can . . . prevail on [a] claim that [an agency] should have issued a single EA or EIS . . . .").   Nevertheless, a failure-to-issue-a-programmatic-EIS claim lies where "the agency's goal was to minimize the possible cumulative environmental impacts by segmenting" its analysis of the environmental impact of one action "from the analysis of other foreseeable actions." *Churchill Cnty.*, 276 F.3d at 1079.   *See also Dombeck*, 304 F.3d at 895 (rejecting programmatic EIS claim because "[n]othing in the record suggests that the Forest Service's goal was to segment review of the road density amendments so as to minimize their seeming cumulative impact").  Here, there is no allegation that Defendants attempted to "segment" or "minimize" the collective environmental impact of their plan to augment the population by only conducting individual analyses of the impact of each component of the plan.  To the contrary, the State alleges that Defendants failed to perform individual EISs

for any of the component parts of the alleged plan.  (Doc. 13 ¶ 152.)  Defendants, in turn, deny that the alleged Population Augmentation Program even exists.  (Doc. 24 at 45 ["There is no 'Population Augmentation Program.'"].)  The State has not identified any case suggesting that a failure-to-issue-a-programmatic-EIS claim will lie in this circumstance and the Court is skeptical that such a claim could be reconciled with *Whitewater Draw*, *Lujan*, and *SUWA*, all of which suggest that a plaintiff cannot unilaterally characterize a collection of agency policies and programs as a unitary agency action when the agency itself has never viewed the policies and programs in that fashion.

The cases cited by the State do not compel a different conclusion.  For example, *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008), involved a dissimilar regulatory regime.  There, the Federal Communications Commission ("FCC") was exempted, by regulation, from considering the environmental impact of individual communications towers, but a different regulation authorized parties to file a petition requesting further review if they believed that a "particular action, otherwise categorically excluded, will have a significant environmental effect."  *Id.* at 1032-33.  The regulations further provided that, upon receipt of such a petition, the FCC was required to obtain an environmental assessment ("EA") if it determined there was as possibility of a significant environmental impact.  *Id.*  Finally, depending on the results of the EA, the FCC was potentially required to prepare a programmatic EIS.  *Id.*  The controversy in *American Bird Conservancy* arose when the FCC denied a petition for review without obtaining an EA. *Id.* at 1029.   The D.C. Circuit held that this was error because "the Commission's regulations mandate at least the completion of an EA before the Commission may refuse to prepare a programmatic EIS."  *Id.* at 1034.  Here, in contrast, the State's claim does not arise against a regulatory backdrop that expressly grants interested parties to right to request a programmatic EIS concerning an agency's actions in a specific area (*i.e.*, communications tower approvals).  As Defendants aptly put it, "[n]owhere did the [*American Bird Conservancy*] court suggest that a plaintiff could compel programmatic NEPA analysis for a program of the plaintiff's own making."  (Doc. 24 at 43.)

- 12 -

Meanwhile, in *Forelaws on Board v. Johnson*, 743 F.2d 677 (9th Cir. 1984), an agency prepared "what it termed an 'Environmental Report'" in an effort to evaluate the environmental consequences of a series of 145 long-term contracts for power delivery that it offered to customers, but this document did not analyze the environmental consequences "in detail" and thus "did not . . . do what an environmental impact statement is supposed to do." *Id.* at 681.  As a result, the Ninth Circuit "agreed with plaintiffs that an EIS should have been prepared prior to the offer of contracts."  *Id.* at 685.  This outcome, at most, shows that when an agency chooses to perform a programmatic EIS, it must do so in a competent manner.  It does not support the State's position here, which is that a pair of federal agencies must prepare a programmatic EIS concerning an assortment of policies and programs that the agencies themselves do not view as an overarching plan.  Neither does *Center for Biological Diversity v. Nielsen*, 2018 WL 5776419 (D. Ariz. 2018), where the plaintiffs' theory was that an agency improperly failed to *supplement* a programmatic EIS it had voluntarily prepared years earlier.  *Id.* at *1.

