1    **WO**

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9    State of Arizona, et al.,                    No. CV-21-00617-PHX-DWL

10                        Plaintiff,              **ORDER**

11   v.

12   Alejandro Mayorkas, et al.,

13                        Defendants.

14

15                                **INTRODUCTION**

16          In this action, the State of Arizona ("the State") has sued an array of federal agencies

17   and officials for implementing what the State characterizes as "the Population

18   Augmentation Program," which is a "collection of policies of Defendants that have the

19   direct effect of causing growth in the population of the United States generally, and Arizona

20   specifically, through immigration."   (Doc. 13 ¶¶ 1-12, 33, 61-65.)   The five specific

21   components of the Population Augmentation Program identified by the State, which "all

22   work in tandem," are: (1) President Biden's January 2021 "proclamation" to stop building

23   the border wall, which has since been implemented by the Department of Homeland

24   Security ("DHS") and the Department of Defense ("DoD"); (2) DHS's formal recission in

25   June 2021 of the Migrant Protection Protocols ("MPP"), a program created in 2018 to

26   "ensure[] that individuals who lacked a legal basis to be in the United States, and who had

27   passed through Mexico *en route* to the United States, had to remain in Mexico for the

28   duration of their immigration proceedings"; (3) DHS's discontinuation in April 2021 of the

practice of issuing fines to aliens who fail to comply with orders to leave the country; (4) DHS's decision in May 2021 to exempt 250 migrants per day from a pandemic-related public health order barring the entry of migrants without valid travel documents; and (5) DHS's issuance of a guidance in February 2021 that has resulted in "detaining fewer migrants than ever, including migrants with serious felony convictions."  (*Id.* ¶¶ 61-65.)

The State, to be clear, emphasizes that it has no quarrel with immigrants or "population grown *per se*."  (*Id.* ¶¶ 13, 135.)  Instead, the State contends that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, by failing to consider the environmental impact of their challenged policies and programs, including "the proliferation of garbage and refuse as a result of the transit of hundreds of thousands of migrants"; "increased air emissions, including emissions of greenhouse gases"; other unspecified "growth impacts" arising from the fact that "[m]igrants (like everyone else) need housing, infrastructure, hospitals, and schools"; and impacts to "wildlife and endangered species," such as the creation of "*de facto* predator corridors" caused by the existing gaps in the border wall.  (*Id.* ¶¶ 112-47.)

To that end, the State has moved for a preliminary injunction on three of its claims, all of which arise under the Administrative Procedures Act ("APA") and are premised on the notion that Defendants were required by NEPA to prepare an environmental impact statement ("EIS") before pursuing the policies and programs in question.  (Doc. 17.)[1] However, as the briefing process was unfolding, the legal landscape twice shifted.  First, in mid-July 2021, less than a week after the State filed its operative complaint, the Ninth Circuit decided *Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021).  There, the court upheld the dismissal of NEPA claims that were premised, similar to the State's claims here, on the theory that the plaintiffs suffered harm as a result of immigration-related policies that encouraged population growth.  Meanwhile, in mid-December 2021, the Fifth Circuit decided *Texas v. Biden*, 20 F.4th 928 (5th Cir.

---

[1]     The State also asserts various non-NEPA claims in its complaint (Doc. 13 ¶¶ 160-85) but does not move for a preliminary injunction on those claims (Doc. 17 at 4 n.1). Thus, the analysis here is confined to the NEPA claims.

2021).  There, the court upheld the issuance of a permanent injunction that required DHS to overturn its recission of the MPP (albeit for different reasons than the State advances in its preliminary injunction request).

Given these developments, the State's motion does not present a particularly close call.  As explained below, the State has not shown a likelihood of success on (or even serious questions going to the merits of) its first claim, which is a challenge to the entirety of the alleged "Program Augmentation Program," because, as *Whitewater Draw* makes clear, it is impermissible for a NEPA plaintiff to challenge an amalgamation of individual programs and policies in this fashion.  As for the State's second claim, which is a challenge to the cessation of border wall construction, *Whitewater Draw* undermines the State's position for a different reason—because it casts doubt upon the so-called "enticement theory" of environmental harm on which the State largely relies to establish causation.  Alternatively, even if the State had standing to pursue this claim, the Court is skeptical that NEPA has any applicability where, as here, the challenged agency action is the cessation of construction that has the effect of preserving the environmental status quo.  Finally, it is unnecessary to delve into the merits of the State's third claim, which is a challenge to the rescission of the MPP, in light of the Fifth Circuit's ruling in *Texas v. Biden*.  The Ninth Circuit has recognized that it is unnecessary to issue what would essentially be a piggyback injunction where a different court has already enjoined the same conduct.

## BACKGROUND

On April 11, 2021, the State initiated this action by filing a complaint for declaratory and injunctive relief.  (Doc. 1.)

On July 12, 2021, the State filed its operative pleading, the first amended complaint ("FAC").  (Doc. 13.)  The named defendants are two federal agencies (DHS and DoD), three DHS officials who are sued in their official capacities, and one DoD official who is sued in his official capacity.  (*Id.* ¶¶ 20-25.)

On July 14, 2021, the State filed the pending motion for preliminary injunction. (Doc. 17.)

On July 19, 2021, the Ninth Circuit decided *Whitewater Draw*.

On August 20, 2021, the State filed a notice of factual and legal developments. (Doc. 21.)

On September 3, 2021, Defendants filed a response to the motion for preliminary injunction.  (Doc. 24.)

On October 1, 2021, Defendants filed a motion to dismiss the FAC.  (Doc. 27.)

On October 18, 2021, the State filed a corrected reply in support of its motion for preliminary injunction.  (Doc. 29.)  Although the preliminary injunction request became fully briefed at this point, the Court did not immediately set a hearing because the motion-to-dismiss briefing continued to develop and elaborate upon some of the arguments raised in the preliminary-injunction briefing.

On October 25, 2021, the State filed a second notice of additional factual developments.  (Doc. 31.)

On November 18, 2021, the State filed a response to the motion to dismiss.  (Doc. 33.)

On December 10, 2021, Defendants filed a reply in support of the motion to dismiss. (Doc. 36.)

On December 13, 2021, the Fifth Circuit decided *Texas v. Biden*.  An amended version of the decision was issued on December 19, 2021.

On January 3, 2022, the State filed a notice of supplemental authority regarding *Texas v. Biden*.  (Doc. 37.)

On January 10, 2022, the State filed a third notice of additional factual developments.  (Doc. 38.)

On January 21, 2022, Defendants filed a response to the State's notice of supplemental authority and third notice of additional factual developments.  (Doc. 42.)

On January 26, 2022, the State filed a reply to Defendants' response.  (Doc. 44.)

On January 27, 2022, the Court issued a tentative ruling.  (Doc. 45.)

On February 1, 2022, the Court heard oral argument.  (Doc. 46.)

**ANALYSIS**

I.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such a "drastic remedy . . . should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted).

To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief is denied, (3) that the balance of equities weighs in the plaintiff's favor, and (4) that the public interest favors injunctive relief.  *Id.* at 20.  The Ninth Circuit has also stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  Regardless of which standard applies, the movant "carries the burden of proof on each element of the test." *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Also, "[w]hen the government is a party, the[] last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The first factor incorporates an assessment of both the plaintiff's standing and the merits of the underlying claim.  *LA Alliance for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 958 (9th Cir. 2021) (reversing preliminary injunction in part because "Plaintiffs have not made the required 'clear showing' that any individual Plaintiff has standing to bring the . . . claim"); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1104 (9th Cir. 2005) ("We therefore hold that R-CALF lacks standing to bring a NEPA challenge to the Final Rule.  Thus, the district court erred in . . . concluding that it had a likelihood of success on that claim.").

