**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)
Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Robert J. Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiff State of Arizona*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona,<br><br>　　　　Plaintiff,<br>　　v.<br>Alejandro Mayorkas in his official capacity as Secretary of Homeland Security; United States Department of Homeland Security; Troy Miller in his official capacity as serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection; Tae Johnson in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; United States Department of Defense; Lloyd Austin in his official capacity as Secretary of Defense.<br><br>　　　　Defendants. | No. 2:21-cv-00617-DWL<br><br>**State's Reply To Response In Support Of Its Motion For Jurisdictional Discovery (Doc. 48)** |

**INTRODUCTION**

This motion is the latest chapter in ongoing Federal efforts to obstruct the State's access to information about the wall construction on the State's border. The government (at 1) characterizes the State's motion as "meritless." But "meritless" motions rarely require a month and twice the original month's length for a response. *See generally* Doc. 51 ("Opp."). Defendants' conduct thus belies their characterization—as well as their fear of what jurisdictional discovery might unearth.

This fear is exemplified by the government's conduct and repeated refusal to address their own obligations under (and violations of) FOIA. In July of 2021, the State filed FOIA requests for the similar information to that requested here, and the government has been stonewalling those for nearly a year now. *See* Doc. 38 (Jan. 10, 2022) ("DHS has yet to provide a single responsive document [to the State's July 27, 2021 request], even though FOIA's deadlines have now been blown multiple times over"). Indeed, although the State has repeatedly raised DHS's violations of FIOA in briefing in this Court, DHS just as repeatedly refused to acknowledge those requests in responsive briefing *whatsoever*—including its opposition to the State's request for discovery. *See* Exhibit A.

The State reached out to counsel for DHS to attempt to secure any information about the status of its request, but all that DHS would offer is that it "intend[s] to respond by April 30th" though it "emphasize[s] that this date is approximate"—and that tellingly is not a commitment to produce all relevant documents (or indeed any). *Id.* In other words, having blown FOIA's 20-business-day deadline roughly *eight times over* already, DHS might get around to responding after a *ninth* such period runs—but commits to nothing, either in terms of timing or production. And that follows off of DHS taking *three* separate emails and 22 days just to *docket* the State's FOIA request. *See* Exhibit B. Defendants' egregious violations of FOIA's deadlines underscores the need for discovery here since DHS has unlawfully denied the State access to information that would assist it in developing its standing arguments.

1

More generally, the State has ample reason to believe that government documents and witnesses would confirm what it has alleged—that the termination of the border barrier has caused additional migration and other environmental injuries on the State.

This Court, in denying the State's Motion for Preliminary Injunction, did not determine that it was impossible for the State to demonstrate that Defendants' action terminating construction of the border wall in Arizona caused harm to the State. Rather, this Court held "the State's evidence is insufficient to establish any causal connection to a degree of reasonable probability" between the termination of the border wall and environmental injury. *Arizona v. Mayorkas*, 2022 WL 357348 at *12 (Feb. 7, 2022). This was a conclusion based primarily on the record before the Court at the preliminary injunction stage. Indeed, as the Court stated, the State's burden at that stage was prove its case by a "*clear showing*." *Id.* As the Court determined that the State had failed to meet this high burden, its motion for preliminary injunction was denied.

Defendants' Response seeks to mischaracterize the Court's decision as forbidding Arizona's standing *theory* writ large. Opp. at 1. But nothing about the decision forecloses the State's theory that the termination of the border wall injured the State. And, as the State explained in its motion, there is ample reason to believe that the federal government possesses information which would confirm this theory in a number of respects.

DHS's response to the State's assertion that it has relevant information depends in large part on mischaracterizing the State's burden, as though the State must show precisely what is in the minds of prospective migrants in order to show standing. *See* Opp. at 3-4 ("The specific reasons underlying individual migration decisions are known only to the migrants themselves."). This is not the standard. The question is whether the Defendant's action *caused* the alleged injury. *See Mayorkas*, 2022 WL 357348 at *8. This is an empirical question, not a doctrinal one—and one to which the government certainly has exclusive knowledge because of its particular responsibilities and expertise regarding migration and the border.

