1
2
3
4
5
6                   **IN THE UNITED STATES DISTRICT COURT**
7                     **FOR THE DISTRICT OF ARIZONA**
8
9   State of Arizona,                          No. CV-21-00617-PHX-DWL
10               Plaintiff,                     **ORDER**
11  v.
12  Alejandro Mayorkas, et al.,
13               Defendants.
14

15          In advance of the motion hearing on April 26, 2022, the Court wishes to provide the
16  parties with its tentative ruling.  This is, to be clear, only a tentative ruling.  The point of
17  providing it beforehand is to allow the parties to focus their argument on the issues that
18  seem salient to the Court and to maximize their ability to address any perceived errors in
19  the Court's logic.  This is not an invitation to submit additional briefing.
20          Dated this 15th day of April, 2022.
21
22
23                                              _____
24                                              Dominic W. Lanza
                                                United States District Judge
25
26
27
28

## INTRODUCTION

In this action, the State of Arizona has sued an array of federal agencies and officials for implementing what the State characterizes as the "Population Augmentation Program," which is a "collection of policies of Defendants that have the direct effect of causing growth in the population of the United States generally, and Arizona specifically, through immigration." (Doc. 13 ¶¶ 1-12, 33, 61-65.)  During the early stages of the case, the State moved for a preliminary injunction on a subset of its claims.  (Doc. 17.)  In a February 2022 order, the Court denied the State's motion.  (Doc. 47.)

As the briefing process on the State's motion was unfolding, Defendants moved to dismiss the State's complaint under Rules 12(b)(1) and 12(b)(6).  (Doc. 27.)  That motion is now fully briefed.  (Docs. 33, 36.)  Additionally, following the issuance of the order denying preliminary injunctive relief, the State filed a motion to conduct jurisdictional discovery.  (Doc. 48.)  That motion, too, is now fully briefed.  (Docs. 51, 52.)

For the following reasons, the State's discovery motion is denied, Defendants' motion to dismiss is granted in part, and the parties are ordered to file supplemental briefing regarding Counts Three and Six of the State's complaint, which raise challenges to Defendants' termination of the Migrant Protection Protocols ("MPP").

## BACKGROUND

The details of this case are summarized at length in the February 2022 order denying the State's motion for a preliminary injunction.  (Doc. 47.)

As relevant here, on July 12, 2021, the State filed its operative pleading, the First Amended Complaint ("FAC").  (Doc. 13.)  The named defendants are the Department of Homeland Security ("DHS"), the Department of Defense ("DoD"), three DHS officials sued in their official capacities, and one DoD official sued in his official capacity.  (*Id.* ¶¶ 20-25.)

Broadly speaking, the FAC seeks to challenge the "Population Augmentation Program," which is alleged to have five specific components that "all work in tandem": (1) President Biden's January 2021 "proclamation" to stop building the border wall, which has

since been implemented by DHS and DoD; (2) DHS's formal rescission in June 2021 of the MPP, a program created in 2018 to "ensure[] that individuals who lacked a legal basis to be in the United States, and who had passed through Mexico *en route* to the United States, had to remain in Mexico for the duration of their immigration proceedings"; (3) DHS's discontinuation in April 2021 of the practice of issuing fines to aliens who fail to comply with orders to leave the country; (4) DHS's decision in May 2021 to exempt 250 migrants per day from a pandemic-related public health order barring the entry of migrants without valid travel documents; and (5) guidance issued by DHS in February 2021 that has led to "detaining fewer migrants than ever, including migrants with serious felony convictions." (*Id.* ¶¶ 61-65.)

On July 14, 2021, the State filed a motion for a preliminary injunction. (Doc. 17.) The State sought injunctive relief only on the first three counts of the FAC, all of which are premised on the notion that Defendants were required by the National Environmental Policy Act ("NEPA") to prepare an environmental impact statement ("EIS") before pursuing the policies and programs in question. (*Id.*)

On September 3, 2021, Defendants filed a response to the State's motion for a preliminary injunction. (Doc. 24.)

On October 1, 2021, Defendants filed the pending motion to dismiss the FAC. (Doc. 27.)

On October 18, 2021, the State filed a corrected reply in support of its motion for a preliminary injunction. (Doc. 29.) Although the preliminary injunction request became fully briefed at this point, the Court did not immediately set a hearing because the motion-to-dismiss briefing continued to develop and elaborate upon some of the arguments raised in the preliminary-injunction briefing.

On November 18, 2021, the State filed a response to the motion to dismiss. (Doc. 33.)

On December 10, 2021, Defendants filed a reply in support of the motion to dismiss. (Doc. 36.)

Between that date and January 27, 2022, the parties filed an array of notices concerning factual and legal developments. (Docs. 37, 38, 42, 44.)

On February 1, 2022, the Court heard oral argument on the State's motion for a preliminary injunction. (Doc. 46.)

On February 7, 2022, the Court issued an order denying the State's motion. (Doc. 47.) As discussed in more detail below, the Court began by noting that the jurisdictional landscape underlying the State's NEPA claims had changed as the briefing process was unfolding by virtue of the Ninth Circuit's July 2021 decision in *Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021), which rejected a NEPA-based challenge to various programs that were alleged to encourage illegal immigration, and the Fifth Circuit's December 2021 decision in *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), which overturned DHS's recission of the MPP and ordered DHS "to enforce and implement MPP in good faith." With that background in mind, the Court concluded that the State's NEPA-based challenges to the entirety of the Population Augmentation Program and to the cessation of border wall construction (Counts One and Two) were unlikely to succeed on the merits and that the State was not entitled to injunctive relief with respect to its NEPA-based challenge to the recission of the MPP (Count Three) because any relief the Court might grant would be duplicative of the permanent injunction already issued by the Fifth Circuit.

On February 17, 2022, the State filed the pending motion for jurisdictional discovery. (Doc. 48.)

On March 17, 2022, Defendants filed an opposition to the State's motion for jurisdictional discovery. (Doc. 51.)

On March 24, 2022, the State filed a reply in support of its request for jurisdictional discovery. (Doc. 52.)

On April 8, 2022, the State filed a notice of appeal as to the February 2022 order denying its motion for a preliminary injunction. (Doc. 53.)

