1  **MARK BRNOVICH**
   **ATTORNEY GENERAL**
2  (Firm State Bar No. 14000)

3  Joseph A. Kanefield (No. 15838)
4  Brunn (Beau) W. Roysden III (No. 28698)
   Drew C. Ensign (No. 25463)
5  James K. Rogers (No. 27287)
   Robert J. Makar (No. 33579)
6  2005 N. Central Ave
7  Phoenix, AZ 85004-1592
   Phone: (602) 542-8958
8  Joseph.Kanefield@azag.gov
9  Beau.Roysden@azag.gov
   Drew.Ensign@azag.gov
10 James.Rogers@azag.gov
11 Robert.Makar@azag.gov
   *Attorneys for Plaintiff State of Arizona*

12

## UNITED STATES DISTRICT COURT
13 ## DISTRICT OF ARIZONA

| | |
|---|---|
| 14  State of Arizona, | No. 2:21-cv-00617-DWL |
| 15         Plaintiff, | |
|         v. | **SECOND AMENDED COMPLAINT** |
| 16  Alejandro Mayorkas in his official | **FOR DECLARATORY AND** |
| 17  capacity as Secretary of Homeland | **INJUNCTIVE RELIEF** |
|     Security; United States Department of | |
| 18  Homeland Security; Troy Miller in his | |
| 19  official capacity as serves as Senior | |
|     Official Performing the Duties of the | |
| 20  Commissioner of U.S. Customs and | |
|     Border Protection; Tae Johnson in his | |
| 21  official capacity as Senior Official | |
| 22  Performing the Duties of Director of U.S. | |
|     Immigration and Customs Enforcement; | |
| 23  United States Department of Defense; | |
| 24  Lloyd Austin in his official capacity as | |
|     Secretary of Defense. | |
| 25  | |
|           Defendants. | |
| 26 | |

27

28

**INTRODUCTION**

1.      This is an action challenging Defendants' pervasive violations of law related to immigration policy.

2.      Defendants, driven by the President's campaign promises to enact lax immigration enforcement and loosen border security, have found themselves with a crisis at the southern border. Undeterred, they have moved ahead with a policy of loosening migration restrictions and enforcement, causing the number of migrants to surge. This surge has strained the resources and damaged the environment of Plaintiff, the State of Arizona (the "State").

3.      This complaint focuses on the Defendant's entire program causing increased migration, while also identifying two policies which have played a major role in causing this sudden influx of migrants: Defendant's decisions to terminate construction of border barriers and cancel contracts regarding same ("Border Wall Construction Termination"); and the defendant's decision to terminate, with minimal explanation, the Migrant Protection Protocols ("MPP").

4.      On January 20, 2021, President Biden, in one of his first official actions, issued a proclamation directing Defendants to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall[.]"[1] Following this proclamation, Defendants stopped all work on any border fencing or associated structures, leaving over 100 miles of

---

[1]  *Proclamation on the Termination Of Emergency With Respect To The Southern Border Of The United States And Redirection Of Funds Diverted To Border Wall Construction*, Office of the White House (Jan. 20, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/proclamation-termination-of-emergency-with-respect-to-southern-border-of-united-states-and-redirection-of-funds-diverted-to-border-wall-construction/

1

planned and funded—but unfinished—wall in Arizona, in an arbitrary and haphazard manner.

5. Subsequently, on April 30, the Deputy Secretary of Defense directed the Secretary of the Army to "cancel all section 284 construction projects" and to use funds transferred for construction to "pay contract termination costs" including costs associated with activities necessary for contractor demobilization."[2] Finally, the Deputy Secretary of Defense issued a memorandum to the Secretary of Homeland Security reflecting that the Department of Homeland Security "will accept custody of border barrier infrastructure constructed pursuant to section 284, account for such infrastructure in its real property records, and operate and maintain the infrastructure."[3]

6. Defendants' termination of any building connected to the wall has also meant the end of all wall-related construction by DHS, notwithstanding the fact that there remain unspent funds which were allocated for wall construction by Congress.

7. On the same day the President announced he would not build any more border fencing, Defendants suspended new entrants into the MPP.[4] Previously, the MPP had ensured that individuals who lacked a legal basis to be in the United States, and who had passed through Mexico *en route* to the United States, had to remain in Mexico for the

---

[2] Letter from Elizabeth Prelogar, Acting Solicitor General, to Clerk of the Supreme Court (Apr. 30, 2021), *available at* https://www.supremecourt.gov/DocketPDF/20/20-138/177066/20210430165630859_letter%2020-138%20%204-30-20.pdf.

[3] *Id.*

[4] Memorandum from David Pekoske, Department of Homeland Security, *Review of and Interim Revision of Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf; Jaclyn Diaz, *Biden Suspends Deportations, Stops 'Remain In Mexico' Policy*, NPR (Jan. 21, 2021), https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy.

duration of their immigration proceedings (particularly as Mexico was also a country that they could have applied for asylum in during their travels, but they refused to do so preferring the United States).

8.    Defendants then announced they would process into the United States individuals who had previously been returned to Mexico under the MPP.[5] Beginning on February 19, 2021, DHS started to execute this policy and bring those individuals into to the United States. DHS has also continued processing new migrants arriving across the Mexican border who would previously have been covered by the MPP. The result is the admission of tens of thousands of aliens that otherwise would have been excluded from the U.S. pending resolution of their asylum claims (the vast majority of which fail).

9.    These decisions were formalized on June 1, 2021, when the Administration attempted to end the MPP with a seven-page memorandum,[6] and again on October 29, 2021 when DHS issued a four-page termination memorandum titled "Termination of the Migrant Protection Protocols"[7] and a 39-page addendum titled "Explanation of the Decision to Terminate the Migrant Protection Protocols"[8] purporting to further explain its reasons.

---

[5] *See Press Release, Department of Homeland Security, DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*(Feb. 11, 2021), *available at* https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[6] *See* Memorandum from Alejando Mayorkas, Department of Homeland Security, *Termination of the Migrant Protection Protocols*, (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

[7] *See* Memorandum from Alejando Mayorkas, Department of Homeland Security, Termination of the Migrant Protection Protocols (October 29, 2021), available at https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-memo.pdf.

[8] *See* Memorandum from Alejando Mayorkas, Department of Homeland Security, Explanation of the Decision to Terminate the Migrant Protection Protocols (October 29, 2021), available at https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf .

10.     At no point in the process of terminating border wall construction and the MPP did Defendants ever consider any environmental impacts of those actions.

11.     Defendants also failed to consider the degree to which the State relied on both previous policies, and failed adequately to explain its abrupt reversal in course.

12.     Furthermore, these decisions are both pieces of Defendant's overarching program of encouraging migration and augmenting the U.S. population. This *de facto* program has enormous impacts on the people and environment of Arizona.

13.     The impacts of population growth are by no means uniformly, or even on balance, negative. Population growth, for example, has contributed substantially to Arizona's remarkable economic growth over the last century. Immigrants have contributed to every facet of American society in a manner that has benefited the United States's economic, cultural, military, and societal strengths. This suit does not (and could not) challenge population growth *per se*. Instead, this action challenges Defendants' persistent failures to analyze, as federal law mandates, the entirely predictable and foreseeable environmental impacts of population growth caused by Defendants' policies of increasing the population of the United States through immigration.

14.     Defendant's decisions are both arbitrary and capricious and have been enacted in violation of numerous federal laws. In particular, although these policies undeniably have significant effects on the environment, Defendants have not even attempted to comply with the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq.* Defendants' policies also have unstudied impact on endangered species in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*

15.     As Justice Holmes explained in 1907: "the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Arizona

4

has a strong interest in ensuring that policies that affect the environment of the State are enacted consistent with federal law governing environmental protection.

16. Furthermore, the Supreme Court has recognized "the importance of immigration policy to the States" and that the States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The additional costs of housing, educating, providing healthcare, and other social services places burdens on the State of Arizona as a consequence of Defendants' actions.

17. Defendant's policies encouraging migration and downgrading enforcement have subverted federal law, damaged the environment in Arizona, and have not been subject to any required public process or participation. Accordingly, they should be declared unlawful, vacated, and/or enjoined.

## PARTIES

18. Plaintiff State of Arizona is a sovereign state of the United States of America, and is represented by its Attorney General Mark Brnovich. The Attorney General is the chief legal officer of the State of Arizona, and has the authority to represent the State in federal court.

19. Arizona is one of four states on the United States-Mexico border. As a border state, it suffers disproportionately from immigration-related burdens.

20. Defendant Alejandro Mayorkas is the Secretary of Homeland Security. Defendant Mayorkas is sued in his official capacity.

21. Defendant United States Department of Homeland Security is a federal agency.

22. Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection ("CBP"). Defendant Miller is sued in his official capacity.

23.     Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Defendant Johnson is sued in his official capacity.

24.     Defendant Lloyd Austin is the Secretary of Defense. Defendant Austin is sued in his official capacity.

25.     Defendant Department of Defense is a federal agency.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, as well as 5 U.S.C. §§ 702-703.

27.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

28.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiff resides in Arizona and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

## LEGAL BACKGROUND

**A.     The National Environmental Policy Act**

29.     NEPA establishes "a national policy [to] encourage productive and enjoyable harmony between man and his environment[.]" 42 U.S.C. § 4321.

30.     "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (*citing Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)) (cleaned up); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

31.     NEPA thus ensures that important environmental effects will not be "overlooked or underestimated[.]" *Robertson*, 490 U.S. at 349. The requirement to evaluate environmental impacts also provides the public with information about environmental impacts, assuring the public that the agency is considering the environment and providing a "springboard for public comment[.]" *Id.* Public participation under NEPA serves to improve the agency's processes by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (cleaned up).

32.     NEPA is "particularly" concerned with "the profound influences of population growth" on the environment. 42 U.S.C. § 4331(a). Human population is among the biggest factors in environmental change. It is "plain common sense" that the number of people in an area has a significant impact on the environment, through factors such as urbanization, infrastructure development, pollution, and stress on natural resources. *See City of Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir. 1975).

33.     This action challenges, among other things, a collection of policies of Defendants that have the direct effect of causing growth in the population of the United States generally, and Arizona specifically, through immigration (collectively, "Population Augmentation Policies"). These policies have a direct and substantial impact on the environment in the United States, with particularly acute effects in Arizona.

34.     Population growth can have significant benefits. For example, Arizona's economy has benefited substantially from population growth over the last century. That growth, effectuated by both domestic migration and international immigration, has strengthened Arizona in innumerable ways. But at the same time, population growth can have environmental impacts, both positive and negative. Those impacts can be particularly acute when they result (as here) from haphazard policy-making that is allowed to escalate into a crisis, whose existence is then repeatedly denied (punctuated by occasional

accidental admissions that it is, indeed, a "crisis"). NEPA mandates that federal agencies analyze these environmental impacts *before* they take action. Defendants have failed to do so here.

35. NEPA declares that "it is the continuing responsibility of the Federal Government to … improve and coordinate" federal programs in order to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;" "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;" and, significantly, to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]" 42 U.S.C. § 4331(b).

36. To accomplish its goals, NEPA creates a set of procedures which force federal agencies to take account of environmental concerns. Accordingly, the statute provides, in relevant part, that "all agencies of the Federal Government shall" consider the environmental impacts of all "proposals . . . and other major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332.

37. Under NEPA, agencies must make a "detailed statement" on those impacts, addressing, among other things, alternatives to the proposed action. *Id.* This detailed statement is generally known as an environmental impact statement ("EIS").