In a related vein, the Court is unpersuaded by the State's suggestion that the preparation of programmatic EISs in 1994 and 2001 for border-related activities shows that Defendants were required to prepare one here.  In a 2019 notice of withdrawal, DHS explained that the earlier programmatic EISs were "intended to address the cumulative effects" of projects undertaken on behalf of various "law enforcement agencies" by JTF-6, which was "a recently formed military command that provided assistance and support to various counter drug law enforcement agencies along the southwest border."  *See* DHS, *Notice of the Withdrawal of a 1994 Programmatic Environmental Impact Statement and a 2001 Supplemental Environmental Impact Statement Regarding Certain Activities Along the U.S. Southwest Border*, 84 Fed. Reg. 25,067 (May 30, 2019).  DHS went on to explain that it was withdrawing the earlier programmatic EISs because it was able to "achieve NEPA compliance for [certain agencies'] actions and activities on the southwest border through site-specific or project-specific NEPA analyses" and that it was "well-served" by this approach because, "[u]nlike a sprawling programmatic NEPA analysis, a site-specific

or project-specific NEPA analysis gives decision-makers tangible information regarding potential impacts of a proposed action.  In addition, because every site-specific or project-specific analysis contains an analysis of cumulative impacts, they also present decision-makers with a larger frame of reference in which to understand those impacts."  *Id.*

As this discussion shows, the 1994 and 2001 programmatic EISs covered a narrower and more discrete range of activities (*i.e.*, law enforcement authorities' efforts to combat drug trafficking) than the Population Augmentation Program is alleged to encompass.  Thus, even though government decisionmakers in 1994 and 2001 may have concluded that the former collection of activities should be analyzed via a programmatic EIS, it doesn't follow that the latter would require a programmatic EIS, too.  At any rate, the 2019 withdrawal document reveals that DHS made a reasoned decision that a "sprawling programmatic EIS" would be unnecessary because project-specific EISs would do a better job of providing the necessary analysis of cumulative environmental impacts.  The State has not argued, much less established, that the 2019 withdrawal decision was arbitrary and capricious and the Ninth Circuit has suggested that a failure-to-prepare-a-programmatic-EIS claim will not lie in this circumstance.  *Churchill Cnty.*, 276 F.3d at 1079 ("The regulations and case law would support a decision by the Service to prepare a programmatic EIS, had it decided to prepare one.  Indeed, had we been charged with the decision, we may have elected to prepare a programmatic EIS first.  The problem, of course, is that it was not our decision to make. . . .  [I]ts decision not to proceed with a programmatic EIS was not arbitrary.").

For these reasons, the State's request for a preliminary injunction as to Count One is denied.[3]

---

[3]      The State also asserts in the FAC that "[a]lternatively, each of the components of the Population Augmentation Program: *e.g.*, eliminating fines, exempting individuals from Title 42, and drastically decreasing deportation of individuals with final orders of removal, all individually have significant environmental impacts requiring preparation of an EIS." (Doc. 13 ¶ 151.)  Although the State briefly notes in its motion that these components have environmental impacts (Doc. 17 at 43-44), the State does not develop this alternative claim in any detail.  Accordingly, the Court will not address it further here.  But even assuming the State had developed this alternative theory, it would fail for the standing-related reasons discussed below as to Count Two.

III.   Count Two (Border Wall)

In Count Two of the FAC, the State raises an APA/NEPA challenge to a more discrete action: the termination of border wall construction.  Specifically, the State alleges that "the termination of border wall construction has left huge holes in the border fencing, including substantial gaps of over 100 miles along the Arizona-Mexico border," allowing migrants to "cross[] the border in Arizona in greater numbers than ever before," "signal[ing] the relative openness of the United States-Mexico border[,] and . . . encourag[ing] migration."  (Doc. 13 ¶¶ 78, 85, 89.)