…

…

…

II.     <u>Count One (Population Augmentation Program)</u>

In Count One of the FAC, the State argues that Defendants violated NEPA by failing to prepare a "programmatic EIS" before adopting the Population Augmentation Program. (Doc. 13 ¶ 152.)  Defendants argue the State is not entitled to preliminary injunctive relief on Count One for five reasons: (1) a lack of standing (Doc. 24 at 11-16, 20-21); (2) failure to demonstrate irreparable harm in the absence of injunctive relief (*id.* at 21-22); (3) because "the APA's requirement of a discrete 'final agency action' precludes broad, programmatic challenges where the agency has not itself proposed a programmatic action," and thus "Arizona's programmatic NEPA challenge is not cognizable" (*id.* at 40-45); (4) because the components of the alleged Population Augmentation Program are, for various reasons, not subject to individual challenge (*id.* at 45-47); and (5) because the equities weigh against the State's request (*id.* at 47-49).  The Court will focus on Defendants' third argument—whether the type of challenge being asserted in Count One is cognizable—because it is dispositive of the request for injunctive relief.

On that issue, the State argues that Defendants were required to prepare a programmatic EIS to consider the collective environmental impact of all of the components of the Population Augmentation Program and that Defendants' failure to do so is actionable because courts have "made clear that the failure to prepare a programmatic EIS for ongoing agency programs is reviewable under the APA and NEPA."  (Doc. 17 at 23-25, 34-37.) The State further contends that because "the Population Augmentation Program's individual components all constitute final agency action, . . . the constellation of them should be no less reviewable."  (*Id.*)  In response, Defendants argue that multiple decisions of the Supreme Court, as well as *Whitewater Draw*, "expressly forbid broad, programmatic APA challenges when the agency has not itself proposed a programmatic action."  (Doc. 24 at 40-45.)  In reply, the State argues that Defendants' cited cases are distinguishable because "here the challenged program actually exists" and note that, in 1994 and 2001, the government prepared programmatic EISs for similar collections of programs.  (Doc. 29 at 19-21.)

Defendants have the better side of these arguments.  As background, NEPA "imposes procedural requirements" that are intended to "protect[] the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (citations and internal quotation marks omitted).  Among other things, "NEPA requires that federal agencies prepare an EIS for any 'major Federal actions significantly affecting the quality of the human environment.'" *Id.* (quoting 42 U.S.C. § 4332(2)(C)).  Additionally, "although NEPA does not address the question," the applicable regulations issued by the Council on Environmental Quality ("CEQ") "call for preparation of a programmatic EIS in appropriate circumstances." *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1074 (9th Cir. 2001).  A programmatic EIS "is required for distinct projects when there is a single proposal governing the projects, or when the projects are 'connected,' 'cumulative,' or 'similar' actions under the regulations implementing NEPA." *Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002) (citations omitted).  "Although federal agencies are given considerable discretion to define the scope of NEPA review, connected, cumulative, and similar actions must be considered together to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.* at 894 (citation and quotation marks omitted).  Finally, because NEPA itself does not "contain provisions allowing a right of action," a party seeking to assert a NEPA violation must "bring an action under the APA." *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998).  Under the APA, "the person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion" and "the 'agency action' in question must be 'final agency action.'" *Lujan v. Defenders of Wildlife*, 497 U.S. 871, 882 (1990) (citations omitted).

In *Whitewater Draw*, the plaintiffs asserted a NEPA/APA claim that is similar to Count One.  There, the plaintiffs (a collection of "organizations and individuals who seek

to reduce immigration into the United States because it causes population growth, which in turn . . . has a detrimental effect on the environment") alleged that DHS violated NEPA "by failing to consider the environmental impacts of various immigration programs and immigration-related policies." 5 F.4th at 1003-04, 1010-11.  The seven programs and policies at issue were (1) employment-based immigration; (2) family-based immigration; (3) long-term nonimmigrant visas; (4) parole; (5) Temporary Protected Status; (6) refugees; and (7) asylum.  *Id.* at 1010.[2]  The district court granted DHS's motion to dismiss this claim under Rule 12(b)(6) and the Ninth Circuit affirmed, holding that a plaintiff asserting an APA claim "must direct its attack against some *particular* agency action that causes it harm" and, as a result, the APA "precludes broad programmatic attacks, whether couched as a challenge to an agency's action or failure to act." *Id.* (cleaned up).  The court reasoned that the plaintiffs' claim qualified as an impermissible "broad programmatic attack" because "the challenged 'programs' merely refer to continuing operations of DHS in regulating various types of immigration." *Id.* at 1012.  Although the court acknowledged that requiring a "case-by-case approach is understandably frustrating to those seeking across-the board relief," it concluded that "Plaintiffs either must identify a particular action by DHS that they wish to challenge under the APA, or they must pursue their remedies before the agency or in Congress." *Id.* at 1011-12 (cleaned up).

If the challenge in *Whitewater Draw* to seven of DHS's immigration-related policies and programs was treated as a "broad programmatic attack" that is unreviewable under the APA, it is difficult to see how the State's claim in Count One could escape the same characterization.  The State is seeking to challenge all of Defendants' actions pertaining to "encouraging immigration" and "augmenting population" by characterizing a collection of

---

[2]  Although the plaintiffs in *Whitewater Draw* also identified an eighth program, Deferred Action for Childhood Arrivals ("DACA"), that was subject to the challenge, the Ninth Circuit analyzed the DACA challenge separately from the challenge to the other seven programs.  *Id.* at 1010 n.5.  Here, similarly, to the extent the State wishes to raise individual APA/NEPA challenges to discrete components of the alleged Population Augmentation Program, as it has done in Count Two (border wall cessation) and Count Three (MPP rescission), such challenges do not run afoul of the prohibition against broad programmatic attacks.

actions implemented by two different federal agencies as a "*de facto* program" that has, "in effect," encouraged migration and population growth.  (Doc. 17 at 11.)  This approach is foreclosed by *Whitewater Draw*, which holds that a "challenge [to] *all* rules relating to one subject matter in the aggregate . . . is not sufficient for review under the APA."  5 F.4th at 1012 n.7.

Courts have repeatedly held that similar "broad programmatic attacks" cannot be brought under the APA.  *See, e.g.*, *Lujan*, 497 U.S. at 890 (concluding that a "challenge [to] the entirety of petitioners' so-called 'land withdrawal review program' . . . [was] not an 'agency action' . . . , much less a 'final agency action,'" because the challenged program was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans"); *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 60-64 (2004) (rejecting APA action alleging that agency violated NEPA in the course of "fail[ing] to act to protect public lands in Utah from damage caused by [off-road vehicle] use" and emphasizing that that the APA's requirement that a plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take* . . . rule[s] out several kinds of challenges," including "broad programmatic attack[s]" of the sort rejected in *Lujan*); *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) ("[Plaintiffs] contend that the totality of various government actions contributes to the deprivation of constitutionally protected rights. Because the APA only allows challenges to discrete agency decisions, the plaintiffs cannot effectively pursue their constitutional claims—whatever their merits—under that statute.") (citations omitted).  As one treatise summarizes: "The APA authorizes challenges to specific actions—such as a particular rule or order.  It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'"  33 Charles Alan Wright et al., Fed. Prac. and Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update).  That is exactly what the State is attempting to do in Count One—characterize a "mish-mash" of actions by two different

federal agencies as a unitary program.