Moreover, because DHS has *itself* concluded that environmental remediation measures are required as a result of terminating construction of the border wall, it is essentially inconceivable that DHS would not possess documents to the State's standing. That is particular so since the environmental harms that DHS acknowledges and is attempting to ameliorate are harms *in Arizona's environment*—unless Defendants are engaged in constructing such remediation projects without any planning whatsoever.

Defendants remaining arguments, which relate to the Court's alternative holding on NEPA and to the availability of discovery in the APA context, are equally meritless. Accordingly, the State should be granted the modest amount of discovery necessary to determine if the courtroom door is open.

**ARGUMENT**

The federal government does not disagree with the Standard articulated in the States' Motion. Generally, jurisdictional discovery should be granted where "discovery on th[e] issue *might well* demonstrate facts sufficient to constitute a basis for jurisdiction." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (emphasis added). The Ninth Circuit has reversed a court's refusal to countenance jurisdictional discovery where such discovery would merely have been "useful" for purposes of establishing federal subject matter jurisdiction. *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (denial of discovery not an abuse of discretion only when "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction"). *See also* Opp. at 2 ("Courts should deny discovery requests 'when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.'" (citation omitted)). Here, it is far from "clear" that discovery would not yield information sufficient to show jurisdiction.

The State believes discovery would primarily provide two categories of information that would show how the termination has injured the State. *First*, the State has strong reason to believe that the government possesses information about the likely consequences of wall

construction termination on migration. This information will answer the specific question posed in the Court's opinion about whether the termination of the wall is causing any migration which might harm Arizona. *Mayorkas*, 2022 WL 357348 at *12.

*Second*, the actual remediation activities that DHS is undertaking will inform whether the termination harmed the State. While Defendants persist in arguing that remediation is only related to wall *construction* and not wall *termination*, common sense and the governments' own statements indicate that these activities have been impacted by the termination of the wall. Thus, the government's decisions involving remediation will shed considerable light on whether that termination has harmed the State.

In response to the State's argument that DHS is likely to possess information about how the termination of the wall has impacted migration, the agency asserts that such information would be useless because the State has to show the "specific reasons" why individual migrants chose to migrate. Opp. at 3; 5 (State offers "no explanation of how discovery … could uncover the motivations of third-party migrants"). But that is *not* the governing legal standard. The State does not have to show the mental states of individual migrants in order to establish causation. Rather, the State only needs to establish that the injury was a "predictable effect" of the Defendant's actions. *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015-18 (9th Cir.), *cert. denied*, 142 S. Ct. 713 (2021) (dismissing claim because "Plaintiffs have offered no evidence showing that population growth is a predictable effect of the DSO and STEM rules").

The Supreme Court has squarely held standing in a case like this one, and it did not require the Plaintiffs to meet the impossible standard the government advances here. In *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2563-64 (2019), discussed at length in *Whitewater Draw*, the Supreme Court held that plaintiffs had satisfied their burden of showing that "third parties will … react in predictable ways to the citizenship question" with evidence that these groups "historically responded to the census in lower rates than other groups." *Id.* at 2566. This evidence was sufficient for the Court to conclude that the

plaintiffs' theory of standing did not rest on "speculation" but on "the predictable effect of Government action on the decisions of third parties." *Id. See also Whitewater Draw*, 5 F.4th at 1018. The defect in *Whitewater Draw* was that the plaintiffs there did not show that population growth was a similarly "predictable effect" of the challenged programs. *Id.*

The State has reason to believe that evidence in the government's possession will show that increased migration or increased concentration of migration in Arizona was a "predictable effect" of the termination of wall construction—and indeed was the *observed* effect that has in fact occurred. It is essentially impossible that the federal government terminated the border wall construction in question without asking and analyzing what impact that termination would have and has had on border crossing.