On April 12, 2022, the Sixth Circuit decided *Arizona v. Biden*, __ F.4th __, 2022

WL 1090176 (6th Cir. 2022). As discussed in more detail below, that decision represents yet another potential change to the relevant jurisdictional landscape.

**DISCUSSION**

I. <u>Legal Standards</u>

A. **Dismissal Under Rule 12(b)(1)**

Courts "have an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways. A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.*

B. **Dismissal Under Rule 12(b)(6)**

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-680. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The Court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*,

795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.     Count One: Population Augmentation Program—NEPA Challenge

   A.   **Parties' Arguments**

In Count One of the FAC, the State argues that Defendants violated NEPA by failing to prepare a "programmatic EIS" before adopting the Population Augmentation Program. (Doc. 13 ¶¶ 148-53.)

Defendants argue that the State lacks standing for each of its NEPA claims—that is, Counts One, Two, and Three—for the same reasons set forth in Defendants' response to the preliminary injunction motion (Doc. 24): namely, "(1) Arizona's generic and speculative affidavits do not show an imminent, concrete injury to the State's interests and (2) Arizona cannot show that its alleged harms are fairly traceable to the challenged decisions or redressable by a Court order." (Doc. 27 at 3-4.) Additionally, as to Count One specifically, Defendants argue the claim fails under Rule 12(b)(6) because it "is an impermissible programmatic challenged barred under Supreme Court and Ninth Circuit precedent, and none of the components of the so-called 'program' are reviewable." (*Id.* at 6.)

The State responds by reasserting the arguments made in its preliminary injunction briefs (Docs. 15, 29): namely, that it has standing to assert all of its NEPA claims because (1) it provided "reams of evidence for a host of impacts" that directly result from migration caused by border wall gaps, the MPP termination, and Defendants' "other policies"; and (2) Defendants' standing arguments are inconsistent with *Massachusetts v. EPA*, 549 U.S. 497 (2007), which entitled states to "special solicitude" in the standing analysis. (Doc. 33 at 3-5.) The State also notes that the standing arguments Defendants raised in the preliminary injunction response "are even weaker in this [motion to dismiss] context, where the State's allegations must be accepted as true." (*Id.* at 5-6.) Finally, as for Count One specifically, the State asserts that "Defendants have previously recognized that their interlocking and related actions involving the southern border require programmatic treatment under NEPA . . . . Accepted as true, this more than shows that some sort of

programmatic treatment was appropriate here." (*Id.* at 6-7.)

In reply, Defendants reassert that the State fails to demonstrate standing for Count One because the State "alleges no facts showing Defendants' actions have *caused* migration"; because "the causation requirement remains implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant"; and because *Massachusetts* reduced states' burdens on imminence and redressability but did not create a lower standard for traceability. (Doc. 36 at 3-5 [citation and internal quotation marks omitted].) Additionally, Defendants reassert that any programmatic claim is foreclosed by precedent. (*Id.* at 1.)

## B. **Analysis**

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (cleaned up).

The Court declines to dismiss Count One under Rule 12(b)(1). In *Texas v. Biden*, the Fifth Circuit held that the district court did not clearly err in "finding . . . that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri." 20 F.4th at 966. As discussed in the February 2022 order, the Court agrees with this aspect of *Texas v. Biden*'s standing analysis. (Doc. 47 at 21-22 ["In *Texas v. Biden*, the challenge was to DHS's recission of the MPP. Due to the mechanics of how that program worked, its presence or absence was the but-for explanation for why certain aliens remained in the United States or were returned to

Mexico. The State makes this point in the portions of its briefs addressing whether it has standing with respect to Count Three of the FAC, which also raises a challenge to the termination of the MPP"].) And because the MPP recission is one component of the collection of programs challenged in Count One, the Court is satisfied that the State has standing to pursue Count One.

Nevertheless, Count One is subject to dismissal under Rule 12(b)(6). On this point, the Court adopts its rationale for denying the State's request for preliminary injunctive relief as to Count One. (Doc. 47 at 6-13.) As discussed there, the Ninth Circuit has held that "a plaintiff asserting an APA claim 'must direct its attack against some particular agency action that causes it harm' and, as a result, the APA 'precludes broad programmatic attacks, whether couched as a challenge to an agency's action or failure to act.'" (*Id.* at 8.) Here, as in *Whitewater Draw*, Count One qualifies as an "impermissible 'broad programmatic attack' because the challenged 'programs' merely refer to continuing operations of DHS in regulating various types of immigration.'" (*Id.*) Additionally, the State did not, in either its preliminary injunction briefing or in its response to the motion to dismiss, "identif[y] any case suggesting that a failure-to-issue-a-programmatic-EIS claim will lie in this circumstance." (*Id.* at 10.) Although the analysis in the preliminary injunction order was tied to the likelihood-of-success standard, the Court now takes one step further and concludes that Count One fails to state a claim upon which relief can be granted.

III.    Count Two: Border Wall—NEPA Challenge

A.    **Parties' Arguments**

In Count Two of the FAC, the State raises a NEPA challenge to the termination of border wall construction. (Doc. 13 ¶¶ 154-56.) The State alleges that "the termination of border wall construction has left huge holes in the border fencing, including substantial gaps of over 100 miles along the Arizona-Mexico border," which has in turn allowed migrants to "cross[] the border in Arizona in greater numbers than ever before," "signal[ed] the relative openness of the United States-Mexico border," and "encourage[d] migration."

(*Id.* ¶¶ 78, 85, 89.)

In addition to arguing that Count Two must be dismissed based on the standing arguments described above—*i.e.*, the State cannot show that Defendants' actions caused migration or harm to wildlife—Defendants seek dismissal under Rule 12(b)(6) on the ground that Count Two is premised on the same "enticement theory" that was rejected by the Ninth Circuit in *Whitewater Draw*. (Doc. 27 at 1, 4; *see also* Doc. 24.) Defendants also contend that Count Two "fails because: (1) NEPA was waived under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA); (2) IIRIRA's jurisdictional bar forecloses judicial review of APA claims challenging the waivers; (3) the decision to not build more border wall does not alter the environmental status quo; and (4) Arizona may not invoke APA review to challenge the policy directives of the President." (*Id.* at 5-6.)