38. Alongside these provisions, NEPA established the Council on Environmental Quality ("CEQ") with authority to issue regulations to assist federal agencies in administering the statute's requirements. The CEQ regulations define important terms such as the "[m]ajor Federal action" and "[e]ffects or impacts[,]" 40 C.F.R. § 1508.1, and set up procedures for public participation in the EIS process. *See, e.g.*, 40 C.F.R. § 1503 *et seq.* CEQ regulations also set forth the process for agencies to use in determining whether NEPA applies or is otherwise fulfilled. *See* 40 C.F.R. § 1501 *et seq.*

39.     Under existing CEQ regulations, environmental impacts should be "considered early in the process in order to ensure informed decision making by Federal agencies." 40 C.F.R. § 1500.1(b). NEPA should be integrated with other planning "at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions[.]" 40 C.F.R. § 1501.2(a).

40.     Agencies may identify "categories of actions" which "normally do not have a significant effect on the human environment" and which therefore do not require the preparation of an EIS. 40 C.F.R. § 1501.4(a) ("categorical exclusions"). Such actions are exempt from environmental review, absent unusual circumstances.

41.     CEQ regulations provide that agencies should prepare an Environmental Assessment ("EA") for proposed actions that are not categorically excluded if those actions are "not likely to have significant effects or when the significance of the effects is unknown[.]" 40 C.F.R. § 1501.5(a). The EA may assist the agency in determining whether to prepare a full-fledged EIS or whether to issue a finding of no significant impact. 40 C.F.R. § 1501.5(b).

42.     The regulations also state that agencies "shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a). As the Supreme Court has recognized, programmatic environmental analysis is required where a program is "a coherent plan of national scope, and its adoption surely has significant environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976). When considering such programmatic action, agencies should consider factors such as whether the relevant actions are "occurring in the same general location," and whether they "have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(b)(1).

43. CEQ regulations define the "[e]ffects or impacts" that agencies must consider to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." 40 C.F.R. § 1508.1(g)(1).

44. NEPA requires that all environmental impacts of major federal actions—the good, the bad, and the ambiguous—be studied prior to the government taking action. *See, e.g.*, 40 C.F.R. § 1501.3 (requiring federal agencies to consider "[b]oth beneficial and adverse effects" under NEPA); 40 C.F.R. § 1508.1 (agencies must consider effects "resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial"). But Defendants here are simply ignoring NEPA entirely while engaging in actions that are certain to have dramatic impacts on the environment.

45. This suit seeks to end these pervasive violations and require that Defendants discharge their duties under NEPA. It further seeks to compel Defendants to allow public participation in these processes, which is a central requirement of NEPA.

46. NEPA's requirements "are to be strictly interpreted to the fullest extent possible in accord with the policies embodied in the Act." *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (cleaned up).

47. "NEPA protects the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action *before* the government launches any major federal action." *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (cleaned up) (emphasis added).

48. "[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998).

**B. The Endangered Species Act**

49. The ESA, passed in 1973, was enacted in order "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). *See also* 16 U.S.C. § 1531. "As it was finally passed, the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Hill*, 437 U.S. at 180.

50. The ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1).

51. To implement this policy, Section 7 of the ESA provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2).

52. An agency violates this section when it fails to consult with an applicable agency about an action which could be potentially harmful to endangered species. *See, e.g.*, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005).

53. The applicable regulations define key terms for purposes of when consultations under the ESA are required. For example, "action" is defined broadly, as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "actions directly or indirectly causing modifications to the

land, water, or air." 50 C.F.R. § 402.02. "Effects of the Action" are defined as "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* Moreover, as the Ninth Circuit has made clear, there is "agency action" for purposes of the ESA whenever an agency "makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1011 (9th Cir. 2012) (en banc).

54.     An agency can avoid ESA Section 7 consultation only if it makes a "no effect determination." The threshold for requiring consultation is thus "relatively low": "'*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character,' " triggers the requirement" of informal consultation. *Id.* at 1027 (quoting *California ex rel. Lockyer v. USDA*, 575 F.3d 999, 1018–19 (9th Cir. 2009) (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)) (emphasis in *Lockyer*). An agency thus cannot avoid ESA Section 7 consultation even if it believes that the effect of its action on endangered species will be beneficial. Instead, it must engage in ESA consultation to confirm that belief.

55.     There is no indication that Defendants have considered effects on threatened and endangered species from their challenged actions whatsoever, let alone reached a formal no-effect finding commanding any deference (even under the "relatively low" no-effect threshold).

56.     The ESA has a citizen suit provision, allowing individuals to bring suit to "enjoin any person, including the United States and any other governmental instrumentality or agency…who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." 16 U.S.C. § 1540(g)(1). *See also Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("§ 1540(g)(1)(A) is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties—both private entities and Government agencies").

## C.    The Administrative Procedure Act

57.    The Administrative Procedure Act ("APA") provides for judicial review of agency action. *See* 5 U.S.C. § 701 *et seq.* Under the APA, a federal court reviewing agency action "shall" "hold unlawful and set aside agency action, findings, and conclusions" that the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706.

58.    When an agency undertakes final agency action that fails to comply with NEPA, such action is unlawful and set must be set aside under the APA. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n.2 (9th Cir. 2001) ("Although NEPA does not provide a private right of action for violations of its provisions, private parties may enforce the requirements of NEPA by bringing an action against the federal agency under § 10(a) of the Administrative Procedure Act.").

59.    Furthermore, federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (cleaned up). In other words, "agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up).

60.    In reviewing an agency's failure to act, the APA states that the Court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

## A.    Program to Increase Migration

61.    Since his presidential campaign, President Biden and his administration have prioritized migration and population growth. From the earliest days of his administration, Defendants have sought to further these policy priorities by enacting a program of lax border enforcement and encouraging increased immigration through administrative action.

62.     Defendants knew early on that their program would cause a surge in migration, and only sought to manage the pace of this swell.[9] For example, Defendant Secretary Mayorkas recently pleaded with migrants merely to *delay* coming—not to stay in their home countries: telling would-be migrants on March 1: "[w]e [DHS] are not saying, 'Don't come' … We are saying, 'Don't come now.'"[10] In effect, the Secretary Mayorkas inadvertently said the quiet part loudly: Defendants do not wish to avoid radically increased immigration; they merely wish to manage the swiftness of the increase.

63.     There are many aspects to this program, and they all work in tandem. For example, immediately after taking office, Defendants directed ICE to stop issuing any fines to individuals that had been ordered to leave the country but had failed to comply.[11] This policy reduces deterrence for the conduct in question—which is the very purpose of the fines. Accordingly, this program intentionally boosts migration by eliminating this deterrence effect.

64.     In another agency action, which is part of the Population Augmentation Program and designed to encourage migration, Defendants have determined to reduce a key component of this country's pandemic response, by exempting 250 migrants per day

---

[9] *See* Steven Nelson, *Joe Biden says fast immigration changes could cause '2 million people on our border'*, New York Post (Dec. 22, 2020), https://nypost.com/2020/12/22/biden-says-fast-immigration-changes-could-cause-rush-at-border/. This understanding continued as the Defendants actually enacted the program.

[10] *See* Nick Miroff, *At the border, a widely predicted crisis that caught Biden off guard*, Washington Post (Apr. 26, 2021), https://www.washingtonpost.com/national/biden-border-timeline/2021/04/26/a5550aa4-a2a8-11eb-8a6d-f1b55f463112_story.html

[11] *See* Press Release, Department of Homeland Security, *DHS Announces Rescission of Civil Penalties for Failure-to-Depart* (Apr. 23, 2021), *available at* https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-penalties-failure-depart.

14

from Title 42, a public health order barring the entry of migrants without valid travel documents.[12]

66.     In another policy, which is also part of the Population Augmentation Program and designed to encourage migration, recent disclosures from the federal government reveal that defendants are detaining fewer migrants than ever, including migrants with serious felony convictions.[13]

66.     In a late-night email on February 4, 2021, Defendant Tae Johnson emailed DHS personnel and told them ""Effective immediately … *only those who meet the [Department] priorities will be removed*." (emphasis added). Those categories were largely limited to terrorism-related activities.

67.     At a hearing on May 27, 2021, this Court explained that "[W]hat the evidence … shows is … that *Immigration and Customs Enforcement lifted detainer*s that were previously in place, *has not placed detainers on individuals* that … they know or can know with ease are in detention or incarceration that have final orders of removal and, most significantly, that *they have only removed some incredibly small number* -- seven or ten – nonpriority [cases]." 5/27/21 Tr. at 14-15 (emphasis added). This Court further explained that "So, of 325 individuals *who, before February 18th, would have been put into immigration detention and removed, only seven have*. Doesn't that sound like a prohibition

---

[12]  *See* Alyssa Aquino, *US To Exempt 250 Asylum-Seekers Daily From Pandemic Rule*, Law360     (May     18,     2021),     *available     at* https://www.law360.com/articles/1385840/print?section=immigration.

[13]  *See, e.g.*, Press Release, Arizona Attorney General's Office, *AG Brnovich Obtains Records Detailing Dangerous Shift in Immigration Polices* (Apr. 28, 2021), *available at* https://www.azag.gov/press-release/ag-brnovich-obtains-records-detailing-dangerous-shift-immigration-polices. *See also* Adam Shaw, *ICE predicted 50% drop in illegal immigrant arrests under new DHS guidance, email shows*, Fox News (Apr. 28, 2021), *available at* https://www.foxnews.com/politics/ice-50-drop-illegal-immigrant-arrests-new-dhs-guidance-email.

on removal of anybody other than in the first three categories?" *Id.* at 19-20 (emphasis added).

68.     Migrants and human smugglers understand that Defendants have enacted a program to encourage migration. As the New York Times recently explained: "While most of the migrants do not necessarily understand the intricacies of U.S. border policy, many said in interviews that they perceived a limited-time offer to enter the United States. Friends and family members already in the country, along with smugglers eager to cash in, have assured them that they will not be turned away—and this is proving to be true."[14]

69.     In addition to the elements discussed above, two key aspects of this program are the Defendants' Border Wall Construction Termination and MPP Termination. These decisions have enormous direct impacts on population flows, as well as indirect impacts by encouraging migration. Cumulatively, the Population Augmentation Programs will likely increase the population of the United States by hundreds of thousands—if not millions—of people, with a disproportionate share of the increased burdens occurring in Arizona.

**B.     Promised Termination of Border Wall Construction**

70.     On August 5, 2020, Joe Biden declared in an NPR interview that "[t]here will not be another foot of wall constructed in my administration, number one."[15]

---

[14]  Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), *available at* https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html.

[15]  *See* Lulu Garcia-Navarro August 5, 2020, interview of Joe Biden, https://twitter.com/i/status/1291000306915057669; *see also* Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't Tear Down Trump's Additions*, NPR, (August 5, 2020), *available at* https://www.npr.org/2020/08/05/899266045/biden-would-end-border-wall-construction-but-wont-tear-down-trump-s-additions (last visited April 11, 2021).

71. He further stated, "Number 2, … I'm gonna make sure that we have border protection, but it's going to be based on making sure that we use high-tech capacity to deal with it *and at the ports of entry, that's where all the bad stuff happens*."[16]

72. He also responded when asked about land confiscations, he responded "End. Stop. Done. Over. Not gonna do it. *Withdraw the lawsuits. We're out.* We're not gonna confiscate the land."[17]

73. These statements by Mr. Biden, individually and collectively, show that he promised to, and intended to, stop all new wall construction.

74. On January 20, 2021, President Biden, in one of his first official actions, put his promises into action. He issued a proclamation directing DHS to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall[.]"[18]

75. This proclamation was issued without any notice and comment or interagency review.

76. The proclamation directs Defendant Secretary Mayorkas to, in consultation with various other members of the cabinet and other appropriate agency and department heads, "shall develop a plan for the redirection of funds concerning the southern border wall[.]" *Id.* Since then, the Administration has canceled border wall projects paid for with funds diverted from Defense Department accounts.[19]

---

[16] *See* https://twitter.com/i/status/1291000306915057669 (emphasis added)

[17] *See* https://twitter.com/i/status/1291000306915057669 (emphasis added).