Defendants argue the State is not entitled to preliminary injunctive relief on Count Two for six reasons: (1) a lack of standing (Doc. 24 at 11-16, 20-21); (2) failure to demonstrate irreparable harm in the absence of injunctive relief (*id.* at 21-22); (3) because the Secretary of DHS exercised his authority under the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") to waive all of NEPA's requirements with respect to border wall construction (*id.* at 23-26); (4) because § 102(c)(2)(A) of IIRIRA strips the federal courts of jurisdiction over any challenge to the Secretary's waiver authority (*id.* at 26-27); (5) because NEPA does not apply to federal actions, like the termination of the border wall projects, that maintain the "environmental status quo" (*id.* at 28-29); and (6) because the APA does not apply when agencies are "merely carrying out the directives of the president," which is alleged to be the case here (*id.* at 29-31).  The Court will focus on Defendants' first argument—standing—because it is dispositive of the request for injunctive relief.

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

The State contends that it has suffered two categories of injuries arising from the termination of border wall construction: (1) environmental injuries, including trash left behind by migrants, increased air emissions, growth-related impacts, and impacts to wildlife; and (2) increased costs, including education expenditures, emergency health care, community supervision of felons, and increased crime.  (Doc. 17 at 20-28.)  The parties spill much ink debating whether such injuries are sufficient to satisfy the injury-in-fact component of the standing test (and whether the State's proffered evidence is sufficient to establish the existence of its alleged injuries), but the Court finds it unnecessary to resolve the parties' disputes on these points due to the State's failure to establish a likelihood of success on (or even serious questions going to the merits of) its ability to satisfy the next element of the standing test, causation.

On that issue, the State argues that, because its NEPA claims are procedural and it is a state, it is entitled to "special solicitude" in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497 (2007), and the ordinary standing requirements of causation and redressability are "relaxed."  (Doc. 17 at 18-22.)  Defendants respond that the State's alleged injuries are premised on "enticement theories" that were explicitly rejected by the Ninth Circuit in *Whitewater Draw*.  (Doc. 27 at 3-4; *see also* Doc. 24 at 15-18.)  Defendants contend that "even if these ambiguous claims of harm from litter or greenhouse gas emissions were cognizable injuries, Arizona cannot show that they are caused by the challenged decisions rather than the result of the myriad economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States."  (Doc. 27 at 4, citation omitted.)  Defendants also rely on *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), arguing that the plaintiffs there unsuccessfully "advanced similar theories of standing to Arizona's: that a change in immigration policy . . . would increase immigration and have unwanted effects on the localities (*e.g.*, increases in crime in *Arpaio* or detrimental environmental impacts in *Whitewater Draw*)."  (Doc. 36 at 2.)  In reply, the

State argues that it is "not relying solely on an inducement theory: the border barrier would have directly prevented such crossings.  The State is *not* relying on border barriers as a purely psychological obstacle to illegal immigration, but rather principally as a *physical* and difficult-to-surmount *literal* wall."  (Doc. 29 at 3.)  Accordingly, the State contends that its asserted injuries "are not remotely comparable to the impacts at issue" in *Whitewater Draw* and *Arpaio* because "[i]n both of those cases there was considerable attenuation between the 2012 DACA policy, subsequent immigration, and the alleged impacts . . . .  By contrast, here there is no need to extrapolate at all from construction termination to the impacts in question.  The State is supported by specific evidence that migrants have been and are crossing—in incredible and unprecedented numbers—in the areas where Defendants have terminated border wall construction."  (*Id.* at 12.)  The State also reasserts that the standards for causation and redressability are "loosened" under *Massachusetts*.  (*Id.* at 10.)