With that said, courts have seemed to draw a distinction between "broad programmatic attacks" on an agency's actions in a particular subject area (which are verboten under *Whitewater Draw*, *Lujan*, and *SUWA*) and a claim that an agency was required to prepare a "programmatic EIS." As noted, the Ninth Circuit has recognized that the latter type of claim is cognizable. *Dombeck*, 304 F.3d at 894 ("Plaintiffs can . . . prevail on [a] claim that [an agency] should have issued a single EA or EIS . . . ."). Nevertheless, a failure-to-issue-a-programmatic-EIS claim lies where "the agency's goal was to minimize the possible cumulative environmental impacts by segmenting" its analysis of the environmental impact of one action "from the analysis of other foreseeable actions." *Churchill Cnty.*, 276 F.3d at 1079. *See also Dombeck*, 304 F.3d at 895 (rejecting programmatic EIS claim because "[n]othing in the record suggests that the Forest Service's goal was to segment review of the road density amendments so as to minimize their seeming cumulative impact"). Here, there is no allegation—much less evidence—that Defendants attempted to "segment" or "minimize" the collective environmental impact of their alleged plan to augment the population by only conducting individual analyses of each component of the plan. To the contrary, the State alleges that Defendants failed to prepare individual EISs for any of the component parts of the alleged plan. (Doc. 13 ¶ 152.) Defendants, in turn, deny that the plan even exists. (Doc. 24 at 45 ["There is no 'Population Augmentation Program.'"].) The State has not identified any case suggesting that a failure-to-issue-a-programmatic-EIS claim will lie in this circumstance and the Court is skeptical that such a claim could be reconciled with *Whitewater Draw*, *Lujan*, and *SUWA*, all of which suggest that a plaintiff cannot unilaterally characterize a collection of agency policies and programs as a unitary agency action when the agency itself has never viewed the policies and programs in that fashion.

The cases cited by the State do not compel a different conclusion. For example, *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008), involved a dissimilar regulatory regime. There, the Federal Communications Commission ("FCC")

was exempted, by regulation, from considering the environmental impact of individual communications towers, but a different regulation authorized parties to file a petition requesting further review if they believed that a "particular action, otherwise categorically excluded, will have a significant environmental effect." *Id.* at 1032-33. The regulations further provided that, upon receipt of such a petition, the FCC was required to obtain an environmental assessment ("EA") if it determined there was as possibility of a significant environmental impact. *Id.* Finally, depending on the results of the EA, the FCC was potentially required to prepare a programmatic EIS. *Id.* The controversy in *American Bird Conservancy* arose when the FCC denied a petition for review without obtaining an EA. *Id.* at 1029. The D.C. Circuit held that this was error because "the Commission's regulations mandate at least the completion of an EA before the Commission may refuse to prepare a programmatic EIS." *Id.* at 1034. Here, in contrast, the State's claim does not arise against a regulatory backdrop that expressly grants interested parties to right to request a programmatic EIS concerning an agency's actions in a specific area that is otherwise excepted from NEPA. Moreover, as Defendants correctly note, "[n]owhere did the [*American Bird Conservancy*] court suggest that a plaintiff could compel programmatic NEPA analysis for a program of the plaintiff's own making." (Doc. 24 at 43.)

Meanwhile, in *Forelaws on Board v. Johnson*, 743 F.2d 677 (9th Cir. 1984), an agency prepared "what it termed an 'Environmental Report'" in an effort to evaluate the environmental consequences of a series of 145 long-term contracts for power delivery that it offered to customers, but this document did not analyze the environmental consequences "in detail" and thus "did not . . . do what an environmental impact statement is supposed to do." *Id.* at 681. As a result, the Ninth Circuit "agreed with plaintiffs that an EIS should have been prepared prior to the offer of contracts." *Id.* at 685. This outcome, at most, shows that when an agency chooses to prepare a programmatic EIS, it must do so in a competent manner. It does not support the State's position here, which is that a pair of federal agencies must prepare a programmatic EIS concerning an assortment of policies and programs that the agencies themselves do not view as an overarching plan. Neither

1    does *Center for Biological Diversity v. Nielsen*, 2018 WL 5776419 (D. Ariz. 2018), where

2    the plaintiffs' theory was that an agency improperly failed to *supplement* a programmatic

3    EIS it had voluntarily prepared years earlier.  *Id.* at *1.

4         In a related vein, the Court is unpersuaded by the State's suggestion that the

5    preparation of programmatic EISs in 1994 and 2001 for border-related activities shows that

6    Defendants were required to prepare one here.  In a 2019 notice of withdrawal, DHS

7    explained that the earlier programmatic EISs were "intended to address the cumulative

8    effects" of projects undertaken on behalf of various "law enforcement agencies" by JTF-6,

9    which was "a recently formed military command that provided assistance and support to

10   various counter drug law enforcement agencies along the southwest border."  *See DHS,*

11   *Notice of the Withdrawal of a 1994 Programmatic Environmental Impact Statement and a*

12   *2001 Supplemental Environmental Impact Statement Regarding Certain Activities Along*

13   *the U.S. Southwest Border*, 84 Fed. Reg. 25,067 (May 30, 2019).  DHS went on to explain

14   that it was withdrawing the earlier programmatic EISs because it was able to "achieve

15   NEPA compliance for [certain agencies'] actions and activities on the southwest border

16   through site-specific or project-specific NEPA analyses" and that it was "well-served" by

17   this approach because, "[u]nlike a sprawling programmatic NEPA analysis, a site-specific

18   or project-specific NEPA analysis gives decision-makers tangible information regarding

19   potential impacts of a proposed action.  In addition, because every site-specific or project-

20   specific analysis contains an analysis of cumulative impacts, they also present decision-

21   makers with a larger frame of reference in which to understand those impacts."  *Id.*

22        As this discussion shows, the 1994 and 2001 programmatic EISs covered a narrower

23   and more discrete range of activities (*i.e.*, law enforcement authorities' efforts to combat

24   drug trafficking) than the Population Augmentation Program is alleged to encompass.

25   Thus, even though government decisionmakers in 1994 and 2001 may have concluded that

26   the former collection of activities should be analyzed via a programmatic EIS, it doesn't

27   follow that the latter would require a programmatic EIS, too.  At any rate, the 2019

28   withdrawal document reveals that DHS made a reasoned decision that a "sprawling

programmatic EIS" would be unnecessary because project-specific EISs would do a better job of providing the necessary analysis of cumulative environmental impacts.  The State has not argued, much less established, that the 2019 withdrawal decision was arbitrary and capricious.  The Ninth Circuit has suggested that a failure-to-prepare-a-programmatic-EIS claim will not lie in this circumstance.  *Churchill Cnty.*, 276 F.3d at 1079 ("The regulations and case law would support a decision by the Service to prepare a programmatic EIS, had it decided to prepare one.  Indeed, had we been charged with the decision, we may have elected to prepare a programmatic EIS first.  The problem, of course, is that it was not our decision to make. . . .  [I]ts decision not to proceed with a programmatic EIS was not arbitrary.").