Indeed, the "predictable effect" of its actions on the activities of migrants is precisely the expertise and sole province of DHS. The State presented evidence from property owners and law enforcement on the border that attempted to show that illegal crossings had increased in areas with gaps and that there was a connection between the termination of the border barrier and the increased migration in those areas. *See, e.g.*, Napier Decl. ¶¶ 11-13 (Doc. 15-3); Chilton Decl. ¶¶ 6-8 (Doc 29-3). But these documents lack first-hand perspective of those actually enforcing border security. The State does not have access to planning documents, law enforcement records from border patrol about migrant crossings, or even the administrative record on this decision. These documents would likely show that termination of border barriers caused or was expected to cause more migration directly, or that it caused it to take place in specified corridors. Border patrol experts are likely to have first-hand knowledge of these facts. This information should be made available to the State before its claim is dismissed.

Nor does it matter, as Defendants point out, that the Administration came in with a preconceived idea of the ineffectiveness of the border barrier. Opp. at 5. The agency still has a statutory obligation to engage in reasoned decision-making, and there were numerous follow-on decisions to be made even if the President had broadly determined walls were

ineffective. These decisions must have been reasoned, unless the agency's termination of the wall was a particularly egregious arbitrary and capricious action, and the agency must have considered alternatives. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). The agency accordingly *must* have considered the potential impact of discontinuing border wall construction and its likely affect on the activities of migrants. Indeed, "[t]hat the [DHS's actions] are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Defendants thus cannot avoid discovery by confessing to violating the APA's requirement of reasoned decision-making through blind, unthinking obedience to executive orders. The APA has no such "just following orders" exception.

The second category of information that the government is likely to possess relates to considerable environmental remediation projects on the Arizona-Mexico border. Defendants continue to insist (at 6) that their remediation activities have nothing to do with wall termination—an implausible assertion, to the say the least. These remediations, as the government has explained, will involve "activities necessary to address life, safety, environmental, and remediation requirements for border barrier projects previously undertaken by the Department of Defense (DoD) and located within the Border Patrol's San Diego, El Centro, Yuma, Tucson, El Paso, and Del Rio Sectors."[1] That statement goes on to explain that the remediations will "address safety concerns by closing construction access gaps that were left open at the time of the border barrier construction pause, and will also include adding missing gates, addressing incomplete foundations, and connecting power to gates that are already hung but are currently inoperable." *Id.* It is clear that these

---

[1] *See* DHS, *DHS to Address Life, Safety, Environmental, and Remediation Requirements for Border Barrier Projects Previously Undertaken by DoD* (Dec. 20, 2021) *available at* https://www.dhs.gov/news/2021/12/20/dhs-address-life-safety-environmental-and-remediation-requirements-border-barrier

remediations are necessarily related to the *termination* of wall construction. But for that termination, it is far from clear how many of the remediations would have been necessary, or whether they would have proceeded in the same fashion.

The State reasonably believes that, apart from the migration impacts discussed above, these remediation efforts, once more detail is made available about them, will show that the termination of the border wall *caused* harmful environmental impacts on the State. *Whitewater Draw*, 5 F.4th at 1018. The State has been unable to substantiate its standing for these injuries to this Court's satisfaction because specific details about the remediations are in the hands of the government. And, as noted above, Defendants have completely stone-walled the State's FOIA requests which might have helped shed light on these theories. However, the undisputed facts in the public record about these remediations are certainly enough to create "at least an arguable claim that the federal government plays a significant enough role . . . to render actions taken pursuant to the program subject to NEPA requirements" and to "create a 'reasonable probability' that the outcome of the factual motion to dismiss would be different" after discovery. *See Laub*, 342 F.3d at 1093.

Defendants also suggest (at 2, 7 n.3) that the fact that this is an APA case should somehow impact whether discovery is permitted. But they do not really press this argument, because, as DHS surely knows, this Court is not limited to the administrative record (still unproduced) in ascertaining the State's standing. *See, e.g.*, *Nw. Envir. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997). Indeed, courts routinely rely on extra-record evidence to support standing in APA cases. *See, e.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010) (relying on declarations to find that plaintiffs had Article III standing in an APA case); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010) (same). But even if this was relevant, they should at least produce the administrative record here, and they have refused to do even that.