In response, the State argues that it can establish causation, and therefore standing, because it has provided considerable evidence that migrants are crossing in unprecedented numbers in the areas where Defendants have terminated border wall construction. (Doc. 33 at 2-3, 6; *see also* Docs. 17, 29.) Additionally, the State argues that, as for its injury-to-wildlife theory, "Defendants do not seriously contend that their actions will not affect Arizona wildlife, they only assert that such impacts will be positive. It is not clear on what basis Defendants could make that assertion, since they have not prepared an EIS or any other environmental analysis. But in any case, it is irrelevant at this stage of the litigation, where Arizona's allegations must be accepted as true." (*Id.* at 4.) The State also contends that its "NEPA challenge to the termination of border wall construction should go forward notwithstanding the Secretary's waiver of NEPA compliance for wall *construction* under IIRIRA. DHS's authority to waive NEPA extends only to 'ensure expeditious construction of barriers.' Defendants, however, seek to use the waivers for the precise *opposite* purpose." (*Id.* at 6.)

In reply, Defendants reassert that even if the State had standing, NEPA "does not apply to a decision to terminate border wall projects, or to enforcement decisions," as

explained in its response to the preliminary injunction motion.  (Doc. 36 at 1; *see also* Doc. 24 at 22-31.)

B.     **Analysis**

The Court concludes that Count Two is subject to dismissal under Rule 12(b)(1) due to lack of causation (and, hence, subject-matter jurisdiction).  Alternatively, even if jurisdiction existed, Count Two would be subject to dismissal under Rule 12(b)(6).

First, as for standing, the Court concluded in the February 2022 order that the State was not entitled to preliminary injunctive relief on Count Two in part because the State had not established a likelihood of success as to its standing to pursue that claim.  (Doc. 47 at 14-26.)  Although it was unnecessary at that time to decide whether the State actually lacked standing to pursue Count Two, the Court now concludes that it does, for the same reasons discussed in the February 2022 order (which are incorporated by reference here).

The Sixth Circuit's recent decision in *Arizona v. Biden* underscores this conclusion. There, as here, Arizona sought to challenge aspects of the current administration's immigration policy.  Specifically, after the secretary of DHS "issued a memorandum to his deputies outlining the Department's immigration enforcement priorities and policies," a coalition of states led by Arizona "filed [a] lawsuit in the Southern District of Ohio to enjoin its implementation" and "block[] the Department from relying on the priorities and policies in the memorandum in making certain arrest, detention, and removal decisions." 2022 WL 1090176 at *1.  The theory underlying this challenge was that "the Guidance violates the Administrative Procedure Act . . . [because] the Guidance fails to honor 8 U.S.C. § 1226(c), which requires the Department to take custody of certain criminal noncitizens . . . when they are released from state or federal prison, and 8 U.S.C. § 1231(a), which requires the Department to remove noncitizens within 90 days of receiving final orders of removal.  Failure to respect the requirements of the two statutes, the three States claim, has led to fewer detainers and removals, meaning individuals are being released from state custody into their communities and imposing costs and burdens on them: additional costs to pay for medical and educational services and additional law-

enforcement burdens given the risks of recidivism." *Id.* at *2.[1] "After rejecting a host of justiciability challenges to the lawsuit and after concluding the Guidance likely violated the Administrative Procedure Act, the district court issued a 'nationwide preliminary injunction.'" *Id.* However, in *Arizona v. Biden*, the Sixth Circuit granted the defendants' emergency motion for a stay pending appeal. Writing for the court, Judge Sutton explained that Arizona and the other states likely lacked standing to pursue their challenge, in part because of "causation and redressability problems" stemming from the fact that it "is speculative whether and how the Guidance's prioritization of the apprehension and removal of noncitizens in the three States will injure each of them" and the related fact that the states' alleged "injury turns on choices made by others." *Id.* at *2-3. As part of its standing analysis, the Sixth Circuit also rejected Arizona's reliance on the "special solicitude" doctrine of *Massachusetts*, explaining—similar to this Court's analysis in the February 2022 order (Doc. 47 at 23-24)—that "even if a State can be distinguished from a private entity in this way and even if we put to the side that the key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States, that does not liberate the States from establishing causation and redressability." *Id.* at *4. The Sixth Circuit concluded that "[e]ven under *Massachusetts*, there are many dubious justiciability questions with respect to the States' theory of standing—enough for us to be skeptical at this stage of the case that they can bring the action." *Id.*

The Court acknowledges that the motion now being resolved, a motion to dismiss, arises in a different procedural posture (and implicates different burdens of proof) than the requests for injunctive relief addressed in the February 2022 order and in *Arizona v. Biden*. Nevertheless, the State goes too far in its suggestion that, because Defendants are the movants here, "Arizona's allegations must be accepted as true" at "this stage of the

---

[1]    The challenged policy in *Arizona v. Biden* appears to overlap, at least in part, with one of the components of the Population Augmentation Program being challenged in this action. (Doc. 13 ¶¶ 65, 151 [alleging that "another policy, which is also part of the Population Augmentation Program and designed to encourage migration, . . . [is] detaining fewer migrants than ever" and that one "component[] of the Population Augmentation Program . . . [is] drastically decreasing deportation of individuals with final orders of removal"].)

litigation." (Doc. 33 at 4.) Defendants are mounting a factual attack on the Court's subject-matter jurisdiction, and when "[f]aced with a factual attack on subject matter jurisdiction, the trial court may proceed as it never could under Rule 12(b)(6) or Fed.R.Civ.P.56. No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).[2] Thus, the Court need not uncritically accept the FAC's allegations of injury and causation. The State provided no additional evidence or argument in its response to the motion to dismiss to persuade the Court that aliens are entering the country illegally *because of* certain gaps in the border wall (which would remain gap-filled regardless of the termination decision) or that wildlife is being harmed by the challenged decision.

Alternatively, even if the State had standing to pursue Count Two, that claim would be subject to dismissal under Rule 12(b)(6) because NEPA does not apply to federal actions that maintain the environmental status quo. On this point, the Court again incorporates the relevant analysis in the February 2022 order (Doc. 47 at 26-31) after clarifying that, although that analysis only addressed whether the State had shown of likelihood of success on the merits on Count Two, the same reasoning compels the conclusion that the State has failed to state a valid claim or articulate a valid legal theory in Count Two.