[18] *Proclamation on the Termination Of Emergency With Respect To The Southern Border Of The United States And Redirection Of Funds Diverted To Border Wall Construction*, Office of the White House (Jan. 20, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/proclamation-termination-of-emergency-with-respect-to-southern-border-of-united-states-and-redirection-of-funds-diverted-to-border-wall-construction/.

[19] *See* Nick Miroff, *Biden cancels border wall projects Trump paid for with diverted*

77.     The President's Proclamation justifies its policy change by stating that "building a massive wall … is not a serious policy solution," and the wall is "a waste of money that diverts attention from genuine threats to our homeland security." *Id.*

78.     DHS has implemented this proclamation by suspending all border wall projects, on information and belief leaving hundreds of miles of fencing unfinished compared to what DHS had studied and planned. The termination of border wall construction has left huge holes in the border fencing, including substantial gaps of over 100 miles along the Arizona-Mexico border.

79.     Subsequently, on April 30, the Deputy Secretary of Defense directed the Secretary of the Army to "cancel all section 284 construction projects" and to use funds transferred for construction to "pay contract termination costs" including costs associated with activities necessary for contractor demobilization."[20] Finally, the Deputy Secretary of Defense issued a memorandum to the Secretary of Homeland Security reflecting that the Department of Homeland Security "will accept custody of border barrier infrastructure constructed pursuant to section 284, account for such infrastructure in its real property records, and operate and maintain the infrastructure."[21] Accordingly, neither DOD nor DHS has constructed or intends to construct any additional barriers.

80.     Since January 20, machinery has been literally standing idle in some areas of Arizona's wilderness, with awkward-seeming and incomplete work in numerous places.[22]

---

*military funds*, Washington Post (Apr. 30, 2021), *available at* https://www.washingtonpost.com/national/border-wall-cancelled/2021/04/30/98575af0-a9ec-11eb-b166-174b63ea6007_story.html.

[20] Letter from Elizabeth Prelogar, Acting Solicitor General, to Clerk of the Supreme Court Apr. 30, 2021), *available at* https://www.supremecourt.gov/DocketPDF/20/20-138/177066/20210430165630859_letter%2020-138%20%204-30-20.pdf.

[21] *Id.*

[22] *See* Mia Jankowicz, *Biden's order to pause construction on Trump's border wall expires on March 20. Nobody knows what happens next.*, Business Insider (Mar. 16, 2021, 6:47

81.     Concurrently with these events, on March 17, 2021, a number of U.S. Senators sent a letter to Gene L. Dodaro, the Comptroller General at the Government Accountability Office (GAO).[23] This letter also highlighted the January 20th suspension of border wall construction, and asserted that the President's actions froze funds that were appropriated by Congress for wall construction.

82.     As explained in that letter, in appropriations bills for fiscal years 2020 and 2021 Congress appropriated nearly three billion dollars for "the construction of a barrier system along the southwest border." *Id.* (*citing* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2511; Consolidated Appropriations Act, 2021, Pub L. No. 115-141, 132 Stat. 348). Although these laws place the obligation on Defendants to execute those funds for the stated purposes, on information and belief, this Administration is withholding substantial portions of those funds and has suspended all construction.

83.     On information and belief, the order to halt construction on the wall in Arizona involved the sudden termination of several large contracts. Contractors who were ready to work received a stand-down order from the Army Corps of Engineers on January 21. These contractors remain ready to return to work, but the Administration and Defendants have given no indication that this is going to be forthcoming.

84.     As a result of this termination of wall construction, countless employers and workers in the State of Arizona have been put out of work, directly harming them, and costing the State valuable tax revenue.

---

AM), *available at* https://www.businessinsider.com/what-happen-end-biden-60-day-pause-border-wall-work-2021-3. *See also Work has stopped on Trump's border wall. See how it looks now*, CNN (May 3, 2021), *available at* https://www.youtube.com/watch?v=q1fT_dEgoqg.

[23] *See* Letter from Shelly M. Capito, et al., *to Hon. Gene L. Dodaro* (Mar. 17, 2021), https://www.appropriations.senate.gov/imo/media/doc/Capito%20GAO%20Border%20Letter.pdf.

85.     One major purpose of the Defendants' actions in affirmatively halting this construction was to signal the relative openness of the United States-Mexico border and to encourage migration.

86.     None of the gaps in the border wall was the product of planning or reasoned decision-making. The current state of the border is entirely arbitrary, and none of the impacts flowing from Defendants' actions were studied before taking the decision to affirmatively halt construction.

87.     Despite this, DHS, following the policy prescriptions in the President's proclamation, has finally decided that the United States-Mexico border is adequately secured without the wall, in its current condition.

88.     Furthermore, contrary to the unsupported claims that the wall was "not a serious policy solution" in the Proclamation, many individuals are constantly seeking to cross the United States-Mexico border, for whom the wall has served both as a meaningful physical barrier and a powerful signal of the federal government's commitment to enforcing immigration law. And while DHS has reportedly "consider[ed]" making changes to address gaps in particular areas or implementing technology in places where the wall is unfinished, DHS has no intent to deviate from the fundamental policy announced in the Presidential Proclamation.[24]

89.     As a direct and foreseeable consequence of the gaps in the nation's border wall and the signal intentionally transmitted by the President and the Defendants, migrants have been crossing the border in Arizona in greater numbers than ever before. CBP reported it "encountered 171,700 migrants in March, including a record number of

---

[24] *See* Ryan Saavedra, *Biden Admin Considers Restarting Border Wall Construction To 'Plug Gaps' Amid Biden's Border Crisis: Report*, Daily Wire (Apr. 6, 2021), *available at* https://www.dailywire.com/news/biden-admin-considers-restarting-border-wall-construction-to-plug-gaps-amid-bidens-border-crisis-report.

unaccompanied minors, far exceeding the prior month's totals."[25] Indeed, "[t]he US is on track to encounter more than 2 million migrants at the US-Mexico border by the end of the fiscal year, according to internal government estimates[,] marking a record high."[26]

90.     One border county sheriff stated that, at a particular gap in the fencing, "'five or six groups'" of migrants are able to cross a day.[27] One news outlet reported that "[s]mugglers send groups of asylum seekers through the gaps [in the fencing] to overwhelm the agents. When agents leave to intercept or apprehend one group, another group scampers across."[28]

91.     One source estimates that approximately 1,000 individuals are able to evade detention and enter the United States illegally every single day, many of whom are able to do so because of these glaring holes in the border barriers.[29] Inevitably, many of these migrants settle in Arizona, increasing the population of the state.

---

[25]  *See* Priscilla Alvarez, *Border apprehensions spiked in March, including a record number of unaccompanied migrant minors*, CNN (April 2, 2021), https://www.cnn.com/2021/04/02/politics/us-mexico-border-immigration-apprehended/index.html .

[26]  *See* Priscilla Alvarez, *US on* track *to encounter record 2 million migrants on the southern border, government estimates show*, CNN (Apr. 11, 2021), https://www.cnn.com/2021/03/31/politics/migrants-us-southern-border/index.html.

[27]  *See* Roman Chiarello, *Arizona sheriff says Biden halting border wall construction left area wide open for cartels*, Fox News (Mar. 5, 2021), https://www.foxnews.com/us/arizona-sheriff-biden-border-wall-construction-cartels.

[28]  *See* William La Jeunesse, *Migrants stream through gaps in border wall following Biden's order to halt construction*, Fox News (Mar. 31, 2021), *available at* https://www.foxnews.com/politics/migrants-stream-through-gaps-in-border-wall-following-bidens-order-to-halt-construction.

[29]  *See Heritage Experts Release New Biden Border Crisis Fact Check*, Heritage Foundation (March 25, 2021), *available at* https://www.heritage.org/press/heritage-experts-release-new-biden-border-crisis-fact-check.

92.     This border control policy has been—correctly—understood worldwide as an invitation. From as far as India and elsewhere in Asia, migrants have traveled to Mexico and seek to enter the United States through wide gaps in the border wall around Yuma, Arizona.[30]

93.     As the New York Times explains, these migrants are here to stay: "Most migrants are being released to await immigration hearings that could take years, and if they fail to win asylum, many may wind up staying anyway, adding to the millions of immigrants living in the United States without permission."[31]

94.     On information and belief, the gaps in the wall may also have significant effects on Arizona wildlife, including endangered species. Many commentators have noted how the construction of the wall itself may have risked endangered species.[32] However, the state of affairs created by the Defendant's sudden halt of construction has led to an environment for these species which is unstudied and unknown. For example, the current gaps have created a "bottleneck for species" which may affect predator patterns and harm endangered species.[33] This "could lead to a variety of unknown consequences, from migration and mating patterns, to throwing predator-prey relationships out of whack. It

---

[30] *See* Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), *available at* https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html.
[31] *Id.*
[32] *See, e.g.*, Garet Bleir, *Endangered Species Are Casualties of Trump's Border Wall*, Sierra (Feb. 18, 2020), *available at* https://www.sierraclub.org/sierra/endangered-species-are-casualties-trump-s-border-wall (discussing how the border wall construction puts "nearly 100 endangered species" at risk).
[33] *See, e.g.*, Nathaniel Janowitz, *Trump's Border Wall Is Threatening Endangered Species*, Vice (Feb. 2, 2021) https://www.vice.com/en/article/y3gekk/trumps-border-wall-is-threatening-endangered-species. ("Border wall construction in eastern and western Arizona has created a bottleneck for species."),

22

could also potentially eliminate endangered species who might not be able to survive the change—around 90 endangered and threatened species call the area home."[34]

95.     The combined effect of (1) partially constructing a barrier (2) followed by intentional refusal to complete portions of the barrier, leaving enormous "gaps," also has significant environmental impacts by itself. In particular, the barrier—with its new gaps—fragments the habitat of wildlife that lives in the U.S.-Mexico border region. And it does so in a manner that is completely arbitrary, unplanned, and unstudied under NEPA or the ESA.

**C.     The Planned Additional Border Wall Segments Would Reduce Illegal Border Crossings into Arizona**

96.     In 2006, Congress passed the Secure Fence Act of 2006, which requires DHS to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638 (2006). The Act specifically defines "operational control" to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, *other unlawful aliens*, instruments of terrorism, narcotics, and other contraband." *Id*. (emphasis added).

97.     The Secure Fence Act remains in force. It enjoyed bipartisan support in both houses of Congress, and passed in the Senate by an 80-19 vote, including with the backing of then-Senator Biden.[35] Congress made its intent plain in the Secure Fence Act: DHS must "take all actions ... [to] prevent[] ... all unlawful entries into the United States."

98.     The Secure Fence Act required DHS to construct additional reinforced fencing along the southern border. The Consolidated Appropriations Act of 2008 further clarified the requirement, stating that "the Secretary of Homeland Security shall construct

---

[34] *Id*.

[35] https://www.senate.gov/legislative/LIS/roll_call_votes/vote1092/vote_109_2_00262.htm

reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border." Pub. L. No. 110-161, 121 Stat 1844 § 564 (2007).