Once again, the Court agrees with Defendants that *Whitewater Draw* largely drives the analysis.  There, in addition to raising a "broad programmatic attack" against a collection of DHS immigration-related policies (which, as discussed in Part II above, was dismissed for failure to state a claim), the plaintiffs asserted an APA/NEPA challenge to a specific DHS program, Deferred Action for Childhood Arrivals ("DACA"), which was "a policy to defer removal proceedings for two years (subject to renewal) for individuals who came to the United States as children, met certain eligibility criteria, and cleared a background check."  5 F.4th at 1014.  The Ninth Circuit dismissed this claim for lack of standing.  *Id.* at 1014-16.  Notably, the court did not take issue with the plaintiffs' theory that increased immigration leads to environmental harm and that such environmental harm qualifies as an injury-in-fact.  *Id.* at 1014 n.10.  Instead, the court held that the plaintiffs could not establish causation because they could not demonstrate that DHS's challenged program was the cause of increased illegal immigration to the United States, as opposed to "the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States."  *Id.* at 1015 (cleaned up).

1    Similarly, in a different portion of the opinion, the Ninth Circuit held that the plaintiffs

2    could not establish causation with respect to their APA/NEPA challenge to two specific

3    visa-related programs ("the DSO and STEM Rules"), which the plaintiffs characterized as

4    "lead[ing] to permanent population growth by encouraging additional foreign students to

5    come to the United States," because they "fail[ed] to show that these aliens would [come

6    to the United States] *because* of the challenged rules.  As with the DACA claim, any

7    number of variables might influence an alien's independent decision to resettle."  *Id.* at

8    1017.

9        It is difficult to see how the Ninth Circuit would reach a different conclusion

10   here.  The State's theory is that the existing gaps in the border wall are enticing aliens who

11   would otherwise remain in Mexico to stream into Arizona, which is in turn causing all

12   manner of environmental and financial harm, and that if those gaps had only been filled

13   through continued construction of the border wall, the would-be entrants would have been

14   deterred from entering.  There are two problems with this logic.  First, Defendants have

15   submitted undisputed evidence that the cancelled projects affect, at most, 18 miles of

16   territory, that "there are still a number of areas along the border in Arizona where there is

17   no barrier," and that "even if DHS and DoD had completed all the barrier that was planned

18   for Arizona . . . those gaps would have persisted."  (Doc. 24-1 ¶ 14.)  The State does not

19   argue otherwise.  (Doc. 27 at 14 [not disputing that "the cancelled portions of the border

20   wall still leave gaps along Arizona's 370-mile border with Mexico"].)  Thus, regardless of

21   Defendants' action or inaction, Arizona would have been left with an incomplete wall on

22   its southern border filled with gaps.  It is speculative, to put it charitably, that the less-

23   incomplete version of the border wall the State wishes to compel Defendants to build would

24   necessarily deter migrants from entering Arizona.  An incomplete wall is an incomplete

25   wall.

26       Second, and more broadly, the State fails to acknowledge that aliens committed to

27   entering the United States have time and again found ways to overcome and bypass walls

28

on the southern border.[4]   At bottom, the State is asking the Court to speculate about why aliens choose to enter the country illegally and about whether the construction of certain impediments to their entry—which would not eliminate the many other avenues of entry—would result in effective deterrence, such that the absence of those impediments may be said to be the literal cause of increased migration to Arizona.   The Court concludes that this "chain of reasoning," like the chain of reasoning in *Whitewater Draw*, is marred by "attenuation . . . unsupported by well-pleaded facts" and impermissibly ignores "the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States."   *Whitewater Draw*, 5 F.4th at 1015 (cleaned up).   "[A]ny number of variables might influence an alien's independent decision" to enter the country illegally, and the State has failed to show that "aliens would do so *because of*" Defendants' failure to build portions of an incomplete border wall.   *Id.* at 1017.   As the Supreme Court has emphasized, when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed [to prove causation].   In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. . . .   Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."   *Lujan*, 504 U.S. at 562 (citations omitted).