For these reasons, the State's request for a preliminary injunction as to Count One is denied.[3]

III.    Count Two (Border Wall)

In Count Two of the FAC, the State raises an APA/NEPA challenge to a more discrete action: the termination of border wall construction.  Specifically, the State alleges that "the termination of border wall construction has left huge holes in the border fencing, including substantial gaps of over 100 miles along the Arizona-Mexico border," allowing migrants to "cross[] the border in Arizona in greater numbers than ever before," "signal[ing] the relative openness of the United States-Mexico border[,] and . . . encourag[ing] migration."  (Doc. 13 ¶¶ 78, 85, 89.)

Defendants argue the State is not entitled to preliminary injunctive relief on Count Two for six reasons: (1) a lack of standing (Doc. 24 at 11-16, 20-21); (2) failure to demonstrate irreparable harm in the absence of injunctive relief (*id.* at 21-22); (3) because

---

[3]        The State also asserts in the FAC that "[a]lternatively, each of the components of the Population Augmentation Program: *e.g.*, eliminating fines, exempting individuals from Title 42, and drastically decreasing deportation of individuals with final orders of removal, all individually have significant environmental impacts requiring preparation of an EIS." (Doc. 13 ¶ 151.)  Although the State briefly notes in its motion that these components have environmental impacts (Doc. 17 at 43-44), the State does not develop this alternative claim in any detail.  Accordingly, the Court will not address it further here.  But even assuming the State had developed this alternative theory, it would fail for at least the standing-related reasons discussed below as to Count Two.

the Secretary of DHS exercised his authority under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to waive all of NEPA's requirements with respect to border wall construction (*id.* at 23-26); (4) because § 102(c)(2)(A) of IIRIRA strips the federal courts of jurisdiction over any challenge to the Secretary's waiver authority (*id.* at 26-27); (5) because NEPA does not apply to federal actions, like the termination of the border wall projects, that maintain the "environmental status quo" (*id.* at 28-29); and (6) because the APA does not apply when agencies are "merely carrying out the directives of the president," which is alleged to be the case here (*id.* at 29-31). The Court will focus on Defendants' first and fifth arguments.[4]

### A.   **Standing**

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

The State contends it has suffered two categories of injuries arising from the termination of border wall construction: (1) environmental injuries, including trash left behind by migrants, increased air emissions, growth-related impacts, and impacts to wildlife; and (2) increased costs, including education expenditures, emergency health care, community supervision of felons, and increased crime. (Doc. 17 at 20-28.) The parties spill much ink debating whether such injuries are sufficient to satisfy the injury-in-fact

---

4   Although the tentative ruling only addressed the State's standing to pursue Count Two, the NEPA-inapplicability issue was addressed at length during oral argument. Given that discussion, and in light of the State's showing during oral argument that the question of standing may be closer than the tentative ruling portrayed it to be, this order also addresses NEPA's applicability.

component of the standing test (and whether the State's proffered evidence is sufficient to establish the existence of its alleged injuries), but the Court finds it unnecessary to resolve the parties' disputes on these points due to the State's failure to establish a likelihood of success on its ability to satisfy the next element of the standing test, causation.

On that issue, the State argues that, because its NEPA claims are procedural and it is a state, it is entitled to "special solicitude" in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497 (2007), and the ordinary standing requirements of causation and redressability are "relaxed." (Doc. 17 at 18-22.) Defendants respond that the State's alleged injuries are premised on "enticement theories" that were explicitly rejected by the Ninth Circuit in *Whitewater Draw*. (Doc. 27 at 3-4; *see also* Doc. 24 at 15-18.) Defendants contend that "even if these ambiguous claims of harm from litter or greenhouse gas emissions were cognizable injuries, Arizona cannot show that they are caused by the challenged decisions rather than the result of the myriad economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States." (Doc. 27 at 4, citation omitted.) Defendants also rely on *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), arguing that the plaintiffs there unsuccessfully "advanced similar theories of standing to Arizona's: that a change in immigration policy . . . would increase immigration and have unwanted effects on the localities (*e.g.*, increases in crime in *Arpaio* or detrimental environmental impacts in *Whitewater Draw*)." (Doc. 36 at 2.) In reply, the State argues that it is "not relying solely on an inducement theory: the border barrier would have directly prevented such crossings. The State is *not* relying on border barriers as a purely psychological obstacle to illegal immigration, but rather principally as a *physical* and difficult-to-surmount *literal* wall." (Doc. 29 at 3.) Accordingly, the State contends that its asserted injuries "are not remotely comparable to the impacts at issue" in *Whitewater Draw* and *Arpaio* because "[i]n both of those cases there was considerable attenuation between the 2012 DACA policy, subsequent immigration, and the alleged impacts . . . . By contrast, here there is no need to extrapolate at all from construction termination to the impacts in question. The State is supported by specific evidence that

migrants have been and are crossing—in incredible and unprecedented numbers—in the areas where Defendants have terminated border wall construction." (*Id.* at 12.) The State also reasserts that the standards for causation and redressability are "loosened" under *Massachusetts*. (*Id.* at 10.)

Once again, *Whitewater Draw* provides the starting point for the analysis. There, in addition to raising a "broad programmatic attack" against a collection of DHS immigration-related policies (which, as discussed in Part II above, was dismissed for failure to state a claim), the plaintiffs asserted an APA/NEPA challenge to a specific DHS program, Deferred Action for Childhood Arrivals ("DACA"), which was "a policy to defer removal proceedings for two years (subject to renewal) for individuals who came to the United States as children, met certain eligibility criteria, and cleared a background check." 5 F.4th at 1014. The Ninth Circuit dismissed this claim for lack of standing. *Id.* at 1014-16. Notably, the court did not take issue with the plaintiffs' theory that increased immigration leads to environmental harm and that such environmental harm qualifies as an injury-in-fact. *Id.* at 1014 n.10. Instead, the court held that the plaintiffs could not establish causation because they could not demonstrate that DACA was the cause of increased immigration, as opposed to "the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States." *Id.* at 1015 (cleaned up). Similarly, in a different portion of the opinion, the Ninth Circuit held that the plaintiffs could not establish causation with respect to their APA/NEPA challenge to two specific visa-related programs ("the DSO and STEM Rules"), which the plaintiffs characterized as "lead[ing] to permanent population growth by encouraging additional foreign students to come to the United States," because the plaintiffs "fail[ed] to show that these aliens would [come to the United States] *because* of the challenged rules. As with the DACA claim, any number of variables might influence an alien's independent decision to resettle." *Id.* at 1017.

The Ninth Circuit would likely reach the same conclusion here. The State's theory is that the existing gaps in the border wall are enticing aliens who would otherwise remain

in Mexico to stream into Arizona, which is in turn causing all manner of environmental and financial harm, and that if those gaps had only been filled through continued construction of the border wall, the would-be entrants would have been deterred from entering. There are two problems with this logic. First, Defendants have submitted undisputed evidence that the cancelled projects affect, at most, 18 miles of territory, that "there are still a number of areas along the border in Arizona where there is no barrier," and that "even if DHS and DoD had completed all the barrier that was planned for Arizona . . . those gaps would have persisted." (Doc. 24-1 ¶ 14.) The State does not argue otherwise. (Doc. 27 at 14 [not disputing that "the cancelled portions of the border wall still leave gaps along Arizona's 370-mile border with Mexico"].) Thus, regardless of Defendants' action or inaction, Arizona would have been left with an incomplete wall on its southern border filled with gaps. It is speculative that the less-incomplete version of the border wall the State wishes to compel Defendants to build would necessarily deter migrants from entering Arizona. An incomplete wall is an incomplete wall.