Equally unavailing is DHS's outlandish suggestion that "the record before the Court

7

on the efficacy of border wall in Arizona is *well developed*." Opp. 5 (emphasis added). The record here does not include (1) a *single page* of Defendants' administrative record or (2) a *single page* produced in response to the State's FOIA requests. The record is hardly developed *at all* due largely to Defendants' stonewall tactics. Their suggestion that the record is "well developed" despite their failure to contribute virtually anything to it (aside from self-serving declarations) is specious.

The government next argues that this Court's alternative holding that the Defendant's argument on the applicability of NEPA is "more persuasive" is somehow dispositive to ascertaining Arizona's standing. *Mayorkas*, 2022 WL 357348 at *13. But it is not at all clear how. First, Arizona has claims besides its NEPA claim involving the border wall. *See* FAC ¶¶ 160-185 (Doc. 13). Standing for these claims in no way depends on NEPA—in particular, the State's Take Care Clause claim that is not even conceivably controlled by this Court's order or waivable by Congress. Second, the Court's determination that NEPA likely would not apply is, by its own terms, merely a prediction about which side is likely to prevail. It should not control whether the State can obtain evidence to support this Court's jurisdiction.

Finally, the government argues that Judge Bolton's decision granting jurisdictional discovery in *Arizona v. DHS* is not applicable because the chain of causation was allegedly less attenuated there than the chain here. But the government misunderstands what happened in that case; Arizona's claim there did not challenge an MPP-like policy which facially had the effect of introducing new migrants "directly into the state." Opp. at 7. Rather, Arizona challenged a memorandum which Arizona alleged had the *predictable effect* of greatly reducing immigrant detainers and the *effect* of releasing people from detention. There, as here, the government argued there was no causation because "[T]he [challenged] Memorandum does not institute a 'blanket' moratorium; it expressly continues removals for noncitizens arriving after November 1, 2020. It therefore does not encourage additional immigration." *Arizona v. DHS*, No. 21-cv-186, Doc. 26 at 6.

In other words, just like here, the government claimed its action was not causing additional migration because the challenged action allegedly did not have the effects the State argued that it had—individual migrants could still be detained under the memorandum, if certain requirements were met. But discovery revealed that the government's action in that case had the intended and actual effect of increasing migration because the actual effect of the guidance, despite its formal language about continuing removals, was to lift detainers and reduce the number of detainers issued in the first place—which this Court relied upon in specifically holding that the State had standing. *See Arizona v. DHS*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *7 (D. Ariz. June 30, 2021).

This is precisely the same as this case. Here, the government asserts it has no knowledge or information about the effects of its actions in terminating wall construction which could support Arizona's standing. This is almost certainly false—Arizona fully expects that discovery will reveal the government has ample knowledge and understanding that its action terminating the wall has actually and predictably *caused* migration into the state and across specific corridors. In any case, even if the government were right that there was no connection between the termination of the wall near Nogales and increased migration, the State should be permitted to test that assertion via modest discovery rather than being forced to accept DHS's naked *ipse dixit*.

## CONCLUSION

For the foregoing reasons, this Court should grant the State's request for targeted jurisdictional discovery.

1  RESPECTFULLY SUBMITTED this 24th day of March, 2022.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By s/ Drew C. Ensign
   Joseph A. Kanefield (No. 15838)
   Brunn W. Roysden III (No. 28698)
   Drew C. Ensign (No. 25463)
   Robert J. Makar (No. 33579)
     *Assistant Attorneys General*

*Attorneys for Plaintiff Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for parties that are registered CM/ECF users will be served by the CM/ECF system pursuant to the notice of electronic filing.

 s/ Drew C. Ensign
*Attorney for the State of Arizona*