---

[2] An exception to this rule arises "where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits," in which case "the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Mecinas v. Hobbs*, __ F.4th __, 2022 WL 1052620, *3 (9th Cir. 2022) (citations and internal quotation marks omitted). This exception is inapplicable here because the jurisdictional and substantive issues are not intertwined—the State concedes that the merits of its NEPA claim in Count Two have nothing to do with whether there is, in fact, a causal relationship between the termination of border wall construction and State's alleged harms. (Doc. 17 at 4 ["As a purely procedural statute, 'NEPA itself does not mandate particular results[.]' NEPA therefore does not itself preclude any of the particular challenged actions here. But NEPA absolutely does prohibit Defendants from taking them without first studying the environmental impacts adequately under NEPA's auspices. Ultimately, 'NEPA merely prohibits uninformed—rather than unwise—agency action.' Because Defendants have taken many such uniformed decisions here, relief is warranted."].)

- 12 -

IV.     Count Three: MPP—NEPA Challenge

       A.     **Parties' Arguments**

       In Count Three of the FAC, the State alleges that Defendants' "cancellation of the MPP has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA."  (Doc. 13 ¶¶ 157-59.)

       Defendants argue that Count Three should be dismissed for lack of standing and for failure to state a claim because "(1) returning certain noncitizens to contiguous countries pending their removal proceedings is committed to DHS's discretion by law; (2) the decision to terminate MPP is not a reviewable final agency action; and (3) the decision to terminate MPP is an enforcement decision, and so not a 'major federal action' requiring NEPA analysis."  (Doc. 27 at 6.)

       The State responds that Defendants' arguments "are essentially the same arguments DHS made to the Fifth Circuit in *Texas v. Biden*."  (Doc. 33 at 6.)  Specifically, the State contends that "Defendants' attempt to shield their blanket construction halt . . . fails, because the . . . presumption of unreviewability applies to challenges to individual decisions not to initiate enforcement actions, not sweeping policies of non-enforcement."  (*Id.* at 6.)

       In reply, Defendants simply reference their response to the preliminary injunction motion.  (Doc. 36 at 5 [citing Doc. 24 at 31-39].)

       B.     **Analysis**

       In the February 2022 order, the Court declined to grant preliminary injunctive relief on Count Three for reasons unrelated to the merits of the claim (or the State's standing to pursue the claim).  (Doc. 47 at 31-32.)  Instead, the Court concluded that the State would not suffer irreparable harm in the absence of preliminary injunctive relief in light of the Fifth Circuit's decision in *Texas v. Biden* to uphold the issuance of a permanent injunction that "vacated the [MPP] Termination Decision, 'permanently enjoined and restrained [DHS] from implementing or enforcing' it, and ordered DHS 'to enforce and implement MPP in good faith until such a time as it has been lawfully rescinded in compliance with

the APA and until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225] without releasing any aliens because of a lack of detention resources.'" (*Id.*) The Court noted that, under Ninth Circuit law, "it is unnecessary to issue what would essentially be a piggyback injunction where a different court has already enjoined the same conduct." (*Id.* at 3.)

The Fifth Circuit's decision in *Texas v. Biden* is not the only development related to the MPP that has occurred since the State filed its operative complaint. As noted, the State's NEPA-based challenge in this action is based on Defendants' failure to prepare an EIS before announcing the recission of the MPP in *June* 2021. (Doc. 13 ¶ 102 ["[O]n June 1, 2021, the Administration formally ended the MPP with a cursory seven-page memorandum."].) However, as discussed at length in *Texas v. Biden*, "DHS issued two more memoranda [in October 2021] to explain the Termination Decision," and "[t]hese much longer documents purported to 're-terminate' MPP." 20 F.4th at 941-42. DHS argued in *Texas v. Biden* that the issuance of these memoranda mooted the plaintiff's APA challenge to the June 2021 MPP termination decision, but the Fifth Circuit rejected that argument for various reasons. *Id.* at 956-66.

Notably, on February 18, 2022—about a week after the issuance of the order denying the State's motion for preliminary injunction in this action—the Supreme Court granted certiorari in *Texas v. Biden*. *Biden v. Texas*, 142 S. Ct. 1098 (2022). The issues on which the Court granted certiorari are (1) "[w]hether 8 U.S.C. 1225 requires DHS to continue implementing MPP"; and (2) "[w]hether the court of appeals erred by concluding that the Secretary's new decision terminating MPP had no legal effect." Petition for a Writ of Certiorari, 2021 WL 6206109, *1. The Supreme Court ordered expedited briefing and set the case "for argument in the second week of the April 2022 argument session." *Biden*, 142 S. Ct. at 1098.

Given these developments, it is unclear to the Court whether Count Three, which involves a NEPA-based challenge to the June 2021 MPP termination decision, is now moot. Not only did Defendants purport to re-terminate the MPP in October 2021, via a

decisional process the State has not challenged in the FAC, but Defendants have now vacated the June 2021 MPP termination decision and reinstated the MPP (per the permanent injunction in *Texas v. Biden*) and the Supreme Court has granted expedited review to consider whether the Fifth Circuit erred in failing to recognize the mootness-inducing effect of the October 2021 memoranda. If any of these developments have mooted the State's claim in Count Three, the Court would lack subject-matter jurisdiction over that claim. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)."). And if the Court lacks subject-matter jurisdiction over Count Three for this reason, there would be no need to resolve Defendants' other dismissal arguments directed toward Count Three.

Accordingly, expressing no prejudgment on the issue, the parties are ordered to file supplemental briefing on whether Count Three is now moot.

## V. Count Five: Border Wall—Arbitrary And Capricious Challenge

### A. **Parties' Arguments**

In Count Five of the FAC,[3] the State alleges that "Defendants' Border Wall Construction Termination was not the product of reasoned decision-making," leaving "gaps in border barriers that are entirely unstudied and arbitrary," and is accordingly arbitrary and capricious in violation of the APA. (Doc. 13 ¶¶ 166-71.)

Defendants move to dismiss Count Five for lack of standing and for failure to state a claim. (Doc. 27 at 1, 6-8.) As for the latter, Defendants contend that any arbitrary-and-capricious claim necessarily fails because the State "has not identified any statutory criteria against which this Court could review the challenged decisions. And, indeed, none exist," given Congress's decision to vest the Secretary of DHS with discretion over "if, how, and where to build border infrastructure." (*Id.* at 6-7.)