99.   "As of April 2010, 282 miles of pedestrian fence and 227 miles of vehicle barriers had been constructed" in partial fulfilment of Congress's requirements in the Secure Fence Act and Consolidated Appropriations Act of 2008.[36] However, even though this construction of new border barrier still left substantial gaps along the 1920-mile southern border with Mexico (and most of those gaps remain currently), a comprehensive econometric analysis found that this relatively small amount of additional border barrier significantly reduced illegal border crossing: "for [Mexican] residents of a given border municipality, fence construction in that municipality reduce[d] the migration rate to the United States by 27 percent. Construction in an adjacent border municipality reduce[d] migration rates by an additional 15 percent."[37] Furthermore, "fence construction reduce[d] migration rates for prospective migrants from non-border municipalities by up to 35 percent."[38]

100.   One of the reasons that a partial barrier can so significantly reduce border crossings is that "changes in migration rates can be attributed to changes in migration costs."[39] "[T]he rise in crossing costs associated with fence construction is likely quite large."[40] Additional border barrier reduces "ease of crossing" and thus has a "deterrent

---

[36] Benjamin Feigenberg, Fenced Out: The Impact of Border Construction on US-Mexico Migration, 12 AMERICAN ECONOMIC JOURNAL: APPLIED ECONOMICS 106, 111 (2020).
[37] *Id.* at 107.
[38] *Id.*
[39] *Id.* at 133.
[40] *Id.* at 134.

effect" since "individuals ... face particularly large cost increases if forced to use alternative crossing routes" because there is "high elasticity of migration with respect to fence construction" and because "the number of crossing deaths per migration episode ... roughly doubled" following the additional fence construction.[41]

101. These effects are particularly remarkable because decisions about where to build this additional 2007-2010 fencing was based "as much on expediency and cost as on [border] security concerns."[42] Thus, the border barrier construction projects at issue here are likely to have even greater deterrent effects than the prior construction from 2007 to 2010, since the projects at issue in this case were chosen based strictly on border security needs and not on the expediency of needing to fulfill a congressionally imposed deadline for constructing a certain number of miles of border barrier.

102. Thus, peer-reviewed academic research shows that additional construction of border barrier does not merely channel migration to remaining gaps in the barrier, but actually deters migration because of increased "mortality (and perhaps apprehension) risk faced by migrants who choose to go around the fence and cross in remote, topographically inhospitable border segments where border fencing was more likely to be delayed."[43]

103. This makes sense: would-be migrants respond to incentives, just like everyone else. Those seeking to migrate illegally choose to cross the border at the places where crossing is easiest. Construction of border barriers in the places where crossing most frequently occurs will make crossing more difficult. And as the difficulty of crossing increases, the number of aliens choosing to cross will decrease.

---

[41] *Id.* at 107-108, 134.
[42] *Id.* at 111.
[43] *Id.* at 119.

104. Additionally, a border barrier serves as a powerful symbol of border security and enforcement. Its mere presence has a deterrent effect. Thus, construction of border barrier in a community had a deterrent effect on illegal crossing by residents of neighboring communities, even though the border next to those communities still remained unfenced.[44]

105. Construction of additional border barrier reduces total crossings, and does not merely channel crossing to the remaining gaps in the barrier. The 2007-2010 barrier construction led to a "net decrease of 17.8–22.8 percent" in Mexican migrants unlawfully present in the United States "over the 2007–2012 period."[45]

106. Further confirming the fact that the 2007-2010 partial border barrier construction had a significant deterrent effect on illegal immigration is that "[s]muggler prices also rose after fence construction began."[46]

107. Furthermore, closing more gaps in the border barrier frees up U.S. Border Patrol Agents to patrol in other areas, thus acting as a force multiplier. Even Defendants recognize this. For example, a DHS Categorical Exclusion ("CATEX") document prepared under NEPA requirements, and which was produced to the State of Arizona pursuant to a FOIA request, justifies construction of additional border barrier to close a 390-foot gap in the Yuma border sector because it will "lower the number of illegal border crossings in the YUM Sector," which will "reduce the number of agents required to apprehend, transport, process, and medically clear these illegal entries," so that these "YUM USBP agents could then focus on patrolling [REDACTED] to better achieve operational control in the Area of Responsibility (AOR)."

---

[44] *Id.* at 122.
[45] *Id.* at 130.
[46] *Id.* at 116.

**D.    DHS Has Recently Announced Plans to Restart Previously Cancelled Border Wall Construction**

108.    Contrary to the claims Defendants have made that walls are not effective, they have decided to complete construction of unfinished border wall segments, because they now apparently judge border walls to be effective. Only last week, the Biden Administration reversed course and recognized publicly the value of constructing additional border barrier at places of frequent crossing—even though gaps may remain in other places.

109.    On July 28, 2022, the Biden Administration announced that it had "authorized completion of the Trump-funded U.S.-Mexico border wall in an open area of southern Arizona near Yuma, where four wide gaps make it among the busiest corridors for illegal crossings."[47] CBP had apparently been internally requesting that the Administration allow completion of border barriers in Arizona. An internal, undated DHS Action Memo produced to Arizona as part of a FOIA request specifically asks Secretary Mayorkas to "approve the ... Yuma Hill Gap Closure Project."

110.    A DHS press release announcing the Biden Administration's decision to build additional border wall in the Yuma Border Patrol sector states that "Secretary of Homeland Security Alejandro N. Mayorkas has authorized U.S. Customs and Border Protection (CBP) to execute the Yuma Morelos Dam Project to close four gaps located within *an incomplete border barrier project* near the Morelos Dam in the U.S. Border Patrol's Yuma Sector. These projects address *operational impacts*, as well as immediate life and safety risks, and will be funded with DHS's Fiscal Year 2021 appropriations. The gaps *are located within the former Yuma 6 project area, a border barrier project that was*

---

[47] Associated Press, *Biden administration to fill border wall gaps near Yuma, Arizona*, NBC News, July 29, 2022, (https://www.nbcnews.com/politics/immigration/biden-administration-fill-border-wall-gaps-yuma-arizona-rcna40567)

*previously funded by the Department of Defense's (DoD)* military construction appropriation pursuant to 10 U.S.C. § 2808." (emphasis added.)

**E.  Internal DHS Documents Affirm the Effectiveness of Border Walls**

111.  The Biden Administration has also internally acknowledged that border barriers help achieve operational control of the border. DHS documents produced to the State of Arizona pursuant to a FOIA request, and which were created during the Biden Administration, admit that "[t]he primary goal of the border barrier [construction] and associated border security elements is to gain operational control of the border. The barrier provides persistent impedance of illegal cross-border activity, which offers USBP agents sufficient time to respond to and resolve threats." Additionally, "[t]he proposed border barrier would afford operational control of the border, by providing persistent impedance of illegal cross-border activity. This impedance would allow USBP agents sufficient time to respond to and resolve threats." These documents were referring to planned border barrier construction in Texas, but the same principles apply to barrier constructed in Arizona.

112.  The Biden Administration has also acknowledged internally the problems caused by its abrupt Border Wall Construction Termination. An internal DHS PowerPoint presentation produced to the State through a FOIA request, dated January 13, 2022 and titled "Border Barrier Plan Update," acknowledges that, because of Defendants' abrupt cessation of construction, gaps in construction "create a security vulnerability to agent safety and, without a complete operable gate providing close ingress or egress, Border Patrol agents are unable to leave and/ or respond to threats."

113.  A DHS "Draft Communications Rollout Plan" that DHS produced to Arizona pursuant to a FOIA request contains a question and answer section with the following questions: "Why does DHS need to build new border barrier in order to address safety needs?" and "Q: The Fiscal Year (FY) 2022 budget does not include a rescission or

cancellation of prior year border wall funds. Does DHS/CBP plan to construct new border barrier with these funds?" Curiously, DHS redacted the answers to those questions, claiming a (b)(5) FOIA exemption, which is for privileged documents, even though the document does not appear to be related in any way to litigation or to seeking legal counsel from an attorney.

### F.    Defendants' Border Wall Construction Termination Causes Environmental Harm to the State of Arizona

114.    Internal DHS documents produced to the State of Arizona pursuant to a FOIA request admit that the Border Wall Construction Termination has caused damage to Arizona's environment.

115.    For example, the DHS categorical exclusion evaluating the environmental impact of construction of border barrier wall to close a 390-foot gap in the Yuma border sector determined that "[t]he site of the Proposed Action has been heavily disturbed, with visible foot paths created from illegal border crossings, as well as vandalism of the rock outcropping and the Monument 198 itself" and that construction of border wall in the area "will reduce the level of ongoing disturbance in the area by closing the opening which is currently being used by trans-border activity on a frequent basis." Thus, because the area was "in poor environmental condition due to heavy foot and vehicular traffic through the current opening," DHS concluded that building the border barrier "will lead to a reduction in illegal crossings through this location, *which could improve the overall environmental condition of the project area*." (emphasis added). In other words, DHS itself acknowledges that failure to close the border gaps will cause preventable harm to Arizona's environment.

116.    DHS documents created under the Biden Administration and produced to the State pursuant to FOIA also confirm that barrier construction comes with environmental improvements: "Erosion control and drainage. Earth retaining systems and erosion control may be needed to control grades and could include items such as concrete or block walls,

erosion control mats and/or rip rap. Drainage improvements are anticipated to include, but not be limited to, concrete low water crossings, reinforced concrete pipe culverts, reinforced concrete box culverts, bridges drainage gates and associated scour protection that may include concrete slope protection, grouted rip rap, and sheet piles."

117. Internal DHS documents produced through FOIA also admit that the Biden Administration's Border Wall Construction Termination caused significant environmental damage in Texas: "While the sites were secured for a temporary suspension, they were not properly secured for a permanent suspension or termination. This has led to deteriorating site conditions and incomplete activities which are posing serious risks to both agents and the local community. The current condition of these areas pose numerous serious safety risks and environmental restoration issues if not remediated."

118. The same harms occurred with border wall construction sites in Arizona, and Arizona has suffered the same type of environmental damage. The same document acknowledges a number of actions that need to be taken because of the environmental damage caused by the Border Wall Construction Termination:

Activities requiring remediation include, but are not limited to:
- Completion of roads to ensure safe driving surfaces and sight distances.
- Completion of roads to ensure adequate egress/ ingress is provided to and through the Project sites.
- Completion of overall site grading to complete drainage and erosion control measures needed to protect the integrity of constructed infrastructure and maintain safety for personnel in the area to include agents and the community. For the levee projects, this will help ensure the projects are able to be certifiable by the U.S. Army Corps of Engineers (USACE) upon completion.
- Adding missing caps to the bollards which are currently posing an environmental risk in trapping small birds.
- Addressing and mitigating exposed rebar and sharp points which are an impalement risk.
- Relocating and/or completing access ramps for agents, landowners and first responders.
- Completing associated existing utility line relocations that are required to complete make safe construction work.

30

- Installing canal crossings where required to maintain access for agents and landowners.
- Honoring existing real estate agreements with landowners and farmers by, among other things, remediating interruption to irrigation lines and installing access gates and ramps. If irrigation lines are not remediated, landowners and farmers will continue to lack access to water from the river, which is situated on the south side of the barrier, for crops and livestock.

119.    An internal DHS PowerPoint presentation dated January 13, 2022 and titled "Border Barrier Plan Update" acknowledges the environmental harm caused by the termination of planned border barrier construction in Arizona: "[n]early all of these miles will require make safe and environmental restoration work once DoD finishes their make safe activities." The PowerPoint acknowledges that "[a] large majority of the incomplete DoD 284 Projects are located within the Tucson Sector," and states that "following a safety analysis by CBP, work to address life, safety, environmental, or other remediation Sector, requirements will begin there." The PowerPoint goes on to explain that "[a]pproximately 119 miles of previously planned and approved DoD 284 projects in Tucson Sector were left in various stages of completion at the time of the pause. Activities requiring remediation include:

- Erosion control measures,
- Completion of construction gaps and gates,
- Completing and repairing damaged drainage,
- Completing Stormwater Pollution Prevention Plan measures,
- Completing hardware installation on drainage gates,
- Completing grouting of bollards and connector plates,
- Permanently filling in trenches,
- Completing and repairing automated vehicle gates and associated foundation work,
- Completing incomplete bridge construction,
- Safety work on border roads for safe passage, and
- Completing and repairing electrical systems."