The evidence submitted by the State does nothing to shore up these deficiencies. Although the State submits evidence that migration "has increased dramatically since the

---

[4]      *See, e.g.*, *United States v. Leos-Maldonado*, 302 F.3d 1061, 1062 (9th Cir. 2002) (affirming attempted illegal-reentry conviction where, "[t]wo months after being deported to Mexico, [the defendant], along with six other Mexican nationals, climbed the fence along the international border"); *United States v. Antona-Flores*, 2009 WL 484410, *1 (D. Ariz. 2009) ("Defendant was arrested west of the City of San Luis, Arizona.   The border between Mexico and the United States in this location . . . follows the former path of the Colorado River . . . [and] illegal aliens attempting to cross the border in this area would be required to walk east across the river bottom, swim the canal, and climb over, under, or through the secondary fence."); *United States v. Torres-Castillo*, 2010 WL 3057345, *1 (S.D. Cal. 2010) ("Petitioner, a Mexican citizen with a previous deportation from the United States, was found, along with two other individuals, in the trunk of a car at the Otay Mesa Port of Entry into the United States.").

issuance of the Border Wall Proclamation" (Doc. 17 at 7, citing Doc. 17-2 at 9-10 [Flood report]), the State makes no effort to show that the increase was caused *by the cessation of construction on the border wall*, as compared to economic, social, and political factors (or due to the many other immigration-related policies and programs the State seeks to challenge in this action).[5]   Nor would it make sense to attribute the immediate increase in migration to the cessation of construction activities, given that the border wall would not have otherwise been completed overnight (and, thus, the immediate increase in migration cannot be attributed to the cessation).   At most, then, the State has shown a temporal correlation between the President's proclamation and an increase in migration to Arizona. But "[c]orrelation is not causation." *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988).   *See also Whitewater Draw*, 5 F.4th at 1018 (holding that the plaintiffs' expert's affidavit was insufficient to prove causation because it "provide[d] only general population increase numbers" and did not "draw any line connecting the [specific challenged rules] to population increase").   This flaw also undermines the State's contention "that the termination of wall construction has led to an increase in fentanyl coming into the state." (Doc. 29 at 11.  *See also* Docs. 21, 21-2.)  As Defendants correctly point out, the State's proffered statistics "includ[e] amounts seized at ports of entry."  (Doc. 24 at 14.)  To the extent there has been an uptick in drug smuggling activities via Arizona's ports of entry since the challenged policies and programs went into effect, this undermines rather than supports the notion that the unfilled gaps in the border wall attributable to Defendants' cessation plan are the but-for cause of more crime.

*Texas v. Biden* does not compel a different conclusion on the issue of causation.  First, the facts of *Texas v. Biden* were different from the facts here, at least as they pertain to Count Two.  In *Texas v. Biden*, the challenge was to DHS's recission of the

---

[5]     The State's failure to disaggregate the increased migration allegedly caused by the termination of border wall construction from the increased migration allegedly caused by the other policies and practices it seeks to challenge in this action is a critical omission for purposes of its standing to pursue Count Two.  As the Supreme Court has noted, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  "A plaintiff must [instead] demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

MPP.  Due to the mechanics of how that program worked, its presence or absence was the but-for explanation for why certain aliens remained in the United States or were returned to Mexico.  20 F.4th at 972-73.  The State makes this point in the portions of its briefs addressing whether it has standing with respect to Count Three of the FAC, which also raises a challenge to the termination of the MPP.  (Doc. 29 at 17 ["Arizona has shown that the MPP is leading to thousands of new migrants, both indirectly through changed incentives and directly by releasing individuals into the country who otherwise would be removed.  A highway interchange *may lead* to additional growth in an area.  But adding additional people directly *is* growth."].)  But the same is not true with respect to the termination of border wall construction.  As discussed above, one is still forced to speculate about whether the unfilled gaps, as opposed to "the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States," are the cause of increased migration.  Second, *Texas v. Biden* is a decision of the Fifth Circuit, not the Ninth Circuit.  To the extent there are conflicts between *Texas v. Biden* and *Whitewater Draw* concerning how to analyze standing and causation in this context, this Court obviously must follow Ninth Circuit law, which makes clear that "[a]lthough causation and redressability requirements are relaxed when a plaintiff has established injury in fact under NEPA, the causation requirement remains implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant.  Stated otherwise, . . . a claim of procedural injury [under NEPA] does not relieve Plaintiffs of their burden—even if relaxed—to demonstrate causation."  5 F.4th at 1015 (citations and internal quotation marks omitted).