Recent experience bears out this point. The undisputed evidence submitted by Defendants shows that, between 2018 and 2020, DoD completed over 190 miles of border wall construction. (Doc. 24-1 ¶¶ 10-13.) Nevertheless, the State alleges that, since 2021, "migrants have been crossing the border in Arizona in greater numbers than ever before." (Doc. 13 ¶ 89.) As these figures make clear, filling some of the gaps in an incomplete border wall, as the federal government did between 2018 and 2020, does not ensure that migrants will be deterred from entering. The State fails to explain why completing 18 more miles of construction, while still leaving the overall wall gap-filled and incomplete, would achieve what the previous 190 miles of construction could not.

Second, and more broadly, the State fails to acknowledge that aliens committed to entering the United States have time and again found ways to overcome and bypass walls on the southern border.[5] At bottom, the State is asking the Court to speculate about why

---

[5] *See, e.g.*, *United States v. Leos-Maldonado*, 302 F.3d 1061, 1062 (9th Cir. 2002) (affirming attempted illegal-reentry conviction where, "[t]wo months after being deported to Mexico, [the defendant], along with six other Mexican nationals, climbed the fence along the international border"); *United States v. Antona-Flores*, 2009 WL 484410, *1 (D.

aliens choose to enter the country illegally and about whether the construction of certain impediments to their entry—which would not eliminate the many other avenues of entry—would result in effective deterrence, such that the absence of those impediments may be said to be the literal cause of increased migration to Arizona. The Court concludes that this "chain of reasoning," like the chain of reasoning in *Whitewater Draw*, is marred by "attenuation . . . unsupported by well-pleaded facts" and impermissibly ignores "the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States." *Whitewater Draw*, 5 F.4th at 1015 (cleaned up).

To be clear, the connection between border-wall construction and migration is more direct and less attenuated than the connections at issue in *Whitewater Draw* and *Arpaio*, where the defendants argued that migrants would be incentivized to enter the United States based on the "mistaken understanding" that they would benefit from certain government policies. *Id.* at 1014-15. As a result, this case presents a closer call on the issue of causation than *Whitewater Draw* or *Arpaio*. Nevertheless, the State's position is ultimately unpersuasive because it overlooks that "any number of variables might influence an alien's independent decision" to enter the country illegally and fails to show that "aliens would do so *because of*" Defendants' failure to build portions of an incomplete border wall. *Id.* at 1017. As the Supreme Court has emphasized, when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed [to prove causation]. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. . . .

_____

Ariz. 2009) ("Defendant was arrested west of the City of San Luis, Arizona. The border between Mexico and the United States in this location . . . follows the former path of the Colorado River . . . [and] illegal aliens attempting to cross the border in this area would be required to walk east across the river bottom, swim the canal, and climb over, under, or through the secondary fence."); *United States v. Torres-Castillo*, 2010 WL 3057345, *1 (S.D. Cal. 2010) ("Petitioner, a Mexican citizen with a previous deportation from the United States, was found, along with two other individuals, in the trunk of a car at the Otay Mesa Port of Entry into the United States.").

Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citations omitted).[6]

The evidence submitted by the State does nothing to shore up these deficiencies. Although the State submits evidence that migration "has increased dramatically since the issuance of the Border Wall Proclamation" (Doc. 17 at 7, citing Doc. 17-2 at 9-10 [Flood report]), the State makes fails to show that the increase was caused *by the cessation of construction on the border wall*, as compared to economic, social, and political factors (or due to the many other immigration-related policies and programs the State seeks to challenge in this action).[7]  Nor would it make sense to attribute the immediate increase in migration to the cessation of construction activities, given that the border wall would not have otherwise been completed overnight (and, thus, the immediate increase in migration cannot be attributed to the cessation) and given that the 190 miles of additional border wall built between 2018 and 2020 was unable to stop this increase in migration.  At most, then, the State has shown a temporal correlation between the proclamation and an increase in

---

[6]     During oral argument, the State identified *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), as a decision demonstrating that the "predictable result" of the cessation of border wall construction would be an increase in migration to Arizona.  The Court disagrees.   In *Department of Commerce*, the district court made a factual determination, after considering "the evidence at trial," that "the reinstatement of a citizenship question would result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted and lead to many of respondents' asserted injuries." *Id.* at 2565.  The Supreme Court merely held that "these findings of fact were not so suspect as to be clearly erroneous." *Id.*  This portion of *Department of Commerce* does not stand for the proposition that a district court must always find that government policies have a predictable effect on aliens' behavior.  The facts matter, and here the facts and evidence proffered by the State fail to establish the requisite causal link.   Additionally, the disputed causation issue in *Department of Commerce* (whether certain factors would cause noncitizen households to decline to respond to the census) is much different than the causation issue here.  The decision whether to respond to the census is not a decision that causes the putative respondent to weigh "myriad economic, social, and political realities" against a "risk [of] life and limb." *Whitewater Draw*, 5 F.4th at 1015 (cleaned up).

[7]     The State's failure to disaggregate the increased migration allegedly caused by the termination of border wall construction from the increased migration allegedly caused by the other policies and practices it seeks to challenge in this action is a critical omission for purposes of its standing to pursue Count Two.  As the Supreme Court has noted, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  "A plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

migration to Arizona.  But "[c]orrelation is not causation." *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988).  *See also Whitewater Draw*, 5 F.4th at 1018 (holding that the plaintiffs' expert's affidavit was insufficient to prove causation because it "provide[d] only general population increase numbers" and did not "draw any line connecting the [specific challenged rules] to population increase").

This flaw also undermines the State's contention "that the termination of wall construction has led to an increase in fentanyl coming into the state." (Doc. 29 at 11.  *See also* Docs. 21, 21-2.)  As Defendants correctly point out, the State's proffered statistics "includ[e] amounts seized at ports of entry." (Doc. 24 at 14.)  To the extent there has been an uptick in drug smuggling activities via Arizona's ports of entry since the challenged policies and programs went into effect, this undermines rather than supports the notion that the unfilled gaps in the border wall attributable to Defendants' cessation plan are the cause of more crime.