The State responds that it is not required to allege separate statutory violations to

---

[3] This order contains no analysis concerning Count Four because the State has withdrawn that claim. (Doc. 20.)

bring an APA challenge, and because the consolidated appropriations acts at issue constrain DHS's discretion in meaningful ways, its APA challenge is reviewable. (Doc. 33 at 7-11.)

In reply, Defendants contend that "the parties agree that APA review is unavailable for decisions committed to agency discretion by law, [a]nd Congress has committed the challenged [border wall construction] decisions to the Secretary of Homeland Security's discretion" through IIRIRA. (Doc. 36 at 8-9.)

## B. **Analysis**

The State lacks standing to pursue Count Five for the same reasons that it lacks standing to pursue Count Two—namely, the State has not shown the requisite causal connection between Defendants' decision to terminate border wall construction and its alleged harms. This obviates the need to reach the merits of Count Five, including whether the State's claims constitute "standalone APA claims" and whether the relevant statutes commit the decision to terminate border wall construction to agency discretion.

## VI. Count Six: MPP—Arbitrary And Capricious Challenge

### A. **Parties' Arguments**

In Count Six of the FAC, the State alleges that the decision to terminate the MPP "represents an abrupt departure from [previous] policy without sufficient justification" and is also arbitrary and capricious under the APA. (Doc. 13 ¶¶ 172-77.)

Defendants move to dismiss Count Six for the same reasons as Count Five: a lack of standing; because "[w]ith no identified statutory criteria, there is no law to apply, and Arizona's claims fall beyond the APA's limited waiver of sovereign immunity"; and because "whether to return certain noncitizens to Mexico pending removal proceedings is committed to DHS's discretion by statute." (Doc. 27 at 1, 7.)

The State responds that the validity of its challenge is confirmed by *Texas v. Biden*, which characterized the termination of the MPP as an enforcement decision and determined that Texas had shown a strong likelihood of success on the merits because the termination of the MPP failed to consider "relevant factors" and "important aspects of the problem." (Doc. 33 at 11-12.)

In reply, Defendants reassert that, as with Count Five, APA review is unavailable for decisions committed to agency discretion by law and Congress has committed the challenged decisions to terminate the MPP to DHS's discretion via the Immigration and Nationality Act ("INA"). (Doc. 36 at 8-9.)

B. **Analysis**

This claim requires supplemental briefing for the reasons given above as to Count Three. Because the Court must assure itself that subject-matter jurisdiction exists before proceeding to the merits, the Court will postpone any further analysis of Count Six until supplemental briefing has been provided.

VII. Count Seven: Take Care Clause

A. **Parties' Arguments**

In Count Seven of the FAC, the State alleges that Defendants violated Article II, Section 3 of the Constitution (the "Take Care Clause") via the decision to terminate border wall construction projects. (Doc. 13 ¶¶ 178-85.) Specifically, the State alleges that "Congress allocated to DHS considerable funds to spend on border construction, with specific instructions detailing what those funds may be used for. Defendants, in violation of their obligation to take care that those laws are faithfully executed, are withholding the funds and refusing to proceed with the statutorily mandated program."[4] (*Id.* ¶ 179.)

In response, Defendants argue that Count Seven (like all of the other claims) fails for a lack of standing. (Doc. 27 at 1.) Alternatively, Defendants argue that "the Take Care Clause does not provide a private right of action against the Executive, and the State may not circumvent Congress' prescribed mechanism for judicial review—the APA—by characterizing its claim as a constitutional violation." (*Id.* at 8.) Defendants continue that, "[a]s far as [they] can tell, no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the Executive. Courts confronted with the

_____

[4] Although the FAC also alleges that "Defendants' actions similarly violate the Impoundment Control Act of 1974" (Doc. 13 ¶ 182), both parties now agree that the State is not pursuing a freestanding claim under that statute. (Doc. 33 at 12 n.5; Doc. 37 at 9 n.7.)

question have either failed to resolve it or else answered in the negative." (*Id.* at 9.) Finally, Defendants argue that even if Count Seven were otherwise cognizable, it would still fail to state a claim for relief because "DHS does not violate the appropriations acts or the Take Care Clause by using its appropriated funds to close out existing projects or to prepare environmental reviews to guide future exercises of that discretion." (*Id.* at 11.)

The State responds that "[i]n spite of th[e] affirmative obligation" to construct a border wall as directed in the consolidated appropriations acts, "Defendants have— consistent with the President's procla[]mation—determined not to spend these funds, decided to illegally impound them, and have resorted to repeatedly asking Congress to relieve them from this known illegality by cancelling the funding. . . . [N]o more clear violation of the Take Care Clause of the Constitution could be imagined than this attempt to dispense with a law of Congress." (Doc. 33 at 12.) The State contends that, "[a]t best, the authorities cited by Defendants state that it is 'unclear' whether some Take Care claims against the President are . . . justiciable. . . . But it is simply not true that courts have not entertained these claims." (*Id.* at 13-14.) In support of this assertion, the State cites *Center for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019), and *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). The State further argues that its Take Care Clause claim is a "validly pled alternative basis for invalidating Defendants' Border Wall Construction Termination. There is nothing that prevents agency action from violating *both* the Constitution *and* the APA." (*Id.* at 15.) The State argues that Defendants displaced an obligation of Congress and pursued a contrary policy, under the guise of nonenforcement (*id.* at 15-16), and that Count Seven is valid because the FAC "specifically alleged that Defendants have finally terminated the construction of the border wall and have no intention of spending that money" (*id.* at 16).

In reply, Defendants contend that the State is "simply alleging that the President has exceeded his statutory authority [which is] not [a] 'constitutional' claim[]." (Doc. 36 at 9 [quoting *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994)].) According to Defendants, "[t]he State's Take Care Clause allegations hinge on whether DHS violated statutes . . . .

- 18 -

Under Arizona's approach, every statutory violation would be a constitutional Take Care Clause claim, and any litigant could evade the APA by alleging the violation advances a contrary policy goal. (*Id.* at 10.) Finally, Defendants contend that "DHS's publicly available Border Wall Plan, . . . shows that DHS is not withholding border barrier funding but will use its funding to—among other things—close out project sites and remediate environmental harm from past construction." (*Id.* at 11.)