120.    An internal DHS talking points document produced to Arizona through FOIA acknowledges that termination of border barrier construction in Arizona "will not address all actions that need to be taken to address life, safety, environmental, or other

remediation requirements at these project sites." Some of the work that DHS internally recognized as needing to be done "needed to address life, safety, environmental, and other remediation requirements will include, but are not limited to, completion of drainage and erosion control measures, completion of roads, remediation of temporary use areas used for construction, and disposal of residual materials" and that the "first priority for these activities will be Tucson Sector and open gap locations to include gates." Furthermore, the border wall created "a risk of environmental degradation related to lack of proper grading, erosion control measures, and slope stabilization" and also "potential failures in the barriers and roads constructed by DoD and the potential flooding of private and public lands."[48] The document also promises "DHS intends to assess the extent to which border wall funds may be used to remediate or mitigate environmental damage caused by past border wall construction" and that "[o]pportunities for mitigation will be identified through the environmental planning process."

121.  Notably, even though DHS knew about and acknowledged the environmental harm caused by Border Wall Construction Termination, and even though internal DHS talking points contain a promise to do so, DHS never actually planned to properly address those harms by consulting with the States affected, including Arizona. The same PowerPoint discusses how DHS conducts outreach to "involve stakeholders" and solicit comments with "various NGOs, tribes, and federal agencies" and specifically, "[i]n Arizona, we held tailored briefings with the Arizona Trail Association on proposed projects adjacent to the trail, and we also coordinated with local and national NGOs on the barrier at San Pedro River." Astoundingly, not once does DHS mention consulting with Arizona, or with any other state government.

122.  Even worse, funding for border construction in Texas is still appropriated for that purpose, yet DHS refuses to build any additional barriers there. Yet, since DHS is

---

[48] *Id.* at FOIA_CBP_AZ_0002141.

required to spend that money, it is intentionally slow-rolling the construction process by engaging in an extensive NEPA process, with no intent to actually follow through on spending the appropriated funds, in an effort to run out the clock and avoid construction of the border wall. In such cases, internal DHS talking points explain that "CBP intends to engage in a robust environmental planning process with potentially affected and interested stakeholders for these barrier projects consistent with DHS's border barrier plan, which lays out the guiding principles framing future decisions related to border barrier construction. These environmental planning activities will not entail any construction of new border barrier or permanent land acquisition."

123. A DHS document produced through FOIA explains that the purpose of the extensive NEPA analysis is because "[t]he law requires DHS to use the funds consistent with their appropriated purpose." As part of its extensive NEPA analysis for the border wall in Texas, DHS explained in a letter sent to local stakeholders that "[i]n fiscal year 2020, Congress appropriated funds for the construction of barrier system in high priority locations on the southwest border. Pub. L. 116-13, Div. D, Title II,§ 209 (Dec. 20, 2019). Consistent with the DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 11, 2021 ), CBP is conducting environmental planning concerning the proposed construction. The development of the EA will not involve any construction of new border barrier or permanent land acquisition."

124. A DHS "Feedback Stakeholder Report" affirms that "The Biden-Harris Administration has requested that Congress permanently cancel this [border wall] funding. While the funds remain appropriated, and consistent with the Department of Homeland Security Border Barrier Plan Pursuant to Presidential Proclamation 10142 (June 11, 2021) (https://www.dhs.gov/sites/default/files/publications/21_0611_dhs_security_border_wall_plan.pdf), CBP is conducting environmental planning concerning the proposed

construction, maintenance, and repair. The development of the EA will not involve any construction of new border barrier or permanent land acquisition."

125.    An internal DHS question-and-answer document produced to Arizona through FOIA acknowledges that Secretary Mayorkas "has the discretion to extend waivers if needed. However, the Secretary has directed CBP conduct environmental planning under NEPA for" 86 miles of border barrier that has been fully funded by Congress and that DHS itself acknowledges will help DHS acquire operational control of the border. Rather than issue that waiver, an internal DHS talking points document affirms that the plan is to instead run out the clock with a NEPA process that will "take between nine and fifteen months."

126.    An internal DHS email produced through FOIA acknowledges the internal contradictions, with the unidentified sender writing: "Frankly, this situation is confusing because we are conducting the ENV planning because we have to plan to construct, in accordance with our appropriations, but the DHS Plan outlines that we will conduct additional/'robust' planning. I know that [REDACTED] explained this during the Webinar, but inherently this is confusing."

127.    DHS is intentionally avoiding construction of border wall in Texas, even though (1) its own analysis of that potential border wall construction would help it achieve the congressionally mandated command that DHS achieve operational control of the border, (2) its own analysis reveals construction would ameliorate environmental harms that would otherwise occur, and (3) Congress appropriated funds for that specific purpose. At the same time DHS is using NEPA (unnecessarily) to prevent border wall construction in Texas, it has refused to follow any of NEPA's requirements in Arizona to address the environmental harm caused by the Border Wall Construction Termination—harm that its own internal documents readily acknowledge.

## G. Ending the "Remain in Mexico" Policy

128. In 2018, the United States faced a massive surge of migrants, many from Central American countries, attempting to cross through Mexico to enter the United States despite having no lawful basis for admission. *See, e.g.*, 83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018). This surge created a humanitarian, public safety, and security crisis on the United States-Mexico border.

129. In response to this crisis, in January 2019, DHS enacted the "Migrant Protection Protocols," (the "MPP") commonly known as the "Remain in Mexico" policy. Under this policy, "certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation" were "returned to Mexico [to] wait outside of the U.S. for the duration of their immigration proceedings[.]"[49]

130. The purpose of this program, among other things, was to alleviate crushing burdens on the U.S. immigration detention system and to eliminate a "key incentive" for illegal immigration—the ability of aliens to stay in the United States during lengthy immigration proceedings, regardless of the validity of their asylum claims. Moreover, many, if not most, will skip their court dates and instead attempt to stay in the country for as long as possible: either attempting to remain undetected or, if found, avoid enforcement/deportation under the policies of the current administration.

131. Under this program, approximately 65,000 non-Mexican migrants who were detained attempting to enter the United States illegally or without proper documentation across the Mexican border were sent back to Mexico to await the completion of their immigration processes.[50]

---

[49] *See Migrant Protection Protocols*, Department of Homeland Security (Jan. 24, 2019), *available at* https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols.

[50] *See* Ted Hesson & Mimi Dwyer, *Biden to bring in asylum seekers forced to wait in Mexico under Trump program*, Reuters (Feb. 12, 2021, 4:10 AM), *available at* https://www.reuters.com/article/us-usa-biden-immigration-asylum/biden-to-bring-in-asylum-seekers-forced-to-wait-in-mexico-under-trump-program-idUSKBN2AC113.

132.    The MPP functionally came to an end on January 20, 2021, when it was rescinded by Defendants with little-to-no-explanation. On February 2, 2021, President Biden issued "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border."[51] This order, among other things, ordered DHS and HHS to "reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints" and commanded DHS to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols[.]" *Id.*

133.    On February 11, 2021, DHS announced it would process into the United States individuals who had been returned to Mexico under the MPP.[52] Beginning on February 19, 2021, DHS started to execute this policy and bring those individuals into to the United States.

134.    Finally, on June 1, 2021, the Administration formally ended the MPP with a cursory seven-page memorandum.[53] This memorandum provides several insufficient

---

[51] *See Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Office of the White House (Feb. 2, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

[52] *See Press Release, Department of Homeland Security, DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, (Feb. 11, 2021), *available at* https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[53] *See* Memorandum from Alejando Mayorkas, Department of Homeland Security, *Termination of the Migrant Protection Protocols*, (June 1, 2021), *available at*

explanations, including that it allegedly failed to reduce resource usage at DHS and failed to reduce Executive Office of Immigration Review case backlogs. *Id.* However, this memorandum makes no mention of a major justification for the MPP in the first place: *i.e.*, the ability of asylum applicants to file non-meritorious claims in order to stay in the country, with the ultimate intent of absconding and remaining illegally.[54]

135.    The Biden Administration's termination of MPP has continued and furthered their program of expanding the population of the United States by pro-migration policies and has greatly exacerbated the crisis at the southern border. This "catch and release" program has bolstered cartels and other criminal operations and greatly increased the sophistication and frequency of human smuggling operations.[55]

136.    Today, tens of thousands of migrants are crossing the border in Arizona with the expectation they will be released in the United States to await their immigration hearing.[56] They can then skip out on the hearing and disappear into the country. Defendant's action here encourages precisely the sort of meritless asylum claims that the MPP program was designed to avoid.

---

https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

[54] *See* 83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018). *See also* Executive Office for Immigration Review Adjudication Statistics, Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019 (Oct. 23, 2019), *available at* https://www.justice.gov/eoir/file/1216991/download (illustrating that only 14% of aliens claiming credible fear are granted asylum, and 32% abscond into the United States and are ordered removed in absentia).

[55] *See* Dave Graham, *Exclusive: 'Migrant president' Biden Stirs Mexican Angst Over Boom Time for Gangs*, Reuters (Mar. 10, 2021), https://www.reuters.com/article/us-usa-immigration-mexico-exclusive/exclusive-migrant-president-biden-stirs-mexican-angst-over-boom-time-for-gangs-idUSKBN2B21D8.

[56] *See* Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html

137. On information and belief, thousands of individuals have been released and are being released into Arizona as a result of the termination of this program that otherwise would never have entered the country. Many, if not most, will be able to remain and reside in the State, regardless of the formal outcomes of their immigration proceedings. Despite the intent to cause this outcome, as well as its ready foreseeability, at no time did Defendants undertake any analysis of the environmental impacts on the human environment, in Arizona specifically and the United States generally, of this additional population and the additional migration.

**H.    The October 29, 2021 Memoranda**

138. On October 29, 2021, DHS issued two memoranda (the "October 29 Memoranda"). The first was four pages long (the "October Termination Memo") and again purported to announce the termination of MPP. The second was a 39-page addendum (the "October Addendum") providing additional reasons for the purported termination.

139. On June 30, 2022, the Supreme Court held that "[t]he October 29 Memoranda were ... final agency action for the same reasons that the June 1 Memorandum was final agency action. That is, both the June 1 Memorandum and the October 29 Memoranda, when they were issued, marked the consummation of the agency's decisionmaking process and resulted in rights and obligations [being] determined." *Biden v. Texas*, 142 S. Ct. 2528, 2544–45 (2022) (cleaned up).

140. The Supreme Court, however, did not examine whether the October 29 Memoranda violated the APA, but instead remanded the case to the Northern District of Texas to make that determination in the first instance. *Id.* at 2548. The Supreme Court also clarified that the purported rescission of the MPP did not violate section 1225 of the INA. *Id.*

141. The October Addendum attempts to justify MPP termination by claiming that "the program deterred too many meritorious asylum claims at the expense of deterring non-

meritorious claims" for aliens from Northern Triangle countries. October Addendum at 21. Yet, the very same memo acknowledges that prior DHS estimates were that 90 percent of all Northern Triangle asylum applications were non-meritorious (it also claimed, without explanation, that DHS's prior 90 percent figure was incorrect and that the correct figure was actually 71 percent). *Id.* The October Memoranda juxtaposed these figures with a claim that the asylum grant rate for MPP applicants was only 1.1 percent. *Id.* Yet, this is an apples-to-oranges comparison. Just one page earlier, DHS itself acknowledged in a parenthetical note that the overall grant rate for all other asylum applicants over the same period was a similarly low 2.7 percent. *Id.* The October Addendum acknowledges that these figures are so much lower than the historical grant rate from Northern Triangle countries because "a policy was implemented that barred asylum for individuals who transited through third countries [the "Third Country Policy"] and decisions were issued that limited humanitarian protection claims based on family membership and gender; these likely depressed grant rates. Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court." *Id.* n.87.