Nor is there any merit to the State's contention that *Whitewater Draw* is distinguishable because the plaintiffs in that case were private individuals and entities, whereas it is a State and is therefore entitled to "special solicitude" in the standing analysis.  (Doc. 44 at 1-3.)  Although the law on this point is not entirely clear—as other courts have noted, there is a "lack of guidance on how lower courts are to apply the special solicitude doctrine to standing questions," *Wyoming v. U.S. Dept. of Interior*, 674 F.3d 1220, 1238

(10th Cir. 2012)—the special solicitude appears to go only to the redressability and immediacy aspects of the standing analysis, not causation. *Massachusetts*, 549 U.S. at 517-21 (holding that, because states are "entitled to special solicitude in our standing analysis," they need not "meet[] all the normal standards for redressability and immediacy"); *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1144 (9th Cir. 2013) ("The [*Massachusetts*] Court . . . relaxed the standing requirement [in part because] Massachusetts was exercising a procedural right to challenge the rejection of its rulemaking petition, which permitted it to 'assert that right without meeting all the normal standards for redressability and immediacy.'") (citation omitted). Indeed, in *Massachusetts*, the fact of causation was not disputed. 549 U.S. at 523 ("EPA does not dispute the existence of a causal connection between manmade greenhouse gas emissions and global warming.").

Finally, to the extent the State argues that the cessation of border wall construction has resulted in harm to wildlife and endangered species in Arizona (as opposed to environmental and economic harm suffered directly by the State due to increased human migration), this argument is unavailing. As an initial matter, it is not clear that the State may rely on such alleged harms for purposes of its NEPA claim in Count Two. In Count Four of the FAC—a claim the State has since agreed to withdraw (Doc. 20 ¶ 4)—the State alleged that Defendants violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, by failing to "engage[] in any consultation under ESA Section 7 regarding potential impacts to threatened and [endangered] species from the Border Wall Construction Termination." (Doc. 13 ¶¶ 160-65.) Ninth Circuit law suggests that a plaintiff may not assert a NEPA claim against an agency for failing to consider impacts on threatened and endangered species when such a claim could be brought under the ESA. *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1502-05 (9th Cir. 1995) (concluding, under the heading "ESA Procedures Have Displaced NEPA Requirements," that the ESA's "carefully crafted" procedural framework "displaces NEPA's procedural and informational requirements"); *Bennett v. Plenert*, 63 F.3d 915, 922 (9th Cir. 1995), *reversed on other grounds by Bennett v. Spear*, 520 U.S. 154 (1997) ("*Douglas County* squarely holds that no NEPA claim lies

for a violation of the ESA's provisions for determining critical habitat.").

At any rate, even assuming that Count Two could be predicated on such harms, the evidence proffered by the State is too conclusory and speculative to establish causation for purposes of a preliminary-injunction request. That evidence consists of a declaration from Cameo Flood, who asserts in relevant part as follows:

> The cessation of border wall construction will likely result in diversion of illegal immigration and wildlife migration through the remaining currently open pathways, *potentially* affecting the wildlife and ecology in these areas in ways they would not have been affected otherwise. However, the *potential* effects of this scenario on the threatened and endangered species that occur in some of these areas, including the Mexican gray wolf, jaguar, ocelot, and Sonoran pronghorn, have not been studied through the ESA consultation process. As Vice magazine reported, "Border wall construction in eastern and western Arizona has created a bottleneck for species, forcing them into the remaining open portions in the center of the state in the San Rafael Valley and the Tohono O'odham Nation. That *could* lead to a variety of unknown consequences, from migration and mating patterns, to throwing predator-prey relationships out of whack. It *could* also potentially eliminate endangered species who might not be able to survive the change" (Janowitz, 2021). [¶] Cessation of the construction of the border wall *could* have significant impacts on humans, wildlife including threatened and endangered species, and the environment. The National Environmental Policy Act and the Endangered Species Act mandate that federal agencies document the impacts of proposed federal actions on the human environment and minimize impacts to threatened and endangered species. No Federal government review of the impacts of the cessation of wall construction on threatened and endangered species in the region was undertaken, violating the ESA. [¶] Sonoran pronghorn or jaguar or others can continue to migrate but *could* be funneled to certain areas. Furthermore, these and other species *could* be impacted by invasive species carried by migrants or as a result of the loss of habitat from human traffic and more fire starts from migrants.