Another piece of evidence submitted by the State, which was the subject of extensive discussion during oral argument, is the declaration of James Chilton, a cattle rancher whose property is "located between Sasabe, Arizona, to our west and Nogales, Arizona, to our east" and has a "southernmost boundary" consisting of "roughly five and a half miles (5.5 mi) of the international border between the United States and Mexico." (Doc. 29-3 ¶ 2.)  It is questionable whether the Chilton declaration is properly before the Court, given that the State failed to submit the declaration as an attachment to its motion (which addressed the issue of standing in depth, *see* Doc. 17 at 18-23) and instead waited to submit the declaration as an attachment to its reply.  *Cf. T & E Inv. Grp., LLC v. Faulkner*, 2012 WL 12822296, *2 (N.D. Tex. 2012) ("While Plaintiffs did attach two exhibits in their Reply brief, such evidence is not contained with their original motion nor would it be sufficient to support a motion for an injunction. . . .  [T]his Court generally refuses to consider evidence presented for the first time in a reply brief.").  *See generally Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Yet even assuming the Chilton declaration was properly submitted, it does not change the analysis with respect to causation.  In his declaration, Mr. Chilton states that the government had almost finished extending the border wall across the entire southern border of his property in January 2021 but, due to the cessation order, there is now "roughly half a mile [of land] along the U.S.-Mexico border unprotected but for a four-strand barbed wire fence designed to discourage cattle from crossing."  (Doc. 29-3 ¶ 4.)  Additionally, "[p]ortions of the border wall where a physical barrier is present on [Mr. Chilton's] land are still unfinished as they do not contain operating lights, electronic sensors, or other technology that may aid enforcement at the border."  (*Id.* ¶ 5.)  Mr. Chilton further reports that "there has been a dramatic increase in the volume of individuals coming across the border and through [his] ranch since construction on the border wall ceased."  (*Id.* ¶ 7.)  Although the Court is quite sympathetic to Mr. Chilton's circumstances—any property owner would be outraged if a contractor, let alone the federal government, abruptly walked away from an unfinished job that exposed the property owner to potential harm—his observations do not establish that Defendants' cessation of border wall activity has caused increased migration into *Arizona*, which is the relevant injury for purposes of evaluating Arizona's standing to assert Count Two.  As discussed above, even if Defendants had completed building the portion of the wall on Mr. Chilton's property, there would be other gaps on other areas of the border (including areas where other ranchers and individuals live).  It is entirely speculative that aliens willing to "risk life and limb" to cross the border via the gap on Mr. Chilton's property would have decided the risk wasn't worth it if their next-best option was to cross via the many other gaps that would have remained regardless of Defendants' conduct.

*Texas v. Biden* does not compel a different conclusion on the issue of causation.  First, the facts of *Texas v. Biden* were different from the facts here, at least as they pertain to Count Two.  In *Texas v. Biden*, the challenge was to DHS's recission of the MPP.  Due to the mechanics of how that program worked, its presence or absence was the but-for explanation for why certain aliens remained in the United States or were returned

to Mexico.  20 F.4th at 972-73.  The State makes this point in the portions of its briefs addressing whether it has standing with respect to Count Three of the FAC, which also raises a challenge to the termination of the MPP.  (Doc. 29 at 17 ["Arizona has shown that the MPP is leading to thousands of new migrants, both indirectly through changed incentives and directly by releasing individuals into the country who otherwise would be removed.  A highway interchange *may lead* to additional growth in an area.  But adding additional people directly *is* growth."].)  But the same is not true with respect to the termination of border wall construction.  As discussed above, one is still forced to speculate about whether the unfilled gaps, as opposed to "the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States," are the cause of increased migration.  Second, *Texas v. Biden* is a decision of the Fifth Circuit, not the Ninth Circuit.  To the extent there are conflicts between *Texas v. Biden* and *Whitewater Draw* concerning how to analyze standing and causation in this context, this Court obviously must follow Ninth Circuit law, which makes clear that "[a]lthough causation and redressability requirements are relaxed when a plaintiff has established injury in fact under NEPA, the causation requirement remains implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant.  Stated otherwise, . . . a claim of procedural injury [under NEPA] does not relieve Plaintiffs of their burden—even if relaxed—to demonstrate causation."  5 F.4th at 1015 (citations and internal quotation marks omitted).

The State also contends that *Whitewater Draw* is distinguishable because the plaintiffs in that case were private individuals and entities, whereas it is a State and is therefore entitled to "special solicitude" in the standing analysis.  (Doc. 44 at 1-3.)  The Court disagrees.  As an initial matter, it is unclear whether the special solicitude doctrine goes to the causation prong of the standing inquiry.  In *Massachusetts*, the Supreme Court held that because states are "entitled to special solicitude in our standing analysis," they need not "meet[] all the normal standards for redressability and immediacy."  549 U.S. at 517-21.  *See also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1144 (9th Cir. 2013)

("The [*Massachusetts*] Court . . . relaxed the standing requirement [in part because] Massachusetts was exercising a procedural right to challenge the rejection of its rulemaking petition, which permitted it to 'assert that right without meeting all the normal standards for redressability and immediacy.'") (citation omitted).   But the redressability and immediacy components of the standing analysis are distinct from causation.   During oral argument, the State suggested that *Massachusetts* did not intend to limit the special solicitude doctrine to redressability and immediacy and simply used those terms as "shorthand" for the entire concept of standing, including causation.   Perhaps this understanding is correct—the Fifth Circuit has suggested as much, *Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015), as have other judges, *Arpaio*, 797 F.3d at 25 (Brown, J., concurring)—but it seems odd that the *Massachusetts* Court would have made a point of only mentioning redressability and immediacy if it didn't intend the doctrine to be limited to those inquiries.   Notably, recent Ninth Circuit do not suggest that states have special solicitude when it comes to demonstrating causation.   *California v. Trump*, 963 F.3d 926, 940 (9th Cir. 2020) (concluding "that California has alleged environmental and sovereign injuries 'fairly traceable' to the Federal Defendants' conduct" without any mention of *Massachusetts* or special solicitude).   Neither do recent Supreme Court decisions.   *California v. Texas*, 141 S. Ct. 2104, 2112, 2117 (2021) (where "Texas and 17 other States brought this lawsuit against the United States and federal officials," concluding that "the states "failed to show how [their alleged] injury is directly traceable to any actual or possible unlawful Government conduct" without any mention of *Massachusetts* or special solicitude).

At any rate, even assuming the special solicitude doctrine goes to causation, it is unclear how it alters the inquiry.   *See generally Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1238 (10th Cir. 2012) ("[W]e note the lack of guidance on how lower courts are to apply the special solicitude doctrine to standing questions.").   Whatever its contours, the special solicitude doctrine cannot be some sort of magic wand that a state can wave over an otherwise inadequate record to automatically cure standing defects that would be

fatal to a private litigant.  *California v. Trump*, 2020 WL 1643858, *6 (D.D.C. 2020) (noting that "[l]ower courts have lamented the" lack of guidance in this area and emphasizing that "the 'special solitude' that the federal courts owe to the states does not mean that states that elect to sue in federal court are relieved of their burden of establishing each of the traditional elements of Article III standing").  Thus, even if entitled to a measure of special solicitude, the State still hasn't shown a likelihood of success on, or serious questions going to the merits of, its standing to pursue Count Two.  It remains speculative that completing 18 more miles of construction on the border wall, while still leaving many other gaps unfilled, would deter migrants from entering Arizona.

Finally, the State has not adequately established standing based on its claim that Defendants' conduct has resulted in harm to wildlife and endangered species in Arizona (as opposed to environmental and economic harm suffered directly by the State due to increased human migration).[8]  Although the Ninth Circuit previously recognized that it is "apparent" that the *construction* of the border wall will cause border states to suffer environmental injuries such as "separat[ing certain animal] populations, decreasing biodiversity, and harming these species," *California v. Trump*, 963 F.3d at 940, it doesn't necessarily follow that the *cessation* of border wall construction activities will also cause such harms.  On that issue, the State's evidence consists of a report from Cameo Flood, who asserts in relevant part as follows:

> The cessation of border wall construction will likely result in diversion of illegal immigration and wildlife migration through the remaining currently open pathways, *potentially* affecting the wildlife and ecology in these areas in ways they would not have been affected otherwise.  However, the *potential* effects of this scenario on the threatened and endangered species that occur in some of these areas, including the Mexican gray wolf, jaguar, ocelot, and Sonoran pronghorn, have not been studied through the ESA consultation process.  As Vice magazine reported, "Border wall construction in eastern and western Arizona has created a bottleneck for species, forcing them into the remaining open portions in the center of the state in the San Rafael Valley and the Tohono O'odham Nation.  That *could* lead to a variety of unknown

---

[8]    Based on the parties' contentions at oral argument, the passage in the tentative ruling concerning displacement under the Endangered Species Act has been deleted.

consequences, from migration and mating patterns, to throwing predator-prey relationships out of whack. It *could* also potentially eliminate endangered species who might not be able to survive the change" (Janowitz, 2021). [¶]   Cessation of the construction of the border wall *could* have significant impacts on humans, wildlife including threatened and endangered species, and the environment.  The National Environmental Policy Act and the Endangered Species Act mandate that federal agencies document the impacts of proposed federal actions on the human environment and minimize impacts to threatened and endangered species.   No Federal government review of the impacts of the cessation of wall construction on threatened and endangered species in the region was undertaken, violating the ESA.   [¶] Sonoran pronghorn or jaguar or others can continue to migrate but *could* be funneled to certain areas.   Furthermore, these and other species *could* be impacted by invasive species carried by migrants or as a result of the loss of habitat from human traffic and more fire starts from migrants.