## B. **Analysis**

The Court agrees with Defendants that Count Seven is subject to dismissal. First, it is unclear how the State could have standing to pursue this claim if it lacks standing to pursue Counts Two and Five. In all three claims, the State seeks to challenge Defendants' termination of border wall construction projects and argues that it has standing because the challenged conduct has caused it to sustain various environmental and other injuries. The lack of causation that undermined the State's claim of standing in Counts Two and Five is equally present here. Additionally, because Count Seven (unlike Counts Two and Five) does not arise under the APA, the State cannot attempt to take advantage of any "relaxation of causation and redressability" that applies to claims of "procedural injury." (Doc. 29 at 10.)

Second, even if the State had standing to pursue Count Seven, that claim would be subject to dismissal under Rule 12(b)(6). As an initial matter, it is unclear whether Take Care Clause claims are ever cognizable. In *Mississippi v. Johnson*, 71 U.S. 475 (1866), the Supreme Court explained that the President's constitutional duty "in the exercise of the power to see that the laws are faithfully executed" is "[v]ery different" from other constitutional duties and then stated that any "attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'" *Id.* at 499. It appears that, in the 150 years since *Johnson* was decided, no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials. *See, e.g.*, *Citizens for Resp.*

& *Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019) ("Whether claims brought directly under the Take Care Clause are even justiciable is open to debate."); *id.* at 139 (noting that *Johnson* "can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable" but also noting that "the government cites no case adopting that understanding of *Johnson* and the Court is aware of none"); *Am. Fed'n of Gov't Employees, AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 439 (D.D.C. 2018), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019) ("[I]t is not at all clear that a claim under the Take Care Clause presents a justiciable claim for this Court's resolution.").

The cases cited by the State are not to the contrary. In *City & County of San Francisco*, the question was "whether, in the absence of congressional authorization, the Executive Branch may withhold all federal grants from so-called 'sanctuary' cities and counties." 897 F.3d at 1231. Although the Ninth Circuit happened to mention the Take Care Clause in the course of its analysis—"[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon. Rather, the President has a corresponding obligation—to 'take Care that the Laws be faithfully executed.' Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations. Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role." *Id.* at 1233-34 (citations omitted)—the court did not hold or even suggest that the challengers' claim *arose* under the Take Care Clause. To the contrary, the court held that the challenged conduct was impermissible "under the principle of Separation of Powers and in consideration of the Spending Clause." *Id.* at 1231. *See also id.* at 1233 ("For us, then, the question is whether the Executive Order violates the Separation of Powers, pursuant to which the Constitution committed the Spending power to Congress."); *id.* at 1235 ("Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers."). Although it might be possible to construe the Ninth Circuit's references to the "Separation

of Powers" as some sort of shorthand for the Take Care Clause, this interpretation is implausible—if the Ninth Circuit was attempting to break new ground by explicitly recognizing a species of constitutional claim against the President that has not been recognized by other courts in the century and a half since *Johnson* was decided, it presumably would have said so with more precision.

Meanwhile, in *Center for Biological Diversity*, Congress relied on its authority under the Congressional Review Act ("CRA") to enact a joint resolution that disapproved of certain hunting-related regulations promulgated by the Department of Interior ("Interior"). 946 F.3d at 556-57. After the President signed the joint resolution, Interior rescinded the regulations in question. *Id.* at 558-59. In response, an environmental group filed a lawsuit in which it sought to compel Interior to reinstate the regulations for various reasons, including that "the Joint Resolution and the CRA violate the Take Care Clause of the Constitution." *Id.* at 559. As for that claim, the challenger's specific theory was that because Congress failed to follow "the constitutionally required process of bicameralism and presentment" when passing the joint resolution, the resolution was ineffective and thus improperly "*prevent[ed]* the President from exercising his constitutional duty to faithfully execute the laws." *Id.* at 561-62. The Ninth Circuit easily rejected this claim, holding that it was not "plausible on its face" because "validly enacted legislation that requires an agency to take a specified action does not impinge on the Take Care Clause or violate separation-of-powers principles." *Id.* at 562. In reaching this conclusion, the court did not cite *Johnson* or include any discussion of the general cognizability of claims arising under the Take Care Clause. *Id.* Again, although it might be possible to construe the absence of such discussion as an implicit determination that Take Care Clause claims are cognizable, the Court is hesitant to conclude that the Ninth Circuit reached such a potentially groundbreaking conclusion *sub silentio*. *Cf. Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1231 (10th Cir.

2004) ("Cases are not authority for propositions not considered.") (cleaned up).  *See generally United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (law of the circuit arises only when "a panel confronts an issue germane to the eventual resolution of the case, and resolves it *after reasoned consideration* in a published opinion") (cleaned up) (emphasis added).

At any rate, even assuming that Take Care Clause claims might be cognizable in a narrow range of circumstances, the Supreme Court has emphasized that not all separation-of-powers related claims directed against the executive branch are truly constitutional claims.  *See, e.g.*, *Dalton*, 511 U.S. at 472 ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.  On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.").  It is possible that a claim that the President "*affirmatively displaced* a congressionally mandated test" or process—rather than a claim that the President simply did not comply with a congressionally prescribed process—may implicate constitutional concerns.  *See, e.g.*, *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020) (emphasis added).  Here, however, the State claims that the President flouted congressional mandates by refusing to spend appropriated funds to build the border wall.  This is best categorized as a statutory claim.

In *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), the D.C. Circuit addressed an analogous situation.  Under the Nuclear Waste Policy Act, the Nuclear Regulatory Commission ("NRC") is required to consider the Department of Energy's licensing applications to store nuclear waste and issue final decisions approving or disapproving such applications.  *Id.* at 257.  The controversy in *Aiken County* arose after the NRC failed to take action on a license application by the statutory deadline, even though "Congress appropriated funds to the Commission so that the Commission could conduct the statutorily mandated licensing process."  *Id.* at 258.  This failure arose because the NRC "ha[d] no . . . intention of complying with the law."  *Id.*  Although the D.C. Circuit recognized that

"[t]his case raises significant questions about the scope of the Executive's authority to disregard federal statutes," the court ultimately concluded that "[i]n these circumstances, where previously appropriated money is available for an agency to perform a statutorily mandated activity, . . . the Commission's inaction violates the Nuclear Waste Policy Act." *Id.* at 257, 260-61.