142. The October Addendum's justification for cancelling MPP because it resulted in a much lower asylum grant rate is thus pretextual. The grant rate was lower because the Third Country Policy precluded virtually every asylum application from Northern Triangle applicants who applied after crossing into the United States from Mexico. Thus, the grant rate for aliens from non-Northern Triangle Countries was higher because the third country policy would not apply to Mexicans who cross the southern border, nor to asylum applicants who directly arrived in the United States from their country of origin. The October Addendum does not even attempt to address these discrepancies.

143. Furthermore, neither of the October Memoranda even mention the Secure Fence Act or DHS's statutory duty to secure operational control of the border, nor analyze how MPP cancellation might affect that duty.

144. The October Addendum also acknowledges that there was a "notable" and "sharp decrease in [southwest border] encounters during the months in which MPP was fully operational." October Addendum at 23. The only response that the October Addendum offers is the weak protestation that "correlation does not equal causation." However, the Addendum offers no other plausible explanation for the "sharp decrease" in border crossings following adoption and full implementation of MPP, except to note that Mexico stepped up its own immigration enforcement in April of 2019. *Id.* Yet, according to the Addendum itself, border crossings had already decreased before Mexico increased its own enforcement. Indeed, Mexico likely increased enforcement on its side of the border only after MPP started having a measurable effect precisely *because* MPP was forcing Mexico to deal more directly with the consequences of so many aliens crossing through its territory, as Mexico was no longer able to send those aliens on to the United States, but instead was forced instead to provide care and social services for those aliens itself.

145. And as with Defendants' prior attempts to terminate the MPP, the October Memoranda does not engage in any environmental analysis at all.

## I. Defendants Have Affirmatively Degraded Their Own Detention Capacity

146. The October Addendum claims that the federal government cannot detain asylum applicants as an alternative to the MPP (even though detention is required by 8 U.S.C. § 1225) because it lacks "sufficient detention capacity to maintain in custody every single person described in section 1225." October Addendum at 28. The government cannot make this claim in good faith, however, because the federal government has affirmatively degraded its own detention capacity. Astonishingly, at the same time the federal government has been claiming that it lacks sufficient detention capacity for aliens,

it also submitted a budget request to Congress that would decrease DHS's alien detention capacity by 25%.[57]

147.    The federal government further affirmatively degraded its own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities.[58] In addition, even where DHS has capacity, it has often failed to utilize it. For example, an April 12, 2022 DHS Inspector General Report explains how DHS acquired detention capacity from hotels from no-bid contracts and then inexplicably failed to use it: indeed, DHS "spent approximately $17 million for hotel space and services at six hotels that went largely unused between April and June 2021" and "did not adequately justify the need for the sole source contract to house migrant families."[59] Moreover, DHS has entered into settlement agreements with ideologically aligned groups to hobble its detention capacity further.[60]

148.    The Addendum claims that DHS cannot detain aliens as an alternative to implementing MPP, but it ignores DHS's own role in ensuring that its detention capacity would be insufficient. This rationale "calls to mind the man sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan." *Glossip,* 576 U.S. at 898 (Scalia, J., concurring).

---

[57] Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, NEW YORK TIMES (Mar. 25, 2022), https://nyti.ms/3vOI00F.

[58] *Id*.; Priscilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol.

[59] DHS Off. of Inspector Gen., *ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels* at 3, 5 (April 12, 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-04/OIG-22-37-Apr22.pdf

[60] *See, e.g.*, Rae Ann Varona, *ICE Agrees To Restrictions In COVID-19 Hot Spot Settlement*, LAW360 (July 7, 2022), https://www.law360.com/articles/1509393/ice-agrees-to-restrictions-in-covid-19-hot-spot-settlement.

**J.     Prior Programmatic Environmental Impact Statements**

149.    The federal government has previously recognized the need to address the environmental impacts of its interlocking border programs in a programmatic EIS. In 1994, the Department of Justice ("DOJ") issued a draft programmatic environmental impact statement ("DPEIS") addressing border enforcement efforts, addressing collaborative efforts between the then-DOJ entities the Immigration and Naturalization Service ("INS"), and the Border Patrol and DOD entity Joint Task Force Six ("JTF-6") (now "JTF-N"). *See Draft Programmatic Environmental Impact Statement to Continue the Program of Protecting the Southwest Border Through the Interdiction of Illegal Drugs With the Support of the Joint Task Force Six*, 59 FR 26322-02 (May 19, 1994). The Notice indicates that "INS elected to act as lead agency for the preparation of this DPEIS" because the border patrol—now a part of CBP in the DHS—was the primary "beneficiary" of most JTF-6 engineering. *Id.*

150.    The purpose of the DPEIS was "to address cumulative environmental impacts of previous actions as well as those actions which may be developed within the reasonably foreseeable future." *Id.* The final programmatic EIS was issued in October 1994. *See Notice of Availability of the Final Programmatic Environmental Impact Statement (DPEIS): Final Programmatic Environmental Impact Statement to Continue the Program of Protecting the Southwest Border Through the Interdiction of Illegal Drugs With the Support of the Joint Task Force Six*, 59 FR 50773 (Oct. 5, 1994).

151.    In 1999, DOJ began supplementing the 1994 programmatic EIS. *See* 64 FR 15969 (April 2, 1999) (weekly EPA notice of EIS availability). A revised draft of the supplemental programmatic EIS was issued in September 2000. *See* 65 FR 58527 (Sept. 29, 2000) (weekly EPA notice of EIS availability); 65 FR 63076 (Oct. 20, 2000) (corrected weekly EPA notice of EIS availability).

152. On May 24, 2019, DHS withdrew both the 1994 programmatic EIS and the 2000 supplemental programmatic EIS. *See Notice of the withdrawal of a 1994 programmatic environmental impact statement and a 2001 supplemental programmatic environmental impact statement regarding certain activities along the U.S. Southwest border*, 84 Fed. Reg. 25067-01 (May 24, 2019). DHS's explanation stated that CBP "believe[s] their decision-makers are well-served by site-specific or project-specific NEPA analyses. Unlike a sprawling programmatic NEPA analysis, a site specific or project-specific NEPA analysis gives decision-makers concrete and tangible information regarding the potential impacts of a proposed action. In addition, because every site-specific or project-specific analysis includes an analysis of cumulative impacts, they also present decision-makers with a larger frame of reference in which to understand those impacts."

153. DHS has also completed a programmatic PEIS for the Northern U.S.-Canada border. *See Notice of Intent To Prepare One Programmatic Environmental Impact Statement for the Northern Border Between the United States and Canada* 75 FR 68810-01 (Nov. 9, 2010). In the Notice announcing the intent to prepare the programmatic EIS, CBP explained why it was providing a single PEIS for the entire border: "(1) CBP's need to identify a single unified proposal and alternatives for maintaining or enhancing security along the Northern Border, and (2) Certain resources of concern for this PEIS extend or move across the PEIS regions previously identified (e.g. habitat of various wildlife)." *Id.*

154. Accordingly, Defendants have recognized that, in actions involving the border and immigration enforcement, their interlocking and related actions often have environmental impacts that must be analyzed comprehensively in a programmatic EIS under NEPA. DHS's conclusory explanation in the 2019 withdrawal that project- and site-specific analysis give more "concrete and tangible" information simply runs contrary to their legal obligation to ensure that actions which "will have cumulative or synergistic

43

environmental impact upon a region … must be considered together." *Kleppe*, 427 U.S. at 410.

## K.   Environmental Consequences of Defendants' Actions

155.   Defendants' actions are likely to have significant environmental impacts. However, Defendants have flouted compliance with NEPA and have not even engaged in the pretense of performing any environmental analysis before taking environmentally transformative actions.

156.   On information and belief, thousands of additional individuals have settled and continue to settle in Arizona than otherwise would have as the intentional, anticipated, and direct result of Defendants' actions. This additional population, and the thousands of individuals traveling across Arizona's lands and wilderness, has significant negative impacts on the human environment in Arizona.

157.   Arizona has not attempted (and need not attempt) to "conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 972 (9th Cir. 2003).

158.   Those environmental effects are classified below into a few main categories.

### a.   *Migration Impacts*

159.   The first main category of environmental impacts includes all effects from migrants crossing in the particular areas left open by Defendants' actions. In particular, this category includes the proliferation of garbage and refuse as a result of the transit of hundreds of thousands of migrants through the passageways in the border fencing created by Defendants' actions, particularly their actions in affirmatively halting wall construction.

160.   Thousands of migrants are crossing and will continue to cross across the Arizona-Mexico border, concentrated at areas where there are gaps in the fencing. As the New York Times has explained: "Many [migrants] are entering the United States through wide openings in the border wall near Yuma, sparing them from the risky routes through

remote desert regions, where migrants frequently lose their bearings, or across the Rio Grande in Texas."[61] This is the entirely foreseeable effect of Defendants' actions in choosing to leave gaps in the border wall—migrants seek out and cross at those gaps, and in greater numbers than ever before.

161.    Because of Defendants' actions, migrants are crossing wilderness areas and other parts of the state not intended for human migration in huge numbers. Accordingly, migrants necessarily leave behind considerable refuse and can damage wildlife by their passing. As the Arizona Department of Environmental Quality ("ADEQ") has explained, border trash typically includes "plastic containers, clothing, backpacks, foodstuffs, vehicles, bicycles and paper. Human waste and medical products have also been found in border trash."[62]

162.    ADEQ estimates that each border-crosser leaves an average of six to eight pounds of trash behind.[63]

163.    The proliferation in border trash as a result of increased unauthorized crossings has numerous negative consequences for the human environment. Some are articulated by the ADEQ, including: "Strewn trash and piles, Illegal trails and paths, Erosion and watershed degradation, Damaged infrastructure and property, Loss of vegetation and wildlife, Campfires and escaped fires, Abandoned vehicles and bicycles, Vandalism, graffiti and site damage (historical and archaeological), Occurrence of bio-hazardous waste."[64]

---

[61] Miriam Jordan, *From India, Brazil and Beyond: Pandemic Refugees at the Border*, New York Times (May 16, 2021), *available at* https://www.nytimes.com/2021/05/16/us/migrants-border-coronavirus-pandemic.html.

[62] *About Arizona Border Trash*, Arizona Department of Environmental Quality, *available at* https://www.azbordertrash.gov/about.html.

[63] *Id.*

[64] *Id.*

164.    These impacts are the direct result of Defendants' actions. By encouraging migrants to come with a host of policies which encourage migration and advertise the relative openness of the border, combined with actively reducing physical security measures in certain areas of the Arizona desert, Defendants certainly caused migrants to cross, and with their crossing, bring huge quantities of trash and litter. These impacts must be addressed pursuant to the process provided by NEPA.

**b.  *Increased Air Emissions***

165.    Another predictable environmental impact of Defendants' actions are increased air emissions, including emissions of greenhouse gases (GHGs), the most common of which is carbon dioxide. *Id.*

166.    The United States has disproportionately high ratios of carbon emissions and energy consumption to population; the U.S. represents approximately 5 percent of the global population but consumes about 25 percent of the world's energy and generates 5 times the world average of CO2 emissions. *Id.* On a per capita basis, U.S. residents generate five times as much carbon as the average individual outside of the country.