(Doc. 17-2 at 12, emphases added.) Distilled to its core, this declaration consists of speculation that the cessation of border wall construction "could" have a "potential" negative effect on certain threatened and endangered species living in Arizona, at least according to an article in *Vice* magazine. The Court has serious doubt that this evidence would be sufficient to meet the State's ultimate burden of establishing causation. *Compare*

*California v. Trump*, 963 F.3d 926, 936-38 (9th Cir. 2020) (states raising non-NEPA challenge to border wall construction had standing where they proffered an array of evidence that explained, in detail, why the challenged construction efforts "would" and "will" have various "significant adverse impacts" on certain wildlife species). And in the face of such doubt, preliminary injunctive relief—which may not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion"—is unavailable. *Lopez*, 680 F.3d at 1072.

For these reasons, the State's request for a preliminary injunction as to Count Two is denied.

## IV.   Count Three (MPP)

In Count Three of the FAC, the State alleges that Defendants' "cancellation of the MPP has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA." (Doc. 13 ¶ 158.) The only form of injunctive relief sought by the State in conjunction with this claim is an injunction barring "Defendants from processing any further migrants into the United States, who were and who would have been covered by the MPP until such time as Defendants comply with NEPA." (*Id.* at 42.)

The parties' briefing related to Count Three is voluminous and raises an array of complicated issues. At least for now, it is unnecessary to wade into this thicket. As noted, the Fifth Circuit in *Texas v. Biden* recently upheld the issuance of an injunction that "vacated the [MPP] Termination Decision, 'permanently enjoined and restrained [DHS] from implementing or enforcing' it, and ordered DHS 'to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens because of a lack of detention resources.'" 20 F.4th at 945. In a recent supplemental filing, Defendants argue that although they believe *Texas v. Biden* was wrongly decided, it "makes Arizona's request for injunctive relief redundant and so properly subject to denial even if the request were otherwise justified." (Doc. 42 at 2.)

- 24 -

The Court agrees.  In *California v. Trump*, 963 F.3d 926 (9th Cir. 2020), the Ninth Circuit addressed an analogous situation.  There, two different groups of plaintiffs (public interest groups and states) filed "separate action[s]" "challenging the Executive Branch's funding of the border wall." *Id.* at 934.  After the district court granted the public interest groups' preliminary injunction request, it "denied without prejudice" the states' preliminary injunction request on the ground that it "would be duplicative." *Id.* at 935. Similarly, the court later issued a permanent injunction in favor of the public interest groups and then denied the states' request for a permanent injunction. *Id.*  The Ninth Circuit affirmed in relevant part, holding that the denial of the states' request for injunctive relief on redundancy grounds "was certainly not an abuse of discretion." *Id.* at 949-50.  Notably, this was true even though the Supreme Court subsequently issued a stay as to the injunction issued in favor of the public interest groups. *Id.*  The Ninth Circuit simply noted that, "depending on further developments in these cases, the States are free to seek further remedies in the district court or this Court." *Id.*

Here, similarly, there would be no point in preliminarily enjoining Defendants "from processing any further migrants into the United States, who were and who would have been covered by the MPP" (Doc. 13 at 42) because Defendants are already precluded from engaging in such conduct by virtue of *Texas v. Biden*, which upheld the reversal of the MPP termination decision and ordered DHS "to enforce and implement MPP in good faith."  20 F.4th at 945.

Accordingly,

**IT IS ORDERED** that the State's motion for preliminary injunction (Doc. 17) is **denied**.