(Doc. 17-2 at 12, emphases added.)   Distilled to its core, this portion of the Flood report consists of an assertion that the cessation of border wall construction "could" have a "potential" negative effect on certain threatened and endangered species living in Arizona, at least according to an article in *Vice* magazine.   The Court has serious doubt that such evidence would be sufficient to meet the State's ultimate burden of establishing causation—it is speculative, conclusory, couched in qualifiers, and lacks foundation. *Compare California v. Trump*, 963 F.3d at 936-38 (states raising non-NEPA challenge to border wall construction had standing where they proffered an array of evidence that explained, in detail, why the challenged construction efforts "would" and "will" have various "significant adverse impacts" on certain wildlife species).

To be clear, because "[t]hreatened environmental harm is by nature probabilistic," a NEPA plaintiff need not establish a *certainty* of future harm to have standing.   *Central Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002) (citation omitted). Instead, "[t]he plaintiff must show that the challenged action will threaten its land interests with reasonable probability."   *Churchill Cnty. v. Babbitt*, 150 F.3d 1072, 1078-79, *amended*, 158 F.3d 491 (9th Cir. 1998).   *See also Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1164 (9th Cir. 2017) ("If [the Nation's] interest in adequate water were, *to*

*a reasonable probability*, potentially injured by a proposed federal action, the Nation would have standing to challenge NEPA compliance.") (emphasis added); *Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 972 (9th Cir. 2003) (emphasizing that "[e]nvironmental plaintiffs . . . need only establish 'the reasonable probability of the challenged action's threat to [their] concrete interest" because any higher standard would "in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake") (citations and internal quotation marks omitted).   But for the reasons discussed above, the State's evidence is insufficient to establish any causal connection to a degree of reasonable probability.  *Cf. Yarbrough v. Wilkey*, 2016 WL 7322514, *2 (E.D. Mo. 2016) ("When an expert merely testifies that a given act or failure to act 'might' or 'could' have yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value.  In other words, an expert's mere conjecture and speculation are insufficient to show causation.") (citations and internal quotation marks omitted); *Bearman v. Prudential Ins. Co. of Am.*, 186 F.2d 662, 665 (10th Cir. 1951) ("The great weight of authority supports the rule that . . . testimony to the effect that a causal connection . . . was possible, such as testimony that the accident or injury 'might have,' or 'may have,' or 'could have' caused the death of Insured, is insufficient . . . because [it] leaves the issue in the field of conjecture . . . .").  Preliminary injunctive relief, which may not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion," is unavailable in this circumstance. *Lopez*, 680 F.3d at 1072.

### B.    NEPA's Applicability

Defendants argue in the alternative that, even assuming the State has standing to pursue Count Two, the State has failed to establish a likelihood of success on (or serious questions going to) the merits of that claim because "a decision to stop border wall construction—*i.e.*, a decision to halt ground disturbance and environmental impacts— would not require NEPA analysis."  (Doc. 24 at 28-29.)  In support of this argument, Defendants cite a line of Ninth Circuit cases holding that NEPA does not apply to federal

actions that "maintain the environmental status quo" or "do nothing to alter the natural physical environment." (*Id.*)  In response, the State does not dispute that NEPA is inapplicable to agency actions that maintain the status quo but argues this doctrine is factually inapplicable here because "the state of the world before the challenged actions were taken . . . was private contractors performing construction under executed contracts" and "Defendants' actions represent a complete change in policy, and do not 'preserve' anything."  (Doc. 29 at 24-26.)

Although Ninth Circuit law does not conclusively address how the status-quo doctrine would apply in this circumstance, the Court concludes that Defendants' position is more persuasive.  As the Ninth Circuit has explained, "NEPA requires federal agencies to prepare a detailed [EIS] for every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.  [W]here a proposed federal action would not change the status quo, however, an EIS is not necessary." *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (internal citations and quotation marks omitted).  Thus, "NEPA procedures do not apply to federal actions that do nothing to alter the natural physical environment." *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995).  Put another way, "an EIS is not required in order to leave nature alone."  *Id.* (citations and internal quotation marks omitted).

The Ninth Circuit's decision in *National Wildlife Federation* provides a helpful illustration of these principles.  There, the Farmers Home Administration ("FmHA") was accused of violating NEPA by transferring a large ranch in Idaho, which included 730 acres of wetlands, to a new owner without obtaining an EIS.  48 F.3d at 1340.  The plaintiffs argued that they were harmed by FmHA's action because the new owners were grazing cattle in the wetlands areas, which was "degrad[ing] the fragile riparian wetlands and injur[ing] plaintiffs' members," and further argued that an EIS may have led FmHA to establish conservation easements in those areas.  *Id.* at 1340-41.  In response, FmHA argued "that because the wetlands were used for grazing before it acquired the Ranch and

are now used for that purpose by the" new owners, its "transfer of the title did not alter the status quo and therefore was not subject to requirements of NEPA." *Id.* at 1343.  The Ninth Circuit "agreed" and upheld the dismissal of the NEPA claim, explaining that "[t]he complaint alleges FmHA's disposal of the Ranch will result in but one injury—continued degradation of the wetlands from grazing" and "[i]t is not alleged that the [transfer] will add to that harm." *Id.* at 1343-44.

Here, similarly, at the time of the President's proclamation, the border wall was incomplete and included the 18 miles of gaps at issue in this case.  Since the proclamation, nothing has changed—those 18 miles of gaps still exist.  And it is those 18 miles of gaps that are the asserted cause of the State's various injuries.  Viewed in this way, the President's proclamation (and DHS's and DoD's subsequent efforts to carry out that proclamation) did not "change the status quo."  Nor did the proclamation "alter the physical environment."  To the contrary, Defendants' actions maintained the status quo and preserved the physical environment.

The State's arguments to the contrary are unpersuasive.  The State suggests that the status quo must be evaluated by reference to what Defendants were doing before and after the proclamation and argues that, because Defendants' new conduct (*i.e.*, not building the border wall) was different from their earlier conduct (*i.e.*, building the border wall), the status quo necessarily changed.  The problem with this argument is that it uses the wrong frame of reference.  In *National Wildlife Federation*, the court did not look to whether the agency embarked on a new course of action (which it clearly did, by engaging in the title transfer) but looked at whether the status quo had changed from the perspective of the environment.  There, because the environmental feature at issue (cattle grazing on the ranch's wetlands) did not change, there was no change to the status quo and no EIS was required.  Here, similarly, because the environmental feature at issue (the 18 miles of gaps) did not change, no EIS was required.