So, too, here. A claim that executive officials failed to follow appropriations acts "is another way of saying that the President and officials violated *those statutes*." *Center for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 53 (D.D.C. 2020) (emphasis added). "Under *Dalton*, [the State] cannot recast these types of claims as constitutional." *Id.*

For these reasons, Count Seven is dismissed. This outcome makes it unnecessary to reach the other dismissal arguments raised by Defendants, including whether DHS's decisions to close out existing projects and engage in environmental planning for any future border infrastructure constitutes a refusal to spend money that Congress has appropriated or merely a delay in spending such funds.

VIII.  Motion For Jurisdictional Discovery

A.  **Parties' Arguments**

Following the issuance of the February 2022 order, which cast doubt upon the State's ability to establish the required causal link between the cessation of border wall construction and the State's asserted injuries, the State moved for "targeted jurisdictional discovery" of information related to this question "uniquely in the custody and control of" Defendants. (Doc. 48 at 1.) The State contends that it satisfies the Ninth Circuit's standard for jurisdictional discovery—which it characterizes as a showing that a "mere possibility" of discovering useful evidence exists—because (1) Defendants "are in the best position to know why, how often, and where migrants cross the border"; (2) Defendants "presumably considered" "why aliens choose to enter the country illegally and whether the construction of certain impediments . . . would result in effective deterrence"; (3) Defendants have announced plans to engage in environmental remediation at the border, and information about such plans "would shed light on the environmental impact of the . . . decision to

terminate the border barrier construction"; and (4) the discovery requested here is the same as that ordered in *Arizona v. U.S. Dept. of Homeland Security*, 2021 WL 2787930, *6-7 (D. Ariz. 2021), which is a case challenging Defendants' February 18, 2021 Interim Guidance affecting civil immigration and enforcement decisions. (*Id.* at 2-4.)

Defendants respond that the State does not explain how the discovery it seeks could cure its lack of standing and "overlooks that any number of variables might influence an alien's independent decision to enter the country illegally and fails to show that aliens would do so *because of* Defendants' failure to build portions of an incomplete border wall." (Doc. 51 at 1.) Defendants also argue that jurisdictional discovery would be futile because the Court identified non-jurisdictional grounds for denying injunctive relief. (*Id.*) As for the applicable standard, Defendants argue that the Court "should deny discovery requests when it is clear further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction" and that "[a] mere hunch that discovery might yield jurisdictionally relevant facts is insufficient." (*Id.* at 2 [cleaned up].) Defendants also contend that, "[b]ecause this is an APA case, discovery would be highly unusual." (*Id.*) Turning to the merits, Defendants contend each of the State's proffered reasons fail. First, Defendants argue that although "[i]t is true that the immigration policy is the exclusive domain of [Defendants] and that [Defendants] compile statistics on migrant encounters . . . , the germane question is not how many migrants are crossing, or where. It is why they choose to cross. And this knowledge is not in Defendants' possession. . . . The specific reasons underlying individual migration decisions are known only to the migrants themselves." (*Id.* at 3-4.) Further, Defendants contend that "divin[ing] the motives of non-parties" is distinct from the personal jurisdiction issues raised in the State's cited cases, in which jurisdictional discovery can more readily be shown to yield useful information. (*Id.* at 4.) Second, Defendants argue that "it is unclear why Arizona believes the government's view on the effectiveness of the border wall as a deterrent is relevant to the State's standing or why the State needs discovery on that point," as the question of efficacy has already been developed in the record. (*Id.* at 5.) Third, Defendants argue that "[r]emediation and close

out work does not bolster Arizona's claim of environmental harm because the agencies are addressing impacts from construction, not from terminating construction" and that the "Court's holding on standing turned on traceability, not injury-in-fact . . . , [s]o any discovery on the remediation plan is untethered to Arizona's standing problem." (*Id.* at 6.) Fourth, Defendants argue that the "decision to allow jurisdictional discovery in *Arizona v. U.S. Department of Homeland Security* does not support discovery here" because that case alleged DHS was releasing migrants directly into the state, which this Court has already determined is not as causally attenuated as terminating border wall construction. (*Id.* at 6-7.)

In reply, the State argues that Defendants "mischaracterize [both] the Court's decision [in the preliminary injunction order] as forbidding Arizona's standing *theory* writ large" as well as "the State's burden, as though the State must show precisely what is in the minds of prospective migrants" to demonstrate standing, when, in fact, it need only establish "that the injury was a 'predictable effect' of the Defendants' actions." (Doc. 52 at 2, 4.) The State further argues that "because DHS has *itself* concluded that environmental remediation measures are required . . . , it is essentially inconceivable that DHS would not possess documents to the State's standing," as such documents will "inform whether termination harmed the State." (*Id.* at 3-4.) The State continues that it "does not have access to planning documents, law enforcement records from border patrol about migrant crossings, or even the administrative record on this decision. These documents would likely show that termination of border barriers caused or was expected to cause more migration directly, or that it caused it to take place in specified corridors." (*Id.* at 5.) The State also reasserts that the Court is not limited to the administrative record in ascertaining standing in an APA case. (*Id.* at 7.) With respect to Defendants' futility argument, the State argues that it "has claims besides its NEPA claim involving the border wall," including its Take Care Clause claim, and "the Court's determination that NEPA would likely not apply is, by its own terms, merely a prediction about which side is likely to prevail." (*Id.* at 8.) Finally, the State argues that Defendants mischaracterize the

challenge in *Arizona v. Department of Homeland Security*—there, the State "challenged a memorandum which [it] alleged had the *predictable effect* of greatly reducing immigrant detainers and the *effect* of releasing people from detention," and discovery revealed these actual effects. (*Id.* at 8-9.)

B. **Analysis**

The motion to conduct jurisdictional discovery is denied for two independent reasons.