167.    These greater per-capita emissions substantially reflect the economic strength of the United States. GHG emissions predictably increase with income, and the United States is one of the wealthiest countries in the world on a per-capita basis. GHG emissions have notably declined recently, with EPA reporting that they dropped 1.7% from 2018 to 2019, for example.[65]

168.    This discrepancy in per-capita emissions is even more pronounced with individuals arriving from the countries that mostly make up the migration occasioned by Defendants' actions. According to one report, "Around four-in-ten (42%) of those apprehended at the southwestern border in February were people of Mexican origin, up from 13% in May 2019, the most recent peak month for monthly apprehensions. People

---

[65]    *See* EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks*, *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks

from El Salvador, Guatemala and Honduras accounted for 46% of apprehensions in February, down from 78% in May 2019."[66] The United States population produces considerably more GHG emissions per capita by comparison: compared to Mexico, 5.4 times; El Salvador, 21.9 times; Guatemala, 22.4 times, and Honduras, 20.3 times. *See* Flood Report at 7.

169.    Furthermore, migrants driven to come across the border by Defendants' actions are largely coming for economic opportunity. While enhanced economic opportunity in the United States undoubtedly makes migrants better off individually, collectively, this can have a significant impact on GHG output. *Id.*

170.    The increased emissions resulting from immigrants reflects migrants' understandable—and laudable—desires to improve their economic conditions. Many migrants, for example, could not afford in their origin countries to purchase automobiles or gasoline, or to heat or cool their residences, or to purchase many products (such as meat). But their improved economic circumstances in the United States frequently permits immigrants to undertake many activities previously unavailable to them. That commendable desire for—and realization of—economic improvement is one of the fundamental components of American history and the American Dream. But it also predictably leads to increased air emissions—potentially resulting in increased smog, acid raid, unhealthy levels of particulate matter and ozone, and GHG emissions—which NEPA requires analysis of. But Defendants have completely failed to conduct that analysis that NEPA requires.

171.    These impacts on air emissions were a direct and foreseeable consequence of Defendants' actions. Because individuals generate substantially more air/GHG emissions in the United States than they would in their countries-of-origin, policies which

---

[66] *See* John Gramlich, *Migrant apprehensions at U.S.-Mexico border are surging again*, Pew Research Center (Mar. 15, 2021), *available at* https://www.pewresearch.org/fact-tank/2021/03/15/migrant-apprehensions-at-u-s-mexico-border-are-surging-again/.

admit more individuals into the country—like the termination of the MPP—or policies which permit or encourage more individuals to come to this country—like the affirmative halt to the construction of the border wall—have significant environmental impacts which must be addressed under NEPA.

172.    Defendants' refusal to consider GHG emissions from additional immigration is particularly baffling in light of the Administration's otherwise-ubiquitous fixation with GHG emissions. For example, as one of his first actions in office, President Biden issued Executive Order 13,990 on January 20, 2021. That order explains, for example, that "It *is essential that agencies capture the full costs of greenhouse gas emissions* as accurately as possible, including by taking global damages into account." Exec. Order 13,990 § 5(a) (Jan. 20, 2021) (emphasis added).

173.    That Executive Order also called for the creation of an Interagency Working Group to promulgate values for "'social cost of carbon' (SCC), 'social cost of nitrous oxide' (SCN), and 'social cost of methane' (SCM), to "publish an interim SCC, SCN, and SCM within 30 days of the date of this order," and "publish a final SCC, SCN, and SCM by no later than January 2022." *Id.* § 5.

174.    The Working Group published interim values for SCC, SCN, and SCM on February 26, 2021.

175.    Defendants have made no attempt to analyze the putative social costs—or any environmental impacts whatsoever—from increased air emissions that directly result from their challenged conduct. In doing so, Defendants have not only violated the Biden Administration's own policies (a violation not directly challenged here), but violated NEPA as well (which is challenged).

176.    Defendants' violations of their own Administration policies thus further demonstrate Defendants' apparent—and glaring—ideological blind spot to GHG emissions resulting from their immigration policies. Defendants are apparently fixated on

48

reducing GHG emissions in all other contexts, but are completely oblivious or willfully ignorant of them in this one particular setting. These apparent ideological blinders violate NEPA.

### c. *Growth Impacts*

177. Since at least 1975, the Ninth Circuit has held that population growth can be an environmental impact that agencies must consider under NEPA. *See City of Davis*, 521 F.2d at 671. In that case, the court held that the Federal Highway Administration violated NEPA by failing to prepare an EIS prior to the construction of a freeway interchange near an agricultural area. *Id.* at 666. As the Ninth Circuit explained, "plain common sense" indicated that the highway interchange was likely to cause growth in the area: "The growth-inducing effects of the … project are its raison d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services such as utilities, education, police and fire protection, and recreational facilities." *Id.* at 675. *See also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011) (holding that, with respect to project adding a new runway to an airport, "even if the stated purpose of the project is to increase safety and efficiency, the agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects"); *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997) ("Consideration of the growth-inducing effects furthers the National Environmental Policy Act's information and public awareness goals.").

178. To be sure, population growth also frequently provides significant benefits, economic and otherwise. In particular, Arizona has benefited substantially from population growth, both from internal migration and international immigration. This suit does not challenge population growth, only Defendants' failure to analyze that growth properly—or, indeed, *at all*—under NEPA.

179.    Each of the Defendant's policies focused on below individually involves environmental consequences that are far greater than construction of a single highway interchange or runway. But Defendants have not prepared an EIS to consider any of them. Indeed, Defendants have not even prepared EAs.

180.    As stated above, NEPA expressly states that one of its purposes is to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities[.]" 42 U.S.C. § 4331(b). As the drafters of NEPA recognized, population growth has significant environmental impacts. Migrants (like everyone else) need housing, infrastructure, hospitals, and schools. They drive cars, purchase goods, and use public parks and other facilities. Their actions also directly result in the release of pollutants, carbon dioxide, and other greenhouse gases into the atmosphere, which directly affects air quality. All of these activities have significant environment impact which, as discussed above, courts have recognized as cognizable impacts under NEPA.

181.    Population and growth effects must be considered as long as such effects are "'reasonably foreseeable[.]'" *Center for Biological Diversity*, 982 F.3d at 737. This includes indirect effects and such effects as may be "'later in time'" or "'farther removed in distance'" from the agency action in question. *Id.* For example, "[a]n increased risk of an oil spill caused by an increase in crude oil tanker traffic … is a reasonably foreseeable indirect effect of a proposed dock extension." *Id.* (citing *Ocean Advocates v. U.S. Army Corps. of Eng'rs*, 402 F.3d 846, 867–70 (9th Cir. 2005)).

### d.  *Impacts To Wildlife*

182.    Another major impact is to wildlife and endangered species from migration and wildlife being concentrated in particular corridors. *See* Flood Report at 5-6.

183.    In particular, threatened and endangered species such as Mexican gray wolf, jaguar, ocelot, and Sonoran pronghorn, are located in Arizona-Mexico border region.

184. The de facto creation of gaps in the Border Wall may affect these species by concentrating their migration activities to those corridors—where they will be exposed to concentrated human activity and potential predators.

185. Indeed, the Border Wall Construction Termination may create *de facto* predator corridors where prey species (including the Sonoran pronghorn) will be forced to "run the gauntlet" of predators that may simply park themselves at the gaps in the Border Wall and feast upon the resulting abundance of prey that passes through.

### e. *Summary Of Impacts*

186. Where there is a question as to whether a major federal action will affect the environment, "[t]he appropriate inquiry" is whether the effect at issue is so "'remote and highly speculative'" that NEPA does not warrant its consideration. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1030 (9th Cir. 2006) (finding that Nuclear Regulatory Commission had violated NEPA by failing to consider the possibility of terrorist attacks on Diablo Canyon nuclear facility). At the very least, "[i]ndirect impacts need only to be 'reasonably foreseeable' to require an assessment of the environmental impact." *Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d 30, 41 (D.D.C. 2000).

187. Furthermore, "NEPA requires that an environmental analysis for a single project consider the cumulative impacts of that project together with all past, present and reasonably foreseeable future actions." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). *See also Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("In a cumulative impact analysis, an agency must take a 'hard look' at all actions that may combine with the action under consideration to affect the environment.") (quoting *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)) (cleaned up).

188.    Defendants—in both the context of past actions relating to the Southern Border and actions relating to the Northern Border—have conducted programmatic analyses of their actions. No such programmatic analysis was conducted here, despite the bevy of actions relating to immigration, all of which are closely related and have similar environmental impacts.

189.    All of the impacts from the actions detailed above should have been considered together, along with other parts of the administration's policy which serve to encourage migration. In addition, whether considered separately or collectively, the impact of those policies, there can be little doubt, will foreseeably and directly impact the population and environments of border-states like Arizona.

190.    Notwithstanding this governing law, in formulating the policies discussed above, the Defendants never took any of the specific procedures required by NEPA and the CEQ regulations. Defendants at no time have ever accounted for any environmental impacts of those policies or the cumulative impact of those actions in combination with each other.

## FIRST CLAIM FOR RELIEF[67]

### Failure To Prepare A Programmatic EIS

### (Asserted Under NEPA/APA)

191.    The allegations in the preceding paragraphs are reincorporated herein.

192.    Defendants' Population Augmentation Program constitutes "a coherent plan of national scope, [whose] adoption surely has significant environmental consequences." *Kleppe*, 427 U.S. at 400.

193.    Defendants were therefore required to prepare a programmatic EIS to evaluate the Population Augmentation Program.

---

[67]    The State acknowledges that this Court has dismissed many of these claims. To the extent that they are re-asserted without amendment, it is solely to preserve potential appellate review and not to seek this Court's reconsideration of its prior orders.

194. Alternatively, each of the components of the Population Augmentation Program: *e.g.*, eliminating fines, exempting individuals from Title 42, and drastically decreasing deportation of individuals with final orders of removal, all individually have significant environmental impacts requiring preparation of an EIS.

195. Defendants have not attempted to comply with NEPA for any of these actions. Defendants have therefore violated NEPA both by failing to prepare a programmatic EIS for their Population Augmentation Program, and by alternatively failing to prepare EISs (or even EAs) for the individual components.

196. Defendants cannot rely on the 1994 programmatic EIS or the 2001 supplemental programmatic EIS, since both of those EISs were vacated. But even if they could, the situation has so radically changed in the ensuing two decades that Defendants' failure to prepare a supplemental EIS violates NEPA.

## SECOND CLAIM FOR RELIEF

## Failure To Prepare An EIS For Border Wall Construction Termination

## (Asserted Under NEPA/APA)

197. The allegations in the preceding paragraphs are reincorporated herein

198. The termination of border wall construction has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA. In particular, Defendants have not prepared either an EIS or EA to study the pertinent environmental effects.

199. In taking the above-referenced major federal actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, Defendants' actions should be held unlawful and set aside. *Id.*

### THIRD CLAIM FOR RELIEF

### Failure To Prepare An EIS For Terminating The MPP

### (Asserted Under NEPA/APA)

200.   The allegations in the preceding paragraphs are reincorporated herein

201.   Plaintiffs' cancellation of the MPP has significant environmental effects which DHS has utterly failed to consider, in defiance of NEPA. In particular, Defendants have not prepared either an EIS or EA to study the pertinent environmental effects. Even after this suit placed them on notice of their failure to follow NEPA's requirements, Defendants still refused to prepare either an EIS or EA in connection with the October Memoranda.