The Fifth Circuit's decision in *Sabine River Authority v. U.S. Dep't of Interior*, 951

F.2d 669 (5th Cir. 1992), which the Ninth Circuit has cited with approval,[9] powerfully supports this conclusion.  In *Sabine River Authority*, the owner of 3,800 acres of land in East Texas donated a "non-development easement" pertaining to that land to the U.S. Fish and Wildlife Service ("FWS").  *Id.* at 671.  This easement "guarantee[d] that the wetlands would be preserved in their pristine state without the corrupting effect[s] of commercial, agricultural, and industrial development."  *Id.*  In response, a group of plaintiffs who were interested in developing the land in question sued FWS under the theory that it violated NEPA by failing to prepare an EIS "in connection with the acquisition of the easement."  *Id.*  The district court dismissed this claim and the Fifth Circuit affirmed, holding in relevant part "that the acquisition of a negative easement which by its terms prohibits any change in the status quo does not amount to 'major Federal action[] significantly affecting the quality of the human environment'" and that "[a]n EIS need not discuss the environmental effects of continuing to use land in the manner which it is presently being used."  *Id.* at 679 (citations omitted) (first alteration in original).  Here, Defendants' challenged action is functionally equivalent to the receipt of the "non-development easement" in *Sabine River Authority*—the effect of that action is to prohibit further construction and development in a specified area.

And again, in *Drakes Bay Oyster Co.*, the plaintiff had a permit to engage in commercial oyster farming operations on land controlled by the Department of the Interior, but the agency allowed the permit to "expire according to its terms."  747 F.3d at 1077-78.  The plaintiff then sued the agency, arguing among other things that the agency violated NEPA by failing to prepare an EIS before allowing the permit to expire and that "the Secretary's decision differs from typical inaction because it effected a change in the status quo, namely, the cessation of commercial operations that had previously been authorized."  *Id.* at 1089-90.  The district court denied the plaintiff's request for a preliminary injunction and the Ninth Circuit affirmed, explaining that it was "skeptical" that the agency's action triggered NEPA because it was "essentially an environmental conservation effort, which

---

[9]     *Douglas County*, 48 F.3d at 1505.

has not triggered NEPA in the past." *Id.* at 1090. In reaching this conclusion, the court emphasized that the agency's conduct had the effect of "prevent[ing] subsequent human interference." *Id.* Here, too, Defendants have caused a cessation of construction activities in a specified area, thereby preventing subsequent human interference. Although *Drakes Bay* is not a perfect analogue—Defendants did not simply allow construction contracts to expire according to their terms but took affirmative steps to cancel those contracts—it strongly suggests the Ninth Circuit would deem NEPA inapplicable here.

Finally, although the aforementioned cases are alone sufficient to demonstrate that the State is not entitled to a preliminary injunction on Count Two, the Court also notes that it is troubled by the counter-intuitive (if not absurd) consequences that would flow from accepting the State's view of how NEPA should apply here. All parties agree that DHS was not required to prepare an EIS before pursuing efforts to *construct* the border wall, because the Secretary of DHS exercised his statutory authority "to waive compliance with NEPA and other laws to construct border barriers along the U.S.-Mexico border, including in Arizona." (Doc. 17 at 28.)[10] It would be anomalous, particularly in light of the precedents discussed above, if Defendants were nevertheless required to prepare an EIS before *ending* the construction program. This outcome would, as the State acknowledges, transform NEPA into a "one-way ratchet" (Doc. 29 at 6) that only requires analysis of the environmental effects of the cancelation of construction, but not construction. Tellingly, during oral argument, the State conceded that it is unaware of any case construing NEPA in this fashion. Additionally, and as Defendants point out in their response brief, "[t]he NEPA analysis required by the State would need to include alternatives to the proposed action, including a no-action alterative," "the no-action alterative to a decision to terminate the border wall projects would be to leave the contracts in place and continue construction," and "Arizona's requested EIS would thus require an analysis of the environmental impacts of border wall construction—the very analysis Arizona concedes was waived in the first

---

[10]     *See generally In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019).

place."  (Doc. 24 at 25-26.)  The Court is doubtful that this could possibly be the correct outcome under NEPA.

For these reasons, the State's request for a preliminary injunction as to Count Two is denied.

IV.    Count Three (MPP)

In Count Three of the FAC, the State alleges that Defendants' "cancellation of the MPP has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA."  (Doc. 13 ¶ 158.)  The only form of injunctive relief sought by the State in conjunction with this claim is an injunction barring "Defendants from processing any further migrants into the United States, who were and who would have been covered by the MPP until such time as Defendants comply with NEPA."  (*Id.*at 42.)

The parties' briefing related to Count Three is voluminous and raises an array of complicated issues.  At least for now, it is unnecessary to wade into this thicket.  As noted, the Fifth Circuit in *Texas v. Biden* recently upheld the issuance of an injunction that "vacated the [MPP] Termination Decision, 'permanently enjoined and restrained [DHS] from implementing or enforcing' it, and ordered DHS 'to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens because of a lack of detention resources.'"  20 F.4th at 945.  In a recent supplemental filing, Defendants argue that although they believe *Texas v. Biden* was wrongly decided, it "makes Arizona's request for injunctive relief redundant and so properly subject to denial even if the request were otherwise justified."  (Doc. 42 at 2.)

The Court agrees.  In *California v. Trump*, 963 F.3d 926 (9th Cir. 2020), the Ninth Circuit addressed an analogous situation.  There, two different groups of plaintiffs (public interest groups and states) filed "separate action[s]" "challenging the Executive Branch's funding of the border wall."  *Id.* at 934.  After the district court granted the public interest groups' preliminary injunction request, it "denied without prejudice" the states'

preliminary injunction request on the ground that such relief "would be duplicative." *Id.* at 935.   Similarly, the court later issued a permanent injunction in favor of the public interest groups and then denied the states' request for a permanent injunction.   *Id.*   The Ninth Circuit affirmed in relevant part, holding that the denial of the states' request for injunctive relief on redundancy grounds "was certainly not an abuse of discretion."   *Id.* at 949-50.   Notably, this was true even though the Supreme Court subsequently issued a stay as to the injunction issued in favor of the public interest groups.   *Id.*   The Ninth Circuit simply noted that, "depending on further developments in these cases, the States are free to seek further remedies in the district court or this Court."   *Id.*

Here, similarly, there would be no point in preliminarily enjoining Defendants "from processing any further migrants into the United States, who were and who would have been covered by the MPP" (Doc. 13 at 42) because Defendants are already precluded from engaging in such conduct by *Texas v. Biden*, which upheld the reversal of the MPP termination decision and ordered DHS "to enforce and implement MPP in good faith."   20 F.4th at 945.   This outcome also raises questions about whether the State's request for a preliminary injunction on Count Three is ripe.   Finally, there is no merit to the State's contention that "the *Texas* PI does not require Defendants to comply with NEPA by preparing an EIS."   (Doc. 29 at 30.)   As noted, *Texas v. Biden* requires Defendants "to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with the APA."

Accordingly,

**IT IS ORDERED** that the State's motion for preliminary injunction (Doc. 17) is **denied**.

Dated this 7th day of February, 2022.

Dominic W. Lanza
United States District Judge