First, the motion is untimely. Defendants filed their motion to dismiss in October 2021. (Doc. 27.) The State filed its response in November 2021. (Doc. 33.) Nowhere in the response did the State suggest that it needed to pursue additional discovery in order to meet its burden of establishing subject-matter jurisdiction—instead, the State chose to stand on the sufficiency of its existing allegations and evidence. (*Id.* at 3-5.) The motion to dismiss became fully briefed and ripe for resolution in early December 2021. (Doc. 36.) Finally, in early February 2022, the Court issued a detailed order that analyzed the sufficiency of the State's jurisdictional-related evidence for purposes of the State's request for preliminary injunctive relief. (Doc. 47.) Although the procedural posture of the case dictated that the February 2022 order only address whether the State was likely to succeed on its jurisdictional showing, the order strongly indicated that the State would ultimately be found to lack standing, at least with respect to its border wall-related claims. It was only after this order issued that the State filed its pending motion to conduct jurisdictional discovery. (Doc. 48.) Under the circumstances, this request comes too late. *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 187-88 (D.D.C. 2018) (noting that "[w]hen a defendant has moved to dismiss a complaint on jurisdictional grounds, the appropriate time to request jurisdictional discovery is in opposition to the defendant's motion" and holding that the plaintiffs' request "came too late" because "Plaintiffs waited until after the Court's hearing to file a 24-page motion for jurisdictional discovery, presumably because the Court's extensive questioning on personal jurisdictional alerted plaintiffs to the risk of relying on their complaint"). *Cf. Dearing v. Magellan Health Inc.*,

2020 WL 7041048, *2 (D. Ariz. 2020) (denying request for jurisdictional discovery as "untimely" because it was not raised until after the motion to dismiss was fully briefed and resolved); *City of Moundridge v. Exxon Mobil Corp.*, 244 F.R.D. 10, 14-15 (D.D.C. 2007) ("Here, plaintiffs neither independently sought jurisdictional discovery, nor requested it in response to defendants' motion to dismiss. Only now, after an adverse decision, have plaintiffs asserted a need for jurisdictional discovery. This alone is reason to deny the request for jurisdictional discovery.").

Second, and alternatively, the request fails on the merits. "An appellate court will not interfere with the trial court's refusal to grant discovery except upon the clearest showing that the dismissal resulted in actual and substantial prejudice to the litigant; such a refusal is not an abuse of discretion when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction. Discovery, however, should be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (cleaned up). "Prejudice is established if there is a reasonable probability that the outcome would have been different had discovery been allowed." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). It is not an abuse of discretion to deny a request for jurisdictional that is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).

Here, as an initial matter, although this order will result in the dismissal of four of the State's claims (Counts One, Two, Five, and Seven), three of those claims (Counts One, Two, and Seven) are being dismissed at least in part for failure to state a claim under Rule 12(b)(6). The State obviously does not need to pursue additional jurisdictional discovery with respect to those claims because they would fail regardless of the presence or absence of jurisdiction.

As for Count Five, the claim asserted there is that Defendants' decision to terminate construction on the border wall violated the APA because that decision "was not the

product of reasoned decision-making," was "entirely unstudied and arbitrary," and was done without "any thoughtful analysis . . . [and] without engaging in meaningful thought." (Doc. 13 ¶ 168-69.) The allegations are difficult to reconcile with the State's current position, which is that jurisdictional discovery would be fruitful because "[t]he federal government, in making the decisions challenged in this case, presumably considered [various] precise questions," including "why aliens choose to enter the country illegally and whether the construction of certain impediments to their entry . . . would result in effective deterrence." (Doc. 48 at 3.) Such an internally inconsistent theory resembles "little more than a hunch." *Boschetto*, 539 F.3d at 1020.

Even putting aside this contradiction, jurisdictional discovery would not be warranted here. The State argues that Defendants "are in the best position to know why, how often, and where migrants cross the border" and that the requested materials will therefore help demonstrate that increased migration was a "predictable effect" of Defendants' conduct. However, the Ninth Circuit in *Whitewater Draw* made clear that statistics about how often and where migrants cross the border is irrelevant to answering the question of *why* they cross the border. 5 F.4th at 1017. The Ninth Circuit also clarified that, when addressing the "predictable effect" of immigration-related rules on migration, "the degree of predictability matters" and plaintiffs must still come forward with "relevant evidence" and not "mere speculation about the decisions of third parties." *Id.* at 1017-18. Here, beyond making vague requests for "planning documents" and "law enforcement records," the State does not point to any specific evidence allegedly in Defendants' possession—such as, hypothetically, interviews of migrants collected at border detention sites detailing what spurred them to cross the border at certain wall gaps—that would address the "why" question in this case. Nor does the State explain how the evidence it seeks would otherwise goes to the crux of the causation issues discussed in the February 2022 order, this order, or *Arizona v. Biden*. *See also Carrero v. Farrelly*, 310 F. Supp. 3d 542, 549 n.5 (D. Md. 2018) (denying request for jurisdictional discovery in part because "none of the specific topics cited by Plaintiff are relevant to her standing" and "discovery

into 'how that information is used by state and local law enforcement officers' is a strikingly open-ended request that would presumably involve third-party discovery"); *Schuchardt v. President of the United States*, 839 F.3d 336, 353 (3d Cir. 2016) ("Jurisdictional discovery is not a license for the parties to engage in a 'fishing expedition' . . . .").

## IX.    Leave To Amend

The State requests leave to amend if this Court concludes it has not adequately alleged standing. (Doc. 33 at 3 n.4.) The State explains that, if granted leave, it would amend its complaint by adding new factual allegations consistent with "the evidence submitted in the preliminary injunction briefing." (*Id.*) Defendants do not address this request in their reply.

The State's request is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, the State's amendment request should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Despite the policies favoring liberal amendment, the State's request is denied because amendment would be futile. The only new standing-related allegations the State would add if given the chance are allegations consistent with the evidence it proffered during the preliminary injunction proceeding, but the Court has now concluded that such evidence is insufficient. It would be an empty exercise to allow the State to amend its complaint simply to summarize this evidence. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989) ("Leave to amend need not be given if a complaint, as amended, is subject to dismissal.").

…

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 27) is **granted in part**. Counts One, Two, Five, and Seven are dismissed without leave to amend.

**IT IS FURTHER ORDERED** that the parties file supplemental briefing regarding Counts Three and Six. Each side's brief, which may not exceed 10 pages, must be filed within 14 days of the issuance of this order.

**IT IS FURTHER ORDERED** that the State's motion for jurisdictional discovery (Doc. 48) is **denied**.

Dated this 15th day of April, 2022.

Dominic W. Lanza
United States District Judge