202.   In taking the above-referenced major federal actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, Defendants' actions should be held unlawful and set aside. *Id.*

### FOURTH (CONTINGENT) CLAIM FOR RELIEF

### Violation of ESA – Border Wall Construction Termination

203.   The allegations in the preceding paragraphs are reincorporated herein.

204.   Defendants' Border Wall Construction Termination will have effects on endangered species without engaging in the required consultation under Section 7 of the ESA.

205.   At no point have Defendants engaged in any consultation under ESA Section 7 regarding potential impacts to threatened and species from the Border Wall Construction Termination.

206. On July 9, 2021, the State sent a 60-day letter to Defendants under 16 U.S.C. § 1540(g) alerting them to their violations of ESA Section 7 concerning their Border Wall Construction Termination. Defendants will receive notice from those letters on July 12.

207. If Defendants have not remedied its ESA violations within 60 days, the State intends to assert a claim under the ESA challenging Defendants' Border Wall Construction Termination.

208. This claim for relief is intended to become operative automatically on September 10, 2021—*i.e.*, 60 days after receipt of the State's July 9, 2021 60-day letter. If necessary, the State will formally amend this First Amended Complaint to do so.

## FIFTH CLAIM FOR RELIEF

### Arbitrary and Capricious Agency Action – Lack of Reasoned Decision-Making

### Border Wall Construction Termination

### (Asserted Under APA)

209. The allegations in the preceding paragraphs are reincorporated herein.

210. The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

211. Defendants' Border Wall Construction Termination was not the product of reasoned decision-making. In particular, that halt has left gaps in border barriers that are entirely unstudied and arbitrary.

212. The timing of the Border Wall Construction Termination—being issued on the first day of the new administration—precludes any thoughtful analysis by Defendants. Instead, Defendants only had time to follow the President's January 20 Proclamation without engaging in meaningful thought.

213. The January 20 Proclamation does not supply any meaningful analysis, and instead merely announces that "building a massive wall … is not a serious policy solution" and the wall is "a waste of money that diverts attention from genuine threats to our

homeland security." These *ipse dixit* assertions do not supply reasoned analysis upon which Defendants could rely.

214. The Secure Fence Act of 2006 provides specific criteria against which DHS's Border Wall Construction Termination can be reviewed. Specifically, the Secure Fence Act requires that DHS "achieve and maintain operational control over the entire international land and maritime borders of the United States." Pub. L. No. 109-367, 120 Stat. 2638 § 2(a) (2006). It specifically defines "operational control" to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." *Id.* § 2(b).

215. The Border Wall Construction Termination is arbitrary and capricious for several independently sufficient reasons, including:

216. *First*, Defendants' Border Wall Construction Termination did the opposite of what the Secure Fence Act requires. Rather than promoting operational control of the border, it actively degraded operational control of the border by allowing increased unlawful entries into the United States than would have happened if the planned wall sections had been built.

217. *Second*, the Border Wall Construction Termination failed to consider the negative environmental effects of termination.

218. *Third*, Defendants failed to estimate or account for the costs of the Border Wall Construction Termination, such as the increased illegal immigration caused by the termination, and the presence of much greater numbers of aliens who were able to enter the United States.

219. *Fourth*, the Border Wall Construction Termination is arbitrary and capricious because the Defendants did not consider Arizona's reliance interests in the continuation of the planned construction. The government is obligated to "turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). When

an agency changes course, as Defendants have done here, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

220. *Fifth*, Defendants failed to justify their deviation from prior practice. The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923-27; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (APA requirements ensure that an agency's "prior policies and standards are being deliberately changed, not casually ignored"). Yet Defendants fail to grapple with their prior actions and act as if their prior positions do not exist.

221. *Sixth*, the Border Wall Construction Termination is arbitrary and capricious because its rationales are obviously pretextual. The actions of the President, Secretary Mayorkas, and other Administration officials have made clear that the intent of the Administration's immigration policies is to facilitate illegal immigration. Indeed, that the Administration's immigration policies incentivize high amounts of illegal immigration is widely recognized internationally. For example, the President of Mexico called President Biden the "migrant president" and observed that the Biden Administration's policies and rhetoric greatly incentivize illegal immigration.[68] Human traffickers have recognized this as well. Internal Mexican government assessments "state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.'"[69]

---

[68] Dave Graham, *Exclusive: 'Migrant president' Biden stirs Mexican angst over boom time for gangs*, REUTERS, Mar. 10, 2021 https://reut.rs/3vKlk1x.
[69] *Id.*

222.    The presence of such blatant pretext is enough to render the Border Wall Construction Termination arbitrary and capricious. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Accepting Defendants' description of the Border Wall Construction Termination requires this Court to "'exhibit a naiveté from which ordinary citizens are free.'" *Id.*

223.    Defendants' Border Wall Construction Termination is accordingly arbitrary and capricious, and should be set aside. 5 U.S.C. § 706(2)

### SIXTH CLAIM FOR RELIEF

### Arbitrary and Capricious Agency Action – Lack of Reasoned Decision-Making

### MPP Termination

### (Asserted Under APA)

224.    The allegations in the preceding paragraphs are reincorporated herein.

225.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

226.    Defendants previously provided a robust justification for the MPP. Current DHS policy represents an abrupt departure from this policy without sufficient justification.

227.    Neither the January 20 suspension of the MPP nor the June 1 memorandum, nor the October Memoranda adequately explain the Defendants' departure from the previous policy.

228.    Additionally, the Secure Fence Act of 2006 provides specific criteria against which DHS's MPP Termination can be reviewed. Specifically, the Secure Fence Act requires that DHS "achieve and maintain operational control over the entire international land and maritime borders of the United States." Pub. L. No. 109-367, 120 Stat. 2638 § 2(a) (2006). It specifically defines "operational control" to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." Id. § 2(b).

229. The MPP Termination is arbitrary and capricious for several independently sufficient reasons.

230. *First*, it did the opposite of what the Secure Fence Act requires. Rather than promoting operational control of the border, it actively degraded operational control of the border by incentivizing increased illegal border crossings by a population of whom the vast majority (either 90 or 71 percent) make non-meritorious asylum claims in order to gain illegitimate entry into the United States. Illegal crossings into the United States, and into Arizona are therefore significantly higher than they would have been if MPP had not been terminated.

231. *Second*, Defendants failed to estimate or account for the costs to Arizona of the increased illegal immigration caused by the MPP Termination.

232. *Third*, Defendants failed to consider or arbitrarily rejected obvious alternatives to the MPP, such as increasing detention capacity. In fact, Defendants have affirmatively degraded their detention capacity.

233. *Fourth*, Defendants failed to consider Arizona's reliance interests. The October Addendum claims that "[t]he Secretary takes these [State reliance] concerns seriously," but does not outline any steps DHS has taken to attain operational control of the border, or even to reduce the number of aliens illegally crossing the border. "Stating that a factor was considered ... is not a substitute for considering it." *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). And Defendants' cursory nod to the existence of reliance interests misses the mark. Their analysis fails to account for the actual real-world effects of the MPP and how States might have legitimately relied on it. Arizona has overwhelming reliance interests in federal enforcement of immigration law. Arizona's state budget and resource allocations are determined in reliance on Defendants' continued enforcement of immigration law and prevention of the entry of aliens with non-meritorious asylum claims. Defendants did not consider whether Arizona relied on continuation of the MPP when

Arizona determined how it would marshal and distribute its resources to deal with the number of unauthorized aliens entering their states. The MPP Termination is arbitrary and capricious because it utterly ignores these reliance interests. *See Regents of the Univ. of Cal.,* 140 S. Ct. at 1913-14.

234. *Fifth*, Defendants' reason for terminating the MPP is pretextual, as explained above.

235. *Sixth*, the MPP Termination fails to account for the reality that the vast majority of asylum claims have no merit and that DHS officers have a terrible track record of correctly adjudicating asylum claims. Between FY2008 and FY 2019, the asylum grant rate aliens claiming a credible fear was only 14%. Rather than make the system stricter to solve this problem, the MPP Termination inexplicably relaxes the system and thus makes it even easier for aliens with meritless claims improperly to gain entry into the United States. The MPP Termination makes it significantly easier for aliens with non-meritorious asylum claims to get into the United States, and it fails to consider the effect that this change will have on illegal immigration rates, unemployment rates for citizens and authorized aliens, and the effect on wages.

236. As such, Defendants' actions should be held arbitrary and capricious and set aside. 5 U.S.C. § 706(2).

## SEVENTH CLAIM FOR RELIEF

### Violation of the Constitution And The Impoundment Control Act Of 1974

237. The allegations in the preceding paragraphs are reincorporated herein.

238. Under Article II, Section 3 of the Constitution, the President "shall take Care that the Laws be faithfully executed." Consistent with this obligation, and Articles I and II generally, when Congress allocates funds for a particular program, the President generally cannot refuse to administer that program or spend those funds for purely policy or political

60

reasons. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 261–66 (D.C. Cir. 2013) (Kavanaugh, J., concurring). *See also* 2 U.S.C. §§ 682-88.

239. Congress allocated to DHS considerable funds to spend on border construction, with specific instructions detailing what those funds may be used for. Defendants, in violation of their obligation to take care that those laws are faithfully executed, are withholding the funds and refusing to proceed with the statutorily mandated program.

240. Accordingly, Defendants have violated the Constitution and their actions are unlawful. Defendants' actions violated the APA and are actionable independent of the APA.

241. Defendants' actions similarly violate the Impoundment Control Act of 1974, 2 U.S.C. §§ 681-88. That statute broadly prohibits the President from refusing to expend moneys that Congress has appropriated. Defendants' actions here violate this prohibition.

242. Nor has the President invoked his authority to pause expenditures pending Congress's consideration of a rescission bill. *See id.*

243. Although the General Accounting Office ("GAO") determined on June 15 that the Biden Administration's non-expenditure of funds appropriated for border wall construction did not yet violate the Impoundment Control Act of 1974, that determination was in error. In particular, the GAO relied upon the Biden Administration's statement that the expenditures of funds was merely "delayed in order to perform environmental reviews" "such as the National Environmental Policy Act of 1969 (NEPA)." *See* https://www.gao.gov/assets/b-333110.pdf. But NEPA required Defendants to undertake NEPA analysis *before* taking irreversible action such as terminating contracts.

244. Moreover, it does not appear that Defendants have published any draft EAs or EIS in the Federal Register, or notified the public of their intent to do so. Defendants' response to GAO is thus pretextual and cannot withstand scrutiny.

61

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment:

A. Declaring that Defendants have violated NEPA and the APA by their Border Wall Construction and MPP Terminations without preparing EISs or EAs, and by failing to prepare a programmatic EIS to study their Population Augmentation Program;

B. Declaring that Defendants' refusal to expend moneys appropriated by Congress for construction of the border wall for actual border wall construction violates both the Constitution and the Impoundment Control Act of 1974;

C. Enjoining Defendants from continuing to take actions, including diverting and impounding appropriated funds, to prevent the continuation of construction of border wall under contracts already entered into by the United States until such time as Defendants comply with NEPA;

D. Enjoining Defendants from processing any further migrants into the United States, who were and who would have been covered by the MPP until such time as Defendants comply with NEPA;

E. Enjoining Defendants to secure the border in Arizona to the satisfaction of this Court to prevent additional unlawful migration until such time as Defendants comply with NEPA;

F. Vacating Defendants' actions that violate the APA and the Constitution;

G. Awarding Plaintiff costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

H. Granting any and all other such relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this 15th of August, 2022.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By: /s/ *James K. Rogers*
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    James K. Rogers (No. 27287)
    Robert J. Makar (No. 33579)

*Attorneys for Plaintiff State of Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for parties that are registered CM/ECF users will be served by the CM/ECF system pursuant to the notice of electronic filing.

        /s/ James K. Rogers
        *Attorney for the State of Arizona*